IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x
In re                                    :    Chapter 11
                                         :
Spheris Inc., et al.,                    :    Case No. 10-*10352* (      )
                                         :
                        Debtors.         :    Joint Administration Pending
----------------------------------------------------x

**AFFIDAVIT OF ROBERT L. BUTLER,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN**
**SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

STATE OF TENNESSEE        )
                          ) ss:
COUNTY OF WILLIAMSON      )

     I, Robert L. Butler, of full age, being duly sworn, state that the following is true

and correct to the best of my knowledge, information and belief:

     1.    I am the Chief Restructuring Officer ("CRO") of Spheris Inc. ("Holdco"),

a corporation organized under the laws of Delaware, Spheris Operations LLC ("Spheris"), a

limited liability company formed under the laws of Tennessee, and each of the other debtors

and debtors in possession in the above-captioned cases (collectively with Holdco and Spheris,

the "Debtors").[1]  I have been providing services to the Debtors since November 2009.  As such,

I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

     2.    On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors intend to continue in the possession of their respective

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses:  (i) Spheris Inc. (5254); (ii) Spheris Holding II, Inc. (7969); (iii) Spheris Canada Inc. (9757); (iv) Spheris Leasing LLC (4780); (v) Spheris Operations LLC (1371); and (vi) Vianeta Communications (1121).  The Debtors' executive headquarters are located at 9009 Carothers Parkway, Suite C-3, Franklin, Tennessee 37067.

                         

properties and the management of their respective businesses as debtors in possession. In order to enable the Debtors to operate effectively and to avoid the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day" applications and motions (the "First Day Motions") filed with the Court concurrently herewith, including a motion seeking to have the Debtors' chapter 11 cases consolidated for procedural purposes and jointly administered (the "Joint Administration Motion").

3.     I submit this affidavit pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) in support of the relief requested in the First Day Motions, and (b) to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge and the knowledge I have acquired from those who report to me, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this affidavit.

4.     Part I of this affidavit provides background with respect to the Debtors' business and capital structure. Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

## I.     BACKGROUND

### A.     The Debtors

5.     Spheris and its direct and indirect wholly-owned subsidiaries: Spheris Leasing LLC, Spheris Canada Inc., Vianeta Communications, and Spheris, India Private Limited ("Spheris India"), a non-Debtor entity (collectively, with Holdco, the "Company"),

2

provide clinical documentation technology and services to health systems, hospitals and group medical practices located throughout the United States.[2]  Health care providers are required to maintain records that document patient visits, treatments and procedures.  The Company assists such health care providers in the efficient creation of such records.  The Company receives medical dictation in digital format from subscribing physicians, converts the dictation into text format (either through manual transcription or voice-recognition software), stores specific data elements from the records, and then transmits the completed medical record to the originating physician in the prescribed format.  The turnaround time and detail with respect to any given record is dictated by the nature of the subject visit, treatment or procedure — regular patient visit records may be of lower priority and have a longer turnaround time, whereas records regarding critical surgery may be prioritized to "stat" status and transcribed in less than a few hours.

6.     As of the Petition Date, the Company employs approximately 4,200 skilled medical language specialists ("MLS") in the United States and India, making the Company one of the largest global providers of clinical documentation technology and services. Approximately 1,900 of these MLS are employed by Spheris India, a wholly-owned non-Debtor indirect subsidiary of Spheris.  Such personnel work out of the Company's facilities in India, which are leased and operated by Spheris India.  Pursuant to various service agreements, Spheris India provides approximately 35% of the Company's services to its customers. Accordingly, Spheris India's seamless and sustained operation is a vital and irreplaceable component of the Debtors' efforts to continue to operate in the ordinary course and maximize the value of their estates.

---

[2]     Attached hereto as Exhibit A is an organizational chart of the entities comprising the Company.

3

**B.    Prepetition Indebtedness and Capital Structure**

7.    In November 2004, Holdco became a wholly-owned subsidiary of Spheris Holding II, Inc. ("Holding II"), which in turn is wholly-owned by Spheris Holding III, Inc. ("Holding III"), an entity owned by affiliates of Warburg Pincus LLC and TowerBrook Capital Partners LLC, CHS/Community Health Systems, Inc., and indirectly by certain members of the Company's current and past management team.

*Senior Credit Facility*

8.    Spheris is the borrower under a credit agreement dated July 17, 2007 (the "Senior Credit Agreement"), pursuant to which Holding II, Holdco, and each of the other Debtors act as guarantors, Ableco Finance LLC acts as collateral agent (the "Collateral Agent"), Cratos Capital Management, LLC acts as administrative agent (the "Administrative Agent" and, together with the Collateral Agent, the "Agents"), and certain other lenders are party thereto (collectively, with the Agents, the "Senior Lenders"). The Senior Credit Agreement governs a credit facility consisting of a term loan in the principal amount of $69.5 million (the "Term Loan") and a revolving credit facility in an aggregate principal amount not to exceed $25.0 million at any time outstanding (the "Revolving Loan"). The obligations outstanding under the Senior Credit Agreement (the "Senior Loan Obligations") mature on July 17, 2012, and are secured by liens on substantially all of Spheris' assets (the "Prepetition Collateral"). As of January 31, 2010, the Debtors had approximately $75.6 million in Prepetition Loan Obligations outstanding, including accrued interest.

