# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| Spheris Inc., et al., | : Case No. 10-10352 (KG) |
| | : |
| Debtors.[1] | : Joint Administration Pending |

----------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING, AND (B) GRANT SENIOR LIENS, JUNIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) APPROVING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") hereby move for entry of an interim order and a final order, pursuant to sections

105(a), 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Local Rules 2002-1, 4001-2 and 6004-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), authorizing the Debtors to enter into a debtor-in-possession

financing facility, grant senior liens, junior liens and superpriority administrative expense status,

use cash collateral, provide "adequate protection" to certain prepetition secured lenders and

schedule a final hearing with respect to the relief requested herein, all as more fully described

herein (the "Motion"). In support of the Motion, the Debtors rely upon the Affidavit of Robert

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Spheris Inc. (5254); (ii) Spheris Holding II, Inc. (7969); (iii) Spheris Canada Inc. (9757); (iv) Spheris Leasing LLC (4780); (v) Spheris Operations LLC (1371); and (vi) Vianeta Communications (1121). The Debtors' executive headquarters are located at 9009 Carothers Parkway, Suite C-3, Franklin, Tennessee 37067.

L. Butler, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings (the "Butler Affidavit"), which was filed with the Court concurrently herewith and is incorporated herein by reference. In further support of the Motion the Debtors, by and through their undersigned proposed co-counsel, respectfully represent:

## PRELIMINARY STATEMENT[2]

1.    The Debtors intend to support ongoing operations of their business during these cases through the use of Cash Collateral and borrowings under a $15 million senior secured, superpriority revolving credit facility (the "DIP Facility"), which will be provided under a Senior Secured Super-Priority Debtor-in-Possession Financing Agreement among the Debtors, Ableco, L.L.C., as Collateral Agent (in its capacity as such, the "Collateral Agent"), Cratos Capital Management LLC, as Administrative Agent (in its capacity as such, the "Administrative Agent," and together with the Collateral Agent, each an "Agent" and collectively, the "Agents") and a syndicate of lenders party thereto from time to time (in their capacities as such, the "Lenders"). At the close of business on the day immediately prior to filing, the Debtors held approximately $4 million in unrestricted cash. On the Petition Date, prior to filing, as required under the DIP Facility, the Debtors remitted approximately $2 million to the Prepetition Lenders (as defined below) in partial satisfaction of their prepetition claims. In light of that cash drain, the DIP Facility and use of Cash Collateral are the Debtors' only available liquidity to fund operating, working capital and capital expenditure needs during the course of these chapter 11 cases.

2.    The reasons supporting the Debtors' request for authority to use Cash Collateral and obtain postpetition financing under the DIP Facility are simple yet compelling.

---

[2]    Unless indicated otherwise, capitalized terms used but not immediately defined herein have the meanings ascribed to them later in this Motion.

DB02:9227344.1                                                    068920.1001

As explained in greater detail below, the Debtors require immediate access to the DIP Facility for working capital and other general corporate purposes of the Debtors. While the Debtors are also requesting use of Cash Collateral, it will be insufficient to fund their operations, and even the liquidity proposed under the DIP Facility may leave the Debtors with a shortfall if certain contingencies (e.g., litigation or a protracted sales process) occur that the Lenders were unwilling to fund. The lifeline provided by the Lenders is short — but it is the Debtors' only hope to get to the safe harbor of the sale of substantially all of their assets (the "Sale").

        3.     By this Motion, and pursuant to sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code, the Debtors hereby seek entry of two (2) orders — an interim order in the form annexed hereto as Exhibit A (the "Interim Order") and a final order (the "Final Order"),[3] following notice of the Motion and the Interim Order, and a hearing (the "Final Hearing") on the relief requested on a final basis (together, the "DIP Orders"). The entry of each of the DIP Orders is necessary to satisfy the conditions to borrowing under that certain $15 million Debtor-in-Possession Credit Agreement (as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Agreement"):[4]

      (a)    authorizing (i) Spheris Operations LLC ("Spheris," or the "Borrower") to obtain up to $7,500,000 in principal amount of postpetition financing on an interim basis (the "Interim DIP Loans") and, thereafter, an additional $7,500,000 on a final basis under a $15,000,000 maximum aggregate principal amount DIP Facility on the terms and conditions set forth in the Interim Order, the Final Order and the DIP Agreement (collectively, with all agreements, documents and instruments delivered or executed in connection therewith, including, without limitation, the Budget, in each case as hereafter amended, supplemented or otherwise modified from time to time, the "Loan Documents"), among the Lenders, the Borrower, and Spheris Holding II, Inc., Spheris, Inc., Spheris Leasing LLC, Spheris Canada Inc.,

---

[3]    A copy of the proposed Final Order will be filed prior to the Final Hearing.

[4]    A copy of the DIP Agreement in substantially final form is annexed hereto as Exhibit B (excluding schedules and exhibits).

and Vianeta Communications (collectively, the "Guarantors") and (ii) each of the Guarantors to guaranty Spheris's obligations in respect of the DIP Facility;

(b)    authorizing the Debtors to execute and deliver the DIP Agreement and the other Loan Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith, including, without limitation, executing any deposit account control agreements (including in the form attached hereto as Exhibit C );

(c)    authorizing the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited consensual priming liens pursuant to section 364(d)(1) of the Bankruptcy Code) to the Agents and Lenders to secure all obligations of the Debtors in respect of the DIP Facility;

(d)    authorizing the Debtors' use of cash in which the Prepetition Lenders have an interest (the "Cash Collateral"), in accordance with the terms of the DIP Orders;

(e)    authorizing the Debtors to grant adequate protection to the Prepetition Lenders for, among other things, the Debtors' use of Cash Collateral and the Debtors' use, and any resulting diminution in the value of, the other Prepetition Collateral;

(f)    granting, pursuant to the applicable provisions of the Bankruptcy Code, including sections 361, 363, 503(b) and 507(b) thereof, and the terms of the DIP Orders, the Prepetition Lenders, whose Cash Collateral and other Prepetition Collateral may be used, sold or leased by the Debtors, the following as adequate protection of their interests: (i) a superpriority claim having priority over all administrative expenses, subject and subordinate only to the Carve-Out Expenses and the claims under the DIP Facility, (ii) replacement liens on substantially all property and assets of the Debtors, wherever located, subject only to the Carve-Out Expenses, the Liens, and any valid, perfected, enforceable and unavoidable liens (A) existing as of the Petition Date or (B) pursuant to sections 546 and 362(18) of the Bankruptcy Code, which are otherwise senior to the liens in favor of the Prepetition Lenders, but in any event excluding liens in favor of the Prepetition Lenders or otherwise securing the Prepetition Obligations (the "Permitted Liens"); and (iii) payment of all reasonable costs and expenses of all of the Prepetition Lenders (not just the Prepetition Agents), including reasonable attorney and advisor fees on a current basis without the need for filing fee applications or fee statements.

