# EXHIBIT B

## DIP Agreement

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

Dated as of February 3, 2010

by and among

**SPHERIS HOLDING II, INC., as a debtor and debtor-in-possession,
SPHERIS INC., as a debtor and debtor-in-possession,
SPHERIS OPERATIONS LLC, as a debtor and debtor-in-possession, and certain of its
Subsidiaries, each as a debtor and debtor-in-possession**

—————————————————————

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**

—————————————

**ABLECO, L.L.C.,**

as Collateral Agent,

and

**CRATOS CAPITAL MANAGEMENT LLC,**

as Administrative Agent

# Table of Contents

ARTICLE I DEFINITIONS; CERTAIN TERMS ............................................................ 2

    Section 1.01   Definitions ................................................................................. 2

    Section 1.02   Terms Generally ...................................................................... 24

    Section 1.03   Accounting and Other Terms ................................................... 24

    Section 1.04   Time References ...................................................................... 24

ARTICLE II THE LOANS ..................................................................................... 25

    Section 2.01   Commitments .......................................................................... 25

    Section 2.02   Making the Loans ................................................................... 25

    Section 2.03   Repayment of Loans; Evidence of Debt .................................. 28

    Section 2.04   Interest ................................................................................... 29

    Section 2.05   Reduction of Commitments; Prepayment of Loans ................... 32

    Section 2.06   Fees ....................................................................................... 34

    Section 2.07   Securitization ......................................................................... 35

    Section 2.08   Taxes ..................................................................................... 35

ARTICLE III SECURITY AND ADMINISTRATIVE PRIORITY ........................................... 38

    Section 3.01   Collateral; Grant of Lien and Security Interest ......................... 38

    Section 3.02   Administrative Priority ............................................................ 39

    Section 3.03   Grants, Rights and Remedies ................................................... 39

    Section 3.04   No Filings Required ................................................................ 39

    Section 3.05   Survival ................................................................................. 39

    Section 3.06   Further Assurances ................................................................. 40

    Section 3.07   Pre-Petition Credit Facility ...................................................... 40

ARTICLE IV FEES, PAYMENTS AND OTHER COMPENSATION ...................................... 41

    Section 4.01    Audit and Collateral Monitoring Fees ............................................. 41

    Section 4.02    Payments; Computations and Statements ...................................... 41

    Section 4.03    Sharing of Payments, Etc ................................................................ 42

    Section 4.04    Apportionment of Payments ......................................................... 42

    Section 4.05    Increased Costs and Reduced Return.............................................. 43

ARTICLE V CONDITIONS TO LOANS.......................................................................... 45

    Section 5.01    Conditions Precedent to Interim Facility Effectiveness................... 45

    Section 5.02    Conditions Precedent to Final Facility Effectiveness ...................... 49

    Section 5.03    Conditions Precedent to All Loans ................................................. 51

ARTICLE VI REPRESENTATIONS AND WARRANTIES ...................................... 51

    Section 6.01    Representations and Warranties...................................................... 51

ARTICLE VII COVENANTS OF THE LOAN PARTIES............................................. 61

    Section 7.01    Affirmative Covenants................................................................... 61

    Section 7.02    Negative Covenants ...................................................................... 70

ARTICLE VIII MANAGEMENT, COLLECTION AND STATUS OF ACCOUNTS
         RECEIVABLE AND OTHER COLLATERAL ................................................. 75

    Section 8.01    Management of Collateral.............................................................. 75

    Section 8.02    [Intentionally Omitted] ................................................................. 78

    Section 8.03    Status of Collateral....................................................................... 78

    Section 8.04    Collateral Custodian...................................................................... 78

ARTICLE IX EVENTS OF DEFAULT .......................................................................... 78

    Section 9.01    Events of Default .......................................................................... 78

ARTICLE X AGENTS ................................................................................................... 83

Section 10.01   Appointment .................................................................................. 83

Section 10.02   Nature of Duties ............................................................................. 84

Section 10.03   Rights, Exculpation, Etc ................................................................ 84

Section 10.04   Reliance .......................................................................................... 85

Section 10.05   Indemnification .............................................................................. 85

Section 10.06   Agents Individually ....................................................................... 85

Section 10.07   Successor Agent ............................................................................. 86

Section 10.08   Collateral Matters .......................................................................... 86

Section 10.09   Agency for Perfection .................................................................... 88

ARTICLE XI GUARANTY ............................................................................................ 88

Section 11.01   Guaranty ......................................................................................... 88

Section 11.02   Guaranty Absolute ......................................................................... 88

Section 11.03   Waiver ............................................................................................ 89

Section 11.04   Continuing Guaranty; Assignments ............................................... 90

Section 11.05   Subrogation .................................................................................... 90

ARTICLE XII MISCELLANEOUS ................................................................................ 91

Section 12.01   Notices, Etc .................................................................................... 91

Section 12.02   Amendments, Etc. .......................................................................... 92

Section 12.03   No Waiver; Remedies, Etc............................................................. 93

Section 12.04   Expenses; Taxes; Attorneys Fees .................................................. 94

Section 12.05   Right of Set-off .............................................................................. 95

Section 12.06   Severability .................................................................................... 96

Section 12.07   Assignments and Participations ..................................................... 96

Section 12.08   Counterparts ................................................................................... 99

Section 12.09   GOVERNING LAW ....................................................................... 99

Section 12.10   CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE 99

Section 12.11   WAIVER OF JURY TRIAL, ETC .............................................................. 100

Section 12.12   Consent by the Agents and Lenders............................................................ 100

Section 12.13   No Party Deemed Drafter ................................................................. 101

Section 12.14   Reinstatement; Certain Payments ................................................................. 101

Section 12.15   Indemnification........................................................................... 101

Section 12.16   Records ...................................................................................... 102

Section 12.17   Binding Effect............................................................................. 102

Section 12.18   Interest......................................................................................... 102

Section 12.19   Confidentiality .............................................................................. 103

Section 12.20   USA PATRIOT Act...................................................................... 104

Section 12.21   Debtor-Creditor Relationship........................................................ 104

Section 12.22   Section Headings ......................................................................... 104

Section 12.23   Integration ................................................................................... 104

Section 12.24   Parties Including Trustees; Bankruptcy Court Proceedings ......................... 105

Section 12.25   Release ......................................................................................... 105

# SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT

Senior Secured Super-Priority Debtor-In-Possession Financing Agreement, dated as of February 3, 2010, by and among **SPHERIS HOLDING II, INC.**, a Delaware corporation ("Holdings") as a debtor and debtor-in-possession, **SPHERIS INC.**, a Delaware corporation (the "Parent") as a debtor and debtor-in-possession, **SPHERIS OPERATIONS LLC**, a Tennessee limited liability company (the "Borrower") as a debtor and debtor-in-possession, each subsidiary of the Borrower listed as a "Guarantor" on the signature pages hereto (together with Holdings and the Parent, each a "Guarantor" and collectively, jointly and severally, the "Guarantors", each as a debtor and debtor-in-possession), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders"), **ABLECO, L.L.C.**, a Delaware limited liability company ("Ableco"), as collateral agent for the Lenders (in such capacity, together with any successor collateral agent, the "Collateral Agent"), and **CRATOS CAPITAL MANAGEMENT, LLC**, a Delaware limited liability company ("Cratos"), as administrative agent for the Lenders (in such capacity, together with any successor administrative agent, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agents").

## RECITALS

The Borrower and the Guarantors have on February 3, 2010 (the "Filing Date") commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Borrower and the Guarantors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

The Borrower and Guarantors have asked the Lenders to make post-petition loans and advances to the Borrower consisting of a revolving credit facility in an aggregate principal amount not to exceed $15,000,000 at any time outstanding (the "Maximum Credit Facility Amount"); provided that, until the Final Bankruptcy Court Order (as hereinafter defined) shall have been entered by the Bankruptcy Court, no advances or loans under this Agreement shall be made other than revolving credit loans in an aggregate principal amount not to exceed $7,500,000. The proceeds of the loans made under the revolving credit facility shall be used (i) to refinance the revolving credit loans made pursuant to the Pre-Petition Credit Facility (as hereinafter defined), (ii) for general working capital purposes of the Borrower and its Subsidiaries, and (iii) to pay fees and expenses related to this Agreement, in each case, subject to the terms and conditions set forth in this Agreement and the Bankruptcy Court Orders (as defined below). The Lenders are severally, and not jointly, willing to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth.

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01 <u>Definitions</u>. As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"<u>Ableco</u>" has the meaning specified therefor in the preamble hereto.

"<u>Account Debtor</u>" means any Person who is or who may become obligated under, with respect to, or on account of, an Account Receivable, chattel paper, or a general intangible.

"<u>Account Receivable</u>" means, with respect to any Person, all of such Person's now owned or hereafter acquired right, title, and interest with respect to "accounts" (as that term is defined in Article 9 of the Code), and any and all "supporting obligations" (as that term is defined in the Code) in respect thereof.

"<u>Action</u>" has the meaning specified therefor in <u>Section 12.12</u>.

"<u>additional amount</u>" has the meaning specified therefor in <u>Section 2.08(a)</u>.

"<u>Administrative Agent</u>" has the meaning specified therefor in the preamble hereto.

"<u>Administrative Agent's Account</u>" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Borrower shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"<u>Affected Lender</u>" has the meaning specified therefor in <u>Section 4.05(d)</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (i) vote 10% or more of the Capital Stock having ordinary voting power for the election of directors of such Person or (ii) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"<u>Agreed Administrative Expense Priorities</u>" means that administrative expenses with respect to the Loan Parties and, with respect to sub-clause (iv) of clause "first", any statutory committee appointed in the Chapter 11 Cases, shall have the following order of priority:

first, (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the Clerk of the Bankruptcy Court; (iii) an amount up to $500,000

earmarked solely for the payment of a transaction fee to Jefferies & Company, Inc. pursuant to its engagement letter, dated as of February 9, 2009 (as amended on September 30, 2009), with the Loan Parties to the extent such fee is paid only upon the consummation of a Sale the terms and conditions of which are approved by the Agents; and (iv) amounts payable in respect of Carve-Out Expenses (but excluding, for the avoidance of doubt, success, transaction or any similar fees), provided that the amount entitled to priority under this sub-clause (iv) of this clause first ("Priority Professional Expenses") for any period after the Filing Date shall not exceed the lesser of (x) the amount specified in the Budget during such period for the payment of Carve-Out Expenses (inclusive of any holdbacks required by the Bankruptcy Court) and (y) $1,600,000 in respect of Carve-Out Expenses for professionals other than Jefferies & Company, Inc. (the "Professional Expense Cap"); provided, that (1) any payments actually made in respect of Carve-Out Expenses (excluding, for the avoidance of doubt, the transaction fee described in clause (iii) above) shall reduce the Professional Expense Cap on a dollar-for-dollar basis (it being acknowledged and agreed by the Loan Parties, Agents and Lenders that any professional holding a retainer shall apply such retainer to payment of professional's Carve-Out Expenses prior to seeking any additional payment, however, such applications of retainers shall not otherwise reduce the Professional Expenses Cap), and (2) during any Carve-Out Expense Reduction Period, any payments other than applications of retainers actually made in respect of Carve-Out Expenses described in clauses (A) and (B) shall reduce the respective caps set forth in such clauses on a dollar-for-dollar basis; provided, however, that not more than (A) $400,000 of Carve-Out Expenses of the Loan Parties may be incurred during any Carve Out Expense Reduction Period; and (B) $100,000 of Carve-Out Expenses attributable to the attorneys and financial advisors of the Committee (as defined in the Bankruptcy Court Orders) may be incurred during any Carve Out Reduction Period;

second, all Obligations in accordance with Section 4.02; and

third, all other allowed administrative expenses.

"Agent" and "Agents" have the respective meanings specified therefor in the preamble hereto.

"Agreement" means this Financing Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to the Agreement as the same may be in effect at the time such reference becomes operative.

"Applicable LIBOR Rate Margin" means, with respect to the Loans: 8.50%.

"Applicable Reference Rate Margin" means, with respect to the Loans: 7.50 %.

"Approved Foreign Bank" has the meaning specified therefor in the definition of "Permitted Investments".

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Collateral Agent, in accordance with Section 12.07 and substantially in the form of Exhibit A hereto or such other form acceptable to the Collateral Agent.

"Authorized Officer" means, with respect to any Person, the chief restructuring officer, the chief executive officer, chief financial officer, president, executive vice president, general counsel or controller of such Person.

"Avoidance Actions" means all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute.

"Bankruptcy Court Orders" means the Interim Bankruptcy Court Order and the Final Bankruptcy Court Order.

"Base LIBOR Rate" means the rate per annum, determined by the Administrative Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate, on the basis of the rates at which Dollar deposits are offered to major banks in the London interbank market on or about 11:00 a.m. (New York time) 2 Business Days prior to the commencement of the applicable Interest Period, for a term and in amounts comparable to the Interest Period and amount of the LIBOR Rate Loan requested by the Borrower in accordance with this Agreement, which determination shall be conclusive in the absence of manifest error.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which the Parent, any its Subsidiaries or any of their ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past 6 years.

"Blocked Account" has the meaning specified therefor in Section 8.01(a).

"Blocked Account Bank" has the meaning specified therefor in Section 8.01(a).

"Blocked Operating Account" has the meaning specified therefor in Section 8.01(a).

"Blocked Operating Account Bank" has the meaning specified therefor in Section 8.01(a).

