# ARTICLE VII

## COVENANTS OF THE LOAN PARTIES

Section 7.01 <u>Affirmative Covenants</u>. So long as any principal of or interest on any Loan or any other Obligation (other than unasserted contingent indemnification obligations) shall remain unpaid or any Lender shall have any Commitment hereunder, each Loan Party will and will cause each of its Subsidiaries (other than Spheris, India Private Limited which shall be permitted to engage in those activities which are consistent with (i) past business practices, (ii) its obligations and restrictions contained in the Pre-Petition Loan Documents, and (iii) the Budget) to:

(a) <u>Reporting Requirements</u>. Furnish to each Agent and each Lender:

(i) as soon as available and in any event within 45 days after the end of each of the first 3 fiscal quarters in each Fiscal Year of the Parent and its Subsidiaries, consolidated and consolidating balance sheets, consolidated and consolidating statements of operations and retained earnings and consolidated and consolidating statements of cash flows of the Parent and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period of the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Parent as fairly presenting, in all material respects, the financial position of the Parent and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Parent and its Subsidiaries for such quarter, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Parent and its Subsidiaries furnished to the Agents and the Lenders, subject to normal year-end audit adjustments and the absence of footnotes;

(ii) as soon as available, and in any event within 90 days after the end of each Fiscal Year of the Parent and its Subsidiaries, consolidated and consolidating balance sheets, consolidated and consolidating statements of operations and retained earnings and consolidated and consolidating statements of cash flows of the Parent and its Subsidiaries as at the end of such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of (x) Ernst & Young or (y) other independent certified public accountants of recognized standing selected by the Parent and reasonably satisfactory to the Agents;

(iii) as soon as available, and in any event within 30 days after the end of each fiscal month of the Parent and its Subsidiaries, internally prepared consolidated balance sheets, consolidated statements of operations and retained earnings and consolidated statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, in each case, all in the form prepared for the Parent's board of directors and delivered by an Authorized Officer of the Parent.

(iv)     simultaneously with the delivery of the financial statements of the Parent and its Subsidiaries required by clauses (i) and (ii) of this Section 7.01(a), a certificate of an Authorized Officer of the Parent (A) stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Parent and its Subsidiaries during the period covered by such financial statements with a view to determining whether the Parent and its Subsidiaries were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the existence during such period of an Event of Default or Default or, if an Event of Default or Default existed, describing the nature and period of existence thereof and the action which the Parent and its Subsidiaries propose to take or have taken with respect thereto and (B) attaching a schedule showing the calculations in support of the financial statements;

(v)     [Intentionally Omitted];

(vi)     [Intentionally Omitted];

(vii)     (A) on Wednesday of every other week, in each case, after review and approval of an Authorized Officer of the Parent and in form and substance satisfactory to the Collateral Agent in its sole discretion, an updated and extended copy of the Budget, which Budget, when delivered and as so updated and extended, shall (1) be prepared on a reasonable basis and in good faith, (2) be based on assumptions believed by the Loan Parties and their Subsidiaries to be reasonable at the time made and upon the best information then reasonably available to the Loan Parties and their Subsidiaries, and (3) cover a period of eight consecutive weeks, commencing with the Friday of the most recently-ended calendar week, and shall be accompanied by a certificate of an Authorized Officer certifying as to the matters set forth in subclauses (1) and (2) above; and (B) on or before Wednesday of each week, after review and approval of an Authorized Officer of the Parent and in form and substance satisfactory to the Collateral Agent in its sole discretion, (1) a reconciliation of the actual cash receipts, disbursements, net cash, and outstanding Loans for the most recently-ended calendar week (on a weekly basis and for the four consecutive weeks ended as of the last day of the most recently-ended calendar week) to the amount set forth in each budgeted line item in the Budget for such week (and on a cumulative basis for the four consecutive weeks ended as the last day of the most recently-ended calendar week) and (2) a narrative detailing any discrepancies between the actual results for such week (and on a cumulative basis for the four consecutive weeks ended as the last day of the most recently-ended calendar week) and the Budget for such week (and on a cumulative basis for the four consecutive weeks ended as the last day of the most recently-ended calendar week).

(viii)     promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority and other than investigations the resolution of which, if determined adversely to the Parent or any of its Subsidiaries, could not reasonably be expected to have a Material Adverse Effect;

(ix)     as soon as possible, and in any event within 5 Business Days of an Authorized Officer's knowledge of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to result in a Material Adverse Effect, the written statement of an Authorized Officer of the Parent setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto and management's response thereto;

(x)     promptly and in any event within 10 days after any Loan Party thereof sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party thereof;

(xi)     promptly after the commencement thereof but in any event not later than 10 Business Days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(xii)     promptly after the sending or filing thereof, copies of all material written statements, reports and other information any Loan Party sends to all holders of a class of its material Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange;

(xiii)     promptly upon receipt thereof, copies of all management letters, if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xiv)     promptly and in any event within 30 days after the date on which a Loan Party has actual knowledge of the existence thereof, a description of any commercial tort claim, as defined in the Code, that such Loan Party obtains after the Interim Facility Effective Date that could reasonably be expected to result in awarded damages in excess of $2,500,000;

(xv)     as soon as possible and in any event within 5 Business Days after execution, receipt or delivery thereof, copies of any material agreements that any Loan Party executes or receives in connection with the sale or other Disposition of the Capital Stock of, or all or substantially all of the assets of, any Loan Party; and

(xvi)     promptly after the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by any Loan Party in the Chapter 11 Cases, which papers and documents shall also be given or served on each Agent's counsel;

(xvii)     promptly after the sending thereof, copies of all written reports given by any Loan Party to any official or unofficial creditors' committee in the Chapter 11 Cases, other than any such reports subject to privilege, provided that, such Person may redact any confidential information contained in any such report if it provides a summary of the nature of the information redacted to each Agent;

(xviii) as soon as available and in any event within thirty (30) days after the end of each month, a report setting forth as of the last Business Day of such month, a summary of the Loan Parties' hedging positions under each Hedging Agreement, including the type, term, effective date, termination date and notional principal amounts or volumes, the hedged price(s), as applicable, the net market to marked value thereof and any credit support agreements relating to such Hedging Agreement (including any margin required or supplied), and the counterparty to each such Hedging Agreement;

(xix) to the extent not included in clauses (i) through (xxvii) above, no later than the date the same are required to be delivered thereunder, copies of all agreements, documents or other instruments (including, if any, (A) audited and unaudited, pro forma and other financial statements, reports, forecasts, and projections, together with any required certifications thereon by independent public auditors or officers of the Loan Parties or any of their Subsidiaries or otherwise, (B) press releases, (C) statements or reports furnished to any other holder of the securities of the Loan Parties or any of their Subsidiaries, and (D) regular, periodic and special securities reports) that the Loan Parties or any of their Subsidiaries is required to provide pursuant to the terms of the Senior Subordinated Notes or the Sale Documents; and

(xx) promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time may reasonably request.

(b) <u>Additional Guaranties and Collateral Security</u>. Cause:

(i) each Subsidiary of any Loan Party not party to the Chapter 11 Cases on the Interim Facility Effective Date but which later becomes a party to the Chapter 11 Cases (the "<u>New Subsidiary</u>"), to, at the request of the Collateral Agent, execute and deliver to the Collateral Agent promptly (A) a Guaranty guaranteeing the Obligations, (B) a Security Agreement, together with (x) if such New Subsidiary has any Domestic Subsidiaries, (I) certificates (if any) evidencing all of the Capital Stock of such Domestic Subsidiaries owned by such New Subsidiary, (II) undated stock powers executed in blank, and (III) such opinions of counsel and such approving certificate of such Subsidiaries as the Collateral Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares, and (y) if such New Subsidiary has any first-tier Subsidiaries that are CFCs, (I) certificates (if any) evidencing all (or, 65% of the outstanding voting Capital Stock of such Subsidiaries if pledging or hypothecating more than 65% of the total outstanding voting Capital Stock of such Subsidiaries reasonably could be expected to result in material adverse tax consequences to the Loan Parties) of the outstanding voting Capital Stock of such Subsidiaries, (II) undated stock powers executed in blank, and (III) such opinions of counsel and such approving certificate of such Subsidiaries as the Collateral Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares, (C) if such New Subsidiary has a fee interest in any real property that would constitute After Acquired Property if it were acquired by a Loan Party, one or more Mortgages creating on such real property a perfected, first priority Lien (subject to Permitted Liens) on such real property, a Title Insurance Policy covering such real property, a current ALTA survey of such real property and a surveyor's certificate, a Phase I Environmental Site Assessment with respect

to such real property, certified to the Collateral Agent by a company reasonably satisfactory to the Collateral Agent, each in form and substance reasonably satisfactory to the Collateral Agent, together with such other agreements, instruments, and documents as the Collateral Agent may reasonably require whether comparable to the documents required under Section 7.01(k) or otherwise, (D) an amendment to Schedule 6.01(e) with respect to the creation or acquisition of such New Subsidiary, and (E) such other agreements, instruments, approvals, legal opinions, or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien (subject to Permitted Liens) purported to be covered by any such Security Agreement or Mortgage, or otherwise to effect the intent that such New Subsidiary shall become bound by all of the terms, covenants, and agreements contained in the Loan Documents and that all property and assets of such New Subsidiary shall become Collateral for the Obligations; _provided_ that the foregoing Guaranty, Security Agreement, and Mortgage requirements shall not be required to be provided to the Collateral Agent with respect to any New Subsidiary of a Loan Party that is a CFC if providing such documents reasonably could be expected to result in material adverse tax consequences to the Loan Parties; and