*Senior Subordinated Notes*

9.    Pursuant to an indenture dated December 22, 2004 (the "Indenture"), Holdco issued Senior Subordinated Notes in the principal amount of $125 million, which

4

mature on December 15, 2012. The Senior Subordinated Notes bear interest at a fixed rate of 11.0% per annum, which is payable semi-annually through maturity. The obligations under the Senior Subordinated Notes are guaranteed by each of the other Debtors and are unsecured. As of January 31, 2010, the Debtors had approximately $125.0 million in principal outstanding under the Indenture and accrued interest was approximately $8.6 million.

*Interest Rate Derivative Agreements*

10. The Debtors are also party to certain prepetition swap agreements, dated October 11, 2007 (the "Interest Rate Derivatives"), with Deutsche Bank AG ("DB"). The amount outstanding under the Interest Rate Derivatives as of the Petition Date is approximately $1,700,000 (the "Derivative Obligations").

**C.     Events Leading to Chapter 11 Cases**

11. During the past few years, the clinical documentation industry has undergone several changes including significant technology developments as well as accelerated price pressures. As a result, the Company's net revenues began to decline in the second half of 2008 and continued to decline in 2009. Because of the Debtors' liquidity difficulties, they determined that they would be unable to make the interest payment required to be made on December 15, 2009 under the Indenture. The Company's eroding financial performance ultimately indicated that the Debtors would not be able to meet certain financial covenants under the Senior Credit Agreement for the quarter ended December 31, 2009.

12. The Indenture requires that Spheris file quarterly Form 10-Qs with the SEC to provide the holders of the Senior Subordinated Notes with certain financial information. On November 17, 2009, Spheris filed a Form 15 indicating that it would no longer be a voluntary filer, and, accordingly, Spheris did not make an SEC public filing for the quarterly

period that ended on September 30, 2009. On January 3, 2010, the grace period with respect to the Debtors' disclosure failure expired and an Event of Default occurred under the Indenture. The Senior Credit Agreement provides that an Event of Default under the Indenture constitutes an Event of Default under the Senior Credit Agreement. On January 6, 2010, the Agents provided notice that the Senior Lenders were reserving their ability to exercise various rights and remedies as a result of the alleged Event of Default.

13.     Accordingly, the Debtors determined that a financial restructuring would be advisable, and ultimately, decided to effect that restructuring under the protection of chapter 11 of the Bankruptcy Code.

14.     While exploring potential paths to de-levering the Company's balance sheet, the Debtors began to consider a sale of all or substantially all of their assets. To that end, the Company's investment banker, Jefferies & Company, Inc. ("Jefferies") assisted the Company in commencing an M&A process, whereby indications of interest were solicited from both financial and strategic potential purchasers. Given the Debtors' need to reduce their debt load, and the Debtors' increasing concerns about the potential deterioration of their business and concomitant degradation in value, the Debtors determined that the value of their estates would best be maximized and preserved through the sale of their operations. Over 45 parties were initially contacted and invited to conduct diligence and submit offers. Following a lengthy marketing process, the Debtors determined that the bid they received from CBay Inc. ("CBay") and Medquist Transcriptions, Ltd. ("Medquist" and together with CBay, the "Purchasers") was the best available opportunity and commenced these chapter 11 cases to implement the proposed transaction with CBay pursuant to section 363 of the Bankruptcy Code,

6

subject to a competitive sale process and the solicitation of higher and/or otherwise better offers (a "Sale").

**D.** **Proposed Sale Process**

15. The Debtors filed concurrently herewith, a motion (the "Sale Motion") seeking approval of the sale of substantially all of their assets to the Purchasers or an entity submitting an offer that is determined by the Debtors to be higher and/or better than the Purchasers' offer. The Sale Motion also seeks approval of certain protections for the Purchasers in consideration for it acting as the "stalking horse" bidder, and proposed bidding procedures with respect to the sale of the Debtors' assets. The Debtors believe that a sale of the Debtors' assets to the Purchasers or an alternative bidder submitting a higher and/or better offer will maximize recovery to all stakeholders in these cases.

16. The Debtors believe that, unless a Sale is expeditiously consummated, whether to the Purchasers or to a purchaser submitting a higher or otherwise better offer, there will be significant deterioration in the value of their estates. In the wake of these chapter 11 filings, the Debtors began to lose key employees, despite their efforts to retain such personnel, and they expect that continued uncertainty would only lead to additional departures that could negatively effect the business. A drawn-out restructuring process will also likely lead to customer attrition, as customers turn to competitors who they believe can provide the same services with an increased sense of certainty. The Debtors' major competitors are aware of the Debtors' troubled financial condition due to recent public filings; furthermore, upon information and belief, such competitors have been casting doubts on the Company's viability to the Debtors' largest clients. The longer this situation continues without the Debtors having a definitive go-forward plan, the higher the likelihood that the Debtors' major clients will take

7

their business elsewhere. The Debtors will also likely face liquidity issues, as their restructuring costs continue to accrue.