## JURISDICTION

4.    This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue before this

Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1, 4001-2 and 6004-1.

## BACKGROUND

5.    On the date hereof (the "Petition Date"), Spheris and each of the other Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.    The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes.

7.    As of the date hereof, no official committee of unsecured creditors has been appointed.

8.    The Debtors and Spheris, India Private Limited ("Spheris India"), a wholly-owned non-Debtor subsidiary (collectively, the "Company"), provide clinical documentation technology and services to health systems, hospitals and group medical practices located throughout the United States. The Company receives medical dictation in digital format from subscribing physicians, converts the dictation into text format, stores specific data elements from the records, then transmits the completed medical record to the originating physician in the prescribed format.

9.    Additional information regarding the events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Butler Affidavit.

A.     **Prepetition Indebtedness and Capital Structure**

10.     In November 2004, Spheris Inc. ("Holdco") became a wholly-owned subsidiary of Spheris Holding II, Inc. ("Holding II"), which in turn is wholly-owned by Spheris Holding III, Inc. ("Holding III"), an entity owned by affiliates of Warburg Pincus LLC and TowerBrook Capital Partners LLC, CHS/Community Health Systems, Inc., and indirectly by certain members of the Company's current and past management team.

i.     Senior Prepetition Credit Facility

11.     Spheris is the borrower under a credit agreement dated July 17, 2007 (the "Prepetition Credit Facility"), pursuant to which Holding II, Holdco, and each of the other Debtors act as guarantors, Ableco Finance LLC acts as collateral agent (in its capacity as such, the "Prepetition Collateral Agent"), Cratos Capital Management, LLC acts as administrative agent (in its capacity as such, the "Prepetition Administrative Agent" and, together with the Prepetition Collateral Agent, the "Prepetition Agents"), and certain other lenders are party thereto (collectively, with the Prepetition Agents, the "Prepetition Lenders"). Notably, there is a significant identity of interest between the Prepetition Agents and the Agents, and the Prepetition Lenders and the Lenders. The Prepetition Credit Facility consists of a term loan in the principal amount of $69.5 million and a revolving credit facility in an aggregate principal amount not to exceed $25.0 million at any time outstanding. The obligations outstanding under the Prepetition Credit Facility (the "Prepetition Loan Obligations") mature on July 17, 2012, and are secured by liens on substantially all of the Debtors' assets (the "Prepetition Collateral"). As of January 31, 2010, the Debtors had approximately $75.6 million in Prepetition Loan Obligations outstanding, including accrued interest.

DB02:9227344.1                                                                          068920.1001

ii.     Senior Subordinated Notes

12.     Pursuant to an indenture dated December 22, 2004 (the "Indenture"),
Holdco issued Senior Subordinated Notes in the principal amount of $125 million, which mature
on December 15, 2012.  The Senior Subordinated Notes bear interest at a fixed rate of 11.0% per
annum, which is payable semi-annually through maturity.  The obligations under the Senior
Subordinated Notes are guaranteed by each of the other Debtors and are unsecured.  As of
January 31, 2010, the Debtors had approximately $125.0 million in principal outstanding under
the Indenture and accrued interest was approximately $8.6 million.

iii.    Interest Rate Derivative Agreements

13.     The Debtors are also party to certain prepetition swap agreements, dated
October 11, 2007 (the "Interest Rate Derivatives"), with Deutsche Bank AG ("DB").  The amount
outstanding under the Interest Rate Derivatives as of the Petition Date is approximately
$1,700,000 (the "Derivative Obligations").

## TERMS AND CONDITIONS OF THE
## POSTPETITION FINANCING ARRANGEMENTS

**A.     Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2**

14.     The DIP Facility includes a number of terms that bear note, many of
which constitute material provisions requiring explicit disclosure under the Bankruptcy Rules
and Local Rules.[5]  The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the
extent applicable, are set out at the following sections of the DIP Agreement and the Interim
Order:

---

[5]     While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and the
Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this
list at the hearing with respect to this Motion.

(i) Grant of Priority or a Lien on Property of the Estate. DIP Agreement ¶¶ 3.01 and 3.02; Interim Order ¶¶ 9 and 10.

(ii) Adequate Protection or Priority for a Claim that Arose before the Commencement of the Case. Interim Order ¶ 12.

(iii) Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case. DIP Agreement ¶ 3.07; Interim Order ¶¶ F(iii) and (iv).

(iv) Waiver or Modification of the Automatic Stay. Interim Order ¶ 21.

(v) Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral or Request Authority to Obtain Credit. DIP Agreement ¶¶ 3.05 and 9.01(j); Interim Order ¶¶ F(viii) and 9(b).

(vii) Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien. DIP Agreement ¶ 3.05(c); Interim Order ¶ 9(c).

(viii) Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate. DIP Agreement ¶ 12.25; Interim Order ¶¶ F(v), 9(a) and 20.

(ix) Indemnification of Any Entity. DIP Agreement ¶¶ 2.04(d)(ii)(B) and (d)(iii), 2.07, 2.08(c), 7.01(j), 10.05 and 12.15.

(x) Release, Waiver or Limitation on Rights under Section 506(c). DIP Agreement ¶¶ 7.02(r)(ii) and 9.01(o); Interim Order ¶¶ F(ix), J and 22.