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Budget" means, collectively, the consolidated cash requirement forecasts, cash flow statements, statements of operations and cash availability schedules in the form attached hereto as Schedule 1.01(B), which are (a) prepared by or on behalf of the Loan Parties on a weekly basis (for the next succeeding 8 weeks) and on a monthly basis (for the months from the Interim Facility Effective Date through the Final Maturity Date), and (b) delivered by the Loan Parties to the Agents and the Lenders (i) on or before the Interim Facility Effective Date pursuant to Section 5.01(c)(ix) hereto and (ii) each two weeks thereafter pursuant to Section 7.01(a)(vii) hereto (or more frequently should the Agents so elect), in each case, which shall be in substance reasonably satisfactory to the Agents at the time of delivery thereof.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in U.S. Dollar deposits in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, the sum of (i) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed and including all Capitalized Lease Obligations paid or payable during such period, and (ii) to the extent not covered by clause (i) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Capital Stock of, any other Person.

"Capitalized Lease" means, with respect to any Person, any lease of real or personal property by such Person as lessee which is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means (i) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, and (ii) with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person..

"Carve-Out Expenses" means any payments permitted to be made by the Bankruptcy Court in respect of fees and expenses of attorneys, accountants and other professionals retained in the Chapter 11 Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code, provided that in no event shall any success, transaction or any similar fee be considered a Carve-Out Expense except for the transaction fee specifically earmarked for Jefferies & Company, Inc. in sub-clause (iii) of clause "first" of the definition of "Agreed Administrative Expense Priorities".

"Carve-Out Expense Reduction Period" means any period during which an Event of Default under this Agreement or a default by any Loan Party in any of its obligations under any of the Bankruptcy Court Orders, in either case, shall have occurred and be continuing.

"Cash and Cash Equivalents" means all cash, deposit or securities account balances, certificates of deposit or other financial instruments properly classified as cash or cash equivalents under GAAP.

"CFC" means a Subsidiary of the Parent that is a controlled foreign corporation (as that term is defined in the IRC).

"Change in Law" has the meaning specified therefor in Section 4.05(a).

"Change of Control" means each occurrence of any of the following:

(a) Holdings III ceases to own and control, directly or indirectly, 100% of the shares of the Capital Stock of the Parent,

(b) the Parent ceases to own and control, directly or indirectly, 100% of the shares of the Capital Stock of the Borrower,

(c) the Borrower ceases to own and control, directly or indirectly, 100% of the shares of the Capital Stock of the Borrower's Subsidiaries, unless otherwise permitted hereunder, or

(d) (i) Holdings III consolidates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to any Person, or (ii) any entity consolidates with or merges into Holdings III, which in either event (i) or (ii) is pursuant to a transaction in which the outstanding voting Capital Stock of Holdings III is reclassified or changed into or exchanged for cash, securities or other property.

"Chapter 11 Cases" has the meaning specified therefor in the recitals hereto.

"CHS Contract" means that certain Agreement for Health Information Processing Services, dated as of October 3, 2008, by an among the Borrower and Community Health Systems Professional Services Corporation, on behalf of itself and certain of its facilities, together with all amendments, exhibits, schedules and other documents related thereto.

"CHS Escrow Account" means account number 507953312 maintained at JPMorgan Chase Bank, N.A., subject to the terms and conditions of the CHS Escrow Agreement.

"CHS Escrow Agreement" means that Escrow Agreement, dated as of December 29, 2009, between Holdings III, JPMorgan Chase Bank, N.A. and the Borrower relating to the CHS Escrow Account which is in form and substance reasonably satisfactory to the Collateral Agent.

"Code" means the New York Uniform Commercial Code, as in effect from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any

or all of the attachment, perfection, priority, or remedies with respect to Collateral Agent's Liens on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

"Collateral" has the meaning specified therefor in Section 3.01(a).

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 10.08(a).

"Commitment Fee" has the meaning specified therfor in Section 2.06(a).

"Commitments" means, with respect to each Lender, such Lender's Revolving Credit Commitment in the amount set forth opposite such Lender's name in Schedule 1.01(A) hereto, as such amount may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Control Agreement" means a control agreement, in form and substance satisfactory to the Collateral Agent, executed and delivered by a Loan Party, the Collateral Agent

(or its sub-agent) and the applicable securities intermediary with respect to a securities account or a bank with respect to a deposit account.

"Cratos" has the meaning specified therefor in the preamble hereto.

"Current Value" has the meaning specified therefor in Section 7.01(o).

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of any Person that is not a CFC.

"Environmental Actions" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, request for information or other written communication from any Governmental Authority involving violations of Environmental Laws or Releases of Hazardous Materials (i) from any assets, properties or businesses of any Loan Party or any of its Subsidiaries; (ii) from adjoining properties or businesses; or (iii) from any facilities which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the release, emission, deposit, discharge, leaching, migration or spill of any Hazardous Materials into the environment.

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to the liability or potential liability of any Loan

Party with respect to any environmental condition or a Release of Hazardous Materials from or onto (i) any property currently or formerly owned by any Loan Party or any of its Subsidiaries or (ii) any Real Property which received Hazardous Materials generated by any Loan Party or any of its Subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the IRC.

"Escrow Account" means each of the CHS Escrow Account, the Healthscribe Escrow Account, the Sale Escrow Agreement and the Vianeta Escrow Account.

"Escrow Agreements" means each of the CHS Escrow Agreement, the Healthscribe Escrow Agreement, the Sale Escrow Account and the Vianeta Escrow Agreement.

"Event of Default" means any of the events set forth in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Extraordinary Receipts" means any cash received by any Loan Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds of Dispositions or Indebtedness), including (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), and (vi) indemnity payments.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Filing Date" has the meaning specified therefor in the recitals hereto.

"Final Bankruptcy Court Order" means the final order of the Bankruptcy Court with respect to the Loan Parties, substantially in the form of the Interim Bankruptcy Court Order and acceptable to the Agents, as the same may be amended, modified or supplemented from time

to time with the express written joinder or consent of the Agents, the Required Lenders and the Borrower.

"<u>Final Bankruptcy Court Order Entry Date</u>" means the date on which the Final Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"<u>Final Facility Effective Date</u>" has the meaning specified therefor in Section 5.02.

"<u>Final Maturity Date</u>" means the date which is the earliest of (a) the date which is 30 days following the date of entry of the Interim Bankruptcy Court Order if the Final Bankruptcy Court Order has not been entered by the Bankruptcy Court on or prior to such date, (b) if the Final Bankruptcy Court Order has been entered by the Bankruptcy Court on or prior to 30 days following the date of entry of the Interim Bankruptcy Court Order, then May 4, 2010, (c) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (d) the date of a sale of substantially all of the Capital Stock or assets of the Loan Parties (other than Holdings), and (e) the date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"<u>Final Period</u>" means the period commencing on the Final Facility Effective Date and ending on the Final Maturity Date.

"<u>Financial Statements</u>" means (i) the audited consolidated balance sheet of the Parent and its Subsidiaries for the Fiscal Years ended December 31, 2007 and December 31, 2008, and the related consolidated statement of operations, changes in shareholders' equity and cash flows for the Fiscal Years then ended, and (ii) the unaudited consolidated balance sheet of the Parent and its Subsidiaries for the 9 months ended September 30, 2009, and the related consolidated statement of operations and cash flows for the 9 months then ended.

"<u>Fiscal Year</u>" means the fiscal year of the Parent and its Subsidiaries ending on December 31st of each year.

"<u>Funding Losses</u>" has the meaning specified therefor in <u>Section 2.04(d)(ii)(B)</u>.

"<u>GAAP</u>" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis; <u>provided</u>, <u>however</u>, that for the purpose of <u>Section 7.03</u> and the definitions used therein, "GAAP" shall mean generally accepted accounting principles in effect on the date hereof and consistent with those used in the preparation of the Financial Statements; <u>provided further</u>, <u>however</u>, that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in <u>Section 7.03</u>, the Collateral Agent and the Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lenders and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in <u>Section 7.03</u> shall be calculated as if no such change in GAAP had occurred.

"Governmental Authority" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" and "Guarantors" (i) have the meanings specified therefor in the preamble to this Agreement, and (ii) include each other Person which guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations.

"Guaranty" means (i) the guaranty of each Guarantor party hereto contained in Article XI hereof, and (ii) each other guaranty made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders pursuant to the requirements of Section 7.01(b) or otherwise.

"Hazardous Materials" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Healthscribe Escrow Account" means account number 223-44821 of Spheris Operations LLC at Bank of America, N.A. maintained pursuant to the Healthscribe Escrow Agreement.

"Healthscribe Escrow Agreement" means that certain Escrow Agreement dated in December 2004 by and among the Parent, Frank A. Adams, John C. McIlwraith and Wachovia Bank, National Association, as escrow agent.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be

contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdings" has the meaning specified therefor in the preamble hereto.

"Holdings III" means Spheris Holding III, Inc., a Delaware corporation.

"Increased Costs Certificate" has the meaning specified therefor in Section 4.05(c).

"Indebtedness" means, with respect to any Person, without duplication, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services; (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (iv) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used or acquired by such Person, even though the rights and remedies of the lessor, seller or lender thereunder may be limited to repossession or sale of such property; (v) all Capitalized Lease Obligations of such Person; (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (vii) all obligations and liabilities, calculated on a basis satisfactory to the Collateral Agent and in accordance with accepted practice, of such Person under Hedging Agreements; (viii) all Contingent Obligations; (ix) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Indemnified Matters" has the meaning specified therefor in Section 12.15.

"Indemnitees" has the meaning specified therefor in Section 12.15.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan and ending 1, 2, or 3 months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar

month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2, or 3 months after the date on which the Interest Period began, as applicable, and (e) Borrower may not elect an Interest Period which will end after the Final Maturity Date.

"Interim Bankruptcy Court Order" means the order of the Bankruptcy Court with respect to the Loan Parties, substantially in the form of Exhibit D, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Agents, the Required Lenders and the Borrower.

"Interim Bankruptcy Court Order Entry Date" means the date on which the Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court.

"Interim Facility Effective Date" means the date, on or before the 4th Business Day after the Filing Date, on which all of the conditions precedent set forth in Section 5.01 are satisfied.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Final Maturity Date.

"Inventory" means all of each of the Loan Parties' now owned or hereafter acquired right, title, and interest with respect to inventory as defined in the Code.

"Investor Proceeds" has the meaning specified therefore in Section 2.05(c)(iv).

"IRC" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the regulations thereunder.

"Lease" means any lease of real property to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee.

"Lender" and "Lenders" have the meanings specified therefor in the preamble hereto.

"Lender Group" means, individually and collectively, each of the Lenders, and each of the Agents.

"Liabilities" has the meaning specified therefor in Section 2.07.

"LIBOR Deadline" has the meaning set forth in Section 2.04(d)(ii)(A).

"LIBOR Notice" means a written notice in the form of Exhibit B.

"LIBOR Option" has the meaning specified therefor in Section 2.04(d)(i).

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the higher of (i) 2.00% and (ii) rate per annum determined by the Administrative Agent by dividing

(a) the Base LIBOR Rate for such Interest Period, by (b) 100% minus the Reserve Percentage. The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

"LIBOR Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"Lien" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan" means the any Revolving Loan made by an Agent or a Lender to the Borrower pursuant to Article II hereof.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged with all Loans made to, and all other Obligations incurred by, the Borrower.

"Loan Document" means this Agreement, the Interim Bankruptcy Court Order, the Final Bankruptcy Court Order, any Guaranty, any Security Agreement, any Mortgage, and any other agreement, instrument, and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"Loan Party" means the Borrower or any Guarantor.

"Loan Servicing Fee" has the meaning specified therfor in Section 2.06(c).

"Losses" has the meaning specified therefor in Section 12.15.

"Material Adverse Deviation" means, commencing on February 12, 2010 and as of any date of determination thereafter, with respect to the line items set forth in the Budget:

(i) a deviation downward in an amount greater than 15% in the case of the line item in the Budget entitled "Total Cash Receipts" (excluding from the computation thereof any amount received in respect of Investor Proceeds or cash proceeds from the Sale),

(ii) a deviation upward in an amount greater than 10% in the case of the line items in the Budget entitled "Total Employee Related", "Multimodal (Speech Recognition Provider)", and "Total India Disbursements", and

(iii) with respect to the line item in the Budget entitled "Operating Cash Flow before Debt Service & Restructuring Costs", a deviation downward by an amount that exceeds the greater of (A) 10% for such line item or (B) $400,000 for such line item, to be measured on a cumulative basis,

in each case, unless otherwise specified, for any two week period, when measured on a rolling two week basis from and after February 12, 2010.

"Material Adverse Effect" means a material adverse effect on any of (i) the operations, business, assets, properties, or condition (financial or otherwise) of the Loan Parties taken as a whole (except for the commencement of the Chapter 11 Cases and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code) which are reasonably likely to impair the ability of the Borrower to repay the obligations, (ii) the ability of any Loan Party to perform any of its obligations under any Loan Document to which it is a party, (iii) the legality, validity or enforceability of this Agreement or any other Loan Document, (iv) the rights and remedies of any Agent or any Lender under any Loan Document, or (v) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any of the Collateral. The determination of the effect may take into account the effect of the automatic stay under the Bankruptcy Code.

"Material Contract" means, with respect to any Person, all contracts or agreements material to the business, including, without limitation, the CHS Contract, operations, condition (financial or otherwise), performance, prospects or properties of such Person or such Subsidiary, the loss or termination of which could reasonably be expected to result in a Material Adverse Effect.

"Maximum Credit Facility Amount" has the meaning specified therefor in the recitals hereto.

"Maximum Judgment Amount" has the meaning specified therefor in Section 9.01(k).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means a mortgage, deed of trust or deed to secure debt, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent pursuant to the provisions hereof or otherwise.