(ii)    each Loan Party that is the owner of the Capital Stock of such New Subsidiary to execute and deliver promptly and in any event within 3 Business Days after the formation or acquisition of such New Subsidiary (A) if such New Subsidiary is not a CFC or is a CFC and the pledge of 100% of the voting Capital Stock of such CFC could not reasonably be expected to result in material adverse tax consequences to the Loan Parties, (w) certificates (if any) evidencing all of the Capital Stock of such New Subsidiary, (x) undated stock powers or other appropriate instruments or assignment executed in blank, (y) such opinions of counsel and such approving certificate of such New Subsidiary as the Collateral Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares, and (z) such other agreements, instruments, approvals, legal opinions, or other documents reasonably requested by the Collateral Agent, or (B) if such New Subsidiary is a CFC and the granting of a pledge of more than 65% of the voting Capital Stock of such CFC reasonably could be expected to result in material adverse tax consequences to the Loan Parties, (w) certificates (if any) evidencing 65% of the outstanding voting Capital Stock of such New Subsidiary, (x) undated stock powers or other appropriate instruments or assignment executed in blank, (y) such opinions of counsel and such approving certificate of such New Subsidiary as the Collateral Agent may reasonably request in respect of complying with any legend on any such certificate or any other matter relating to such shares, and (z) such other agreements, instruments, approvals, legal opinions, or other documents reasonably requested by the Collateral Agent.

(c)    Compliance with Laws, Etc.    Except to the extent that non-compliance, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, comply, and cause each of its Subsidiaries to comply, with all applicable laws, rules, regulations, orders (including, without limitation, all Environmental Laws), judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), such compliance to include (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all other lawful claims which if unpaid might become a Lien or charge upon any of its properties, except, in

each case, to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP or to the extent that such compliance or payment or any enforcement action is stayed as a result of the Chapter 11 Cases.

(d) <u>Preservation of Existence, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the failure to be so qualified and in good standing could reasonably be expected to result in a Material Adverse Effect.

(e) <u>Keeping of Records and Books of Account</u>.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f) <u>Inspection Rights</u>.  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal business hours and, so long as no Default or Event of Default has occurred and is continuing, upon reasonable prior notice, at the expense of the Borrower (subject to the limitations set forth in <u>Section 4.01</u>), to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.

(g) <u>Maintenance of Properties, Etc.</u>  (i) Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear and damage from casualty excepted, and (ii) comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except to the extent any such noncompliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(h) <u>Maintenance of Insurance</u>.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any Governmental Authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent.  All property insurance policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as its interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to

be made under such policies. All certificates of insurance are to be delivered to the Collateral Agent, with the loss payable and additional insured endorsement in favor of the Collateral Agent and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)    <u>Obtaining of Permits, Etc.</u>  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business, except where the failure to obtain, maintain and preserve could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(j)    <u>Environmental</u>.  (i) Keep any property either owned or operated by it or any of its Subsidiaries free of any Environmental Liens caused by any of the Loan Parties; (ii) comply, and cause each of its Subsidiaries to comply, in with Environmental Laws, except to the extent that non-compliance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and provide to the Collateral Agent any documentation of such compliance which the Collateral Agent may reasonably request; (iii) provide the Agents written notice within 10 Business Days of any material Release of a Hazardous Material in excess of any reportable quantity from or onto property owned or operated by it or any of its Subsidiaries and take any Remedial Actions required to abate said Release; (iv) promptly provide the Agents with written notice within 10 Business Days of the receipt of any of the following: (A) notice that an Environmental Lien has been filed against any property of any Loan Party or any of its Subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Loan Party or any of its Subsidiaries; and (C) written notice of a violation, citation or other administrative order which could reasonably be expected to result in a Material Adverse Effect and (v) defend, indemnify and hold harmless the Agents and the Lenders and their transferees, and their respective employees, agents, officers and directors, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses (including attorney and consultant fees, investigation and laboratory fees, court costs and litigation expenses) arising out of (A) the presence, disposal, release or threatened release of any Hazardous Materials on any property at any time owned or occupied by any Loan Party or any of its Subsidiaries (or its predecessors in interest or title), (B) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials, (C) any investigation, lawsuit brought or threatened, settlement reached

or government order relating to such Hazardous Materials, (D) any violation of any Environmental Law or (E) any Environmental Action filed against any Agent or any Lender.

(k) <u>Further Assurances</u>. Subject to the terms of the Bankruptcy Court Orders, take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge, and deliver, at its sole cost and expense, such agreements, instruments, or other documents as any Agent may reasonably request from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens (subject to Permitted Liens) any of the Collateral and all other property of the Loan Parties (including commercial tort claims, deposit accounts, securities accounts and commodities accounts), (iii) to establish and maintain the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Agent and each Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court Orders, each Loan Party (A) authorizes each Agent to execute any such agreements, instruments, or other documents contemplated in the foregoing sentence in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office if Borrower or its Subsidiaries do not promptly execute, deliver, or file same after a request by either Agent, (B) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (C) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof. The assurances contemplated by this <u>Section 7.01(k)</u> shall be given under applicable non-bankruptcy law (to the extent not inconsistent with the Bankruptcy Code and the Bankruptcy Court Orders) as well as the Bankruptcy Code, it being the intention of the parties that the Collateral Agent may request assurances under applicable non-bankruptcy law, and such request shall be complied with (if otherwise made in good faith by the Collateral Agent) whether or not any of the Bankruptcy Court Orders are in force and whether or not dismissal of the Chapter 11 Cases or any other action by the Bankruptcy Court is imminent, likely or threatened.

(l) <u>Change in Collateral; Collateral Records</u>. (i) Give the Collateral Agent written notice within 30 days of any change in the location of any Collateral, other than to (or in-transit between) locations set forth on <u>Schedule 6.01(ff)</u> and exclusive of Inventory or Equipment with an aggregate value of less than $1,000,000, (ii) advise the Collateral Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or the Lien of the Collateral Agent granted thereon, and (iii) execute and deliver, and cause each of its Subsidiaries to execute and deliver, to the Collateral Agent for the benefit of the Agents and the Lenders from time to time, solely for the Collateral Agent's convenience in maintaining a record of Collateral, such written statements and schedules as the Collateral Agent may reasonably require, designating, identifying or describing the Collateral.

(m) <u>[Intentionally Omitted]</u>.

(n)     Use of Proceeds.  Use the proceeds of the Loans strictly in accordance with Section 6.01(t) and subject to the terms, conditions and limitations of this Agreement and the Bankruptcy Court Orders.

(o)     Fiscal Year.   Cause the Fiscal Year of the Parent and its Subsidiaries to end on December 31st of each calendar year unless the Agents have been given at least 30 days prior written notice of a change in such fiscal year of Parent and its Subsidiaries (and appropriate related changes to this Agreement have been mutually agreed to by the Borrower and the Collateral Agent).

(p)     Sale.

(i)     Cause the Sale Procedure Motion to be filed with the Bankruptcy Court by not later than the Filing Date (or such later date as the Collateral Agent may agree);

(ii)     Obtain entry of the Sale Procedure Order by no later than twenty (20) days after the Filing Date (or such later date as the Collateral Agent may agree); and

(iii)     Consummate the Sale pursuant to Section 363 of the Bankruptcy Code in accordance with the terms of the Purchase Agreement (or on other terms satisfactory to the Agents) and an order of the Bankruptcy Court satisfactory to Agents and Lenders by no later than sixty (60) days after the Filing Date (or as such later date as the Collateral Agent may reasonably agree).

(q)     Daily Cash Sweep of Blocked Accounts.  From the Interim Facility Effective Date until the Final Maturity Date, on each Business Day, the Loan Parties shall transfer, or confirm with each Blocked Account Bank that such Blocked Account Bank has transferred, all funds collected in each Blocked Account to the Administrative Agent's Account to repay the Obligations evidenced under this Agreement, provided, that if no Obligations are outstanding under this Agreement then (i) such funds shall be retained by the Loan Parties and used to fund the Borrower's operations in accordance with the Budget (it being understood and agreed that such funds shall not be permitted to pay Carve-Out Expenses in excess of the Professional Expense Cap), and (ii) the Borrower shall not be permitted to request and the Agents and Lenders shall not be obligated to make any further Loans until the Borrower shall have used such funds to fund the Borrower's operations in accordance with the Budget (it being understood and agreed that such funds shall not be permitted to pay Carve-Out Expenses in excess of the Professional Expense Cap).