17. Indeed, the Debtors believe their business is not only one that cannot endure a prolonged stay in chapter 11 without significant risk to the Debtors' survival, but the Debtors' proposed debtor-in-possession lenders are unwilling to fund a prolonged chapter 11 process. Moreover, the Debtors may not have a viable standalone restructuring proposal, as the Senior Lenders have not indicated that they are willing to fund such an approach. Accordingly, the prompt pursuit and consummation of a Sale is essential to maximize the value of the assets of the estates.

## II.     SUMMARY OF FIRST DAY MOTIONS[3]

18. In order to enable the Debtors to operate effectively, to avoid the adverse effects of the commencement of these cases and maximize the value of the Debtors' assets for the benefit of their stakeholders, the Debtors have filed, or will file upon scheduling of a future hearing by this Court, the motions described below.

19. In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance, or the input and assistance of employees of the Debtors working under my supervision. I believe the information contained in the First Day Motions is accurate and correct to the best of my knowledge. As set forth more fully below, I believe that the entry of orders granting the relief requested in the First Day Motions is critical to the Debtors' ability to maximize and preserve the value of their estates.

---

[3]     Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms in the relevant First Day Motion.

## A.    Motions Related to Case Management

### (i)    Joint Administration Motion

20.    The Debtors seek the joint administration of their chapter 11 cases, 6 in total, for procedural purposes only. I believe that it would be far more practical and expedient for the administration of these chapter 11 cases if the Court were to authorize their joint administration. Many of the motions, hearings, and other matters involved in these chapter 11 cases will affect all of the Debtors. Hence, joint administration of the Debtors' cases will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders.

### (ii)    Motion to Extend Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs

21.    The Debtors request that the Court enter an order extending the deadline to file the Debtors' Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("SOFAs") an additional thirty (30) days, to approximately sixty (60) days after the Petition Date, through and including April 5, 2010, without prejudice to the Debtors' rights to seek an additional extension of the Schedules Deadline.

22.    I believe that good and sufficient cause to extend the deadline to file the Schedules and SOFAs exists due to the significant amount of information that must be assembled and compiled, the significant time of employees and professionals required for the completion of the Schedules and SOFAs, and the lack of prejudice to unsecured creditors. In addition, employee efforts during the anticipated short period of the pendency of these chapter 11 cases are critical to the Debtors' reorganization efforts, and the Debtors' creditors would be better served if the Debtors devoted their time and attention to business operations in order to maximize the value of the estates going forward.

9

(iii)    <u>Application to Retain Notice, Claims and Balloting Agent</u>

23.    The Debtors have in excess of 200 creditors, and in accordance with Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors, as part of their requested first day relief, intend to file an application to The Garden City Group, Inc. ("GCG"), as the Debtors' notice, claims and balloting agent for the Debtors' chapter 11 cases.

24.    I understand that GCG is a data processing firm with extensive experience in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases. Given the need for the services described above and GCG's expertise in providing such services, I believe that retaining GCG will expedite service of notices, streamline the claims administration and balloting processes, and thereby permit the Debtors to focus more closely on their reorganization efforts. I reviewed the proposals of 3 different noticing, claims processing, and balloting agents and determined in my business judgment that GCG was well suited to provide these services for the Debtors. For the foregoing reasons, I think it is in the best interests of the Debtors, their estates and their creditors that the Court approve the retention of GCG as claims, noticing and balloting agent.

**B.**    <u>**Applications and Motions Related to the Retention of Professionals**</u>

25.    The Debtors will file several applications to retain professionals, including Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP as bankruptcy co-counsel. The Debtors are also intending to file a motion to approve their agreement with Capstone Advisory Group LLC ("Capstone") to provide me as Chief Restructuring Officer, as well as certain additional Capstone personnel. In addition to such requests, the Debtors intend to file applications to retain Jefferies & Company, Inc. as financial advisor, Deloitte Tax LLP as

10

tax advisor, The Garden City Group, Inc. as notice, claims, and balloting agent, Ernst & Young LLP as auditor, and Bass, Berry and Sims PLC as special counsel. I believe that approval of the agreement with Capstone and the retention of these professionals that have extensive experience and have become familiar with the Debtors' operations and businesses is in the best interests of the Debtors' estates.

## C.    <u>Motions Related to Financing of Operations</u>

      (i)    Motion to Authorize Continued Use of the Debtors'
            Cash Management System, Bank Accounts and Business Forms

26.    In the ordinary course of business, the Company uses the Cash Management System, which is similar to those utilized by other large companies that operate their businesses in many different states and locations, to efficiently collect, transfer, and disburse funds generated by the Debtors' business operations. The Debtors record such collections, transfers, and disbursements as they are made. The Cash Management System, which is primarily comprised of twelve bank accounts (the "<u>Bank Accounts</u>") held at Bank of America, N.A., has three main components: (a) cash collection, including the aggregation of payments made to the Debtors by customers, and concentration; (b) cash disbursements to fund the Debtors' operations; and (c) funds held for other purposes, including investment