(xi) Liens Granted on Claims Arising Under Chapters 5 or 7. DIP Agreement ¶ 3.01(a); Interim Order ¶ 9(a).

15. In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Agreement and in the relief set forth in the attached Interim Order:

(i) Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B)). DIP Agreement ¶ 3.07; Interim Order ¶¶ F(iii), F(iv) and 16.

8

(iii)   Waiver of Section 506(c) Surcharge (Local Rule 4001-2(a)(i)(C)). DIP Agreement ¶¶ 7.02(r)(ii) and 9.01(o); Interim Order ¶¶ F(ix), J and 22.

(iv)    Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D)). DIP Agreement ¶ 3.01(a); Interim Order ¶ 9(a).

(v)     Roll-Over Provisions (Local Rule 4001-2(a)(i)(E)). DIP Agreement ¶ 6.01(t); Interim Order ¶ 6.

(vi)    Disparate Treatment of Professionals (Local Rule 4001-2(a)(i)(F)). DIP Agreement ¶¶ 3.01(c), 3.02, 3.05(a), 6.01(nn) and 8.01(r)(ii) and (r)(ii); Interim Order ¶¶ F(viii) and (ix), J, 9(a), 10, 12, 13, 15, and 18.

(vii)   Priming Lien (Local Rule 4001-2(a)(i)(G)). DIP Agreement ¶ 3.01; Interim Order ¶ 9.

16.   In addition, the Debtors highlight for the Court the following provisions:

(i)     Except as expressly agreed to by the Agents, the Lenders, the Prepetition Agents and the Prepetition Lenders, no order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to a party shall be entered by the Court unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to indefeasibly pay in full in cash, and completely satisfy, in cash, all obligations under the DIP Facility, the Prepetition Loan Obligations, and Adequate Protection Obligations owed to the Prepetition Lenders, and such obligations are indefeasibly paid in full in cash and the commitments under the DIP Facility and this Interim Order are terminated in accordance therewith on the closing date of such sale.  Interim Order ¶ 39(a).

(ii)    Pursuant to the Interim Order, no plan shall be confirmed in the Debtors' cases that could not have been confirmed but for the provisions of section 1129(b)(2)(A) of the Bankruptcy Code, as applied to the secured claims of the Agents, the Lenders, the Prepetition Agents and the Prepetition Lenders unless otherwise agreed, as applicable, by such parties.  Interim Order ¶ 42.

(iii)   The proposed Interim Order overrides consent rights of landlords, licensors or other parties, and any provisions requiring payment of any fees or obligations to any person, related to the Debtors'

DB02:9227344.1

068920.1001

granting of the security interests on the Collateral to the Lenders. Interim Order ¶ 9(c).

(iv)     The DIP Facility includes a Final Maturity Date of May 4, 2010 (i.e., 90 days from the Petition Date). Therefore, there is a very real risk that the DIP Facility may terminate prior to the closing of the Sale, if the closing deadlines are extended for regulatory reasons under the stalking horse purchase agreement in connection with the Sale. Furthermore, the Debtors have an affirmative covenant under the DIP Facility to consummate the Sale pursuant to an order satisfactory to the DIP Agents and the DIP Lenders by no later than sixty (60) days after the Petition Date (or as such later date as the Collateral Agent may reasonably agree). DIP Agreement ¶ 7.01(p).

(v)     Upon an Event of Default, the automatic stay is lifted to allow the Prepetition Lenders to foreclose upon their collateral and exercise rights under the Prepetition Credit Facility, however, such rights shall terminate upon the indefeasible payment in full in cash of all outstanding obligations under the DIP Facility. Interim Order ¶ 21.

(vi)     Upon entry of the Interim Order, no person is entitled to assert a claim under "equities of case" under section 552(b) of the Bankruptcy Code. Interim Order ¶ 24.

(vii)     The Debtors are prohibited from using Cash Collateral or the funds available under the DIP Facility for a broad range of activities, including asserting or supporting any action for any claim, order, judgment, determination or similar relief against, or adverse to the interests of the DIP Agents, the DIP Lenders, the Prepetition Agents, the Prepetition Lenders or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors (in their capacity as such). Interim Order ¶ 15.

(viii)     Fees and expenses of all Prepetition Lenders are to be paid from the assets of the estates, and such fees are deemed earned as of entry of the Interim Order. Interim Order ¶ 12(c)(i).

(ix)     The Lenders have reserved their rights to sue the Debtors with respect to the DIP Agreement in a forum other than this Court. DIP Agreement ¶ 12.10.

(x)     The Interim Order provides that neither the DIP Agents, the DIP Lenders, the Prepetition Agents nor the Prepetition Lenders shall be considered to be exercising control over any operations of the Debtors or acting in any way as a responsible person, including

without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.* Interim Order ¶ 33.

The provisions addressed above were negotiated and the Lenders have indicated that they are necessary for the Debtors to procure the financing made available under the DIP Agreement in a sufficient amount and on a timely basis.

### B.    Summary of Principal Terms of the DIP Agreement

17.    The significant terms and conditions of the DIP Agreement and the Loan Documents are as follows:[6]

| | |
|---|---|
| **Borrower:** | Spheris Operations LLC |
| **Guarantors:** | Spheris Holding II, Inc., Spheris, Inc., Spheris Leasing LLC, Spheris Canada Inc., and Vianeta Communications |
| **DIP Facility:** | A revolving loan facility in an aggregate principal amount equal to $15,000,000, (the maximum aggregate amount of each Lenders' commitment under the DIP Facility, collectively, the "Commitments"; and the loans under the DIP Facility, the "Loans"). |
| **Agents:** | Cratos Capital Management LLC and Ableco, L.L.C. |
| **Lenders:** | The Agents and certain other lenders as may become party thereto from time to time. |
| **Availability:** | No portion of the Commitments shall be available prior to the date of the Bankruptcy Court's entry of the Interim Order. $7,500,000 of the Commitment shall be made available to the Borrower upon the Bankruptcy Court's entry of the Interim Order. |
| **Maturity:** | All obligations under the DIP Agreement will be due and payable on the earliest to occur of (i) the date which is 30 days following the date of entry of the Interim Order if the Final Order has not been |

---

[6]    This summary is qualified in its entirety by reference to the provisions of the DIP Documents. The DIP Documents will control in the event of any inconsistency between this motion and the DIP Documents. Unless otherwise defined herein, capitalized terms used in this section have the meanings ascribed to them in the DIP Documents.

entered by the Bankruptcy Court on or prior to such date, (ii) if the Final Order has been entered by the Bankruptcy Court on or prior to 30 days following the date of entry of the Interim Order, then May 4, 2010, (iii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (iv) the date of a sale of substantially all of the Capital Stock or assets of the Borrower or any Guarantor (the "Loan Parties"), other than Holdings, and (v) the date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of the DIP Agreement and the other Loan Documents.