"Net Cash Proceeds" means, with respect to any Disposition by any Person or any of its Subsidiaries, the amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (iii) transfer taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (iv) net income taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements) to the extent, but only to the extent, that the amounts so deducted are (x) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any

of its Subsidiaries and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"New Lending Office" has the meaning specified therefor in Section 2.08(d).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.08(d).

"Notice of Borrowing" has the meaning specified therefor in Section 2.02(a).

"Obligations" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders, or any of them, under the Loan Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"Other Taxes" has the meaning specified therefor in Section 2.08(b).

"Parent" has the meaning specified therefor in the preamble hereto.

"Participant Register" has the meaning specified therefor in Section 12.07(g).

"PayPal Account" shall mean an account of any debtor with PayPal Inc. or any of its Subsidiaries.

"Payment Office" means the Administrative Agent's office located at 3440 Preston Ridge Road, Suite 350, Alpharetta, Georgia 30005, or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Borrower.

"Payroll Account" means an account maintained by Ceridian Corporation or its Subsidiaries and located at PNC Bank in Pittsburgh, PA which is subject to the terms and conditions of the Payroll Agreement.

"Payroll Agreement" means that certain agreement, dated as of January 5, 2003, between the Borrower and Ceridian Corporation and its Subsidiaries relating to the Payroll Account which is in form and substance reasonably satisfactory to the Collateral Agent.

"Permitted Dispositions" means (a) sales or other dispositions of Inventory to buyers in the ordinary course of business, (b) sales or other dispositions of obsolete or worn-out equipment in the ordinary course of business, (c) the use or transfer of Cash and Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents, (d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and

other intellectual property rights in the ordinary course of business, (e) the granting of leases or subleases to other Persons not materially interfering with the conduct of business of any of the Loan Parties, and (f) sales or other dispositions of assets from a Loan Party to any other Loan Party.

"Period" means the Interim Period or the Final Period, as the context requires.

"Permitted Indebtedness" means:

(a)     any Indebtedness owing to any Agent and any Lender under this Agreement and the other Loan Documents;

(b)     any Indebtedness existing on the Filing Date, including Indebtedness under the Pre-Petition Credit Facility and the Senior Subordinated Notes.

(c)     any Indebtedness consisting of insurance premium financing arrangements consistent with the Budget;

(d)     [Intentionally Omitted];

(e)     Indebtedness permitted under Section 7.02(e);

(f)     [Intentionally Omitted]; and

(g)     Indebtedness owed by one Loan Party to another Loan Party so long as the making of the investment by the Loan Party that is acting as the lender is permitted hereunder.

"Permitted Investments" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency or instrumentality thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (ii) commercial paper, maturing not more than 270 days after the date of issue rated P-1 by Moody's or A-1 by Standard & Poor's; (iii) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (iv) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with banks included in the commercial banking institutions described in clause (iii) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof, (v) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000; (vi) tax exempt securities rated A or better by Moody's or A+ or better by Standard & Poor's; and (vii) solely with respect to any CFC, in non-Dollar denominated (A) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such CFC maintains its chief executive office and principal place of business provided such country is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from Standard & Poor's is at least A-1 or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof (any such

bank being an "Approved Foreign Bank") and maturing within 270 days of the date of acquisition and (B) equivalents of demand deposit accounts which are maintained with an Approved Foreign Bank.

"Permitted Liens" means:

(a)     Liens securing the Obligations;

(b)     Liens for taxes, assessments, levies, and governmental charges the payment of which is not required under Section 7.01(c);

(c)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted,   or as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)     Liens existing as of the Filing Date, as described on Schedule 7.02(a), but not the extension of coverage thereof to other property or assets or the extension of maturity, refinancing or other modification of the terms thereof or the increase of Indebtedness secured thereby;

(e)     [Intentionally Omitted];

(f)     deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) or statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)     easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)     leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Parent or any of its Subsidiaries;

(i)     precautionary financing statement filings regarding operating leases;

(j)     Liens arising out of the existence of judgments or awards not giving rise to an Event of Default; and

(k)     statutory and common law landlords' liens under leases to which the Parent or any of its Subsidiaries is a party.

"Permitted Priority Liens" means Liens permitted under clauses (d) (other than Liens under the Pre-Petition Loan Documents), (f), (g) and (h) of the definition of the term "Permitted Lien".

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.0 percentage points, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan prior to the Event of Default plus 2.0 percentage points.

"Preferred Stock" means, as applied to the Capital Stock of any Person, the Capital Stock of any class or classes (however designated) that is preferred with respect to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Pre-Petition Agents" means Cratos, as administrative agent for the Pre-Petition Lenders and Ableco, as collateral agent for the Pre-Petition Lenders.

"Pre-Petition Credit Facility" means that certain Financing Agreement, dated as of July 17, 2007 (as amended and in effect from time to time, the "Pre-Petition Financing Agreement"), among Spheris Holding II, Inc., Spheris Inc., Spheris Operations LLC, as borrower, and certain of its Subsidiaries, the Pre-Petition Lenders and the Pre-Petition Agents and all agreements and documents related thereto.

"Pre-Petition Loan Documents" means the Pre-Petition Financing Agreement, and all instruments and documents executed at any time in connection with either thereof.

"Pre-Petition Lenders" means the lenders party to the Pre-Petition Credit Facility, from time to time, under and as defined in the Pre-Petition Financing Agreement.

"Pre-Petition Obligations" means all indebtedness, obligations (including obligations in respect of any letters of credit) and liabilities of the Loan Parties incurred prior to the Filing Date plus fees, expenses, and indemnities due thereunder and interest thereon accruing both before and after the Filing Date to the extent allowable under the Bankruptcy Code, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Priority Professional Expenses" means those Carve-Out Expenses entitled to a priority as set forth in sub-clause (iv) of the clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Prohibited Preferred Stock" means any Preferred Stock that by its terms is mandatorily redeemable or subject to any other payment obligation (including any obligation to

pay dividends, other than dividends of shares of Preferred Stock of the same class and series payable in kind or dividends of shares of common stock) on or before a date that is less than 2 years after the Final Maturity Date, or, on or before the date that is less than 2 years after the Final Maturity Date, is redeemable at the option of the holder thereof for cash or assets or securities (other than distributions in kind of shares of Preferred Stock of the same class and series or of shares of common stock).

"property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Pro Rata Share" means:

(a)     with respect to a Lender's obligation to make Loans and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Lender's Commitment, by (ii) the Total Commitment, provided, that, if the Total Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Loans (including Collateral Agent Advances) and the denominator shall be the aggregate unpaid principal amount of all Loans (including Collateral Agent Advances), and

(b)     with respect to all other matters (including, without limitation, the indemnification obligations arising under Section 10.05), the percentage obtained by dividing (i) the sum of such Lender's Commitment, by (ii) the sum of the Total Commitment, provided, that, if such Lender's Commitment shall have been reduced to zero, such Lender's Commitment shall be deemed to be the aggregate unpaid principal amount of such Lender's Loans (including Collateral Agent Advances) and if the Total Commitment shall have been reduced to zero, the Total Commitment shall be deemed to be the aggregate unpaid principal amount of all Loans (including Collateral Agent Advances).

"Professional Expense Cap" has the meaning specified in subclause (iv) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

"Purchase Agreement" means that certain Stock and Asset Purchase Agreement, dated as of February 2, 2010, by and among Holdings, Parent, Borrower, Vianeta Communications, a California corporation and as a debtor and a debtor-in-possession, Spheris Leasing LLC, a Tennessee limited liability company and as a debtor and a debtor-in-possession, and Spheris Canada Inc., a Tennessee corporation and as a debtor and a debtor-in-possession and CBay, Inc., a Delaware corporation and Medquist Inc., a New Jersey corporation, each as purchasers, together with all schedules, documents and exhibits thereto, in each case, in form and substance reasonably satisfactory to the Agents and Lenders.

"Rating Agencies" has the meaning specified therefor in Section 2.07.

"Reference Bank" means JPMorgan Chase Bank, N.A., its successors or any other commercial bank that is a member of the Federal Reserve System with a combined capital and surplus and undivided profits of not less than $500,000,000 designated by the Administrative Agent to the Borrower from time to time.

"Reference Rate" means the higher of (i) 3.00% and (ii) rate of interest publicly announced by the Reference Bank in New York, New York from time to time as its reference rate, base rate or prime rate. The reference rate, base rate or prime rate is determined from time to time by the Reference Bank as a means of pricing some loans to its borrowers and neither is tied to any external rate of interest or index nor necessarily reflects the lowest rate of interest actually charged by the Reference Bank to any particular class or category of customers. Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Reference Rate Loan" means each portion of a Loan that bears interest at a rate determined by reference to the Reference Rate.

"Register" has the meaning specified therefor in Section 12.07(d).

"Registered Loan" has the meaning specified therefor in Section 12.07(d).

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means a fund, money market account, investment account or other account managed by a Person or an Affiliate of such Person or its investment manager.

"Related Party Assignment" has the meaning specified therefor in Section 12.07(b).

"Related Party Register" has the meaning specified therefor in Section 12.07(d).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Released Parties" has the meaning specified therefor in Section 12.25.

"Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (ii) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (iv) any other actions authorized by 42 U.S.C. § 9601.

"Replacement Lender" has the meaning specified therefor in Section 4.05(d).

"Required Lenders" means Lenders whose Pro Rata Shares (calculated under clause (c) of the definition thereof) aggregate more than 50%.

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Sale" means the sale of all or substantially all of the assets of the Loan Parties (whether in one transaction or a series of related transactions) pursuant to Section 363 of the Bankruptcy Code pursuant to the Purchase Agreement or other documentation approved by the Agents and the Lenders.

"Sale Escrow Account" means the account specified in the Sale Escrow Agreement and maintained at JPMorgan Chase Bank, N.A., subject to the terms and conditions of the Sale Escrow Agreement.

"Sale Escrow Agreement" means that Escrow Agreement, dated as of February 2, 2010, between Medquist Transcriptions, Ltd., a New Jersey corporation and Holdings, Parent, Borrower, Vianeta Communications, a California corporation and as a debtor and a debtor-in-possession, Spheris Leasing LLC, a Tennessee limited liability company and as a debtor and a debtor-in-possession, and Spheris Canada Inc., a Tennessee corporation and as a debtor and a debtor-in-possession.

"Sale Procedure Motion" has the meaning specified therefor in Section 5.01(l).

"Sale Procedure Order" has the meaning specified therefor in Section 5.01(l).

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 2.07.

"Securitization Parties" has the meaning specified therefor in Section 2.07.

"Security Agreement" means a Security Agreement, in form and substance reasonably satisfactory to Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"Senior Subordinated Notes Indenture" means that certain Indenture dated as of December 22, 2004, among the Parent, the guarantors named therein, and The Bank of New York, as trustee, as amended or modified in accordance with the terms hereof and thereof.

"Senior Subordinated Notes" means 11% Senior Subordinated Notes due 2012 issued by the Parent pursuant to the Senior Subordinated Notes Indenture.

"Settlement Period" has the meaning specified therefor in Section 2.02(d)(i).

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (i) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (ii) of which more than 50% of (A) the outstanding Capital Stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such Person, (B) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (C) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.

"Succeeding Fiscal Year" has the meaning specified therefor in Section 7.03(d).

"Taxes" has the meaning specified therefor in Section 2.08(a).

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued by or on behalf of a title insurance company satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"Total Commitment" means the sum of the Lenders' Commitments.

"Transferee" has the meaning specified therefor in Section 2.08(a).

"Unused Line Fee" has the meaning specified therfor in Section 2.06(b).

"Vianeta Escrow Account" means account number 0044-4028-9814 of Spheris Operations LLC at Bank of America, N.A. maintained pursuant to the Vianeta Escrow Agreement.

"Vianeta Escrow Agreement" means the Escrow Agreement, dated as of March 30, 2006, between Spheris Operations Inc., V. R. Ranganath, as representative of certain stockholders, and Bank of America.

"WARN" has the meaning specified therefor in <u>Section 6.01(z)</u>.

Section 1.02    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," whether or not so expressly stated in each such instance and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Except with respect to <u>Section 4.04</u>, any reference herein or in any other Loan Document to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations.  References in this Agreement to "determination" by any Agent include estimates honestly made by such Agent (in the case of quantitative determinations) and beliefs honestly held by such Agent (in the case of qualitative determinations).  References to the phrases "in accordance with the Budget", "specified in the Budget" or such similar phrases used in this Agreement shall permit upward and downward deviations with respect to any line item set forth in the Budget to the extent such deviations could not reasonably be expected to cause a Material Adverse Deviation, <u>provided</u> that, notwithstanding the foregoing, in no event shall the payment of Carve Out Expenses exceed the Professional Expense Cap.

Section 1.03    <u>Accounting and Other Terms</u>.  Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.  All terms used in this Agreement which are defined in Article 8 or Article 9 of the Code and which are not otherwise defined herein shall have the same meanings herein as set forth therein.

Section 1.04    <u>Time References</u>.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; <u>provided</u>, <u>however</u>, that with respect to a computation of fees or interest payable to any Agent or any Lender, such period shall in any event consist of at least one full day.

# ARTICLE II

## THE LOANS

Section 2.01 Commitments. (a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth each Lender severally agrees to make Loans to the Borrower at any time and from time to time from the Interim Facility Effective Date to the Final Maturity Date, or until the earlier reduction of its Commitment to zero in accordance with the terms hereof, in an aggregate principal amount of Loans at any time outstanding not to exceed the amount of such Lender's Commitment.

(b) Notwithstanding the foregoing:

(i) (A) The aggregate principal amount of Loans outstanding at any time to the Borrower shall not exceed the lower of (1) the Total Commitment in effect at such time, or (2) for any 2-week period, the principal amount of the Loans projected to be outstanding at such time as set forth in the Budget; and

(B) The aggregate principal amount of the Loans plus Pre-Petition Obligations under the Pre-Petition Credit Facility outstanding at any time to the Borrower shall not exceed $74,000,000.