(r)     Post-Closing Obligations.  Deliver to the Collateral Agent:

(i)     as soon as possible, but in any event within 5 Business Days after the Interim Facility Effective Date or, upon the reasonable discretion of the Collateral Agent, at such other date specified by the Collateral Agent, fully executed Control Agreements, in form and substance satisfactory to the Collateral Agent, with respect to each Blocked Account and Blocked Operating Account; and

(ii)     as soon as possible, but in any event within 10 Business Days after the Interim Facility Effective Date, or upon the reasonable discretion of the Collateral Agent, at such later date specified by the Collateral Agent, revised financial projections which shall be prepared on a monthly basis and shall include a balance sheet and a statement of cash flows, each in a form satisfactory to the Collateral Agent.

Section 7.02     Negative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (other than contingent indemnification obligations) shall remain unpaid or any Lender shall have any Commitment hereunder, each Loan Party shall not and shall not permit any of its Subsidiaries (other than Spheris, India Private Limited which shall be permitted to engage in those activities which are consistent with (i) past business practices, (ii) its obligations and restrictions contained in the Pre-Petition Loan Documents, and (iii) the Budget) to:

(a)     Liens, Etc.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any similar law or statute of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof); sell any of its property or assets subject to an understanding or agreement, contingent or otherwise, to repurchase such property or assets (including sales of accounts receivable) with recourse to it or any of its Subsidiaries or assign or otherwise transfer, or permit any of its Subsidiaries to assign or otherwise transfer, any account or other right to receive income; other than, as to all of the above, Permitted Liens.

(b)     Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)     Fundamental Changes; Dispositions.   Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or purchase or otherwise acquire, whether in one transaction or a series of related transactions, all or substantially all of the assets of any Person (or any division thereof) (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that

(i)     any wholly-owned Subsidiary of any Loan Party (other than Holdings, the Parent and the Borrower) may be merged into such Loan Party or another wholly-owned Subsidiary of such Loan Party, or may consolidate with another wholly-owned Subsidiary of such Loan Party, so long as (A) no other provision of this Agreement would be violated thereby, (B) such Loan Party gives the Agents at least 10 Business Days' prior written notice of such merger or consolidation, (C) no Default or Event of Default shall have occurred and be continuing either before or immediately after giving effect to such transaction, (D) the

Lenders' rights in any Collateral, including the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger or consolidation and (E) the surviving Subsidiary, if any, is joined as a Loan Party hereunder and is a party to a Guaranty and a Security Agreement and the Capital Stock of which Subsidiary is the subject of a Security Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger or consolidation;

(ii)     any Loan Party and its Subsidiaries may make Permitted Dispositions; and

(iii)     the Loan Parties may consummate the Sale, pursuant to the Purchase Agreement, the Sale Procedure Motion and the Sale Procedure Order.

(d)     <u>Change in Nature of Business; Change in Independent Certified Public Accountant</u>.  Make, or permit any of its Subsidiaries to make, any material change in the nature of its business as described in <u>Section 6.01(l)</u> and business activities reasonably related or incidental thereto, or acquire any material properties or assets that are not reasonably related to the conduct of such business activities.  Make any change in its independent certified public accountant (other than to an accounting firm of nationally recognized standing) without the prior written consent of the Agents, such consent not to be unreasonably withheld or delayed.

(e)     <u>Loans, Advances, Investments, Etc.</u>  Make or commit or agree to make any loan, advance guarantee of obligations, other extension of credit or capital contributions to, or hold or invest in or commit or agree to hold or invest in, or purchase or otherwise acquire or commit or agree to purchase or otherwise acquire any shares of the Capital Stock, bonds, notes, debentures or other securities of, or make or commit or agree to make any other investment in, any other Person, or purchase or own any futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase all or substantially all of the assets of any other Person, or permit any of its Subsidiaries to do any of the foregoing, except for: (i) investments existing on the date hereof, as set forth on <u>Schedule 7.02(e)</u> hereto, but not any increase in the amount thereof as set forth in such Schedule or any other material modification of the terms thereof, (ii) loans by a Loan Party to another Loan Party so long as such loan is made in the ordinary course of business, (iii) Permitted Investments existing on the date hereof, as set forth on <u>Schedule 7.02(e)</u> hereto, but not any increase in the amount thereof as set forth in such Schedule or any other material modification of the terms thereof, (iv) investments and loans in Spheris, India Private Limited solely to the extent set forth in the Budget, and (v) investments in Persons (other than Affiliates) acquired in compromise or settlement of claims against such Person, <u>provided</u>, that any such compromise or settlement in excess of $100,000 shall require the written consent of the Collateral Agent

(f)     <u>Sale/Leaseback Transactions</u>.  Create, incur or suffer to exist, or permit any of its Subsidiaries to create, incur or suffer to exist, any obligations as lessee for the payment of rent for any real or personal property in connection with any sale and leaseback transaction.

(g) <u>Prepayments of Certain Pre-Petition Obligations</u>. (i) Make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with any trustee with respect thereto money or securities before due for the purpose of paying when due) of any Pre-Petition Obligations of any Loan Party, in each case, incurred prior to the Filing Date, (ii) pay any interest on any Pre-Petition Obligations of any Loan Party, or (iii) make any payment or create or permit any Lien pursuant to Section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or apply to the Bankruptcy Court for the authority to do any of the foregoing; <u>provided</u>, however, the Loan Parties shall be entitled to make payments in respect of Pre-Petition Obligations in accordance with <u>Section 7.02(k)</u> and shall (x) make principal payments under the Pre-Petition Credit Facility to the extent permitted or required pursuant to the terms of this Agreement, (y) pay interest then due and owing to the lenders under the Pre-Petition Credit Facility, and (z) pay certain professional fees and expenses to the lenders under the Pre-Petition Credit Facility, in the case of each of clauses (x), (y) and (z), if such payments of principal, interest, fees and expenses are permitted by the Bankruptcy Court.

(h) <u>Restricted Payments</u>. (i) Declare or pay any dividend or other distribution, direct or indirect, on account of any Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (ii) make any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Capital Stock of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (iii) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Capital Stock of any Loan Party, now or hereafter outstanding, or (iv) pay any management fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party other than payments to certain service providers/employees listed on <u>Schedule 7.02(h)(iv)</u> which are (A) permitted pursuant to <u>Section 7.02(k)</u> in the case of payment obligations arising prior to the Filing Date and (B) set forth in the Budget.

(i) <u>Federal Reserve Regulations</u>. Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j) <u>Transactions with Affiliates</u>. Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, (ii) transactions with another Loan Party and (iii) transactions permitted by <u>Section 7.02(e)</u>.

(k) <u>Payments</u>. Make any payment of principal or interest or otherwise on account of any Indebtedness or trade payable incurred prior to the Filing Date, <u>provided</u> that

such payments may be made (x) in accordance with the Budget and (y) solely as and to the extent approved by the Bankruptcy Court: (i) to the holders (including administrators and third parties that are owed obligations in connection with payroll administration and employee benefit programs) of, or in respect of, wage, salary, commission, employee benefit and other employee compensation obligations (including expense reimbursements) which arose prior to the Filing Date; (ii) to landlords and other parties in connection with the assumption of unexpired leases under Section 365 of the Bankruptcy Code in an aggregate amount acceptable to the Collateral Agent; (iii) to non-debtor parties in connection with the assumption of executory contracts under Section 365 of the Bankruptcy Code; (iv) to the Lenders to repay the Pre-Petition Obligations arising under the Pre-Petition Credit Facility to the extent permitted by Section 7.02(g) and the terms of this Agreement; (v) in respect of insurance policies of the Loan Parties, including workers' compensation benefits and liability and property insurance policies of the Loan Parties; (vi) with respect to franchise taxes, payroll taxes, sales and use taxes, garnishment payments or other trust fund disbursements in accordance with past practice of the Loan Parties; (vii) to utility companies providing services to the Loan Parties in accordance with past practice of such Loan Parties; (viii) to persons authorized by the Bankruptcy Court order entered in connection with "DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTORS TO PAY PREPETITION OBLIGATIONS OF CERTAIN CRITICAL VENDORS AND SERVICE PROVIDERS, AND TO PAY CERTAIN PREPETITION CLAIMS ENTITED TO PRIORITY UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE", in a form reasonably satisfactory to the Collateral Agent ; and (ix) to other creditors of the Loan Parties, the identities of which are identified by the Borrower to the Collateral Agent and approved, in writing, by the Collateral Agent in their sole discretion.