27.    The Debtors generate revenue primarily through the provision of clinical documentation technology and services. Each day, customers send payments for the Company's services to a depository account held by Spheris (the "<u>Main Deposit Account</u>"). A small number of the Company's customers take advantage of "e-chart" services, which are less

customized than the Company's other products. Such customers may pay by credit card, and those are funneled to a separate Spheris account (the "Merchant Account").[4]

28.     As needed, funds are transferred from the Main Deposit Account into accounts held by Spheris to fund payroll (the "Main Payroll Account") and accounts payable obligations (the "Main A/P Account" and, together with the Main Payroll Account, the "Disbursement Accounts"). Both of the Disbursement Accounts are "zero-balance" accounts — as disbursements are made, or checks are issued from either Disbursement Account, funds are transferred from the Main Deposit Account to cover such checks and/or disbursements.[5]

29.     Both Holdco and Spheris Leasing, LLC ("Leasing") have operating, general disbursement and, in the case of Leasing, other legacy accounts that are no longer used. Leasing is a largely inactive entity, and its Bank Accounts are rarely used, except to pay for certain costs associated with such entity's corporate existence (e.g., franchise taxes). Holdco has certain obligations under the Debtors' prepetition funded indebtedness, which are generally paid from the Main A/P Account. Thereafter, an intercompany payable is recorded for such amounts by Holdco to Spheris.

30.     In addition to the Main Deposit Account and Disbursement Accounts, Spheris holds a money-market account that invests the Company's cash that is not immediately needed to fund operating costs (the "Money Market Account"). The Money Market Account has minimal funds, as of the Petition Date. While the Debtors believe that the interest earned in

---

[4]     Spheris also has a separate account with PayPal for those few customers that make payments for services through PayPal (the "PayPal Account"), which account takes in approximately $15,000 per month, on average. The PayPal Account is not included on the CMS Schematic.

[5]     Spheris maintains an imprest account with American Express to fund travel and corporate expenses that are charged to charge cards issued under a corporate card program (the "Amex Account"). The Amex Account is funded directly from the Main Deposit Account and typically $40,000 is transferred weekly to meet such charged expenses.

12

the Money Market Account is beneficial to these estates and their creditors, if required by this Court, the Debtors are prepared to forego earning such interest and transfer such funds to the Deposit Account. Additionally, the Debtors have a certificate of deposit account (the "CD Account"), which holds funds that serve as collateral for a security deposit in the form of a standby letter of credit for the Debtors' lease of their facility in Virginia.

31. The continuation of the business relationship between the Debtors and Spheris India is integral to the uninterrupted operations of the Debtors. The Debtors expect to continue to perform under the India Service Agreements and, upon information and belief, the amounts paid postpetition to Spheris India thereunder will allow such entity to satisfy its ordinary course operating liabilities. During the pendency of the Debtors' cases, however, Spheris India may receive a tax assessment resulting from a transfer pricing tax audit by Indian income tax authorities (the "Tax Assessment"). The Tax Assessment may be for an amount of up to approximately $2 million, based on the amounts of historical assessments, which Spheris India will not have the financial wherewithal to satisfy. Upon information and belief, if the Tax Assessment is not satisfied immediately (even if it is being disputed in good faith), Indian governmental authorities may seek to shut down Spheris India's operations — if Spheris India were to cease operating for even only a couple of days, the result would be disastrous to the Debtors' businesses and the value of these estates. The terms of the Debtors' proposed secured postpetition financing facility (the "DIP Facility") permit the Debtors to pay the Tax Assessment on behalf of Spheris India, and the motion requesting approval of the DIP Facility specifically requests this Court's approval of such payments as a component of such credit facility. The Debtors are requesting, pursuant to this motion, authority to fund the Tax Assessment from their Bank Accounts, subject to the requirement of the DIP Facility and

13

applicable orders of this Court. Such funding will be reflected as partial payment of the significant Intercompany payable owing from the Debtors to Spheris India for prepetition services provided under the India Service Agreements.

32. The Debtors believe that modification of their existing accounting system or the implementation of a new cash management system would be prohibitively expensive and would take several months to implement, causing interruptions in the flow and use of funds to the detriment of the Debtors, their customers, vendors and employees.

33. I understand the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts which must be designated debtor in possession bank accounts and utilize new checks for all debtor in possession accounts, which bear the designation "Debtor in Possession." In this motion, the Debtors request that this Court waive the requirement that they close all existing Bank Accounts and open new debtor in possession accounts and, to minimize administrative expense and delay, the authority to continue to use their checks without reference to their status as debtors in possession. In the event the Debtors need to purchase new check stock during the pendency of these chapter 11 cases, such check stock will include a legend referring to the debtors as "Debtors in Possession" or "DIP."

34. The Debtors are also seeking a waiver of the requirement to establish specific bank accounts for tax payments. I believe the Debtors' tax obligations can be paid most efficiently out of their existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among, and out of such accounts, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

DB02:9226464.1

068920.1001

35.     I believe that modification of the Debtors' existing accounting system or the implementation of a new system would be prohibitively expensive and would take several weeks to implement, causing interruptions in the cash management system to the detriment of the Debtors, their customers, vendors and employees.  Accordingly, I believe the relief sought in this motion is essential to the Debtors' efforts to maximize the value of their assets during the chapter 11 process, and is in the best interests of their estates and creditors.