**Interest:**

Each Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the making of such Loan until the date on which such principal amount is repaid in accordance herewith, as follows: (A) if the relevant Loan is a LIBOR Rate Loan, at a rate per annum equal to the LIBOR Rate plus the Applicable LIBOR Margin, and (B) otherwise, at a rate per annum equal to the Reference Rate plus the Applicable Reference Rate Margin.

In lieu of having interest charged at the rate based upon the Reference Rate, the Borrower shall have the option (the "LIBOR Option") to have interest on all or a portion of the Loans be charged at a rate of interest based upon the LIBOR Rate. At any time that an Event of Default has occurred and is continuing, the Borrower no longer shall have the option to request that Loans bear interest at the LIBOR Rate and Administrative Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans to the rate then applicable to Reference Rate Loans hereunder.

**Default Interest:**

To the extent permitted by law, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Loan Parties under the DIP Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of the DIP Agreement plus 2.0 percentage points, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified in the DIP Agreement for any Loan prior to the Event of Default plus 2.0 percentage points.

DB02:9227344.1

068920.1001

| | |
|---|---|
| **Fees:** | Commitment Fee. On the Interim Facility Effective Date, the Borrower shall pay a non-refundable commitment fee (the "Commitment Fee") equal to $300,000, which shall be deemed fully earned when paid. |

Unused Line Fee. From and after the Interim Facility Effective Date and until the Final Maturity Date, the Borrower shall pay to the Administrative Agent for the account of the Lenders, in accordance with their Pro Rata Shares, an unused line fee (the "Unused Line Fee"), which shall accrue at the rate per annum of 0.75% on the excess, if any, of the Total Commitment (defined as the sum of the Lenders' Commitments) over the sum of the average principal amount of all Loans outstanding from time to time and shall be payable monthly in arrears on the first day of each month commencing on March 1, 2010.

Loan Servicing Fee. From and after the Interim Facility Effective Date and until the later of (i) the Final Maturity Date and (ii) the date on which all Obligations are paid in full, the Borrower shall pay to the Administrative Agent for the account of the Administrative Agent, a non-refundable loan servicing fee (the "Loan Servicing Fee") equal to $10,000 each month, which shall be deemed fully earned when paid and which shall be payable on the Interim Facility Effective Date (payable ratably based on the number of days remaining in the calendar month in which the Effective Date occurs) and monthly in advance thereafter on the first day of each calendar quarter commencing on March 1, 2010.

**Prepayment Interest/Fees:** Any prepayment made (other than prepayments made pursuant to subsections (c)(i) and (c)(iii) of Section 2.05 of the DIP Agreement) shall be accompanied by the payment of accrued interest on the principal amount being prepaid to the date of prepayment, and if such prepayment would reduce the amount of the outstanding Loans to zero at a time when the Total Commitment has been terminated, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06 of the DIP Agreement, as addressed above in the summary of Fees.

**Priority and Liens:** Administrative Priority. The Loan Documents provide that the Obligations of the Loan Parties shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the

prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

As security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties, as of the Interim Bankruptcy Court Order Entry Date, assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the Collateral Agent, for the benefit of the Agents and the Lenders, a security interest in and to, and Liens on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of such Loan Party, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all proceeds received in connection with the Confidential Settlement Agreement and Release dated as of December 23, 2009 among certain of the Debtors and CHS Community Health Systems Inc., and Community Health Systems Professional Services Corporation, all of the Capital Stock of each Subsidiary of such Loan Party, all of the Capital Stock of all other Persons directly owned by such Loan Party (provided that if the Capital Stock is issued by a Person that is a CFC and the pledge of 100% of the voting Capital Stock of such CFC could reasonably be expected to result in material adverse tax consequences to the Loan Parties, then the pledge shall be limited to 65% of the voting Capital Stock and the Agents and the Lenders shall have a Lien on all proceeds of such Capital Stock), money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this Section 3.01(a) being hereafter collectively referred to as the "<u>Collateral</u>").

Upon entry of the Interim Order or Final Order, as the case may be, the Liens and security interests in favor of the Collateral Agent referred to in Section 3.01(a) of the DIP Agreement shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than Permitted Priority Liens. Such Liens and security interests and

14

their priority shall remain in effect until the Total Commitment shall have been terminated and all Obligations shall have been repaid in cash in full.

Notwithstanding anything in the Loan Documents to the contrary, all proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted in Section 3.01(a) of the DIP Agreement or in any other Loan Document or by the DIP Orders shall be subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", provided, that no Person entitled to such Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

**Carve-Out Expenses:**    "Carve-Out Expenses" means any payments permitted to be made by the Bankruptcy Court in respect of fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code, provided that in no event shall any success, transaction or any similar fee be considered a Carve-Out Expense except for the transaction fee specifically earmarked for Jefferies & Company, Inc. in sub-clause (iii) of clause "first" of the definition of "Agreed Administrative Expense Priorities".

"Carve-Out Expense Reduction Period" means any period during which an Event of Default under this Agreement or a default by any Loan Party in any of its obligations under any of the Bankruptcy Court Orders, in either case, shall have occurred and be continuing.