(ii) The Commitment of each Lender shall automatically and permanently be reduced to zero on the Final Maturity Date. Within the limits set forth in Section 2.01(b)(i), the Borrower may borrow, repay and reborrow, on or after the Interim Facility Effective Date and prior to the Final Maturity Date, subject to the terms, provisions and limitations set forth herein (it being understood that if the Borrower shall have received any Investor Proceeds and no Obligations are outstanding under this Agreement, then the Borrower shall not be permitted to request and the Agent and Lenders shall not be obligated to make any further Loans until the Borrower shall have used all Investor Proceeds to fund the Borrower's operations in accordance with the Budget.).

Section 2.02 Making the Loans.

(a) The Borrower shall give the Administrative Agent prior written notice, in substantially the form of Exhibit C hereto (a "Notice of Borrowing"), not later than 12:00 noon (New York City time) on the date which is 3 Business Days prior to the date of the proposed Loan, provided, however, notice of the proposed initial Loans to be made upon satisfaction of the conditions precedent set forth in Section 5.01 may be given up to one (1) Business Day prior to the satisfaction of such conditions precedent set forth in Section 5.01. Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Loan, (ii) the proposed borrowing date, which must be a Business Day, (iii) whether the proposed Loan is to be a Reference Rate Loan or a LIBOR Rate Loan, and (iv) in the case of a LIBOR Rate Loan, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period". If no election as to the type of Loan is specified, then the requested Loan shall be a Reference Rate Loan. If no Interest Period is specified with respect to any requested LIBOR Rate Loan, then the Borrower shall be

deemed to have selected an Interest Period of one month's duration. The Administrative Agent and the Lenders may act without liability upon the basis of written or telecopied notice believed by the Administrative Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Administrative Agent). The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)    Each Notice of Borrowing pursuant to this <u>Section 2.02</u> shall be irrevocable and the Borrower shall be bound to make a borrowing in accordance therewith. Each Loan shall be made in a minimum amount of $250,000 and shall be in integral multiples of $50,000 in excess thereof.

(c)    (i)    Except as otherwise provided in this <u>Section 2.02(c)</u>, all Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the Total Commitment; it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

(ii)    Notwithstanding any other provision of this Agreement, and in order to reduce the number of fund transfers among the Borrower, the Agents and the Lenders, the Borrower, the Agents and the Lenders agree that the Administrative Agent may (but shall not be obligated to), and the Borrower and the Lenders hereby irrevocably authorize the Administrative Agent to, fund, on behalf of the Lenders, the Loans pursuant to <u>Section 2.01</u>, subject to the procedures for settlement set forth in <u>Section 2.02(d)</u>; <u>provided</u>, <u>however</u>, that (a) the Administrative Agent shall in no event fund any Loan if the Administrative Agent shall have received written notice from the Collateral Agent or the Required Lenders prior to the time of the proposed Loan that one or more of the conditions precedent contained in <u>Section 5.02</u> will not be satisfied at the time of the proposed Loan, and (b) the Administrative Agent shall not otherwise be required to determine that, or take notice whether, the conditions precedent in <u>Section 5.02</u> have been satisfied. If the Borrower gives a Notice of Borrowing requesting a Loan and the Administrative Agent elects not to fund such Loan on behalf of the Lenders, then promptly after receipt of the Notice of Borrowing requesting such Loan, the Administrative Agent shall notify each Lender of the specifics of the requested Loan and that it will not fund the requested Loan on behalf of the Lenders. If the Administrative Agent notifies the Lenders that it will not fund a requested Loan on behalf of such Lenders, each Lender shall make its Pro Rata Share of the Loan available to the Administrative Agent, in immediately available funds, at the Payment Office no later than 3:00 p.m. (New York City time) (provided that the Administrative Agent requests payment from such Lender not later than 1:00 p.m. (New York City time)) on the date of the proposed Loan. The Administrative Agent will make the proceeds of such Loans available to the Borrower on the day of the proposed Loan by causing an amount, in immediately available funds, equal to the proceeds of all such Loans received by the Administrative Agent at

the Payment Office or the amount funded by the Administrative Agent on behalf of the Lenders to be deposited in an account designated by the Borrower.

(iii)   If the Administrative Agent has notified the Lenders that the Administrative Agent, on behalf of such Lenders, will not fund a particular Loan pursuant to Section 2.02(c)(ii), the Administrative Agent may assume that each such Lender has made such amount available to the Administrative Agent on such day and the Administrative Agent, in its sole discretion, may, but shall not be obligated to, cause a corresponding amount to be made available to the Borrower on such day.  If the Administrative Agent makes such corresponding amount available to the Borrower and such corresponding amount is not in fact made available to the Administrative Agent by any such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for 3 Business Days and thereafter at the Reference Rate.   During the period in which such Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrower shall, for all purposes hereof, be a Loan made by the Administrative Agent for its own account.   Upon any such failure by a Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Borrower of such failure and the Borrower shall promptly (but in any event within 1 Business Day) pay such corresponding amount to the Administrative Agent for its own account.

(iv)   Nothing in this Section 2.02(c) shall be deemed to relieve any Lender from its obligations to fulfill its Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(d)   (i)  With respect to all periods for which the Administrative Agent has funded Loans pursuant to Section 2.02(c), on Friday of each week, or if the applicable Friday is not a Business Day, then on the following Business Day, or such shorter period as the Administrative Agent may from time to time select (any such week or shorter period being herein called a "Settlement Period"), the Administrative Agent shall notify each Lender of the unpaid principal amount of the Loans outstanding as of the last day of each such Settlement Period.  In the event that such amount is greater than the unpaid principal amount of the Loans outstanding on the last day of the Settlement Period immediately preceding such Settlement Period (or, if there has been no preceding Settlement Period, the amount of the Loans made on the date of such Lender's initial funding), each Lender shall promptly (and in any event not later than 2:00 p.m. (New York City time) if the Administrative Agent requests payment from such Lender not later than 12:00 noon (New York City time) on such day) make available to the Administrative Agent its Pro Rata Share of the difference in immediately available funds.  In the event that such amount is less than such unpaid principal amount, the Administrative Agent shall promptly pay over to each Lender its Pro Rata Share of the difference in immediately available funds.  In addition, if the Administrative Agent shall so request at any time when a Default or an Event of Default shall have occurred and be continuing, or any other event shall have occurred as a result of which the Administrative Agent shall determine that it is desirable to present claims against the Borrower for repayment, each Lender shall promptly remit to the

Administrative Agent or, as the case may be, the Administrative Agent shall promptly remit to each Lender, sufficient funds to adjust the interests of the Lenders in the then outstanding Loans to such an extent that, immediately after giving effect to such adjustment, each such Lender's interest in the then outstanding Loans will be equal to its Pro Rata Share thereof. The obligations of the Administrative Agent and each Lender under this Section 2.02(d) shall be absolute and unconditional. Each Lender shall only be entitled to receive interest on its Pro Rata Share of the Loans which have been funded by such Lender.

(ii)   In the event that any Lender fails to make any payment required to be made by it pursuant to Section 2.02(d)(i), the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate for 3 Business Days and thereafter at the Reference Rate. During the period in which such Lender has not paid such corresponding amount to the Administrative Agent, notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the amount so advanced by the Administrative Agent to the Borrower shall, for all purposes hereof, be a Loan made by the Administrative Agent for its own account. Upon any such failure by a Lender to pay the Administrative Agent, the Administrative Agent shall promptly thereafter notify the Borrower of such failure and the Borrower shall immediately pay such corresponding amount to the Administrative Agent for its own account. Nothing in this Section 2.02(d)(ii) shall be deemed to relieve any Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

Section 2.03      Repayment of Loans; Evidence of Debt.    (a) The outstanding principal of all Loans shall be due and payable on the Final Maturity Date.

(b)   [Intentionally Omitted].

(c)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)   The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e)   The entries made in the accounts maintained pursuant to paragraphs (c) or (d) of this Section 2.03 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(f)     Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent and reasonably satisfactory to the Borrower. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 12.07</u>) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04          <u>Interest</u>.

(a)     <u>Loans</u>.

(i)     Each Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the making of such Loan until the date on which such principal amount is repaid in accordance herewith, as follows: (A) if the relevant Loan is a LIBOR Rate Loan, at a rate per annum equal to the LIBOR Rate plus the Applicable LIBOR Margin, and (B) otherwise, at a rate per annum equal to the Reference Rate plus the Applicable Reference Rate Margin.

(b)     <u>[Intentionally Omitted]</u>.

(c)     <u>Default Interest and Fees</u>.  To the extent permitted by law, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities, or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate. All interest at the Post-Default Rate shall be payable on demand.

(d)     <u>LIBOR Option</u>.

(i)     <u>Interest and Interest Payment Dates</u>.  In lieu of having interest charged at the rate based upon the Reference Rate, the Borrower shall have the option (the "<u>LIBOR Option</u>") to have interest on all or a portion of the Loans be charged at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (A) the last day of the Interest Period applicable thereto, (B) the occurrence of an Event of Default in consequence of which the Required Lenders or Collateral Agent on behalf thereof elect to accelerate the maturity of all or any portion of the Obligations, or (C) termination of this Agreement pursuant to the terms hereof.  On the last day of each applicable Interest Period, unless the Borrower properly has exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Reference Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, the Borrower no longer shall have the option to request that Loans bear interest at the LIBOR Rate and Administrative Agent shall have the right

to convert the interest rate on all outstanding LIBOR Rate Loans to the rate then applicable to Reference Rate Loans hereunder.

(ii)    <u>LIBOR Election</u>.

(A)    The Borrower may, at any time and from time to time, so long as no Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying Administrative Agent prior to 11:00 a.m. (New York time) at least 3 Business Days prior to the commencement of the proposed Interest Period (the "<u>LIBOR Deadline</u>"). Notice of the Borrower's election of the LIBOR Option for a permitted portion of the Loans and an Interest Period pursuant to this Section shall be made by delivery to Administrative Agent of a LIBOR Notice received by Administrative Agent before the LIBOR Deadline. Promptly upon its receipt of each such LIBOR Notice, Administrative Agent shall provide a copy thereof to each of the Lenders having a Commitment of the type to which such LIBOR Notice relates.

(B)    Each LIBOR Notice delivered by the Borrower shall be irrevocable and binding on the Borrower. In connection with each LIBOR Rate Loan, the Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders harmless against any loss, cost, or expense incurred by Administrative Agent or any Lender as a result of (1) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (2) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (3) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "<u>Funding Losses</u>"). Funding Losses shall, with respect to Administrative Agent or any Lender, be deemed to equal the amount determined by Administrative Agent or such Lender to be the excess, if any, of (x) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), minus (y) the amount of interest that would accrue on such principal amount for such period at the interest rate which Administrative Agent or such Lender would be offered were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market. A certificate of Administrative Agent or a Lender delivered to the Borrower setting forth any amount or amounts that Administrative Agent or such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error.

(C)    The Borrower shall have not more than 4 LIBOR Rate Loans in effect at any given time. The Borrower only may exercise the

LIBOR Option for LIBOR Rate Loans of at least $250,000 and integral multiples of $50,000 in excess thereof.

(iii) <u>Conversion</u>. The Borrower may convert LIBOR Rate Loans to Reference Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by the Administrative Agent of proceeds of Collateral in accordance with <u>Section 4.04</u> or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders and their participants harmless against any and all Funding Losses in accordance with subsection (ii) above.

(iv) <u>Special Provisions Applicable to LIBOR Rate</u>.

(A) The LIBOR Rate may be adjusted by Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give the Borrower and Administrative Agent notice of such a determination and adjustment and Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Borrower may, by notice to such affected Lender (1) require such Lender to furnish to the Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (2) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under subsection (ii)(B) above).

(B) In the event that any change after the Interim Facility Effective Date in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Administrative Agent and the Borrower and Administrative Agent promptly shall transmit the notice to each other Lender and (1) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender

thereafter shall accrue interest at the rate then applicable to Reference Rate Loans, and (2) the Borrower shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(v)    <u>No Requirement of Matched Funding</u>.  Anything to the contrary contained herein notwithstanding, neither Administrative Agent, nor any Lender, nor any of their participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate. The provisions of this Section shall apply as if each Lender or its participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

(e)    <u>Interest Payment in respect of Reference Rate Loans</u>.  Interest on each Reference Rate Loan shall be payable monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which such Loan is made and at maturity (whether upon demand, by acceleration or otherwise). The Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account pursuant to <u>Section 4.02</u> with the amount of any interest payment due hereunder.

(f)    <u>General</u>.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05      <u>Reduction of Commitments; Prepayment of Loans</u>.

(a)    <u>Reduction of Commitments</u>.  The Total Commitment shall terminate on the Final Maturity Date. The Borrower may, without premium or penalty, reduce the Total Commitment to an amount (which may be zero) not less than the sum of (A) the aggregate unpaid principal amount of all Loans then outstanding, and (B) the aggregate principal amount of all Loans not yet made as to which a Notice of Borrowing has been given by the Borrower under <u>Section 2.02</u>. Each such reduction shall be in an amount which is an integral multiple of $250,000 (unless the Total Commitment in effect immediately prior to such reduction is less than $250,000), shall be made by providing not less than 2 Business Days' prior written notice to the Administrative Agent and shall be irrevocable. Once reduced, the Total Commitment may not be increased. Each such reduction of the Total Commitment shall reduce the Commitment of each Lender proportionately in accordance with its Pro Rata Share thereof.

(b)    <u>Optional Prepayment</u>.

(i)    <u>Loans</u>.  The Borrower may, at any time, prepay without penalty or premium the principal of any Loan, in whole or in part.