(l)  _Limitation on Issuance of Capital Stock_.  Issue or sell or enter into any agreement or arrangement for the issuance and sale of, or permit any of its Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of, any shares of its Capital Stock, any securities convertible into or exchangeable for its Capital Stock or any warrants.

(m)  _Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc._  (i) Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would change the subordination provisions, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any respect, (ii) except for (x) the Obligations and the Pre-Petition Obligations under the Pre-Petition Credit Facility, and (y) Permitted Indebtedness of the type described in clauses (b) (to the extent permitted by this Agreement), (c), (d), (e), and (g) of the definition thereof, make any voluntary or optional payment, prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due), or refund, refinance, replace or exchange any other

Indebtedness for any such Indebtedness (except to the extent such Indebtedness is otherwise expressly permitted by the definition of "Permitted Indebtedness"), or make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any outstanding Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing, (iii) except as permitted by Section 7.02(c), amend, modify or otherwise change its name, jurisdiction of organization, organizational identification number or FEIN, or (iv) amend, modify or otherwise change its certificate of incorporation or bylaws (or other similar organizational documents), including by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it, with respect to any of its Capital Stock (including any shareholders' agreement), or enter into any new agreement with respect to any of its Capital Stock, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iv) that either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(n)   <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)   <u>Hedging Agreement</u>.  At any time, enter into or maintain in effect any Hedging Agreement other than Hedging Agreements entered into prior to the Filing Date to hedge or mitigate risks to which the Loan Parties have actual exposure in the ordinary course of business and not for speculative purposes.

(p)   <u>[Intentionally Omitted]</u>.

(q)   <u>Environmental</u>.  Permit the use, handling, generation, storage, treatment, release or disposal of Hazardous Materials at any property owned or leased by it or any of its Subsidiaries, except in compliance with Environmental Laws in a manner that such handling, generation, storage, treatment, release or disposal of Hazardous Materials could not reasonably be expected to result in a Material Adverse Effect.

(r)   <u>Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims</u>.

(i)   At any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Bankruptcy Court Orders, except for modifications and amendments agreed to by the Agents and the Required Lenders.

(ii)   At any time, suffer to exist a priority for any administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising of any kind or nature whatsoever), including, without limitation, any administrative expense of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 or 1114 of the Bankruptcy Code, equal or superior to the priority of

the Agents and the Lenders in respect of the Obligations, except as provided in <u>Section 3.02</u> and for the Carve-Out Expenses having priority of payment over the Obligations to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities".

(iii) At any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Collateral Agent, for the benefit of the Agents and the Lenders, in respect of the Collateral, except for Permitted Priority Liens.

(iv) Prior to the date on which the Obligations have been paid in full in cash, pay any administrative expense claims except (A) Priority Professional Expenses and other payments pursuant to sub-clause (i) of clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (B) Obligations due and payable hereunder, and (C) other administrative expense and professional claims incurred in the ordinary course of the business of the Loan Parties or their respective Chapter 11 Cases, in each case, to the extent and having the order of priority set forth in the definition of the term "Agreed Administrative Expense Priorities".

(s) <u>Holdings as Holding Company</u>. Permit Holdings to incur after the Filing Date any liabilities (other than liabilities arising under the Loan Documents), own or acquire any assets (other than the Capital Stock of the Parent and cash paid to it to pay liabilities permitted to be incurred by it under the Loan Documents and consistent with the Budget) or engage itself in any operations or business.

(t) <u>Parent as Holding Company</u>. Permit the Parent to incur after the Filing Date any liabilities (other than liabilities arising under the Loan Documents), own or acquire any assets (other than the Capital Stock of the Borrower and cash paid to it to pay liabilities permitted to be incurred by it under the Loan Documents and consistent with the Budget) or engage itself in any operations or business.

## ARTICLE VIII

## MANAGEMENT, COLLECTION AND STATUS OF
## ACCOUNTS RECEIVABLE AND OTHER COLLATERAL

Section 8.01        <u>Management of Collateral</u>.

(a) The Loan Parties shall assist the Administrative Agent in establishing, and, during the term of this Agreement, maintaining (i) blocked accounts (the "<u>Blocked Accounts</u>") with respect to each Loan Party's principal concentration accounts with the financial institutions set forth on <u>Part I of Schedule 8.01</u> hereto (the "<u>Blocked Account Bank</u>") and (ii) operating accounts ("<u>Blocked Operating Accounts</u>") with respect to each Loan Party's principal operating accounts with the financial institutions set forth on <u>Part II of Schedule 8.01</u> (the "<u>Blocked Operating Account Bank</u>"), and, in each case, entering into a Control Agreement relating to the Blocked Accounts and Blocked Operating Accounts with the Borrower, the Collateral Agent, each Blocked Account Bank and each Blocked Operating Account Bank, as applicable. Each of the Loan Parties shall irrevocably instruct its Account Debtors, with respect to its Accounts Receivable, to remit all payments to be made by them,

whether by means of checks or other drafts or by wire transfer or by Automated Clearing House, Inc. payment, to a Blocked Account and shall instruct the Blocked Account Bank to deposit all amounts received by it to a Blocked Account at such Blocked Account Bank on the day received or, if such day is not a Business Day, on the next succeeding Business Day. Accounts Receivable may be paid into the PayPal Account, which will not be subject to a Control Agreement unless otherwise requested by the Collateral Agent, provided, however, that all balances in such account shall be swept on a daily basis into a Blocked Account. The Escrow Accounts shall not be considered blocked accounts, provided, however, that any funds disbursed to any Loan Party shall be swept into a Loan Party's principal concentration account no later than the next succeeding Business Day after receipt thereof. Solely with respect to Section 4(C) of the CHS Escrow Agreement and during the term of this Agreement, the Loan Parties acknowledge and agree that they will not consent to the release of any funds from the CHS Escrow Account to Holdings III (or Community Health Systems Professional Services Corporation or any affiliate thereof) without obtaining the Collateral Agent's prior written consent. Each Loan Party will enforce, collect and receive all amounts owing on their Accounts Receivable for the Agents' benefit and on the Administrative Agent's behalf, but at such Loan Party's expense; such privilege shall terminate, at the election of any Agent, upon the occurrence and during the continuation of an Event of Default. All checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness received directly by any of the Loan Parties from any Account Debtor, as proceeds from their Accounts Receivable, or as proceeds of any other Collateral, shall be held by such Loan Parties in trust for the Agents and the Lenders and upon receipt be deposited by such Loan Parties in original form and no later than the next Business Day after receipt thereof into a Blocked Account. The Loan Parties shall not commingle such collections with their own funds or with the proceeds of any assets not included in the Collateral. All funds received in the Blocked Accounts and, during the continuance of an Event of Default if so directed by the Collateral Agent but subject to any conditions set forth in the Bankruptcy Court Orders, the Blocked Operating Accounts, shall be sent by wire transfer or Automated Clearing House, Inc. payment to the Payment Office or be credited to the Administrative Agent's Account for application at the end of each Business Day when such funds are received in the Administrative Agent's Account to reduce the then principal balance of the Loans, conditional upon final payment to the Administrative Agent, provided, that in the event there are no Obligations outstanding under this Agreement and no Event of Default has occurred or is continuing, then such funds shall be remitted by the Administrative Agent to the operating account of the Borrower identified as such on Schedule 8.01 and used solely to fund the Borrower's operations in accordance with the Budget (it being understood and agreed that such funds shall not be permitted to pay Carve-Out Expenses in excess of the Professional Expense Cap). No checks, drafts or other instruments received by the Administrative Agent shall constitute final payment to the Administrative Agent unless and until such checks, drafts or instruments have actually been collected.

(b)     After the occurrence and during the continuance of an Event of Default, the Collateral Agent may send a notice of assignment or notice of the Collateral Agent's security interest to any and all Account Debtors of the Loan Parties and, thereafter, the Collateral Agent shall have the sole right to collect the Accounts Receivable and payment intangibles of the Loan Parties or take possession of the Collateral and the books and records relating thereto. After the occurrence and during the continuation of an Event of Default, none of the Loan Parties shall, without prior written consent of the Collateral Agent, grant any

extension of time of payment of any Account Receivable or payment intangible, compromise or settle any Account Receivable or payment intangible for less than the full amount thereof, release, in whole or in part, any Person or property liable for the payment thereof, or allow any credit or discount whatsoever thereon.