(ii)     Motion for Use of Cash Collateral and Debtor in Possession Financing

36.     Pursuant to this motion, the Debtors seek authority to enter into a debtor in possession financing facility, grant senior liens, junior liens and superpriority administrative expense status in connection therewith, use cash collateral, provide "adequate protection" to prepetition lenders and schedule a final hearing with respect to the relief requested, all as more fully described in the motion (the "DIP Motion").

37.     The Debtors intend to support ongoing operations of their business during these cases through the use of Cash Collateral and borrowings under a $15 million senior secured, superpriority revolving credit facility (the "DIP Facility"), which will be provided under a Senior Secured Super-Priority Debtor-in-Possession Financing Agreement among the Debtors, Ableco, L.L.C., as Collateral Agent (in its capacity as such, the "Collateral Agent"), Cratos Capital Management LLC, as Administrative Agent (in its capacity as such, the "Administrative Agent," and together with the Collateral Agent, each an "Agent" and collectively, the "Agents") and a syndicate of lenders party thereto from time to time (in their capacities as such, the "Lenders").  At the close of business on the day immediately prior to filing, the Debtors held approximately $4 million in unrestricted cash.  On the Petition Date, prior to filing, as required under the DIP Facility, the Debtors remitted approximately $2

15

million to the Prepetition Lenders (as defined below) in partial satisfaction of their prepetition claims. In light of that cash drain, it is my understanding that the DIP Facility and use of Cash Collateral are the Debtors' only available liquidity to fund operating, working capital and capital expenditure needs during the course of these chapter 11 cases.

38. The reasons supporting the Debtors' request for authority to use Cash Collateral and obtain postpetition financing under the DIP Facility are simple yet compelling. As explained in greater detail in the DIP Motion, the Debtors require immediate access to the DIP Facility for working capital and other general corporate purposes of the Debtors. The Debtors are also requesting use of Cash Collateral to fund their operations.

(a) *Adequate Protection*

39. In exchange for the consent to use Cash Collateral and enter into the DIP Facility, it is my understanding that the Agents, on behalf of the Lenders, have agreed that they should receive the following as adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value, if any, of such collateral (collectively, the "Adequate Protection Obligations"), in each case subject to the Carve-Out Expenses:

**Adequate Protection:**

- superpriority claims as contemplated by section 507(b) of the Bankruptcy Code immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Agents and the Lenders;

- liens on the assets of the Obligors to be encumbered in favor of the Agents, including (subject to entry of the Final Order) causes of actions arising under chapter 5 of the Bankruptcy Code, which adequate protection liens shall have a priority immediately junior to the priming and other liens to be granted in favor of the Agents;

- the payment of the fees and expenses incurred by the Prepetition Agents and Prepetition Lenders incurred under the Prepetition

16

Credit Facility; and

- the Prepetition Lenders shall be entitled to payment of cash interest at the default contractual rate in respect of the Prepetition Credit Facility.

 (b) *Highlighted Provisions Pursuant to*
   *Bankruptcy Rule 4001 and Local Rule 4001-2*

 40. It is also my understanding that the DIP Motion highlights each of the provisions of the DIP Agreement and Interim Order required to be highlighted pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2.

 (c) *No Comparable Alternative to the*
   *DIP Facility is Currently Available*

 41. While the Debtors were in the process of negotiating the terms of the DIP Facility, the Debtors also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms (if at all). Significantly, the Prepetition Lenders advised the Debtors that they would not consent to the granting of senior or *pari passu* liens to a new third party debtor in possession lender. Moreover, the Debtors have no significant unencumbered assets that could serve as collateral for alternative financing. For these and other reasons, the Debtors and their advisors determined that it would not be a prudent, economical or productive exercise to extensively solicit interest from third party financing sources to provide debtor in possession financing on a junior or unsecured basis. However, the Debtors' investment banker, Jefferies & Company, Inc. ("Jefferies"), contacted three potential financing sources, each of whom stated that they would not consider providing financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders and further stated that they believed it was extremely unlikely that another third party would be willing to provide such financing.

17

42. Based on these circumstances, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders would be unobtainable. Nevertheless, it was clear to the Debtors and their advisors that without postpetition financing, the Debtors would not be able to ensure that they would be able to continue operations without interruption to their trade relations and the estate would likely be significantly and immediately harmed. Accordingly, the Debtors have negotiated the DIP Facility as set forth in more detail in the DIP Motion, and I believe that authorizing the relief set forth therein is in the best interests of the Debtors and their the creditors, and will enable the Debtors to continue their operations to the benefit of all parties in interest.