"Agreed Administrative Expense Priorities" means that administrative expenses with respect to the Loan Parties and, with respect to sub-clause (iv) of clause "first", any statutory committee appointed in the Chapter 11 Cases, shall have the following order of priority:

first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the Clerk of the Bankruptcy Court; (iii) an amount up to $500,000 earmarked solely for the payment of a transaction fee to Jefferies & Company, Inc. pursuant to its engagement letter, dated as of February 9, 2009 (as amended on September 30, 2009), with the Loan Parties to the extent such fee is paid only upon the consummation of a Sale the terms and conditions of which are approved by the Agents; and (iv) amounts payable in respect of Carve-Out Expenses (but excluding, for the avoidance of doubt, success, transaction or any similar fees), provided that the amount entitled to priority under this sub-clause (iv) of this clause first

15

("Priority Professional Expenses") for any period after the Filing Date shall not exceed the lesser of (x) the amount specified in the Budget during such period for the payment of Carve-Out Expenses (inclusive of any holdbacks required by the Bankruptcy Court) and (y) $1,600,000 in respect of Carve-Out Expenses for professionals other than Jefferies & Company, Inc. (the "Professional Expense Cap"); provided, that (1) any payments actually made in respect of Carve-Out Expenses (excluding, for the avoidance of doubt, the transaction fee described in clause (iii) above) shall reduce the Professional Expense Cap on a dollar-for-dollar basis (it being acknowledged and agreed by the Loan Parties, Agents and Lenders that any professional holding a retainer shall apply such retainer to payment of professional's Carve-Out Expenses prior to seeking any additional payment, however, such applications of retainers shall not otherwise reduce the Professional Expenses Cap), and (2) during any Carve-Out Expense Reduction Period, any payments other than applications of retainers actually made in respect of Carve-Out Expenses described in clauses (A) and (B) shall reduce the respective caps set forth in such clauses on a dollar-for-dollar basis; provided, however, that not more than (A) $400,000 of Carve-Out Expenses of the Loan Parties may be incurred during any Carve Out Expense Reduction Period; and (B) $100,000 of Carve-Out Expenses attributable to the attorneys and financial advisors of the Committee (as defined in the Bankruptcy Court Orders) may be incurred during any Carve Out Reduction Period;

second, all Obligations in accordance with Section 4.02; and

third, all other allowed administrative expenses.

| | |
|---|---|
| **Conditions Precedent to Availability:** | The DIP Facility will contain conditions, including, without limitation: |

- Prior to commencing the Chapter 11 Cases in the Bankruptcy Court, the Borrower shall have applied $2,021,133.00 of its cash on hand as a voluntary prepayment of the term loan outstanding under the Pre-Petition Credit Facility.

- The Agents shall have received (i) a copy of the Purchase Agreement, certified as true and correct by Parent, which Purchase Agreement shall be (x) in form and substance reasonably satisfactory to Agents and (y) in full force and effect, subject to the entry of the Sale Order, and (ii) evidence satisfactory to Agents that the Loan Parties have submitted to the Bankruptcy Court on the Petition Date a motion, in form and substance satisfactory to the Agents for approval of bidding

16

procedures reasonably acceptable to the Agents with respect to the Sale (such motion, the "Sale Procedure Motion", and the order approving such motion and such bidding procedures, which shall also be in form and substance satisfactory to the Agents, the "Sale Procedure Order").

- The Collateral Agent received, among other documentation, a copy of the Budget, together with a certificate of an Authorized Officer of Parent stating that such Budget (excluding the line items relating to Carve-Out Expenses) has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the Agents.

- The Bankruptcy Court shall have entered the Interim Order, which shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the Agents and the Required Lenders.

- The Collateral Agent shall have determined, in its sole judgment, that no event or development shall have occurred since October 31, 2009 (other than the commencement of the Chapter 11 Cases, and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code), which could reasonably be expected to result in a Material Adverse Effect.

| | |
|---|---|
| **Affirmative and Negative Covenants:** | The DIP Agreement will contain affirmative and negative covenants deemed appropriate by the Lenders, including, without limitation: |

- Comply in all material respects with laws, including without limitation, the Bankruptcy Code.

- Not make or commit to make payments or other distributions in respect of any Prepetition Loan Obligations of any Loan Party during the term of the DIP Facility, other than as provided in the DIP Facility.

- Not at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of either the Interim Order or the Final Order, except for modifications and amendments agreed to by the Agents and the Required Lenders.

- Cause the Sale Procedure Motion to be filed with the Bankruptcy Court by not later than the Petition Date (or such

later date as the Collateral Agent may agree).

- Obtain entry of the Sale Procedure Order by no later than twenty (20) days after the Petition Date (or such later date as the Collateral Agent may agree);

- Consummate the Sale pursuant to section 363 of the Bankruptcy Code in accordance with (a) the terms of the Purchase Agreement (or on other terms satisfactory to the Agents), and (b) an order of the Bankruptcy Court satisfactory to the Agents and Lenders by no later than sixty (60) days after the Petition Date (or as such later date as the Collateral Agent may reasonably agree).

**Borrowing Limitation:**    The DIP Agreement provides that:

- The aggregate principal amount of Loans outstanding at any time to the Borrower shall not exceed the lower of (A) the Total Commitment in effect at such time, or (B) for any 2-week period, the principal amount of the Loans projected to be outstanding at such time as set forth in the Budget.