(ii)    <u>Prepayment In Full</u>.  The Borrower may, upon at least 10 days' prior written notice to the Agents, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations in full (other than unasserted contingent indemnification obligations). Effective as of the date of termination of this Agreement specified

in any notice pursuant to this clause (iii), the Lenders' obligations to extend credit hereunder shall terminate and the Borrower shall be obligated to repay the Obligations in full (other than unasserted contingent indemnification obligations).

(c)   <u>Mandatory Prepayment.</u>

(i)    If at any time, the aggregate principal amount of (A) all Loans made pursuant to <u>Section 2.01(a)</u> exceeds any of the limitations set forth in <u>Section 2.01(b)</u>, or (B) all Loans <u>plus</u> Pre-Petition Obligations under the Pre-Petition Credit Facility outstanding at any time exceeds $74,000,000, the Borrower shall immediately prepay the Loans to the full extent of any such excess and such prepayments shall be applied to the aggregate outstanding principal amount of the Loans.

(ii)    In the event that that Final Bankruptcy Court Order shall not have been entered on or before the date that is thirty (30) days following the entry of the Interim Facility Bankruptcy Court Order, the Borrower shall prepay the Loans in full on such date.

(iii)    The Administrative Agent shall on each Business Day apply all funds transferred to or deposited in the Administrative Agent's Account, to the payment, in whole or in part, of the outstanding principal amount of the Loans pursuant to the terms of this Agreement.

(iv)    Immediately upon the receipt of any funds received either directly or indirectly from Holdings III or Holdings ("<u>Investor Proceeds</u>"), the Borrower shall prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Investor Proceeds received by such Person, <u>provided</u>, that if at the time any Investor Proceeds are received by the Borrower and no Obligations are outstanding under this Agreement, then (a) such Investor Proceeds shall be retained by the Borrower and used solely to fund the Borrower's operations in accordance with the Budget (it being understood and agreed that such funds shall not be permitted to pay Carve-Out Expenses in excess of the Professional Expense Cap), and (b) the Borrower shall not be permitted to request and the Agent and Lenders shall not be obligated to make any further Loans until the Borrower shall have used all Investor Proceeds to fund the Borrower's operations in accordance with the Budget (it being understood and agreed that such funds shall not be permitted to pay Carve-Out Expenses in excess of the Professional Expense Cap).

(v)    Immediately upon the receipt of any proceeds of any Disposition by any Loan Party or its Subsidiaries (other than a Permitted Disposition of the type described in clauses (a), (c), (d), (e) and (f) of the definition of Permitted Dispositions), the Borrower shall prepay the outstanding principal amount of the Loans (together with a corresponding permanent reduction of the Total Commitment) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition. Nothing contained in this clause (v) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than a Permitted Disposition.

(vi)     Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the Loans (together with a corresponding permanent reduction of the Total Commitment) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.  The provisions of this subsection (vi) shall not be deemed to be implied consent to any such issuance or incurrence otherwise prohibited by the terms and conditions of this Agreement.

(vii)     Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Loans (in the case of Extraordinary Receipts consisting of insurance proceeds or condemnation awards, together with a corresponding permanent reduction of the Total Commitment) in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(d)     Application of Payments.  Each prepayment made pursuant to Sections 2.05(b) and (c) shall be applied to *first,* to the Loans and *second,* to the Obligations (it being understood and agreed, that upon the Sale all such proceeds shall be applied to repay the Obligations hereunder to the extent any Obligations are outstanding and then, pursuant to the terms of the Sale Order and subject to Section 7.02(g) to the Pre-Petition Obligations arising under the Pre-Petition Credit Facility).

(e)     Interest and Fees.  Any prepayment made pursuant to this Section 2.05 (other than prepayments made pursuant to subsections (c)(i) and (c)(iii) of this Section 2.05) shall be accompanied by the payment of accrued interest on the principal amount being prepaid to the date of prepayment, and if such prepayment would reduce the amount of the outstanding Loans to zero at a time when the Total Commitment has been terminated, such prepayment shall be accompanied by the payment of all fees accrued to such date pursuant to Section 2.06.

(f)     Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.05, payments with respect to any subsection of this Section 2.05 are in addition to payments made or required to be made under any other subsection of this Section 2.05.

Section 2.06          Fees.

(a)     Commitment Fee.  On the Interim Facility Effective Date, the Borrower shall pay to the Administrative Agent for the account of the Lenders, in accordance with their Pro Rata Shares, a non-refundable commitment fee (the "Commitment Fee") equal to $300,000, which shall be deemed fully earned when paid.

(b)     Unused Line Fee.  From and after the Interim Facility Effective Date and until the Final Maturity Date, the Borrower shall pay to the Administrative Agent for the account of the Lenders, in accordance with their Pro Rata Shares, an unused line fee (the "Unused Line Fee"), which shall accrue at the rate per annum of 0.75% on the excess, if any, of the Total Commitment over the sum of the average principal amount of all Loans outstanding from time to

time and shall be payable monthly in arrears on the first day of each month commencing on March 1, 2010.

(c) <u>Loan Servicing Fee</u>. From and after the Interim Facility Effective Date and until the later of (i) the Final Maturity Date and (ii) the date on which all Obligations are paid in full, the Borrower shall pay to the Administrative Agent for the account of the Administrative Agent, a non-refundable loan servicing fee (the "<u>Loan Servicing Fee</u>") equal to $10,000 each month, which shall be deemed fully earned when paid and which shall be payable on the Interim Facility Effective Date (payable ratably based on the number of days remaining in the calendar month in which the Interim Facility Effective Date occurs) and monthly in advance thereafter on the first day of each calendar month commencing on March 1, 2010.

Section 2.07    <u>Securitization</u>.    The Borrower hereby acknowledges that the Lenders and their Affiliates may sell or securitize the Loans (a "<u>Securitization</u>") through the pledge of the Loans as collateral security for loans to the Lenders or their Affiliates or through the sale of the Loans or the issuance of direct or indirect interests in the Loans, which loans to the Lenders or their Affiliates or direct or indirect interests will be rated by Moody's, Standard & Poor's or one or more other rating agencies (the "<u>Rating Agencies</u>"). The Borrower shall cooperate with the Lenders and their Affiliates to effect the Securitization including by (a) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by the Lenders in connection with the Securitization; <u>provided</u> <u>that</u> (i) any such amendment or additional documentation does not impose material additional costs on the Borrower and (ii) any such amendment or additional documentation does not materially adversely affect the rights, or materially increase the obligations, of the Borrower under the Loan Documents or change or affect in a manner adverse to the Borrower the financial terms of the Loans, (b) providing such information as may be reasonably requested by the Lenders in connection with the rating of the Loans or the Securitization, and (c) providing in connection with any rating of the Loans a certificate (i) agreeing to indemnify the Lenders and their Affiliates, any of the Rating Agencies, or any party providing credit support or otherwise participating in the Securitization (collectively, the "<u>Securitization Parties</u>") for any losses, claims, damages or liabilities (the "<u>Liabilities</u>") to which the Lenders, their Affiliates or such Securitization Parties may become subject insofar as the Liabilities arise out of or are based upon any untrue statement of any material fact contained in any Loan Document or in any writing delivered by or on behalf of any Loan Party to any Agent or Lender in connection with any Loan Document or arise out of or are based upon the omission to state therein a material fact required to be stated therein, or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and such indemnity shall survive any transfer by the Lenders or their successors or assigns of the Loans and (ii) agreeing to reimburse the Agents, the Lenders and their Affiliates for any legal or other expenses reasonably incurred by such Persons in connection with defending the Liabilities.

Section 2.08    <u>Taxes</u>.

(a)    Any and all payments by any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on the net income of any Agent or any Lender (or

any transferee or assignee thereof, including a participation holder (any such entity, a "Transferee")) by the jurisdiction in which such Person is organized or has its principal lending office (all such nonexcluded taxes, levies, imposts, deductions, charges withholdings and liabilities, collectively or individually, "Taxes"). If any Loan Party shall be required to deduct any Taxes from or in respect of any sum payable hereunder to any Agent, or any Lender (or any Transferee), (i) the sum payable shall be increased by the amount (an "additional amount") necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.08) such Agent or such Lender (or such Transferee) shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, each Loan Party agrees to pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document ("Other Taxes"). Each Loan Party shall deliver to each Agent and each Lender official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c)     The Loan Parties hereby jointly and severally indemnify and agree to hold each Agent and each Lender harmless from and against Taxes and Other Taxes (including Taxes and Other Taxes imposed on any amounts payable under this Section 2.08) paid by such Person, whether or not such Taxes or Other Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 Business Days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Taxes or Other Taxes.

(d)     Each Lender that is organized under the laws of a jurisdiction outside the United States (a "Non-U.S. Lender") agrees that it shall, no later than the Interim Facility Effective Date (or, in the case of a Lender which becomes a party hereto pursuant to Section 12.07 after the Interim Facility Effective Date, promptly after the date upon which such Lender becomes a party hereto) deliver to the Agents (or, in the case of an assignee of a Lender which (x) is an Affiliate of such Lender or a Related Fund of such Lender and (y) does not deliver an Assignment and Acceptance to the Administrative Agent pursuant to the last sentence of Section 12.07(b) for recordation pursuant to Section 12.07(c), to the assigning Lender only, and in the case of a participant, to the Lender granting the participation only) a properly completed and duly executed copy of either U.S. Internal Revenue Service Form W-8BEN, W-8ECI or W-8IMY or any subsequent versions thereof or successors thereto, in each case claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax and payments of interest hereunder. In addition, in the case of a Non-U.S. Lender claiming exemption from U.S. Federal withholding tax under Section 871(h) or 881(c) of the IRC, such Non-U.S. Lender hereby represents to the Agents and the Borrower that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the IRC, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the IRC) of Holdings and is not a controlled foreign corporation related to Holdings (within the meaning of Section 864(d)(4) of the IRC), and such

Non-U.S. Lender agrees that it shall promptly notify the Agents in the event any such representation is no longer accurate. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement and on or before the date, if any, such Non-U.S. Lender changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, such Non-U.S. Lender shall deliver such forms within 20 days after receipt of a written request therefor from any Agent, the assigning Lender or the Lender granting a participation, as applicable. Notwithstanding any other provision of this Section 2.08, a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.08(d) that such Non-U.S. Lender is not legally able to deliver.

(e)  The Loan Parties shall not be required to indemnify any Non-U.S. Lender, or pay any additional amounts to any Non-U.S. Lender, in respect of United States Federal withholding tax pursuant to this Section 2.08 to the extent that (i) the obligation to withhold amounts with respect to United States Federal withholding tax existed on the date such Non-U.S. Lender became a party to this Agreement (or, in the case of a Transferee that is a participation holder, on the date such participation holder became a Transferee hereunder) or, with respect to payments to a New Lending Office, the date such Non-U.S. Lender designated such New Lending Office with respect to a Loan; provided, however, that this clause (i) shall not apply to the extent the indemnity payment or additional amounts any Transferee, or Lender (or Transferee) through a New Lending Office, would be entitled to receive (without regard to this clause (i)) do not exceed the indemnity payment or additional amounts that the Person making the assignment, participation or transfer to such Transferee, or Lender (or Transferee) making the designation of such New Lending Office, would have been entitled to receive in the absence of such assignment, participation, transfer or designation, or (ii) the obligation to pay such additional amounts would not have arisen but for a failure by such Non-U.S. Lender to comply with the provisions of clause (d) above.

(f)  The obligations of the Loan Parties under this Section 2.08 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(g)  If a Loan Party pays any amounts under this Section 2.08 in respect of Taxes or Other Taxes to a Lender and such Lender becomes aware that it has actually received any refund of such Taxes or Other Taxes, such Lender shall pay such refund to such Loan Party (but only to the extent of the amounts paid by such Loan Party to such Lender in respect of the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses incurred in obtaining such refund; provided, however, that (i) such Loan Party agrees to repay the amount it received from such Lender in the event such Lender is required to repay such refund for any reason; (ii) nothing in this Section 2.08(g) shall require any Lender to disclose to such Loan Party or to any other Person any information it deems to be confidential in its sole discretion (including, without limitation, its tax returns); and (iii) no Lender shall be required to pay any amounts pursuant to this Section 2.08(g) at any time in which a Default or Event of Default shall have occurred and be continuing.

# ARTICLE III

## SECURITY AND ADMINISTRATIVE PRIORITY

Section 3.01          Collateral; Grant of Lien and Security Interest.

(a)     As security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties hereby, as of the Interim Bankruptcy Court Order Entry Date, assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the Collateral Agent, for the benefit of the Agents and the Lenders, a security interest in and to, and Liens on, all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of such Loan Party, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the Capital Stock of each Subsidiary of such Loan Party, all of the Capital Stock of all other Persons directly owned by such Loan Party (provided that if the Capital Stock is issued by a Person that is a CFC and the pledge of 100% of the voting Capital Stock of such CFC could reasonably be expected to result in material adverse tax consequences to the Loan Parties, then the pledge shall be limited to 65% of the voting Capital Stock and the Agents and the Lenders shall have a Lien on all proceeds of such Capital Stock), money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all property of the Loan Parties subject to the security interest referred to in this Section 3.01(a) being hereafter collectively referred to as the "Collateral"). For the avoidance of doubt, the term "Collateral" does not include any funds in any Escrow Agreement until such funds are released to a Loan Party; provided, that such term does include each Loan Party's right, title and interest in, to and under each Escrow Agreement to which it is a party.