(c)     Each Loan Party hereby appoints each Agent or its designee on behalf of such Agent as such Loan Party's attorney-in-fact with power exercisable during the continuance of an Event of Default to (i) endorse such Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Accounts Receivable or payment intangibles of such Loan Party, (ii) sign such Loan Party's name on any invoice or bill of lading relating to any of the Accounts Receivable or payment intangibles of such Loan Party, drafts against Account Debtors with respect to Accounts Receivable or payment intangibles of such Loan Party, assignments and verifications of Accounts Receivable or payment intangibles and notices to Account Debtors with respect to Accounts Receivable or payment intangibles of such Loan Party, (iii) send verification of Accounts Receivable of such Loan Party, and (iv) notify the Postal Service authorities to change the address for delivery of mail addressed to such Loan Party to such address as such Agent may designate and to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction), or for any error of judgment or mistake of fact or law; this power being coupled with an interest is irrevocable until all of the Loans and other Obligations under the Loan Documents are paid in full and all of the Commitments are terminated.

(d)     Nothing herein contained shall be construed to constitute any Agent as agent of any Loan Party for any purpose whatsoever, and the Agents shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof (other than from acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The Agents shall not, under any circumstance or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts Receivable of any Loan Party or any instrument received in payment thereof or for any damage resulting therefrom (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). The Agents, by anything herein or in any assignment or otherwise, do not assume any of the obligations under any contract or agreement assigned to any Agent and shall not be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

(e)     If any Account Receivable of any Loan Party includes a charge for any tax payable to any Governmental Authority, each Agent is hereby authorized (but in no event obligated) in its discretion to pay the amount thereof to the proper taxing authority for such Loan Party's account and to charge the Borrower therefor. The Borrower shall notify the Agents if any Account Receivable of any Loan Party includes any taxes due to any such Governmental Authority and, in the absence of such notice, the Agents shall have the right to

retain the full proceeds of such Account Receivable and shall not be liable for any taxes that may be due by reason of the sale and delivery creating such Account Receivable.

(f) Notwithstanding any other terms set forth in the Loan Documents, the rights and remedies of the Agents and the Lenders herein provided, and the obligations of the Loan Parties set forth herein, are cumulative of, may be exercised singly or concurrently with, and are not exclusive of, any other rights, remedies or obligations set forth in any other Loan Document or as provided by law.

Section 8.02    [Intentionally Omitted].

Section 8.03    Status of Collateral.  With respect to Collateral of any Loan Party at the time the Collateral becomes subject to the Collateral Agent's Lien, each Loan Party covenants, represents and warrants: (a) such Loan Party shall be the sole owner, free and clear of all Liens (except for the Liens granted in the favor of the Collateral Agent for the benefit of the Agents and the Lenders and Permitted Liens), and shall be fully authorized to sell, transfer, pledge or grant a security interest in each and every item of said Collateral; (b) such Loan Party shall maintain books and records pertaining to said Collateral in such detail, form and scope as the Agents shall reasonably require; (c) such Loan Party will, immediately upon learning thereof, report to the Agents any material loss or destruction of, or substantial damage to, any material portion of the Collateral, and any other matters affecting the value, enforceability or collectability of any material portion of the Collateral; (d) if any amount payable under or in connection with any Account Receivable is evidenced by a promissory note or other instrument, such promissory note or instrument shall be immediately pledged, endorsed, assigned and delivered to the Collateral Agent for the benefit of the Agents and the Lenders as additional Collateral; and (e) such Loan Party is not and shall not be entitled to pledge any Agent's or any Lender's credit on any purchases or for any purpose whatsoever.

Section 8.04    Collateral Custodian.    Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests. Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent may reasonably request to preserve the Collateral. All reasonable costs and expenses incurred by the Collateral Agent by reason of the employment of the custodian shall be the responsibility of the Borrower and charged to the Loan Account.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01    Events of Default.  If any of the following events shall occur:

(a) the Borrower shall fail to pay (i) any principal of any Loan or any Collateral Agent Advance when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), or (ii) any interest on any Loan or any Collateral Agent

Advance when due, or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due;

(b)     any representation, warranty, or certification made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate, or other document delivered to any Agent or any Lender by or on behalf of any Loan Party pursuant to any Loan Document shall have been incorrect in any material respect when made or deemed made;

(c)     any Loan Party shall fail to perform or comply with any covenant or agreement contained in

(i)     clauses (a), (b), (d), (f), (h) (as to only the first two sentences thereof), (n), (p), (q) or (r) of Section 7.01, Section 7.02, or Article VIII, or any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement (subject to applicable notice and cure periods set forth therein) to which it is a party or any Mortgage (subject to applicable notice and cure periods set forth therein) to which it is a party;

(ii)     clauses (e), (i), (j) (other than clauses (i) and (ii)), (l) (other than clause (iii)), or (o) of Section 7.01 and (in circumstances described in this clause (ii)) such failure, if capable of being remedied, shall remain unremedied for 5 Business Days, after the earlier of the date on which an Authorized Officer of any Loan Party shall have knowledge of such failure or the date written notice of such default shall have been given by any Agent or Lender to such Loan Party, or

(iii)     clauses (c), (g), (k), or (l)(iii) of Section 7.01 and (in circumstances described in this clause (iii)) such failure, if capable of being remedied, shall remain unremedied for 10 Business Days, after the earlier of the date on which an Authorized Officer of any Loan Party shall have knowledge of such failure or the date written notice of such default shall have been given by any Agent or Lender to such Loan Party.

(d)     any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for 20 days after the earlier of the date an Authorized Officer of any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by any Agent to such Loan Party.

(e)     Holdings or any of its Subsidiaries shall fail to pay any principal of or interest or premium on any of its Indebtedness incurred after the Filing Date (excluding the Obligations) to the extent that the aggregate principal amount of all such Indebtedness incurred after the Filing Date exceeds $50,000 when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such

Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof other than solely by operation of any due on sale clause applicable thereto;

(f)     the Interim Bankruptcy Court Order or the Final Bankruptcy Court Order shall have been stayed, amended, modified, reversed or vacated;

(g)     the Final Bankruptcy Court Order shall not have been entered by the Bankruptcy Court within thirty (30) days from the Interim Bankruptcy Court Order Entry Date;

(h)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(i)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(j)     an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the Total Commitment and payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the Liens and security interests granted to the Collateral Agent for the benefit of the Agents and the Lenders, and the priority thereof until such plan effective date;

(k)     an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Total Commitment, and the payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents, upon entry thereof;

(l)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Agents and the Required Lenders, (i) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Agents and the Lenders in respect of the Obligations, except for allowed administrative expenses having priority over the Obligations to

the extent set forth in the Agreed Administrative Expense Priorities, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien;

(m)     an application for any of the orders described in clauses (f) through (l) above shall be made by any Person and (i) such application is not contested by the Loan Parties in good faith or (ii) the relief requested is granted in an order that is not stayed pending appeal;

(n)     an order shall be entered by the Bankruptcy Court that is not stayed pending appeal granting relief from the automatic stay to any creditor of any Loan Party with respect to any claim in an amount equal to or exceeding $100,000 in the aggregate;

(o)     (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of any Agent's and/or the Lenders' claims or rights against any Loan Party or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any Lien or security interest created by this Agreement, the Bankruptcy Court Orders or any other Loan Document shall, for any reason, cease to be a valid first priority Lien, subject only to Permitted Priority Liens or (iii) any action is commenced by any Loan Party which contests the validity, perfection, enforceability or priority of any of the Liens and security interests of any Agent and/or the Lenders created by this Agreement, any of the Bankruptcy Court Orders or any other Loan Document;

(p)     the determination of any Loan Party, whether by vote of such Loan Party's board of directors or otherwise, to suspend the operation of such Loan Party's business in the ordinary course, liquidate all or substantially all of such Loan Party's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Loan Party's assets (except for the transactions contemplated by the Purchase Agreement or the Sale Procedure Order), or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing;

(q)     this Agreement, the Bankruptcy Court Orders or any other Loan Document, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(r)     any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(s)     any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason (other than as a direct

result of any action or omission of the Collateral Agent) fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(t)     one or more judgments, awards, or orders (or any settlement of any claim that, if breached, could result in a judgment, order, or award) for the payment of money exceeding $100,000 in the aggregate (the "Maximum Judgment Amount") shall be rendered against Borrower or any of its Subsidiaries and remain unsatisfied, or the Borrower or any of its Subsidiaries shall agree to the settlement of any one or more pending or threatened claims, actions, suits, or proceedings and the amount of such settlements requires that the affected Loan Party pay an amount exceeding $100,000 in the aggregate, and in the case of any such judgment or order either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, or (ii) there shall be a period of 30 consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect; provided, however, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection if and for so long as (A) the amount of such judgment, order, award or settlement in excess of the Maximum Judgment Amount is covered by a valid and binding policy of insurance between the Borrower and the insurer covering full payment thereof (subject to applicable deductibles) and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

(u)     any cessation of a substantial part of the business of any Loan Party for any period, or any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 15 days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, in each case if any such cessation, event or circumstance could reasonably be expected to result in a Material Adverse Effect;

(v)     the indictment of Holdings or any of its Subsidiaries under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against any Loan Party, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of Holdings and its Subsidiaries, taken as a whole;

(w)     a Change of Control shall have occurred;

(x)     an event or development occurs which could reasonably be expected to have a Material Adverse Effect; or

(y)     a Material Adverse Deviation shall have occurred;

then, and in any such event, the Collateral Agent may, and shall at the request of the Required Lenders, by notice to the Borrower, (i) terminate all Commitments, whereupon all

Commitments shall immediately be so terminated, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without further order of, or application to, the Bankruptcy Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law (including, but not limited to, the Bankruptcy Code and the Uniform Commercial Code), hereunder and under the other Loan Documents.