**D.     Motion for Authorization to Pay Certain Prepetition Claims of Employees**

43. Pursuant to this motion, the Debtors are seeking: (i) authority to pay certain prepetition employee obligations including, but not limited to, accrued but unpaid prepetition wages, salaries, commissions, reimbursable business expenses, and other compensation owed to the Debtors' employees (collectively, the "Prepetition Employee Obligations"); (ii) authority to continue the Debtors' practices, programs, and policies in effect as of the Petition Date with respect to all Prepetition Employee Obligations; (iii) an order directing the Debtors' banks to honor and pay all prepetition and postpetition checks issued or to be issued, and fund such transfers that may be requested, in respect of the Prepetition Employee Obligations; (iv) authority to issue new postpetition checks or effect postpetition fund transfers in respect of the Prepetition Employee Obligations, if necessary; and (v) authority to pay all related prepetition withholdings and payroll-related taxes associated with the Prepetition Employee Obligations.

DB02:9226464.1

068920.1001

(i)     <u>Executives</u>

44.    As of the Petition Date, the Debtors employed 4 executives, each of whom is party to an employment agreement (collectively, the "<u>Executives</u>"). The Debtors estimate that the average annual salary per Executive is approximately $210,000 (excluding bonuses and other incentive compensation).

(ii)    <u>Production Employees</u>

45.    The majority of the Debtors' employees are medical transcriptionists and other production employees (the "<u>Production Employees</u>"). The Production Employees handle the actual transcription of medical data, which is the crux of the Debtors' business. The Debtors employ approximately 2,200 Production Employees. The majority of the Production Employees are paid according to their productivity on a "per-line" basis, meaning that they earn a certain amount for each line of medical data transcribed. A small subset of the Production Employees, however, are paid on an hourly basis.[6] The Debtors estimate that the average annual salary per full-time Production Employee is approximately $21,000, and the average aggregate payroll to Production Employees is approximately $1,700,000 per two-week pay period.

(iii)    <u>Non-Production Employees</u>

46.    In addition to their Executives and Production Employees, the Debtors employ approximately 400 other employees, the majority of whom fulfill corporate and administrative roles (the "<u>Non-Production Employees</u>"). The Non-Production Employees are

---

[6]    Certain of the Debtors' employees are paid on an hourly basis, including Production Employees, as well as Non-Production Employees, as defined and discussed below. Hourly wages for the Debtors' employees range between $7.50 and $37.57 per hour, depending on the experience and skill level of the particular hourly employee. The Debtors also pay annually, on average, a total of approximately $1.8 million in overtime to all of their hourly employees.

19

paid either on a salaried or hourly basis. The Debtors estimate that the average aggregate payroll to Non- Production Employees is approximately $1,000,000 per two-week pay period.

### (iv) Sales Employees and Commissions

47. Of the Debtors' Non-Production Employees, approximately 6 engage in sales and sales-related activities (the "Sales Employees") and are eligible to receive commissions ("Commissions") based on the volume of sales generated. Generally, when a Sales Employee implements the Debtors' services in a customer's facility, he or she will earn between .5% and 4.5% of the total revenue of the account as Commissions. The Debtors initially pay the Sales Employees 25% of their total potential Commissions (based on an estimation of annual revenues), and the Sales Employees later become eligible to receive further payments in Commissions if and when certain milestones are met. Commissions are not earned consistently, and therefore the amounts paid out and the timing thereof vary greatly. Recently, the Debtors have generally been incurring approximately $4,000 to $13,000 each month in liabilities relating to Commissions, and currently there is approximately $105,000 outstanding with respect thereto.[7] The Debtors hereby request the authority to continue their Commissions program in the ordinary course.

### (v) Employee Benefit Programs

48. In the ordinary course of business, as is customary with most large businesses, the Debtors also maintain various employee benefit plans, programs, and policies, including: health insurance, dental insurance, vision insurance, life insurance, accidental death

---

[7]  While the Debtors have recently been paying relatively small amounts in Commissions each month, depending on the size of an account being activated, the Debtors have paid in the past and may pay in the future approximately $20,000 to $30,000 in aggregate Commissions per account.

and dismemberment insurance, and short and long-term disability coverage (the "Employee Benefit Programs").

49.     The Debtors' employees are essential to the success of the Debtors' business. Consequently, it is critical that the Debtors continue the ordinary course personnel policies, programs, and procedures that were in effect prior to the Petition Date. The requested authority to continue to pay the Debtors' employees and to maintain the Employee Benefit Programs is critical to ensure that the Debtors can retain personnel knowledgeable about the Debtors' business, and to provide an incentive for the Debtors' employees to continue to provide quality services to the Debtors at a time when they are clearly needed. The total amount to be paid, if the relief sought is granted, is modest compared with the size of the Debtors' estates and the importance of the Debtors' employees to the restructuring effort.

50.     In order to attempt to ensure that their employees will not leave their employ, and to enable the Debtors to attain a successful outcome in these cases, I believe the Debtors should be authorized to, among other things, satisfy their prepetition obligations to their employees, reimburse employees for prepetition expenses that were incurred on behalf of the Debtors, and pay prepetition withholdings and payroll-related taxes associated with the employee wage claims and the Employee Benefit Obligations. I believe authorizing the Debtors to pay the Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, the creditors, and all parties in interest, and will enable the Debtors to continue to operate their business without disruption in an economic and efficient manner.