**Events of Default:**    The DIP Agreement will contain events of default (subject to cure periods as may be agreed) for financings of this type and other events of default deemed appropriate by the Lenders (collectively, the "<u>Events of Default</u>"), including, without limitation, unless agreed to by the Required Lenders:

a) reversal, amendment, modification, vacation or stay of the effectiveness of the Interim Order or Final Order;

b) the Final Order not being entered within thirty (30) days from the Interim Bankruptcy Court Order Entry Date;

c) an order with respect to any of the Chapter 11 Cases entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

d) an order with respect to any of the Chapter 11 Cases entered by the Bankruptcy Court appointing, or any Loan Party filing an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers (beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

18

e) an order entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the Total Commitment and payment in full in cash of all Obligations of the Borrowers under the DIP Agreement and the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Agents and the Lenders, and the priority thereof until such plan effective date;

f) an order entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Total Commitment, and the payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents, upon entry thereof;

g) an order with respect to any of the Chapter 11 Cases entered by the Bankruptcy Court without the express prior written consent of the Agents and the Required Lenders, (i) to revoke, reverse, stay, modify, supplement or amend either the Interim Order or the Final Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to the extent set forth in the Agreed Administrative Expense Priorities, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

h) an application for any of the orders described in clauses (a) through (g) above made by any Person and (1) such application is not contested by the Loan Parties in good faith or (2) the relief requested is granted in an order that is not stayed pending appeal;

i) an order entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Loan Party with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate;

j) (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent's and/or the Lenders' claims or rights against any Loan Party or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created

19

by the DIP Agreement, the Interim Order or Final Order or any other Loan Document shall, for any reason, cease to be a valid first priority Lien, subject only to Permitted Priority Liens or (iii) any action is commenced by any Loan Party which contests the validity, perfection, enforceability or priority of any of the Liens and security interests of any Agent and/or the Lenders created by the DIP Agreement, any of the Bankruptcy Court Orders or any other Loan Document;

k) the determination of any Loan Party, whether by vote of such Loan Party's board of directors or otherwise, to suspend the operation of such Loan Party's business in the ordinary course, liquidate all or substantially all of such Loan Party's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Loan Party's assets (except for the transactions contemplated by the Purchase Agreement or the Sale Procedure Order), or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing;

l) the DIP Agreement, the Bankruptcy Court Orders or any other Loan Document, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

m) any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

n) any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason (other than as a direct result of any action or omission of the Collateral Agent) fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

DB02:9227344.1

068920.1001

o) one or more judgments, awards, or orders (or any settlement of any claim that, if breached, could result in a judgment, order, or award) for the payment of money exceeding $100,000 in the aggregate (the "Maximum Judgment Amount") shall be rendered against Borrower or any of its Subsidiaries and remain unsatisfied, or the Borrower or any of its Subsidiaries shall agree to the settlement of any one or more pending or threatened claims, actions, suits, or proceedings and the amount of such settlements requires that the affected Loan Party pay an amount exceeding $100,000 in the aggregate, and in the case of any such judgment or order either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, or (ii) there shall be a period of 30 consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection if and for so long as (A) the amount of such judgment, order, award or settlement in excess of the Maximum Judgment Amount is covered by a valid and binding policy of insurance between the Borrower and the insurer covering full payment thereof (subject to applicable deductibles) and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

p) any cessation of a substantial part of the business of any Loan Party for any period, or any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 15 days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, in each case if any such cessation, event or circumstance could reasonably be expected to result in a Material Adverse Effect;

q) an event or development occurs which could reasonably be expected to have a Material Adverse Effect; and

r) a Material Adverse Deviation shall have occurred.

**Expenses and Indemnity:** The DIP Agreement contains provisions for the payment of expenses and indemnification, including, without limitation, the payment of all reasonable costs and expenses of the Agents (and the reasonable fees and expenses of their counsel and other advisors) incurred in connection with the negotiation, preparation, execution

and delivery of the Loan Documents.

## C.   Use of Cash Collateral

18.     During the ordinary course of their operations, the Debtors generate cash from the use of the cash pledged under the Prepetition Credit Facility. The Debtors use Cash Collateral in the normal course of their business in order to finance their operations, make essential payments, such as employee payroll, taxes and inventory.[7] As of the Petition Date, the Debtors' books reflect a cash balance of less than $2 million (after giving effect to the cash sweep required by the Prepetition Lenders). It is imperative that the Debtors obtain authority to use Cash Collateral. Without the use of Cash Collateral (coupled with the liquidity that the Debtors anticipate will be available under the DIP Facility), the Debtors will be unable to meet their working capital needs. Notably, the use of Cash Collateral terminates upon termination of the DIP Facility.

## ADEQUATE PROTECTION

19.     In exchange for the consent to use Cash Collateral and enter into the DIP Facility, the Lenders have agreed that they should receive the following as adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value, if any, of such collateral (collectively, the "Adequate Protection Obligations"), in each case subject to the Carve-Out Expenses:

---

[7]     In addition, during the pendency of the Debtors' cases, however, Spheris India may receive a tax assessment resulting from a transfer pricing tax audit by Indian income tax authorities (the "Tax Assessment"). The Tax Assessment may be for an amount of up to approximately $2 million, based on the amounts of historical assessments, which Spheris India will not have the financial wherewithal to satisfy. Upon information and belief, if the Tax Assessment is not satisfied immediately (even if it is being disputed in good faith), Indian governmental authorities may seek to shut down Spheris India's operations. Accordingly, the terms of the DIP Agreement permit the Debtors to make pay the Tax Assessment on behalf of Spheris India.

DB02:9227344.1                                                                 068920.1001

**Adequate Protection:**

- superpriority claims as contemplated by section 507(b) of the Bankruptcy Code immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Agents and the Lenders;

- liens on the assets of the Obligors to be encumbered in favor of the Agents, including (subject to entry of the Final Order) causes of actions arising under chapter 5 of the Bankruptcy Code, which adequate protection liens shall have a priority immediately junior to the priming and other liens to be granted in favor of the Agents;

- the payment of the fees and expenses incurred by the Prepetition Agents and Prepetition Lenders incurred under the Prepetition Credit Facility; and

- the Prepetition Lenders shall be entitled to payment of cash interest at the default contractual rate in respect of the Prepetition Credit Facility.

The Prepetition Agents, on behalf of the Prepetition Lenders, have consented to the foregoing Adequate Protection arrangements.

## BASIS FOR RELIEF

### A.    Approval Pursuant to Section 364(c) of the Bankruptcy Code

20.    The Debtors propose to obtain financing under the DIP Agreement by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . " 11 U.S.C. § 364(c).  Financing pursuant to section 364(d) of the Bankruptcy Code is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing

23

under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544,

549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is

authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

      21.    Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to

whether:

> (a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (b)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393,

401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. at 549.