(b)     Upon entry of the Interim Bankruptcy Court Order or Final Bankruptcy Court Order, as the case may be, the Liens and security interests in favor of the Collateral Agent referred to in Section 3.01(a) shall be valid and perfected Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, other than Permitted Priority Liens.  Such Liens and security interests and their priority shall remain in effect until the Total Commitment shall have been terminated and all Obligations shall have been repaid in cash in full

(c)     Notwithstanding anything herein to the contrary, all proceeds received by the Agents and the Lenders from the Collateral subject to the Liens granted in Section 3.01(a) or in any other Loan Document or by the Bankruptcy Court Orders shall be subject to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", provided, that no Person

entitled to such Carve-Out Expenses shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

Section 3.02    Administrative Priority.  Each of the Loan Parties agrees that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

Section 3.03    Grants, Rights and Remedies.  The Liens and security interests granted pursuant to Section 3.01 and the administrative priority granted pursuant to Section 3.02 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the Bankruptcy Court Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agents and the Lenders hereunder and thereunder are cumulative.

Section 3.04    No Filings Required.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, and entry of the Interim Bankruptcy Court Order shall have occurred on or before the date of any Loan.  The Collateral Agent shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document; provided, that the Collateral Agent shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office and to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement, the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, or any other Loan Document.

Section 3.05    Survival.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agents and the Lenders pursuant to this Agreement, the Bankruptcy Court Orders and the other Loan Documents (specifically including, without limitation, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out Expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities" as set forth in Section 3.02, no costs or expenses of administration which have been or may be incurred in the

Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agents and the Lenders against any Loan Party in respect of any Obligation;

(b) the Liens in favor of the Agents and the Lenders set forth in Section 3.01 shall constitute valid and perfected first priority Liens and security interests to which other Liens and security interests shall be subordinate and junior, subject only to Permitted Priority Liens, and which Liens and security interests shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c) the Liens in favor of the Agents and the Lenders set forth herein, in the Bankruptcy Court Orders, and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Collateral Agent file financing statements, mortgages, certificates of title, notices of Lien or other similar instruments or otherwise perfect its Lien under applicable non-bankruptcy law.

Section 3.06 <u>Further Assurances</u>. The Loan Parties shall take any other actions reasonably requested by the Agents and the Lenders from time to time to cause the attachment, perfection and first priority of, and the ability of the Agents and the Lenders to enforce, the security interest of the Agents and the Lenders in any and all of the Collateral, including, without limitation, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Loan Party's signature thereon is required therefor, (c) causing the Collateral Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Collateral Agent to enforce, the security interest of the Collateral Agent in such Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Collateral Agent to enforce, the security interest of the Collateral Agent in such Collateral, and (e) obtaining the consent or approval of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other Person obligated on Collateral, and taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

Section 3.07 <u>Pre-Petition Credit Facility</u>. Each of the Loan Parties hereby acknowledges, confirms and agrees that they are indebted to the Pre-Petition Agents and the Pre-Petition Lenders for certain Pre-Petition Obligations under the Pre-Petition Credit Facility, as of the Filing Date, in an aggregate principal amount of not less than $73,228,467.90, <u>plus</u> accrued and unpaid interest of at least $29,263.74, <u>plus</u> fees, costs, and expenses incurred in connection therewith, in respect of Pre-Petition Obligations under the Pre-Petition Credit Facility, <u>plus</u> indemnities, reimbursement obligations and other charges now or hereafter owed by the Loan Parties to the Pre-Petition Agents and the Pre-Petition Lenders pursuant to the terms of the Pre-Petition Loan Documents, all of which are unconditionally owing by the Loan Parties to the Pre-Petition Agents and the Pre-Petition Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

**ARTICLE IV**

**FEES, PAYMENTS AND OTHER COMPENSATION**

Section 4.01 <u>Audit and Collateral Monitoring Fees</u>. The Borrower acknowledges that pursuant to <u>Section 7.01(f)</u>, representatives of the Agents may visit any Loan Party or conduct audits, inspections or field examinations of any Loan Party and valuations or appraisals of any or all of the Collateral or business or enterprise valuations of the Loan Parties at any time and from time to time in a manner so as to not unduly disrupt the business of such Loan Party, and so long as no Default or Event of Default has occurred and is continuing, during normal business hours and upon reasonable prior notice. The Borrower agrees to pay the reasonable cost of all audits, appraisals and business valuations (including enterprise valuation appraisals) conducted by third party auditors or appraisers on behalf of the Agents. The foregoing notwithstanding, so long as no Event of Default has occurred and is continuing, the Borrower shall not be required to pay for more than 1 such visit, audit, inspection, and field examination during any Fiscal Year.

Section 4.02 <u>Payments; Computations and Statements</u>.

(a) The Borrower will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account. All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Borrower without set-off, counterclaim, deduction or other defense to the Agents and the Lenders. Except as provided in <u>Section 2.02</u>, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement, provided that the Administrative Agent will cause to be distributed all interest and fees received from or for the account of the Borrower not less than once each month and in any event promptly after receipt thereof. The Lenders and the Borrower hereby authorize the Administrative Agent to, and the Administrative Agent shall, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any Loan Document. Each of the Lenders and the Borrower agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in <u>Section 5.02</u> have been satisfied. Any amount charged to the Loan Account of the Borrower shall be deemed a Loan hereunder made by the Lenders to the Borrower, funded by the Administrative Agent on behalf of the Lenders and subject to <u>Section 2.02</u> of this Agreement. The Lenders and the Borrower confirm that any charges which the Administrative Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to the Borrower and solely at the Administrative Agent's discretion, provided that the Administrative Agent shall from time to time upon the request of the Collateral Agent, charge the Loan Account of the Borrower with any amount due and payable under any Loan Document. Whenever any payment to be made under any such Loan Document shall be stated to be due on

a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be. All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such fees are payable. Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)     The Administrative Agent shall provide the Borrower, promptly after the end of each calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrower during such month, the amounts and dates of all Loans made to the Borrower during such month, the amounts and dates of all payments on account of the Loans to the Borrower during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrower during such month, and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations. All entries on any such statement shall be presumed to be correct and, 60 days after the same is sent, shall be final and conclusive absent manifest error.

Section 4.03          Sharing of Payments, Etc.  Except as provided in Section 2.02, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered. The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 4.03 may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

Section 4.04          Apportionment of Payments.  Subject to Section 2.02 hereof:

(a)     all payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the audit and collateral monitoring fees provided for in Section 4.01) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b)     After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Required Lenders shall, apply all payments in respect of any Obligations and all proceeds of the Collateral (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due to the Agents until paid in full; (ii) second, to pay interest due in respect of the Collateral Agent Advances until paid in full; (iii) third, to pay principal of the Collateral Agent Advances until paid in full; (iv) fourth, ratably to pay any fees and indemnities then due to the Lenders until paid in full; (v) fifth, ratably to pay interest due in respect of the Loans until paid in full; (vi) sixth, ratably to pay principal of the Loans (or, to the extent such Obligations are contingent, to provide cash collateral in respect of such Obligations) until paid in full; (vii) seventh, to the ratable payment of all other Obligations then due and payable until paid in full, and (viii) eighth, pursuant to the terms of the Sale Order and subject to Section 7.02(g), to the payment of the Pre-Petition Obligations in accordance with the terms of the Pre-Petition Financing Agreement.

(c)     In each instance, so long as no Event of Default has occurred and is continuing, Section 4.04(b) shall not be deemed to apply to any payment by the Borrower specified by the Borrower to the Administrative Agent to be for the payment of Obligations then due and payable under any provision of this Agreement or the prepayment of all or part of the principal of the Loans in accordance with the terms and conditions of Section 2.05.

(d)     For purposes of Section 4.04(b), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of the Chapter 11 Cases), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in the Chapter 11 Cases.

(e)     In the event of a direct conflict between the priority provisions of this Section 4.04 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.04 shall control and govern.

Section 4.05          Increased Costs and Reduced Return.

(a)     If any member of the Lender Group shall have determined that the adoption or implementation of, or any change in, any law, rule, treaty or regulation, or any policy, guideline or directive of, or any change in, the interpretation or administration thereof by, any court, central bank or other administrative or Governmental Authority, or compliance by any member of the Lender Group or any Person controlling any such member of the Lender Group, with any directive of, or guideline from, any central bank or other Governmental Authority or the introduction of, or change in, any accounting principles applicable to any member of the Lender Group or any Person controlling any such member of the Lender Group (in each case, whether or not having the force of law, but only if occurring after the Interim Facility Effective Date; each, a "Change in Law"), shall (i) subject such member of the Lender

Group, or any Person controlling such member of the Lender Group to any tax, duty or other charge with respect to this Agreement or any Loan made by such member of the Lender Group, or change the basis of taxation of payments to such member of the Lender Group or any Person controlling such member of the Lender Group of any amounts payable hereunder (except for taxes on the overall net income of such member of the Lender Group or any Person controlling such member of the Lender Group), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such member of the Lender Group or any Person controlling such member of the Lender Group or (iii) impose on such member of the Lender Group or any Person controlling such member of the Lender Group any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such member of the Lender Group of making any Loan, or agreeing to make any Loan or to reduce any amount received or receivable by such member of the Lender Group hereunder, then, upon demand by such member of the Lender Group, the Borrower shall pay to such member of the Lender Group such additional amounts as will compensate such member of the Lender Group for such increased costs or reductions in amount.

(b)     If any member of the Lender Group shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such member of the Lender Group or any Person controlling such member of the Lender Group, and such member of the Lender Group determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained or any guaranty or participation with respect thereto, or such member of the Lender Group's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such member of the Lender Group's or any such other controlling Person's capital to a level below that which such member of the Lender Group or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained, or any guaranty or participation with respect thereto or any agreement to make Loans or such member of the Lender Group's other obligations hereunder (in each case, taking into consideration, such member of the Lender Group's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such member of the Lender Group, the Borrower shall pay to such member of the Lender Group from time to time such additional amounts as will compensate such member of the Lender Group for such cost of maintaining such increased capital or such reduction in the rate of return on such member of the Lender Group's or such other controlling Person's capital.

(c)     All amounts payable under this Section 4.05 shall bear interest from the date that is 10 days after the date of demand by any Lender or any Agent until payment in full to such Lender or such Agent at the Reference Rate. A certificate of such Lender or such Agent (the "Increased Costs Certificate") claiming compensation under this Section 4.05, specifying the event herein above described and the nature of such event shall be submitted by such Lender or such Agent to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Lender's or such Agent's reasons for invoking the provisions of this Section 4.05, and shall be final and conclusive absent manifest error. The Borrower agrees to pay such Lender such additional amount within 10 days after presentation by such Lender or such Agent of the Increased Costs Certificate to the

Borrower. Notwithstanding anything contained herein to the contrary, the Borrower shall not be obligated to pay any amount under this Section 4.05 to the extent it arose prior to the date which is 180 days preceding the date of such demand or to the extent such amount is attributable to periods prior to the date which is 180 days preceding the date of such demand.

(d)     Within 90 days after the date of demand by a Lender (such Lender, an "Affected Lender") for the payment of additional amounts to compensate such Affected Lender for increased costs or reductions in amount pursuant to Section 4.05(a) or (b), the Borrower may replace the Affected Lender with a new Lender (the "Replacement Lender") so long as (i) no Default or Event of Default has occurred and is continuing or would result therefrom, and (ii) such Replacement Lender is satisfactory to the Collateral Agent in its sole discretion. Within 30 days following notice by the Borrower of its intention to replace the Affected Lender with the Replacement Lender, the Affected Lender shall, pursuant to execution of an Assignment and Acceptance, sell and assign all of its Loans and Commitments to the Replacement Lender subject only to being paid an amount equal to the outstanding principal amount of all Loans held by the Affected Lender and all accrued interest and fees with respect thereto through the date of such sale; provided, however that the Borrower shall have reimbursed such Affected Lender for the additional amounts or increased costs that it is entitled to receive under this Agreement through the date of such sale and assignment.

## ARTICLE V

## CONDITIONS TO LOANS

Section 5.01          Conditions Precedent to Interim Facility Effectiveness.     The obligation of any Lender to make the initial Loans hereunder (or any other Person to otherwise to extend any credit provided for hereunder) is subject to the fulfillment, to the satisfaction of each Lender (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the conditions precedent set forth below:

(a)     Interim Bankruptcy Court Order.  The Interim Bankruptcy Court Order shall have been entered by the Bankruptcy Court on or before the 4th Business Day after the Filing Date, and the Collateral Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent prior written consent of the Agents, the Required Lenders and the Borrower. The Interim Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agents and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, during the Interim Period, the Liens and security interests in favor of the Collateral Agent referred to in Section 3.01 hereof shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens.

(b)     Payment of Fees, Etc.  The Borrower shall have paid all fees, costs, expenses and taxes then payable pursuant to Sections 2.06 or 12.04.

(c)     Representations and Warranties; No Event of Default.

(i)     The representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Agent or any Lender pursuant hereto or thereto on or prior to the Interim Facility Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Interim Facility Effective Date as though made on and as of such date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date), and

(ii)     No Default or Event of Default shall have occurred and be continuing on the Interim Facility Effective Date or would result from the making of the initial Loans (or other extensions of credit) under this Agreement.

(d)     Legality. The making of the initial Loans shall not contravene any law, rule or regulation applicable to any Agent or any Lender.