## ARTICLE X

## AGENTS

Section 10.01 <u>Appointment</u>. Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints and authorizes the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to <u>Section 2.02</u> of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Loans and Collateral Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; and (viii) subject to <u>Section 10.03</u> of this Agreement, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be

required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all makers of Loans.

Section 10.02 __Nature of Duties.__ The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents. The duties of the Agents shall be mechanical and administrative in nature. The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agents shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If any Agent seeks the consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender. Each Agent shall promptly notify each Lender any time that the Required Lenders have instructed such Agent to act or refrain from acting pursuant hereto.

Section 10.03 __Rights, Exculpation, Etc.__ The Agents and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral

Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The provisions of this <u>Section 10.03</u> are subject to, and shall not limit in any respect, the provisions of <u>Section 12.07</u>. The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to <u>Section 4.04</u>, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

Section 10.04     <u>Reliance</u>.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05     <u>Indemnification</u>.  To the extent that any Agent is not reimbursed and indemnified by any Loan Party, the Lenders will reimburse and indemnify such Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including advances and disbursements made pursuant to <u>Section 10.08</u>; <u>provided</u>, <u>however</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from such Agent's gross negligence or willful misconduct. The obligations of the Lenders under this <u>Section 10.05</u> shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.06     <u>Agents Individually</u>.  With respect to its Pro Rata Share of the Total Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan. The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders. Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any

kind of banking, trust or other business with the Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07          Successor Agent.

(a)     Each Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least 30 Business Days prior written notice to the Borrower and each Lender. Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)     Upon any such notice of resignation, the Required Lenders may appoint a successor Agent. Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. After any Agent's resignation hereunder as an Agent, the provisions of this Article X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(c)     If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Agent, with the consent of the other Agent shall then appoint a successor Agent who shall serve as an Agent until such time, if any, as the Required Lenders, with the consent of the other Agent, appoint a successor Agent as provided above.

Section 10.08          Collateral Matters.

(a)     The Collateral Agent may (but shall not be obligated) from time to time make such disbursements and advances ("Collateral Agent Advances") which the Collateral Agent, in its reasonable discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Loans and other Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement, including costs, fees and expenses as described in Section 12.04; provided, however that (i) the Collateral Agent shall not make any Collateral Agent Advance that would cause the aggregate principal amount of all Collateral Agent Advances outstanding at such time to exceed $5,000,000, and (ii) at or about the time of the making of any Collateral Agent Advance (as the urgency of the of the circumstances may dictate), the Collateral Agent shall provide a written offer to the Administrative Agent to participate (on a ratable basis), and the Administrative Agent shall have the right, but not the obligation, to participate in such Collateral Agent Advance by sending a written acceptance with 1 Business Day of its receipt of such written offer to the Collateral Agent. The Collateral Agent Advances shall be repayable on demand and be secured by the Collateral. The Collateral Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.02. The Collateral Agent shall notify each Lender and the Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such

Collateral Agent Advance. Without limitation to its obligations pursuant to <u>Section 10.05</u>, each Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Collateral Agent Advance. If such funds are not made available to the Collateral Agent by such Lender, the Collateral Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for 3 Business Days and thereafter at the Reference Rate.

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total Commitment and payment in full in cash of all Obligations (other than unasserted contingent indemnification Obligations); or constituting property being sold or disposed of in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders, and in each case to execute such customary documentation with respect to such release as is reasonably requested by the Borrower, at the Borrower's expense. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 10.08(b)</u>. The Collateral Agent agrees for the benefit of the Loan Parties to execute such reasonably requested documentation on the foregoing conditions.

(c)     Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in <u>Section 10.08(b)</u>), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under <u>Section 10.08(b)</u>. Either without such confirmation (if the Collateral Agent has not requested such confirmation) or upon receipt by the Collateral Agent of such confirmation (if the Collateral Agent has requested such confirmation), and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent to the extent permitted by <u>Section 10.08</u>; <u>provided</u>, <u>however</u>, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)     The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the

Collateral Agent in this <u>Section 10.08</u> or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09  <u>Agency for Perfection</u>. Each Lender hereby appoints each Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession or control of any such Collateral for the benefit of the Collateral Agent as secured party. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver possession or control of such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions On the Interim Facility Effective Date, the Collateral Agent hereby appoints the Administrative Agent as the Collateral Agent's sub-agent for purposes of obtaining "control" (as defined in the UCC) of any Blocked Account including actions relating to receiving funds deposited into any Blocked Account pursuant to any Control Agreement. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

## ARTICLE XI

## GUARANTY

Section 11.01  <u>Guaranty</u>. Each Guarantor hereby jointly and severally unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including all interest that accrues after the commencement of the Chapter 11 Cases irrespective of whether a claim therefor is allowed in such case or proceeding), fees, expenses or otherwise (such obligations, to the extent not paid by the Borrower, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Agents and the Lenders (or any of them) in enforcing any rights under the guaranty set forth in this Article. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Agents and the Lenders under any Loan Document but for the fact that they are unenforceable or not allowable for any reason whatsoever, including due to the existence of a bankruptcy, reorganization or similar proceeding involving any Loan Party.

Section 11.02  <u>Guaranty Absolute</u>. Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Agents or the Lenders with respect thereto. Each Guarantor agrees that this Article constitutes a guaranty of payment when due and

not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral. The obligations of each Guarantor under this Article are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions. The liability of each Guarantor under this Article shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Agent or any Lender;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)    any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Agents or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agents, the Lenders or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Section 11.03        Waiver.    Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article and any requirement that the Agents or the Lenders exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Agent or any Lender to seek payment or recovery of any amounts owed under this Article from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) to the extent permitted by applicable law, any other defense

available to sureties. Each Guarantor agrees that the Agents and the Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this Article, and acknowledges that this Article is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04    Continuing Guaranty; Assignments. This Article is a continuing guaranty and shall (a) remain in full force and effect until the later of (i) the cash payment in full of the Guaranteed Obligations (other than indemnification obligations as to which no claim has been made) and all other amounts payable under this Article and (ii) the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agents and the Lenders and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including all or any portion of its Commitments and its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05    Subrogation. No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agents and the Lenders against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Article shall have been paid in full in cash and all of the Commitments have been terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of the Agents and the Lenders and shall forthwith be paid to the Agents and the Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article thereafter arising. If (i) any Guarantor shall make payment to the Agents and the Lenders of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article shall be paid in full in cash and (iii) all Commitments have been terminated, the Agents and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

# ARTICLE XII

# MISCELLANEOUS

Section 12.01 <u>Notices, Etc.</u> All notices and other communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered, if to any Loan Party, at the following address:

**SPHERIS OPERATIONS LLC**
9009 Carothers Parkway
Franklin, TN  37067
Attention:   Chief Financial Officer
Telephone:  (615) 261-1500
Telecopier:  (615) 261-1792

with copies to:

**SPHERIS INC.**
9009 Carothers Parkway
Franklin, TN  37067
Attention:   General Counsel
Telephone:  (615) 261-1500
Telecopier:  (615) 261-1792

**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099
Attention:   William E. Hiller
Telephone:  (212) 728-8228
Telecopier:  (212) 728-8111

if to the Administrative Agent, to it at the following address:

**CRATOS CAPITAL MANAGEMENT, LLC**
3440 Preston Ridge Road, Suite 350
Alpharetta, GA  30005
Attention:   Portfolio Manager
Telephone:  (678) 368-4150
Telecopier:  (678) 366-0794

with a copy to:

**BINGHAM MCCUTCHEN LLP**
399 Park Avenue
New York, NY 10022
Attention:   Katherine G. Weinstein
Telephone:  (212) 705-7761
Telecopier:  (212) 702-3691

if to the Collateral Agent, to it at the following address:

**ABLECO, L.L.C.**
299 Park Avenue, 23rd Floor
New York, NY 10171
Attention:    Gerald M. Daniello
Telephone:  (212) 284-7810
Telecopier:  (212) 909-1489

in each case, with a copy to:

**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, NY 10022
Attention:    Eliot L. Relles
Telephone:  (212) 756-2199
Telecopier:  (213) 593-5955

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01. All such notices and other communications shall be effective, (i) if mailed, when received or 3 days after deposited in the mails, whichever occurs first, (ii) if telecopied, when transmitted and confirmation received, or (iii) if delivered, upon delivery, except that notices to any Agent pursuant to Article II shall not be effective until received by such Agent, as the case may be. Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Loan Parties or any other Person to serve upon the Agents and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Agents and the Lenders pursuant to the Bankruptcy Code.