21

**D.**    **Certain Motions Related to Creditors and Other Parties in Interest**

(i)    Motion to Provide Adequate Assurance to Utilities

51.    In connection with the operation of their business and the management of their properties, the Debtors utilize water, natural gas, electricity, telecommunication services, and similar utility products and services (collectively, the "Utility Services") provided by approximately 49 different utility companies (collectively, the "Utility Companies") covering a number of utility accounts.

52.    The Debtors are seeking an order of this Court, pursuant to section 366 of the Bankruptcy Code, prohibiting the Utility Companies from altering or discontinuing services and deeming the Utility Companies adequately assured of future performance by virtue of the Debtors' proposed adequate assurance.  The Debtors expect that revenues from operations and availability under the Debtors' DIP Facility and from the use of Cash Collateral will be sufficient to pay all postpetition obligations for Utility Services, and intend to continue to pay all such obligations in a timely manner.  As an additional measure, the Debtors propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services or approximately $220,000 into an account maintained by the Debtors (the "Utility Deposit Account") to provide adequate assurance of payment for future services to the Utility Companies.

53.    I believe that the Utility Deposit Account together with the Debtors' ability to pay for future Utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies.  However, in light of the severe consequences to the Debtors of any interruption in services by the Utility Companies and my understanding that Utility Companies have the right

22

to evaluate the proposed adequate assurance on a case-by-case basis, if any Utility Company believes additional assurance is needed, the Debtors have proposed procedures for the Utility Companies to request such additional adequate assurance. I believe these procedures, as outlined in the motion, are not only fair and reasonable, but also necessary for the Debtors to be able to continue to operate properly.

54. I believe that without the relief requested in this motion, the Debtors could be forced to address numerous requests by Utility Companies in an unorganized manner at a critical period in their bankruptcy cases when their efforts should be focused on stabilizing their operations and maximizing value for all of their stakeholders. Accordingly, I submit that granting the relief sought in this motion is in the best interest of the Debtors and all parties involved.

       (ii)     Motion to Authorize Payment of Prepetition
                Claims of Certain Critical Vendors and Priority Vendors

55. In order to continue operating their businesses, the Debtors must rely on certain suppliers (the "Critical Vendors") that provide the Debtors with certain goods and services that are critical to the Debtors' operations. Absent these Critical Vendors, the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions. Unless their prepetition claims are satisfied, I believe the Critical Vendors will refuse to supply goods and services to the Debtors postpetition. Furthermore, replacing the Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible. Accordingly, the Debtors seek authorization to pay the Critical Vendors, including any prepetition obligations owing thereto, in the ordinary course of business.

56. In addition to the Critical Vendors, certain suppliers and vendors (the "Priority Vendors") have provided the Debtors within twenty (20) days prior to the Petition

                                                           

Date with materials, supplies, products and related items that are essential to sustained operations of the Debtors. The Debtors believe that by altering the timing of payments that the Priority Vendors are already entitled to receive as a matter of statute (i.e., paying now rather than waiting for a plan of reorganization to be confirmed), such payments can induce the individual Priority Vendors to adhere to favorable trade terms and do business with the Debtors on a going-forward basis. Therefore, the Debtors seek authorization to pay the Priority Vendors, including any prepetition amounts owing thereto, in the ordinary course of business.

57. For the reasons stated above, and explained more fully in the motion, I believe that the relief sought therein is necessary to preserve, maintain and maximize the value of the Debtors' assets during these chapter 11 cases and, therefore, is in the best interests of the Debtors and their estates.

(iii)     Motion for Authority to Pay Certain
          Prepetition Sales and Use Tax Obligations

58. Pursuant to this motion, the Debtors seek an order: (i) authorizing them to pay Sales and Use Taxes, Franchise Taxes and Fees, including business licenses (collectively, the "Taxes") to various federal, state and local taxing and regulatory authorities (collectively, the "Applicable Authorities") that were incurred in the ordinary course of business prior to the Petition Date and are due and owing to the appropriate Applicable Authorities; and (ii) authorizing all banks and other financial institutions on which such checks or other fund transfers to the Applicable Authorities are drawn to receive, process, honor and pay any and all such checks or other transfers, whether issued or presented prior to or after the Petition Date.

59. Payment of the Taxes is critical to the Debtors' ability to continue operating in the states in which they currently conduct business. Failure to pay the Taxes could affect the Debtors' good standing in certain jurisdictions and significantly impact their ability to

24

reorganize. Further, it is my understanding that it is likely that a significant portion of the Taxes that accrued or were incurred prior to the Petition Date are priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Therefore, the payment of Taxes would likely affect only the timing of the payments and not prejudice the rights of other unsecured creditors. Accordingly, I believe payment of the Taxes, including any amounts assessed prepetition, is critical to the Debtors' ongoing operations and is in the best interests of their estates.

> (iv) Motion to Authorize Debtors to Continue
> Insurance Policies and Agreements Relating Thereto

60. In connection with the operation of their businesses, the Debtors maintain various insurance programs, including those providing coverage for liability related to workers' compensation, foreign liability, commercial general liability, commercial umbrella coverage, directors' and officers' liability, errors and omissions liability, directors' and officers' run-off, directors' and officers' liability run-off, commercial crime, kidnap and ransom, automobile liability, and commercial property. As of the Petition Date, no premiums were outstanding in connection with the Debtors' insurance policies.