      22.    While the Debtors were in the process of negotiating the terms of the DIP

Facility, the Debtors also attempted to identify other sources of postpetition financing to

determine whether they could obtain debtor in possession financing on better terms (if at all).

Significantly, the Prepetition Lenders advised the Debtors that they would not consent to the

granting of senior or *pari passu* liens to a new third party debtor in possession lender. Moreover,

the Debtors have no significant unencumbered assets that could serve as collateral for alternative

financing. For these and other reasons, the Debtors and their advisors determined that it would

not be a prudent, economical or productive exercise to extensively solicit interest from third

party financing sources to provide debtor in possession financing on a junior or unsecured basis.

However, the Debtors' investment banker, Jefferies & Company, Inc. ("Jefferies"), contacted

three potential financing sources, each of whom stated that they would not consider providing financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders and further stated that they believed it was extremely unlikely that another third party would be willing to provide such financing.

23.    Based on these circumstances, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders would be unobtainable. Nevertheless, it was clear to the Debtors and their advisors that without postpetition financing, the Debtors would not be able to ensure that they would be able to continue operations without interruption to their trade relations and the estate would likely be significantly and immediately harmed. Accordingly, the Debtors have been compelled to negotiate postpetition financing from the Prepetition Lenders in order to ensure the continued operations of their business as a going concern, to prevent significant impairment to the value of the Debtors' assets, and to maximize their ability to repay their debts and liabilities.

24.    While the DIP Agreement may terminate even before the Debtors effectuate the Sale, such liquidity is essential for term that it will exist. Nevertheless, given the Debtors' circumstances, the Debtors believe that the terms of the DIP Agreement are fair and reasonable, in light of their current circumstances, and adequate, given the financing constraints presented by the Lenders, all as more fully set forth below.

**B.    Approval of Priming Liens and Adequate Protection
Pursuant to Section 364(d) of the Bankruptcy Code**

25.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of

25

postpetition debt secured by senior or "priming" liens, provides that the court may, after notice

and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or

equal lien on property of the estate that is subject to a lien only if—

> (a)    the trustee is unable to obtain credit otherwise; and
>
> (b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

26.    The Bankruptcy Code does not explicitly define "adequate protection."

Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of

what may constitute "adequate protection" of an interest of an entity in property under sections

362, 363 or 364 of the Bankruptcy Code:

> (1)    requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

27.    Similarly, the Bankruptcy Code does not expressly define the nature and

extent of the "interest in property" of which a secured creditor is entitled to adequate protection

under sections 361, 363, and 364 of the Bankruptcy Code. However, the Bankruptcy Code

plainly contemplates that a qualifying interest demands protection only to the extent that the use

of the creditor's collateral will result in a decrease in "the value of such entity's interest in such

26

068920.1001

property." See 11 U.S.C. § 361. Indeed, courts have repeatedly held that the purpose of

adequate protection "is to safeguard the secured creditor from diminution in the value of its

interest during the Chapter 11 reorganization." In re 495 Cent. Park Ave. Corp., 136 B.R. 626,

631 (Bankr. S.D.N.Y. 1992); see also In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996)

(same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re

Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is

protection of the secured creditor from diminution in the value of its collateral during the

reorganization process").

   28. The determination of adequate protection is a fact-specific inquiry to be

decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

"Its application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process."

Id. (quoting In re Beker Indus. Corp., 58 B.R. at 736). The Debtors have concluded that

financing comparable to that provided by the Lenders under the DIP Agreement is currently

unobtainable.

   29. In accordance with section 364(d) of the Bankruptcy Code, and consistent

with the purposes underlying the provision of adequate protection, the proposed Interim Order

provides the Prepetition Lenders with the Adequate Protection as described in paragraph 19

above, including: (a) administrative claims under section 507(b) of the Bankruptcy Code with

respect to the Prepetition Lenders, junior to the superpriority claims of the Lenders;

(b) replacement liens, junior to those of the Lenders under the DIP Facility and subject to the

Carve-Out Expenses as to the Prepetition Lenders; and (c) adequate protection payments of

reasonable attorneys' fees and expenses. The Prepetition Agents and the Prepetition Lenders

have consented to such Adequate Protection.

C.    **Use of Cash Collateral**

     30.    Section 363 of the Bankruptcy Code governs the Debtors' use of property

of the estates.[8] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated
> under Section . . . 1108 . . . of this title and unless the court
> orders otherwise, the trustee may enter into transactions,
> including the sale or lease of property of the estate, in the
> ordinary course of business, without notice or a hearing,
> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

     31.    Section 363(c)(2) of the Bankruptcy Code, however, provides an

exception with respect to "cash collateral" to the general grant of authority to use property of the

estate in the ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a

trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection

(c)(1) unless:

> (A)    each entity that has an interest in such collateral
> consents; or
>
> (B)    the court, after notice and a hearing, authorizes such
> use, sale, or lease in accordance with the provisions
> of [section 363 of the Bankruptcy Code].

11 U.S.C. § 363(c)(2).

     32.    The Debtors submit that, under the circumstances here, their request to use

Cash Collateral should be approved. The Prepetition Agents, the Prepetition Lenders and the

---

[8]    Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of
a trustee with respect to property of the estate, including the right to use property of the estate in
compliance with section 363 of the Bankruptcy Code. See 11 U.S.C. § 1107(a).

068920.1001

Lenders have consented to the use of Cash Collateral provided that the relief requested herein is granted.

**D.      No Comparable Alternative to the DIP Facility is Currently Available**

33.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). As stated above, the Debtors, through their advisors, contacted potential third party lenders who have historically been active in the debtor in possession financing market. In light of the fact that the Prepetition Lenders have unequivocally represented that they would not consent to any postpetition credit facility that primed their prepetition liens (i.e., a non-consensual priming fight would be required), and that none of the lenders contacted were willing to provide financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders, the Debtors determined that the financing provided under the terms of the DIP Facility was the only postpetition financing available. Thus, in addition to evidence to be introduced at the Interim Hearing if necessary, the Debtors submit that the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

**E.      The DIP Agreement Terms are Fair,**
**Reasonable and Adequate Under the Circumstances**

34.      The proposed terms of the DIP Agreement are fair, reasonable and adequate given today's market, the facts of these cases, and the financing constraints presented by the Lenders. The purpose of the DIP Agreement is to provide the Debtors with sufficient working capital and liquidity to bridge the Debtors to closing a sale of substantially of their

DB02:9227344.1                                                    068920.1001

assets. While it is not at all clear that such financing will be in place until a closing, the Debtors have no practical alternative.