(e)     Delivery of Documents. The Collateral Agent shall have received on or before the Interim Facility Effective Date the following, each in form and substance satisfactory to the Collateral Agent and, unless indicated otherwise, dated the Interim Facility Effective Date:

(i)     certified copies of request for copies of information on Form UCC-11, listing all effective financing statements which name as debtor any Loan Party which are filed in the offices of such Loan Party's jurisdiction of organization together with copies of such financing statements, none of which, except as otherwise agreed in writing by the Collateral Agent, shall cover any of the Collateral and the results of searches for any tax Lien and judgment Lien filed against any Loan Party, which results, except (A) for Permitted Liens and (B) as otherwise agreed to in writing by the Collateral Agent, shall not show any such Liens;

(ii)     a copy of the resolutions of each Loan Party, certified as of the Interim Facility Effective Date by an Authorized Officer thereof, authorizing (A) the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (B) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith;

(iii)     a certificate of an Authorized Officer of each Loan Party, certifying the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (including the persons authorized to provide Notices of Borrowing and LIBOR Notices) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers;

(iv)     a certificate of the appropriate official(s) of the state of organization and each state of foreign qualification of each Loan Party in which the failure to be

duly qualified and licensed would constitute a Material Adverse Effect, certifying as to the subsistence in good standing of, and the payment of taxes by, such Loan Party in such states;

(v)     a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified prior to the Interim Facility Effective Date by an appropriate official of the state of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organized number is issued in such jurisdiction;

(vi)     a copy of the charter and by-laws, limited liability company agreement, operating agreement, agreement of limited partnership or other organizational document of each Loan Party, together with all amendments thereto, certified as of the Interim Facility Effective Date by an Authorized Officer of such Loan Party;

(vii)     an opinion of Willkie Farr & Gallagher LLP, counsel to the Loan Parties, and (B) opinions of other counsel to the Loan Parties, in each case, as to such other matters as the Collateral Agent may reasonably request;

(viii)     a certificate of an Authorized Officer of each Loan Party, certifying as to the matters set forth in Section 5.01(c);

(ix)     a copy of the Budget, together with a certificate of an Authorized Officer of the Parent stating that such Budget (excluding the line items relating to Carve-Out Expenses) has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the Agents;

(x)     a copy of the Financial Statements as described in Section 6.01(g) and financial projections which, other than the line items related to Carve-Out Expenses, have been prepared on a reasonable basis and in good faith and are based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties (it being understood that actual results may differ from projections), certified as of the Interim Facility Effective Date, by an Authorized Officer of the Parent;

(xi)     a schedule of Material Contracts of the Loan Parties, certified as of the Interim Facility Effective Date as true and correct by an Authorized Officer of the Parent;

(xii)     evidence of the insurance coverage required by Section 7.01 and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent may reasonably request, in each case, where requested by the Collateral Agent, with such endorsements as to the named insureds or loss payees thereunder as the Collateral Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days prior written notice to the Collateral Agent and each such named insured or loss payee; and

(xiii) such other agreements, instruments, approvals, opinions and other documents, each reasonably satisfactory to the Collateral Agent in form and substance, as the Collateral Agent may reasonably request.

(f) <u>Material Adverse Effect</u>. The Collateral Agent shall have determined, in its sole judgment, that no event or development shall have occurred since October 31, 2009 (other than the commencement of the Chapter 11 Cases, and events that typically result from the commencement of cases under Chapter 11 of the Bankruptcy Code), which could reasonably be expected to result in a Material Adverse Effect.

(g) <u>Priority</u>. The Collateral Agent shall be satisfied that it has been granted, and holds for the benefit of the Agents and the Lenders, a perfected, first priority Lien on, and security interest in, all of the Collateral, subject only to Permitted Priority Liens.

(h) <u>Payment of Certain Pre-Petition Obligations</u>. Prior to commencing the Chapter 11 Cases in the Bankruptcy Court, the Borrower shall have applied $2,021,133.00 of its cash on hand as a voluntary prepayment of the term loan outstanding under the Pre-Petition Credit Facility. Subject to approval of the Bankruptcy Court the revolving credit loans outstanding under the Pre-Petition Credit Facility shall be refinanced with the proceeds of Loans advanced under this Agreement on the Interim Facility Effective Date.

(i) <u>Approvals</u>. All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect.

(j) <u>Commencement of Chapter 11 Cases</u>. The Loan Parties shall have commenced the Chapter 11 Cases and no trustee, examiner or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over any Collateral.

(k) <u>First Day Motions and Orders.</u> The Agents shall have received on or before the Filing Date, copies of the first day motions to be filed by the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance reasonably satisfactory to the Agents, and the orders of the Bankruptcy Court approving such motions shall have been entered by the Bankruptcy Court on or before the 4th Business Day after the Filing Date.

(l) <u>Sale and Other Documents</u>. Agents shall have received (i) a copy of the Purchase Agreement, certified as true and correct by the Parent, which Purchase Agreement shall be (x) in form and substance reasonably satisfactory to Agents and (y) in full force and effect, subject to entry of the Sale Order and (ii) evidence satisfactory to Agents that the Loan Parties have submitted to the Bankruptcy Court on the Filing Date a motion, in form and substance satisfactory to the Agents for approval of a sale procedure reasonably acceptable to the Agents with respect to the Sale (such motion, the "<u>Sale Procedure Motion</u>", and the order

approving such motion and such procedure, which shall also be in form and substance satisfactory to the Agents, the "Sale Procedure Order").

(m) Payroll Account. Agents shall have received on or before the Filing Date, an executed copy of the Payroll Agreement together with satisfactory evidence that the Borrower has pre-funded the Payroll Account with sufficient funds to pay when due all accrued and unpaid payroll and related taxes for the then current employees of the Loan Parties for any one week period in an aggregate amount not to exceed 110% of the amount set forth in the Budget.

(n) CHS Escrow Account. Agents shall have received on or before the Filing Date, an executed copy of the CHS Escrow Agreement together with satisfactory evidence that such account shall contain not less than $9,238,578.77 in Investor Proceeds.

(o) Litigation. There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority and which is not stayed by the automatic stay which relates to the Loans or which, in the opinion of the Agents after consultation with counsel, has any reasonable likelihood of having a Material Adverse Effect.

(p) Compliance with Laws. The Loan Parties shall be in compliance with all applicable requirements of law, including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System.

(q) Proceedings; Receipt of Documents. All proceedings in connection with the making of the initial Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be reasonably satisfactory to the Collateral Agent, and the Collateral Agent shall have received all such information and such counterpart originals or certified or other copies of such documents as the Collateral Agent may reasonably request.

(r) Patriot Act Compliance. Each of the Agents and the Lenders shall have received satisfactory results of any compliance requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

Section 5.02        Conditions Precedent to Final Facility Effectiveness. The obligation of any Agent or any Lender to make any Loan during the Final Period shall commence as of the Business Day (the "Final Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents:

(a) Final Bankruptcy Court Order, Etc. The Final Bankruptcy Court Order shall have been signed and entered by the Bankruptcy Court on a date that is within thirty (30) days following the date of the entry of the Interim Facility Bankruptcy Court Order, and the Agents shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the Agents, the Required Lenders and the Borrower. The Final Bankruptcy Court Order shall (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agents and the

Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, on the Final Facility Effective Date, the Liens and security interests in favor of the Collateral Agent referred to in <u>Section 3.01</u> shall be valid and perfected Liens and security interests in the Collateral, prior to all other Liens and security interests in the Collateral and subject only to Permitted Priority Liens.

(b) <u>Payment of Fees, Etc</u>. The Borrower shall have paid on or before such date all fees, costs, expenses and taxes then payable pursuant to <u>Section 2.06</u> and <u>Section 12.04</u>.

(c) <u>Representations and Warranties; No Event of Default</u>. The following statements shall be true and correct: (i) the representations and warranties contained in ARTICLE VII and in each other Loan Document, certificate or other writing delivered to the Agents or the Lenders pursuant hereto or thereto on or prior to the Final Facility Effective Date are true and correct on and as of the Final Facility Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Final Facility Effective Date or would result from the making of Loans on such date.

(d) <u>Liens; Priority</u>. The Collateral Agent shall be satisfied that it has been granted, and still continues to hold, as the case may be, for the benefit of the Agents and the Lenders, a perfected, first priority Lien on and security interest in all of the Collateral, subject only to Permitted Priority Liens.

(e) <u>Budget</u>. The Agents shall have received an updated Budget in accordance with <u>Section 7.01(a)(vii)</u>, together with a certificate of an Authorized Officer of the Borrower dated as of the Final Facility Effective Date stating that such (excluding the line items relating to Carve-Out Expenses) has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Loan Parties to be reasonable at the time made and from the best information then available to the Loan Parties, which Budget shall be in form and substance satisfactory to the Agents.

(f) <u>Material Adverse Effect</u>. The Agents shall have determined, in their sole judgment, that no event or development shall have occurred since the Interim Facility Effective Date which could reasonably be expected to have a Material Adverse Effect.

(g) <u>Litigation</u>. There shall exist no claim, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority and which is not stayed by the automatic stay which relates to the Loans or which, in the opinion of the Agents, has any reasonable likelihood of having a Material Adverse Effect.

Section 5.03    <u>Conditions Precedent to All Loans</u>. The obligation of any Agent or any Lender to make any Loan is subject to the fulfillment of each of the following conditions precedent:

(a)    <u>Payment of Fees, Etc.</u>  The Borrower shall have paid all fees, costs, expenses and taxes then payable by the Borrower pursuant to this Agreement and the other Loan Documents, including <u>Sections 2.06</u> and <u>12.04</u>.

(b)    <u>Representations and Warranties; No Event of Default</u>.    The following statements shall be true and correct, and the submission by the Borrower to the Administrative Agent of a Notice of Borrowing with respect to each such Loan, and the Borrower's acceptance of the proceeds of such Loan, shall each be deemed to be a representation and warranty by each Loan Party on the date of such Loan that:   (i) the representations and warranties contained in <u>Article VI</u> and in each other Loan Document, certificate or other writing delivered any Agent or any Lender pursuant hereto or thereto on or prior to the date of such Loan (except to the extent that any such representations or warranties expressly relate solely to an earlier date) are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as though made on and as of such date, and (ii) at the time of and immediately after giving effect to the making of such Loan, no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date.

(c)    <u>Legality</u>.  The making of such Loan shall not contravene any law, rule or regulation applicable to any Agent or any Lender.

(d)    <u>Notices</u>.  The Administrative Agent shall have received a Notice of Borrowing pursuant to <u>Section 2.02</u>.

(e)    <u>Interim Bankruptcy Court Order; Final Bankruptcy Court Order</u>. The Interim Bankruptcy Court Order and/or the Final Bankruptcy Court Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to appeal, absent the prior written consent of the Agents, the Required Lenders and the Borrower.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01    <u>Representations and Warranties</u>.    Each Loan Party hereby represents and warrants to the Agents and the Lenders as follows:

(a)    <u>Organization, Good Standing, Etc.</u>  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the entry and the terms of the Bankruptcy Court Orders, has all requisite power and authority to conduct its business as now conducted and as currently contemplated and, in the case of the Borrower, to make the borrowings hereunder, and to execute and deliver each Loan Document

to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except, in the case of jurisdictions of foreign qualification, where the failure to be so qualified or in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)  <u>Authorization, Etc.</u>  The execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement, as applicable, or any applicable law or any contractual restriction binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties (other than conflicts, breaches and defaults, the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases).

(c)  <u>Governmental Approvals</u>.  Except for the entry of the Bankruptcy Court Orders, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party.

(d)  <u>Enforceability of Loan Documents</u>.  Subject to the entry of the Bankruptcy Court Orders, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws or general principles of equity.

(e)  <u>Subsidiaries</u>.  <u>Schedule 6.01(e)</u> (as such schedule maybe updated pursuant to <u>Section 7.01(b)</u>) is a complete and correct description of the name, jurisdiction of incorporation and ownership of the outstanding Capital Stock of each Subsidiary of Holdings. All of the issued and outstanding shares of Capital Stock of such Subsidiaries have been validly issued and are fully paid and non-assessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  Except as indicated on such Schedule, all such Capital Stock is owned by Holdings or one or more of its wholly-owned Subsidiaries, free and clear of all Liens.  Except as set forth in <u>Schedule 6.01(e)</u>, there are no outstanding debt or equity securities of Holdings or any of its Subsidiaries.  There are no outstanding obligations of Holdings or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from Holdings or any of its Subsidiaries, or other obligations of any Subsidiary to issue, directly or indirectly, any shares of Capital Stock of any Subsidiary of Holdings.

(f)  <u>Litigation; Commercial Tort Claims</u>.  Except for pre-petition litigation that is stayed by 11 U.S.C. §362 or as otherwise set forth in <u>Schedule 6.01(f)</u>, (i) there is no pending or, to the knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party before any court or other Governmental Authority or any arbitrator that (A) if adversely determined, could reasonably be expected to result in a Material Adverse Effect or (B) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby and (ii) as of the Interim Facility Effective Date, none of the Loan Parties holds any commercial tort claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant.

(g)  <u>Financial Condition</u>.

(i)  The Financial Statements, copies of which have been delivered to each Agent and each Lender, fairly present, in all material respects, the consolidated financial condition of the Parent and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of the Parent and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with GAAP (with interim statements subject to year-end adjustments), and since October 31, 2009, no event or development has occurred that has had or could reasonably be expected to result in a Material Adverse Effect (other than the commencement of the Chapter 11 Cases and events that typically result from the commencement of the Chapter 11 Cases).

(ii)  The Budget (excluding the line items relating to Carve-Out Expenses) when delivered, and as so updated, shall be believed by the Loan Parties at the time furnished to be reasonable, shall have been prepared on a reasonable basis and in good faith by the Loan Parties, and shall have been based on assumptions believed by the Loan Parties to be reasonable at the time made and upon the best information then reasonably available to the Loan Parties, and the Loan Parties shall not be aware of any facts or information that would lead it to believe that such Budget, as so updated, is incorrect or misleading in any material respect.