Section 12.02          Amendments, Etc.

(a)    Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, waived, or modified except in accordance with the provisions of this Section 12.02. Subject to the additional requirements of Sections 12.02(b) and 12.02(c), as applicable, the Required Lenders and each Loan Party to the relevant Loan Document may (or, with the consent of the Required Lenders, the Collateral Agent and each Loan Party to the relevant Loan Document), from time to time, (i) enter into written amendments, waivers, or modifications hereto or to the other Loan Documents, or written consents to any departure herefrom or therefrom, or (ii) enter into written waivers, on such terms and conditions as the Required Lenders (or, with the consent of the Required Lenders, the Collateral Agent) may specify in such waivers, of any of the terms or provisions of this Agreement or the other Loan Documents or of any Default or Event of Default and its consequences.

(b)    No amendment, waiver, modification, or consent shall:

(i)    increase the amount or extend the expiration date of any Commitment of any Lender, forgive the principal amount or extend the final scheduled date of

maturity of any Loan, reduce the stated rate of interest on any Loan or any fee payable hereunder (except (x) in connection with the waiver of applicability of the Post-Default Rate (which waiver shall be effective with the written consent of the Required Lenders), and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the stated rate of interest or a reduction of fees for purposes of this clause (i)) or extend the scheduled date of payment thereof, in each case without the written consent of each Lender directly affected thereby,

(ii)      increase the Total Commitment without the written consent of each Lender,

(iii)     eliminate or change the voting rights of any Lender under this Section 12.02 without the written consent of such Lender,

(iv)      reduce the percentage specified in the definition of "Required Lenders" or amend the definition of "Pro Rata Share", without the written consent of each Lender,

(v)      release the Borrower or consent to the assignment or transfer by the Borrower of any of its rights or duties under this Agreement or the other Loan Documents, release all or substantially all of the Collateral, release all or substantially all of the Guarantors from their obligations under the Loan Documents, or subordinate any Lien granted in to the Collateral Agent (other than in respect of Permitted Liens), in each case without the written consent of each Lender,

(vi)     amend, modify or waive Section 4.04 or this Section 12.02 of this Agreement, without the written consent of each Lender,

(vii)    amend, modify or waive any payment required to be made under the terms of this Agreement or any Loan Document, without the written consent of each Lender,

(viii)   amend, modify, or waive any provision of Section 10 pertaining to the Collateral Agent, the definition of, or the terms or provisions of, or any other rights or duties of the Collateral Agent under this Agreement or the other Loan Documents, without the written consent of the Collateral Agent,

(ix)     amend, modify, or waive any provision of Section 10 pertaining to the Administrative Agent or any other rights or duties of the Administrative Agent under this Agreement or the other Loan Documents, without the written consent of the Administrative Agent, or

(x)      modify, waive, release or subordinate the superpriority claim status of the Obligations (except as permitted in this Agreement and the Loan Documents).

Section 12.03      No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right

under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04     <u>Expenses; Taxes; Attorneys Fees</u>.  The Borrower will pay on demand, all reasonable costs and expenses incurred by or on behalf of each Agent, each of its Affiliates and each of its Related Funds (and, in the case of clauses (c) through (n) below, each Lender), regardless of whether the transactions contemplated hereby are consummated (subject to any limitations set forth in <u>Section 4.01</u>), including reasonable fees, costs, client charges and expenses of counsel for each Agent (and, in the case of clauses (c) through (n) below, each Lender), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including the preparation of any additional Loan Documents pursuant to <u>Section 7.01(b)</u> or the review of any of the agreements, instruments and documents referred to in <u>Section 7.01(f)</u>), (b) any syndication of the Loans or the Commitments, (c) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (d) the preservation and protection of any of the Lenders' rights under this Agreement or the other Loan Documents, (e) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith (in each case, other than a claim or action arising from the gross negligence or willful misconduct of the applicable Agent or Lender, as determined by a final judgment of a court of competent jurisdiction), (f) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document (in each case, other than a claim or action arising from the gross negligence or willful misconduct of the applicable Agent or Lender, as determined by a final judgment of a court of competent jurisdiction), (g) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (h) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (j) any attempt to collect from any Loan Party, (k) all liabilities and costs of any Agent or Lender arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources alleged to have resulted from any Release of Hazardous Materials or any harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property, (l) any Environmental Liabilities and Costs of any Agent or Lender incurred in connection with the investigation, removal, cleanup or remediation of any Hazardous Materials present at or arising out of the operations of any facility owned or operated by any Loan Party  (in each case,

other than Environmental Liabilities and Costs arising from the actual operation of any such facility by such Agent or Lender), or (m) any Environmental Liabilities and Costs of any Agent or Lender incurred in connection with any Environmental Lien upon any property owned or operated by any Loan Party, or (n) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing. Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrower agrees to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by any Agent or any Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrower agrees to save each Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, (y) the Borrower agrees to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents (other than any broker engaged by any Agent or Lender), and (z) if the Borrower fails to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the reasonable expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrower.

Section 12.05       Right of Set-off.

(a)     Each of the Lenders agrees that it shall not, without the express written consent of the Collateral Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of the Collateral Agent, set off against the Obligations, any amounts owing by such Lender to Borrower or any deposit accounts of Borrower now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by the Collateral Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Administrative Agent pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent in excess of such Lender's ratable portion of all such distributions by Administrative Agent, such Lender promptly shall (1) turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

Section 12.06    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07    Assignments and Participations. (a) This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Loan Parties pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code); provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Each Lender may with the written consent of either Agent, assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitment and the Loans made by it; provided, however, that (i) such assignment is in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (x) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (y) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $5,000,000 or a multiple of $1,000,000 in excess thereof), (ii) except as provided in the last sentence of this Section 12.07(b), the parties to each such assignment shall execute and deliver to the Collateral Agent (and the Administrative Agent), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Collateral Agent, for the benefit of the Collateral Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required (y) in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or to a Related Fund of such Lender or (z) if Collateral Agent, in its sole discretion, waives payment of such fee), (iii) no written consent of the Collateral Agent or the Administrative Agent shall be required (1) in connection with any assignment by a Lender to an Affiliate of such Lender or a Related Fund of such Lender or (2) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender, and (iv) so long as no Event of Default has occurred or is continuing, such assignment shall require the prior written consent of the Borrower if such assignment is to a competitor (or its Affiliate) of the Loan Parties. Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be at least 3 Business Days after the delivery thereof to the Collateral Agent (or such shorter period as shall be agreed to by the Collateral Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its

obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto). Notwithstanding anything to the contrary contained in this Section 12.07(b), a Lender may assign any or all of its rights under the Loan Documents to an Affiliate of such Lender or a Related Fund of such Lender without delivering an Assignment and Acceptance to the Agents or to any other Person (a "Related Party Assignment"); provided, however, that (I) the Borrower and the Administrative Agent may continue to deal solely and directly with such assigning Lender until an Assignment and Acceptance has been delivered to the Administrative Agent for recordation on the Register, (II) the Collateral Agent may continue to deal solely and directly with such assigning Lender until receipt by the Collateral Agent of a copy of the fully executed Assignment and Acceptance pursuant to Section 12.07(e), (III) the failure of such assigning Lender to deliver an Assignment and Acceptance to the Agents shall not affect the legality, validity, or binding effect of such assignment, and (IV) an Assignment and Acceptance between the assigning Lender and an Affiliate of such Lender or a Related Fund of such Lender shall be effective as of the later of the date specified in such Assignment and Acceptance and the date when such Assignment and Acceptance is recorded on the Related Party Register.

(c) By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(d) The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (each, a

"Registered Loan") owing to each Lender from time to time. Subject to the last sentence of this Section 12.07(d), the entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice. In the case of an assignment pursuant to the last sentence of Section 12.07(b) as to which an Assignment and Acceptance is not delivered to the Administrative Agent, the assigning Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register (the "Related Party Register") comparable to the Register on behalf of the Borrower. Any such Related Party Register shall be available for inspection by the Borrower, any Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon receipt by the Administrative Agent of an Assignment and Acceptance, and subject to any consent required from the Administrative Agent, the Collateral Agent or the Borrower pursuant to Section 12.07(b) (which consents of the Administrative Agent, the Collateral Agent and the Borrower, as applicable must be evidenced by their respective execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(f)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register or the Related Party Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register or the Related Party Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agents shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(g)     In the event that any Lender sells participations in a Registered Loan, such Lender shall maintain a register for this purpose as a non-fiduciary agent of the Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. Any such Participant Register shall be available for inspection by the

Borrower, any Agent and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(h)     Any Non-U.S. Lender who is assigned an interest in any portion of such Registered Loan pursuant to an Assignment and Acceptance shall comply with Section 2.08(d).