61. Arthur J. Gallagher & Co. (the "Broker") serves as the Debtors' insurance broker. Among other things, the Broker is involved in the representation of the Debtors in various ongoing negotiations with the Debtors' insurers. Employment of the Broker has allowed the Debtors to obtain the insurance coverage necessary to operate their business in a reasonable and prudent manner and to realize savings in the procurement of such policies. The Debtors believe that it is in the best interests of their creditors and estates to continue their business relationship with the Broker.

DB02:9226464.1                                                     068920.1001

62. The Debtors pay fees to the Broker in connection with the signing or renewal of certain policies, which generally takes place in March and August of each year. As of the Petition Date, no amounts were owing by the Debtors on account of the Broker.

63. If these insurance policies and programs were allowed to lapse, the Debtors would be exposed to substantial liability for any damages or loss resulting to persons and/or property of the Debtors and others. In addition, absent certain types of coverage (e.g., workers' compensation), the Debtors would not be able to continue to conduct business. Moreover, maintenance of the directors' and officers' liability policy is necessary to retain the Debtors' senior management who are critical to the success of the Debtors' business and reorganization. For the foregoing reasons, and as discussed in greater detail in the motion, I believe that the relief requested therein is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and should be granted in full.

(v)     Motion to Establish Notification Procedures and Approve Certain Restrictions on Certain Transfers of Interests in the Debtors

64. The Debtors and Holding III (together, the "Spheris Entities"), file their income tax returns on a consolidated, unitary, combined or similar basis. In addition, the Spheris Entities are parties to that certain Tax Sharing Agreement, which governs their tax relationship.

65. The Debtors estimate that, as of December 31, 2009, they had federal tax net operating losses of approximately $115 million (collectively, "NOLs"). The NOLs are a valuable asset of the Debtors' estates that the Debtors intend to use to offset future income, thereby significantly reducing their future federal income tax liability, under applicable rules set forth in the Internal Revenue Code of 1986 (as amended, the "I.R.C.").

26

66. Thus, the Debtors are seeking authorization to protect and preserve their NOLs, pursuant to sections 105(a), 362 and 541 of the Bankruptcy Code, by establishing certain notice and hearing procedures governing the transfer or trading in, or any claims of worthlessness with respect to, the common stock or preferred stock (the "Stock") of non-Debtor Holding III or any of its subsidiaries (each of which is a Debtor in these cases with the exception of Spheris India).

67. If left unrestricted, such trading could severely limit the Debtors' ability to use a valuable asset of their estates – their Net Operating Losses – and could have significant negative consequences for the Debtors, their estates and creditors. Specifically, the trading of the Stock could adversely affect the Debtors' ability to utilize their NOLs if too many five percent (5%) or greater blocks of Stock are created, or too many shares are added to or sold from such blocks, such that, together with previous trading by five percent (5%) stockholders during the three-year period prior to the Petition Date, an ownership change within the meaning of section 382 of the I.R.C. is triggered prior to consummation of a confirmed chapter 11 plan for the Debtors.[8]

68. Likewise, if a fifty-percent (50%) or greater shareholder were, for federal tax purposes, to treat its equity securities as becoming worthless prior to the Debtors' emergence from chapter 11, such a claim could trigger an ownership change under section 382(g)(4)(D) of the I.R.C., thus triggering an adverse affect on the Debtors' tax assets.

69. The ownership changes described above may result in all or part of the Debtors' NOLs being disallowed under section 382 of the I.R.C., thereby causing the Debtors'

---

[8] Transactions that may occur between the Petition Date and the date an order is entered in respect of the requested relief. Accordingly, the Debtors reserve the right to seek further relief from the Court to void any specific transfers made within that time that may threaten the Debtors' NOLs.

to lose a valuable asset of their estates, to the detriment of their creditors and stakeholders. Therefore, I believe the relief requested is in the best interests of the Debtors' estates and their creditors and other parties in interest.

*The remainder of this page is intentionally left blank.*

DB02:9226464.1 068920.1001

## CONCLUSION

In furtherance of their reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.

Dated: February 3, 2010

SPHERIS INC.
SPHERIS HOLDING II, INC.
SPHERIS CANADA INC.
SPHERIS LEASING LLC
SPHERIS OPERATIONS LLC
VIANETA COMMUNICATIONS

Robert L. Butler
Chief Restructuring Officer

Notary

# EXHIBIT A

## Corporate Organizational Chart

# Spheris Corporate Structure

**Spheris Holding III, Inc.**
(Delaware Corporation)*

**Spheris Holding II, Inc.**
(Delaware Corporation)

**Spheris Inc.**
(Delaware Corporation)

**Spheris Operations LLC**
(Tennessee Limited Liability Company)
Operating Entity

**Vianeta Communications**
(California Corporation)

**Spheris Leasing LLC**
(Tennessee LLC)

**Spheris Canada Inc.**
(Tennessee Corporation)

**Spheris, India Private Limited**
(Indian Company)*

*Not a filing entity.