35.     The proposed DIP Agreement provides that the security interests and administrative expense claims granted to the Prepetition Lenders are subject to the Carve-Out Expenses. In <u>In re Ames Dep't Stores</u>, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. <u>Id.</u> at 40.

36.     Likewise, the various fees and charges required by the Lenders under the DIP Agreement were mandated to secure their agreement to provide the financing. Pursuant to the terms of the fee arrangement, the Debtors will pay the Agents an a Commitment Fee of $300,000, an Unused Line Fee, which shall accrue at the rate per annum of 0.75% on the excess, if any, of the Total Commitment over the sum of the average principal amount of all Loans outstanding from time to time and shall be payable monthly in arrears on the first day of each month commencing on March 1, 2010, and a Loan Servicing Fee, equal to $10,000 each month. The terms and conditions of the DIP Agreement were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances. Accordingly, the Lenders under the DIP Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

**F.      <u>The Section 506(c) Waiver in the Final Order Should Be Approved</u>**

37.     The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge any or all of the Prepetition Agents, the Prepetition Lenders, the Agents or the Lenders, their respective claims, or their respective collateral. Such waivers and provisions are standard under financings between sophisticated parties. As one court noted in discussing the

later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000). See also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

38.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the Prepetition Agents, the Prepetition Lenders, the Agents or the Lenders by allowing the Debtors to continue to use Cash Collateral and the proceeds of the Collateral to fund the administration of the Debtors' estates in accordance with the Budget.  Under the DIP Facility, the Debtors agree to waive any rights to charge costs and expenses against the Collateral except for the Carve-Out Expenses.   See In re Lunan Family Restaurants Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (citing In re Flagstaff, 739 F.2d 73, 77 (2d Cir. 1984) and New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers), 112 B.R. 811, 815 (E.D. La. 1990), rev'd on other grounds sub nom., In re Delta Towers, 924 F.2d 74 (5th Cir. 1991).

## G.    Modification of Automatic Stay

39.    The DIP Agreement contemplates a modification of the automatic stay to the extent applicable and necessary, to permit both the Lenders and the Prepetition Lenders to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the DIP Agreement as set forth in the Interim Order.  The rights of the Prepetition Agents and the Prepetition Lenders to exercise such rights and remedies shall terminate upon the indefeasible payment in full in cash of all outstanding obligations under the DIP Facility.

## H.    Interim Approval Should Be Granted

40.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

41.    The Debtors request that the Court hold and conduct the Interim Hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to borrow an amount sufficient to fund operating expenses and to use Cash Collateral.  This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

42.    Pending entry of the Final Order, the Debtors request $7,500,000 in immediately available financing.  Such interim availability will avoid a disruption in the

DB02:9227344.1                                              068920.1001

Debtors' operations pending the Final Hearing and will provide the Debtors' customers, vendors and employees with the level of confidence necessary to continue operating.

## I. Notice Procedures and the Final Hearing

43. Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order until at least seven (7) days after the organizational meeting of the creditors' committee. The Debtors shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of the Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the Final Order on the date established by the Court. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware by 4 p.m. on the day that is not less than five (5) business days before the Final Hearing (the "Objection Deadline"); and (iv) be served upon the following parties so as to be received by the Objection Deadline: (a) the Debtors, 9009 Carothers Parkway, Suite C-3, Franklin, Tennessee 37067 (Attn: Russell G. Adkins, Esq.); (b) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq.), co-counsel to the Debtors; (c) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Michael J. Kelly, Esq. and Shaunna D. Jones, Esq.), co-counsel to the Debtors; (d) once appointed, counsel to any statutory committee that may be appointed in these cases; (e) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801 (Attn: Richard Shepacarter, Esq.); (f) Schulte Roth & Zabel, 919 Third Avenue, New York, New York 10022

DB02:9227344.1

068920.1001

(Attn: Adam C. Harris, Esq.), co-counsel to the Agents; and (g) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087, Wilmington, DE 19899 (Attn: Adam G. Landis, Esq.), co-counsel to the Agents.

44.     The Debtors respectfully request that the Court schedule the Final Hearing on this Motion no later than thirty (30) days after the date of entry of the Interim Order, as the Lenders' commitment will terminate unless the Final Order is entered by that date.  Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

## NOTICE

45.     Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the agents for the Debtors' prepetition secured lenders; (c) counsel to the indenture trustee for the Debtors' subordinated notes; (d) counsel to the agent for the Debtors' proposed postpetition secured lenders; (e) counsel to DB; (f) all parties known to the Debtors as having liens on property of the Debtors; and (g) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis.  The Debtors submit that, under the circumstances, no other or further notice is required.

46.     No previous motion for the relief sought herein has been made to this or any other Court.

**CONCLUSION**

WHEREFORE the Debtors respectfully request: (i) entry of an order substantially in the form of the proposed Interim Order annexed hereto as <u>Exhibit A</u>; (ii) after the Final Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and (iii) such other and further relief as is just.

Dated: Wilmington, Delaware
February 3, 2010

          YOUNG CONAWAY STARGATT & TAYLOR, LLP

          Robert S. Brady (No. 2847)
          Matthew B. Lunn (No. 4119)
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware 19801
          Telephone: (302) 571-6600
          Facsimile: (302) 571-1253

                  - and -

          WILLKIE FARR & GALLAGHER LLP
          Michael J. Kelly
          Shaunna D. Jones
          Elizabeth K. Horowitz
          787 Seventh Avenue
          New York, New York 10019-6099
          Telephone: (212) 728-8000
          Facsimile: (212) 728-8111

          *Proposed Co-Counsel to the Debtors and*
          *Debtors in Possession*

DB02:9227344.1                                  068920.1001