(h)  <u>Compliance with Law, Etc.</u>  No Loan Party is in violation of (i) its organizational documents, (ii) any law, rule, regulation, judgment or order of any Governmental Authority applicable to it or any of its property or assets, or (iii) any material term of any agreement or instrument (including any Material Contract) binding on or otherwise affecting it or any of its properties, except, in the case of clauses (ii) and (iii), to the extent such violations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect (taking into account the automatic stay) or as a result of the commencement of the Chapter 11 Cases, and no Default or Event of Default has occurred and is continuing.

(i)  <u>ERISA</u>.  None of the Loan Parties, any of their Subsidiaries, or any of their ERISA Affiliates maintains or contributes to any Benefit Plan; provided, however, that if Parent or one or more of its Subsidiaries elects to adopt a Benefit Plan or to acquire a Person that will become a Subsidiary of Parent and has a Benefit Plan, the parties agree to modify this Agreement pursuant to an amendment hereto that adds customary representations, warranties, covenants and events of default related to ERISA.

(j)    <u>Taxes, Etc.</u> All Federal, state and local tax returns and other reports (other than any immaterial reports) required by applicable law to be filed by any Loan Party have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon any Loan Party or any property of any Loan Party and which have become due and payable have been paid, except to the extent (i) contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP or (ii) the enforcement of the payment of any such taxes, assessments and other governmental charges arising prior to the Filing Date is stayed as a result of the commencement of the Chapter 11 Cases.

(k)    <u>Regulations T, U and X</u>. No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(l)    <u>Nature of Business</u>. No Loan Party is engaged in any business other than as set forth on <u>Schedule 6.01(l)</u> and business activities reasonably related or incidental thereto.

(m)    <u>Adverse Agreements, Etc.</u> No Loan Party is a party to any agreement or instrument, or subject to any charter, limited liability company agreement, partnership agreement or other corporate, partnership or limited liability company restriction or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which has, or could reasonably be expected to result in, a Material Adverse Effect.

(n)    <u>Permits, Etc.</u> Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent such failure to obtain or noncompliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except to the extent such suspension, revocation, impairment, forfeiture or non-renewal could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(o)    <u>Properties</u>.

(i)    Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens. All such properties and assets are in good working order and condition, ordinary wear and tear excepted. <u>Schedule 6.01(o)</u> sets forth a complete and accurate list, as of the Interim Facility Effective Date, of the location, by state and street address, of all real property owned or leased by each Loan Party. As of the Interim

Facility Effective Date, each Loan Party has valid leasehold interests in the Leases described on Schedule 6.01(o) to which it is a party.

(ii)    Schedule 6.01(o) sets forth with respect to each such Lease, as of the Interim Facility Effective Date, the commencement date, termination date, renewal options (if any) and monthly base rents. Each such Lease is valid and enforceable in accordance with its terms in all material respects and is in full force and effect. No consent or approval of any landlord or other third party in connection with any such Lease is necessary for any Loan Party to enter into and execute the Loan Documents to which it is a party, except as set forth on Schedule 6.01(o). As of the Interim Facility Effective Date, (x) to the knowledge of any Loan Party, no other party to any such Lease is in default of its obligations thereunder, (y) no Loan Party (or any other party to any such Lease) has at any time delivered or received any notice of default which remains uncured under any such Lease, and (z) to the knowledge of any Loan Party, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such Lease, except any such default, the enforcement of which is stayed by virtue of the filing of the Chapter 11 Cases.

(p)    Full Disclosure. Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the other reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading; provided that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. There is no contingent liability or fact that could reasonably be expected to result in a Material Adverse Effect which has not been set forth in a footnote included in the Financial Statements or a Schedule hereto.

(q)    [Intentionally Omitted].

(r)    Environmental Matters. Except as set forth on Schedule 6.01(r), (i) the operations of each Loan Party are in compliance with all Environmental Laws, except to the extent non-compliance could not, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect; (ii) there has been no Release at any of the properties owned or operated by any Loan Party which could reasonably be expected to result in a Material Adverse Effect; (iii) no Environmental Action has been asserted in writing against any Loan Party nor does any Loan Party have knowledge or notice of any threatened or pending Environmental Action against any Loan Party which could reasonably be expected to result in a Material Adverse Effect; (iv) to the knowledge of any Loan Party, no property now or formerly owned or occupied by a Loan Party has been used as a treatment or disposal site for any Hazardous Material; (v) no Loan Party has failed to report to the proper Governmental Authority the occurrence of any Release which is required to be so reported by any Environmental Laws which could reasonably be expected to result in a Material Adverse Effect; (vi) each Loan Party holds all licenses, permits and approvals required under any

Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which a Loan Party's failure to maintain or comply with could not reasonably be expected to result in a Material Adverse Effect; and (vii) no Loan Party has received any written notification pursuant to any Environmental Laws that (A) any work, repairs, construction or Capital Expenditures are required to be made in respect of any of its properties as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto or (B) any license, permit or approval referred to above is about to be reviewed, made subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to result in a Material Adverse Effect.

(s)     Insurance. Each Loan Party keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) worker's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law or as may be reasonably required by the Collateral Agent (including against larceny, embezzlement or other criminal misappropriation). Schedule 6.01(s) sets forth a list of all insurance maintained by each Loan Party on the Interim Facility Effective Date.

(t)     Use of Proceeds.  The proceeds of the Loans shall be used in accordance with the expenditure line items in the Budget to (i) in the case of any Loans made prior to the Final Facility Effective Date, (A) refinance existing Indebtedness in respect of the revolving loans outstanding under the Pre-Petition Credit Facility which refinancing shall occur on the Interim Facility Effective Date, (B) pay fees and expenses in connection with the transactions contemplated hereby, provided that in no event shall the Loan Parties apply any Loan proceeds or proceeds of any cash collateral to pay Carve-Out Expenses in excess of the Professional Expense Cap, (C) fund working capital of the Loan Parties and for other general corporate purposes, and (D) to the extent permitted by the Bankruptcy Court and Section 7.02(g) hereof, pay certain interest payments and professional fees owed under the Pre-Petition Credit Facility and (ii) in the case of any Loans made on and after the Final Bankruptcy Court Order Date, (A) pay fees and expenses in connection with the transactions contemplated hereby, provided that in no event shall the Loan Parties apply any Loan proceeds or proceeds of any cash collateral to pay Carve-Out Expenses in excess of the Professional Expense Cap, (B) fund working capital of the Loan Parties and for other general corporate purposes, and (C) to the extent permitted by the Bankruptcy Court and Section 7.02(g) hereof, pay certain interest payments and professional fees owed under the Pre-Petition Credit Facility.

(u)     [Intentionally Omitted].

(v)     Location of Bank Accounts.   Schedule 6.01(v) sets forth a complete and accurate list as of the Interim Facility Effective Date of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Loan Party, together with a description thereof (i.e.,

the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

(w)     Intellectual Property.  Except as set forth on Schedule 6.01(w), each Loan Party owns or licenses or otherwise has the right to use all licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, tradenames, copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other intellectual property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Set forth on Schedule 6.01(w) is a complete and accurate list as of the Interim Facility Effective Date of all material licenses, permits, patents, patent applications, registered trademarks, trademark applications, registered service marks, registered tradenames, registered copyrights, copyright applications, franchises, authorizations, non-governmental licenses and permits and other registered intellectual property rights of each Loan Party.  To the knowledge of the Loan Parties, no slogan or other advertising device, product, process, method, substance, part or other material now employed by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.   To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code is pending or proposed, which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(x)     Material Contracts.  Set forth on Schedule 6.01(x) is a complete and accurate list as of the Interim Facility Effective Date of all Material Contracts of each Loan Party, showing the parties and subject matter thereof and amendments and modifications thereto. Each such Material Contract (i) as of the Interim Facility Effective Date, is in full force and effect and is binding upon and enforceable against each Loan Party that is a party thereto and, to the knowledge of such Loan Party, all other parties thereto in accordance with its terms, (ii) contains no restrictions on the ability of the applicable Loan Party to grant a security interest in any of its rights thereunder in favor of the Collateral Agent, (iii) as of the Interim Facility Effective Date, has not been otherwise amended or modified, and (iv) is not in default due to the action of any Loan Party or, to the knowledge of any Loan Party, any other party thereto other than as a result of the commencement of the Chapter 11 Cases.

(y)     Investment Company Act.   None of the Loan Parties is an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(z)     Employee and Labor Matters.  There is (i) no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party which arises out of or under any collective bargaining agreement, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance

pending or threatened against any Loan Party or (iii) to the knowledge of any Loan Party, no union organizing activity taking place with respect to any of the employees of any Loan Party. No Loan Party or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. All material payments due from any Loan Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(aa) [Intentionally Omitted].

(bb) [Intentionally Omitted].

(cc) Separate Existence.

(i) To the knowledge of the Loan Parties, all material customary formalities regarding the separate existence of each Loan Party have been at all times since its formation observed in all material respects.

(ii) To the knowledge of the Loan Parties, each Loan Party has at all times since its formation accurately maintained its financial statements, accounting records and other organizational documents separate in all material respects from those of any Affiliate of such Loan Party and any other Person. To the knowledge of the Loan Parties, each Loan Party has at all times since its formation accurately maintained in all material respects its own bank accounts and separate books of account.

(iii) To the knowledge of the Loan Parties, each Loan Party has at all times since its formation paid its own material liabilities from its own separate assets.

(dd) Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN. Schedule 6.01(dd) sets forth a complete and accurate list as of the Interim Facility Effective Date of (i) the exact legal name of each Loan Party, (ii) the jurisdiction of organization of each Loan Party, (iii) the organizational identification number of each Loan Party (or indicates that such Loan Party has no organizational identification number), (iv) each place of business of each Loan Party, (v) the chief executive office of each Loan Party and (vi) the federal employer identification number of each Loan Party.

(ee) Tradenames. Schedule 6.01(ee) hereto sets forth a complete and accurate list as of the Interim Facility Effective Date of all tradenames used by each Loan Party.

(ff) Locations of Collateral. There is no location at which any Loan Party has any Collateral (except for Inventory in transit) other than (i) customer locations on which are located Collateral having an aggregate book value not in excess of $1,000,000 at any

time, (ii) those locations listed on Schedule 6.01(ff) and (iii) any other locations approved in writing by the Collateral Agent from time to time or otherwise permitted under Section 7.01(l). Schedule 6.01(ff) hereto contains a true, correct and complete list, as of the Interim Facility Effective Date, of the legal names and addresses of each warehouse at which Collateral of each Loan Party is stored. None of the receipts received by any Loan Party from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns.

(gg) Security Interests. Each Security Agreement creates in favor of the Collateral Agent, for the benefit of the Agents and the Lenders, a legal, valid and enforceable security interest in the Collateral covered thereby. Upon the entry of the Interim Bankruptcy Court Order and the delivery of appropriate Control Agreements, such security interests in and Liens on the Collateral granted thereby shall be perfected, first priority security interests (subject to Permitted Liens), and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens.

(hh) Schedules. All of the information which is required to be scheduled to this Agreement is set forth on the Schedules attached hereto, is correct and accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) and does not omit to state any information material thereto.

(ii) Representations and Warranties in Documents; No Default. All representations and warranties set forth in this Agreement and the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) at the time as of which such representations were made and on the Interim Facility Effective Date. No Event of Default has occurred and is continuing and no condition exists which constitutes a Default or an Event of Default.

(jj) [Intentionally Omitted].

(kk) Holdings as Holding Company. Holdings does not have any liabilities (other than liabilities (a) arising under the Loan Documents, and (b) in connection with the payment of any required franchise taxes and nominal board fees ), own any assets (other than the Capital Stock of the Parent) or engage itself in any operations or business.

(ll) Parent as a Holding Company. Parent does not have any material liabilities (other than certain tax obligations and liabilities (a) arising under the Loan Documents, (b) in connection with Indebtedness evidenced by the Senior Subordinated Notes, and (c) in connection with the payment of any required franchise taxes and nominal board fees), own any material assets (other than the Capital Stock of the Borrower) or engage itself in any operations or business.

(mm) Management Agreement. None of the Loan Parties is a party to any management, consulting or other services agreement with any of the shareholders or other

equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or with any other Subsidiaries or Affiliates of any Loan Party.

(nn) Administrative Priority; Lien Priority.

(i) After the Interim Bankruptcy Court Order Entry Date or the Final Bankruptcy Court Order Entry Date, as the case may be, the Obligations of the Loan Parties will constitute allowed administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of Carve-Out Expenses to the extent set forth in the Agreed Administrative Expense Priorities.

(ii) Upon entry of the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order, as the case may be, the Liens and security interests of the Collateral Agent on the Collateral referred to in Section 3.01 hereof shall be valid and perfected first priority Liens, subject only to Permitted Priority Liens.

(iii) On and after the Interim Bankruptcy Court Order Entry Date and prior to the Final Bankruptcy Court Order Entry Date, the Interim Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal, absent the written consent of the Agents, the Required Lenders and the Borrower, and on and after the Final Bankruptcy Court Order Entry Date, the Final Bankruptcy Court Order is in full force and effect, and has not been reversed, modified, amended, stayed, vacated or subject to appeal absent the written consent of the Agents, the Required Lenders and the Borrower.

(oo) Appointment of Trustee or Examiner; Liquidation. No order has been entered in any Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) to convert any Chapter 11 Case to a Chapter 7 case or to dismiss any Chapter 11 Case.

(pp) Hedging Agreement. Schedule 6.01(pp) sets forth, as of the Interim Facility Effective Date, a true and complete list of all Hedging Agreements, and any other hedging agreement of the Loan Parties, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof (including the hedged prices), all credit support agreements relating thereto, all interest rate(s) or exchange rate(s), as applicable, all margin required or supplied, and the counterparty to each such agreement.