(i)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document). The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.08 and Section 4.05 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender.

Section 12.08     Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

Section 12.09     GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE AND EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT.

Section 12.10     CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE. EACH OF THE PARTIES HERETO AGREE THAT ANY LEGAL ACTION OR

PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12.01. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT—AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 12.11    WAIVER OF JURY TRIAL, ETC.   EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12    Consent by the Agents and Lenders.   Except as otherwise expressly set forth herein to the contrary, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "Action") of any Agent or any Lender shall be

permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.13     No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14     Reinstatement; Certain Payments.  If any claim is ever made upon any Agent or any Lender for repayment or recovery of any amount or amounts received by such Agent or such Lender in payment or on account of any of the Obligations, such Agent or such Lender shall give prompt notice of such claim to each other Agent and Lender and the Borrower, and if such Agent or such Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Agent or such Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Agent or such Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Agent or such Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Agent or such Lender.  The provisions of this Section shall survive the repayment of the Obligations and release of the Liens granted under the Loan Documents.

Section 12.15     Indemnification.  In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each member of the Lender Group and all of their respective officers, directors, employees, attorneys, consultants and agents (collectively called the "Indemnitees") from and against any and all out-of-pocket losses, damages, liabilities, obligations, penalties, reasonable fees, reasonable costs and expenses (including reasonable attorneys fees, costs and expenses) ("Losses") incurred by such Indemnitees, whether prior to or from and after the Interim Facility Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) any Losses arising out of the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions (other than Losses arising from a claim by a Person (other than a Loan Party or an Affiliate thereof) that an Indemnitee has breached its obligations to such Person in connection with the Sale or a similar disposition) contemplated by this Agreement, (ii) any Losses arising out of any Agent's or any Lender's furnishing of funds to the Borrower under this Agreement or any other Loan Document, including the management of any such Loans, (iii) any Losses arising out of any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any Losses arising out of any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this Section 12.15 for

any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee or bad faith breach of such Indemnitee's obligations under the Loan Documents, in each case, as determined by a final judgment of a court of competent jurisdiction. Such indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees. This Indemnity shall survive the repayment of the Obligations and the discharge of the Liens granted under the Loan Documents.

Section 12.16    Records. The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Sections 2.06 or 3.03 hereof or the Fee Letter shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17    Binding Effect. This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrower pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code), except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18    Interest. It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrower); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such

applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrower). All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (i) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.18 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.18.

For purposes of this Section 12.18, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19    Confidentiality. Each Agent and each Lender agrees (on behalf of itself and each of its affiliates, directors, officers, employees and representatives) to keep confidential (using the same degree of care as it use to protect its own confidential information), any material non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing (including, in the case of information supplied orally, by email) by the Loan Parties as being confidential at the same time (or, the case of information supplied orally, at substantially the same time) such information is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure of any such information (i) to the extent required by statute, rule, regulation or judicial process, (ii) to counsel for any Agent or any Lender so long as such counsel is bound by a duty of confidentiality with such Agent or Lender, (iii) to examiners, auditors or accountants so long as such examiners, auditors or accountants are bound by a duty of confidentiality with

such Agent or Lender, (iv) to Securitization Parties; provided, however, that the Agent or Lender making disclosure to such Securitization Party shall be liable to the Borrower for actual damages suffered by the Borrower if such Securitization Party makes a disclosure of information received solely from the applicable Agent or Lender which disclosure would not be permitted to be made hereunder by such applicable Agent or Lender, (v) to the extent required, in connection with any litigation relating hereto or to the other Loan Documents and the transactions contemplated hereby and thereby to which any Agent or any Lender is a party or (vi) to any permitted assignee or participant (or prospective permitted assignee or participant) so long as such permitted assignee or participant (or prospective permitted assignee or participant) first agrees, in writing, to be bound by confidentiality provisions similar in substance to this <u>Section 12.19</u>. Each Agent and each Lender agrees that, upon receipt of a request or identification of the requirement for disclosure pursuant to clause (v) hereof, it will make reasonable efforts to keep the Loan Parties informed of such request or identification and will limit disclosure to that required by applicable law; <u>provided</u> that each Loan Party acknowledges that each Agent and each Lender may make disclosure as required or requested by any Governmental Authority or representative thereof and that each Agent and each Lender may be subject to review by Securitization Parties or other regulatory agencies and may be required to provide to, or otherwise make available for review by, the representatives of such parties or agencies any such non-public information.

Section 12.20      <u>USA PATRIOT Act</u>. Each Lender that is subject to the requirements of the USA PATRIOT Act (Title 111 of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, the "<u>USA PATRIOT Act</u>") hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrower, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrower in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

Section 12.21      <u>Debtor-Creditor Relationship</u>. The relationship between the Lenders and Agents, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor. None of the Lenders or the Agents has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with, and there is no agency or joint venture relationship between the Agents and the Lenders, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

Section 12.22      <u>Section Headings</u>. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

Section 12.23      <u>Integration</u>. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.24    <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>.  This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee or successor in interest of any Loan Party in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and Lenders and their respective assigns, transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agents or the Lenders file financing statements or otherwise perfect their security interests or Liens under applicable law.

Section 12.25    <u>Release</u>.  Subject to any conditions contained in any Bankruptcy Court Order, each Loan Party and each of its Affiliates in its individual capacity hereby forever releases, waives, and discharges each Pre-Petition Agent and each Pre-Petition Lender (whether in its pre-petition or post-petition capacity), together with its respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, in each case, in their capacity as such (collectively, the "<u>Released Parties</u>"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-Petition Loan Documents, any aspect of the pre-petition relationship between any Loan Party relating to any of the Pre-Petition Loan Documents or any transaction contemplated thereby, on the one hand, and any or all of the Released Parties, on the other hand, or any other acts or omissions by any or all of the Released Parties in connection with any of the Pre-Petition Loan Documents or their pre-petition relationship with any Loan Party or any affiliate thereof relating to any of the Pre-Petition Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or perfection of the Pre-petition Liens (as defined in the Interim Bankruptcy Court Order) or the Pre-Petition Obligations, "lender liability" claims and causes of action, any actions, claims, or defenses under chapter 5 of the Bankruptcy Code, or any other claims and causes of action.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER**:

**SPHERIS OPERATIONS LLC,**
a Tennessee limited liability company and as a debtor and debtor-in-possession

By: _____
Name:
Title:

**GUARANTORS**:

**SPHERIS HOLDING II, INC.,**
a Delaware corporation and as a debtor and debtor-in-possession

By: _____
Name:
Title:

**SPHERIS INC.,**
a Delaware corporation and as a debtor and debtor-in-possession

By: _____
Name:
Title:

**SPHERIS LEASING LLC,**
a Tennessee limited liability company and as a debtor and debtor-in-possession

By: _____
Name:
Title:

**SPHERIS CANADA INC.,**
a Tennessee corporation and as a debtor and debtor-in-possession

By: _____
Name:
Title:

**VIANETA COMMUNICATIONS,**
a California corporation and as a debtor and debtor-
in-possession

By: _____
Name:
Title:

**COLLATERAL AGENT AND LENDER**:

**ABLECO, L.L.C.,**
a Delaware limited liability company

By: _____
Name:    Daniel Wolf
Title:     President

**ADMINISTRATIVE AGENT AND LENDER**:

**CRATOS CAPITAL MANAGEMENT, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**LENDERS**:

_____,
a _____

By: _____
Name:
Title:

## SCHEDULES AND EXHIBITS

Schedule 1.01(A)      Lenders and Lenders' Commitments
Schedule 1.01(B)      Budget
Schedule 6.01(e)      Subsidiaries
Schedule 6.01(f)      Litigation; Commercial Tort Claims
Schedule 6.01(l)      Nature of Business
Schedule 6.01(o)      Real Property
Schedule 6.01(r)      Environmental Matters
Schedule 6.01(s)      Insurance
Schedule 6.01(v)      Bank Accounts
Schedule 6.01(w)      Intellectual Property
Schedule 6.01(x)      Material Contracts
Schedule 6.01(dd)     Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN
Schedule 6.01(ee)     Trade Names
Schedule 6.01(ff)     Locations of Collateral
Schedule 6.01(pp)     Hedging Agreements
Schedule 7.02(a)      Existing Liens
Schedule 7.02(e)      Existing Investments
Schedule 7.02((h)(iv) Certain Service Providers/Employees
Schedule 8.01         Blocked Accounts; Operating Account


Exhibit A    Form of Assignment and Acceptance Agreement
Exhibit B    Form of LIBOR Notice
Exhibit C    Form of Notice of Borrowing
Exhibit D    Form of Interim Bankruptcy Court Order