IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x

In re:                              : Chapter 11
                                    :
                                    : Case No. 10-10352 (KG)
                                    :
Spheris Inc., et al.,               :
                                    : Joint Administration Pending
                                    :
                                    :
                                    :
                                    : Objection Deadline for Bid Procedures: _____ __, 2010 at _:00 p.m.
                                    : Hearing Date for Bid Procedures: _____ __, 2010 at _:00 _.m.
                    Debtors.[1]      : Objection Deadline for Sale Motion: _____, 2010 at _:00 _.m.
                                    : Hearing Date for Sale Motion: _____ __, 2010 at _:00 _.m.

---------------------------------------------------x

## DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING BID PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS; (II) SCHEDULING HEARING TO CONSIDER SALE OF ASSETS; (III) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (IV) APPROVING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (B)(I) AUTHORIZING AND APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), through their undersigned proposed co-counsel, submit this motion (the "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of orders approving, among other things, the sale of substantially all of the assets of the Debtors, related bidding procedures, and certain protections for a potential purchaser of such assets. In support of this Motion, the Debtors respectfully represent:

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Spheris Inc. (5254); (ii) Spheris Holding II, Inc. (7969); (iii) Spheris Canada Inc. (9757); (iv) Spheris Leasing LLC (4780); (v) Spheris Operations LLC (1371); and (vi) Vianeta Communications (1121). The Debtors' executive headquarters are located at 9009 Carothers Parkway, Suite C-3, Franklin, Tennessee 37067.

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases

and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory

predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the

Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006 and 9014.

## BACKGROUND

2.     On the date hereof (the "Petition Date"), Spheris Inc. ("Spheris"), Spheris

Operations LLC and each of the other Debtors filed a voluntary petition for relief under chapter

11 of the Bankruptcy Code.

3.     The Debtors intend to continue in the possession of their respective

properties and the management of their respective businesses as debtors in possession pursuant

to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have requested that these

chapter 11 cases be consolidated for procedural purposes.

4.     As of the date hereof, no official committee of unsecured creditors has

been appointed.

5.     Spheris and its direct and indirect wholly-owned subsidiaries:  Spheris

Operations LLC, Spheris Leasing LLC, Spheris Canada Inc., Vianeta Communications, and

Spheris, India Private Limited ("Spheris India"), a non-Debtor entity (collectively, with the

Debtors, the "Company"), provide clinical documentation technology and services to health

systems, hospitals and group medical practices located throughout the United States.  Health care

providers are required to maintain records that document patient visits, treatments and

procedures.  The Company assists such health care providers in the efficient creation of such

2

records. The Company receives medical dictation in digital format from subscribing physicians, converts the dictation into text format (either through manual transcription or voice-recognition software), stores specific data elements from the records, and then transmits the completed medical record to the originating physician in the prescribed format. The turnaround time and detail with respect to any given record is dictated by the nature of the subject visit, treatment or procedure — regular patient visit records may be of lower priority and have a longer turnaround time, whereas records regarding critical surgery may be prioritized to "stat" status and transcribed in less than a few hours.

6. As of September 30, 2009, the Debtors' records reflected total gross revenue of approximately $120 million for the preceding nine months, total assets of approximately $61 million and total liabilities of approximately $225 million.

7. Additional information regarding the events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Affidavit of Robert L. Butler, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings, which was filed concurrently herewith and is incorporated herein by reference.

## DEBTORS' DECISION TO SELL THE ASSETS

8. During the past few years, the clinical documentation industry has undergone several changes including significant technology developments as well as accelerated price pressures. As a result, the Company's net revenues began to decline in the second half of 2008 and continued to decline in 2009. Because of the Debtors' liquidity difficulties, they determined that they would be unable to make the interest payment required to be made on December 15, 2009, under an indenture dated December 22, 2004 (the "Indenture"), pursuant to

3

which Spheris issued Senior Subordinated Notes in the principal amount of $125 million, which mature on December 15, 2012. The Company's eroding financial performance ultimately indicated that the Debtors would not be able to meet certain financial covenants for the quarter ended December 31, 2009, under a credit agreement dated July 17, 2007 (the "Senior Credit Agreement"), pursuant to which Ableco Finance LLC acts as collateral agent (the "Collateral Agent"), Cratos Capital Management, LLC acts as administrative agent (the "Administrative Agent" and, together with the Collateral Agent, the "Agents"), and certain other lenders are party thereto (collectively, with the Agents, the "Senior Lenders").

9.     The Indenture requires that Spheris file quarterly Form 10-Qs with the SEC to provide the holders of the Senior Subordinated Notes with certain financial information. On November 17, 2009, Spheris filed a Form 15 indicating that it would no longer be a voluntary filer, and, accordingly, Spheris did not make an SEC public filing for the quarterly period that ended on September 30, 2009. On January 3, 2010, the grace period with respect to the Debtors' disclosure failure expired and an Event of Default occurred under the Indenture. The Senior Credit Agreement provides that an Event of Default under the Indenture constitutes an Event of Default under the Senior Credit Agreement. On January 6, 2010, the Agents provided notice that the Senior Lenders were reserving their ability to exercise various rights and remedies as a result of the alleged Event of Default. Accordingly, the Debtors determined that a financial restructuring would be advisable, and ultimately, decided to effect that restructuring under the protection of chapter 11 of the Bankruptcy Code.

10.     While exploring potential paths to de-levering the Company's balance sheet, the Debtors began to consider a sale of all or substantially all of their assets. To that end, the Company's investment banker, Jefferies & Company, Inc. ("Jefferies") assisted the Company

4

in commencing an M&A process, whereby indications of interest were solicited from both financial and strategic potential purchasers. Given the Debtors' need to reduce their debt load, and the Debtors' increasing concerns about the potential deterioration of their business and concomitant degradation in value, the Debtors determined that the value of their estates would best be maximized and preserved through the sale of their operations. Over 45 parties were initially contacted and invited to conduct diligence and submit offers.

11.    Following a lengthy marketing process, the Debtors determined that the bid they received from Cbay Inc. ("CBay") and Medquist Inc. ("Medquist" and together with CBay, the "Purchasers") was the best available opportunity and commenced these chapter 11 cases to implement the proposed transaction with the Purchasers pursuant to section 363 of the Bankruptcy Code, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers (a "Sale").

12.    The Debtors believe that, unless a Sale is expeditiously consummated, whether to the Purchasers or to a purchaser submitting a higher or otherwise better offer, there will be significant deterioration in the value of their estates. In the wake of these chapter 11 filings, the Debtors began to lose key employees, despite their efforts to retain such personnel, and they expect that continued uncertainty would only lead to additional departures that could negatively affect the business. A drawn-out restructuring process would also likely lead to customer attrition, as customers turn to competitors who they believe can provide the same services with an increased sense of certainty. The Debtors' major competitors are aware of the Debtors' troubled financial condition due to recent public filings; furthermore, upon information and belief, such competitors have been casting doubts on the Company's viability to the Debtors' largest clients. The longer this situation continues without the Debtors having a definitive go-

forward plan, the higher the likelihood that the Debtors' major clients will take their business elsewhere. The Debtors will also likely face liquidity issues, as their restructuring costs continue to accrue.

13. Indeed, not only do the Debtors believe their business is not one that cannot endure a prolonged stay in chapter 11 without significant risk to the Company's survival, the Debtors believe that their proposed debtor-in-possession lenders are unwilling to fund a prolonged chapter 11 process. Moreover, the Debtors may not have a viable standalone restructuring proposal, as the Senior Lenders have not indicated that they are willing to fund such an approach; the Debtors have not been able to identify any alternative source of capital that would allow the Company to delever and provide it with the means to refinance. Accordingly, the prompt pursuit and consummation of a Sale is essential to maximizing the value of the assets of the estates.

14. In furtherance of this objective, the Debtors negotiated extensively with the Purchasers on the terms and conditions of the Stock and Asset Purchase Agreement (the "Stalking Horse Purchase Agreement"),[2] which was executed prior to the Petition Date. The Stalking Horse Purchase Agreement contemplates the sale of substantially all of the Debtors' assets (as more specifically identified in the Stalking Horse Purchase Agreement, the "Purchased Assets") to the Purchasers, free and clear of all liens, claims, encumbrances and other interests, other than certain permitted encumbrances and those liabilities expressly assumed by the Purchasers, in addition to the sale of the Spheris India Capital Stock (as defined in the Stalking Horse Purchase Agreement). The Stalking Horse Purchase Agreement contemplates that as consideration for the Purchased Assets and Spheris India Capital Stock, Purchasers will provide

---

[2] A copy of the Stalking Horse Purchase Agreement, in substantially final form but excluding schedules and exhibits, is annexed hereto as Exhibit A.

6

$75,249,600.90 in cash consideration. In addition, the Stalking Horse Purchase Agreement contemplates that the Purchasers will assume the Assumed Liabilities as consideration for the Purchased Assets and Spheris India Capital Stock.

15. The Purchasers' obligation to close the transaction under the Stalking Horse Purchase Agreement is subject to a number of conditions. Among others, the Purchasers are not obligated to close the transaction if a "Material Adverse Effect" on the Debtors has occurred. The Stalking Horse Purchase Agreement also includes a provision whereby a Material Adverse Effect will be deemed to have occurred if the Debtors experience customer terminations, volume reductions or provide price concessions to customers in excess of specified thresholds prior to the closing.

16. To obtain the maximum value for the Purchased Assets and the Spheris India Capital Stock, the Debtors propose to subject the sale of the Purchased Assets and the Spheris India Capital Stock to an auction process with the Stalking Horse Purchase Agreement serving as the baseline for any competing bids. In connection with the auction process, as a condition to serving as the "stalking horse," Purchasers requested certain bidding protections, including, in certain instances, a break-up fee in the amount of $2,100,000, (the "Break-Up Fee") and postpetition expense reimbursement not to exceed $375,000 (the "Expense Reimbursement"). Subject to approval by this Court, the Break-Up Fee and Expense Reimbursement shall constitute administrative expenses under Section 503(b)(1) of the Bankruptcy Code.

17. In addition, the Purchasers demanded reimbursement of certain expenses early in the negotiation process. Pursuant to that certain Letter Agreement, dated as of November 19, 2009, between CBaySystems Holdings Limited and Spheris Inc. (the

7

"Reimbursement Agreement"), prior to the Petition Date, the Debtors reimbursed Purchasers' expenses in the amount of $375,000. The obligation to pay the Expense Reimbursement under the Stalking Horse Purchase Agreement is exclusive of reimbursements made pursuant to the Reimbursement Agreement.

18. The Sale of the Purchased Assets and the Spheris India Capital Stock is subject to this Court's approval and the auction process proposed herein. If no other qualified bids are received for the Purchased Assets and the Spheris India Capital Stock that are higher or otherwise better than the transaction set forth in the Stalking Horse Purchase Agreement, the Debtors intend to sell the Purchased Assets and the Spheris India Capital Stock to the Purchasers pursuant to the terms of the Stalking Horse Purchase Agreement. The Debtors believe that the Sale of the Purchased Assets and the Spheris India Capital Stock on these terms will maximize the value of their estates for the benefit of their creditors and other interested parties.

## SUMMARY OF RELIEF REQUESTED[3]

19. The Debtors seek, pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014, the Court's approval of: (a) the Sale of the Purchased Asset and the Spheris India Capital Stock, pursuant to the Stalking Horse Purchase Agreement free and clear of interests, or the right to consummate a higher or otherwise better offer or transaction (a "Superior Transaction") with an alternative buyer (an "Alternative Purchaser"); (b) the institution of certain bidding, auction, and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets and the Spheris India Capital Stock, including the approval of payment of the Break-Up Fee and Expense

---

[3] Capitalized terms in this summary have the meanings given to them in this Motion or the Stalking Horse Purchase Agreement, as applicable.

Reimbursement to the Purchasers, under certain circumstances (collectively, the "Bidding Procedures," attached as Schedule 1 to the Bidding Procedures Order (as defined below)); and (c) the assumption, assignment and/or transfer of certain executory contracts and unexpired leases to the Purchasers or, alternatively, to such other Successful Bidder (as defined in the Bidding Procedures). Under the terms of the Stalking Horse Purchase Agreement, the Bidding Procedures Order must be entered by the Court no later than twenty (20) days after the Petition Date (i.e., February 23, 2010).

20. More specifically, through this Motion, the Debtors request that the Court enter the following orders:

(a) The Bidding Procedures Order: An order (the "Bidding Procedures Order," in substantially the form attached hereto as Exhibit B) approving: (i) the Bidding Procedures; (ii) the Break-Up Fee and Expense Reimbursement provisions of the Stalking Horse Purchase Agreement; (iii) the form of notice (the "Notice of Auction and Sale Hearing") setting forth the dates, times, and locations of the deadline to bid on the Purchased Assets and the Spheris India Capital Stock, the related auction (the "Auction") and the sale hearing (the "Sale Hearing") pursuant to the schedule proposed in the Bidding Procedures Order, subject to the Court's availability; and (iv) the notice (the "Notice of Assumption and Assignment") of the Debtors' intent to assume, assign and/or transfer to the Purchasers or, alternatively, to such other Successful Bidder, certain contracts, commitments, leases, licenses, permits, purchase orders, and any other executory contracts and unexpired leases (collectively, the "Executory Contracts and Unexpired Leases"), and the corresponding cure amounts required to be paid in connection with such assumption, assignment and/or transfer.

(b) The Sale Order: Following the Auction (if any), an order (the "Sale Order," in substantially the form attached hereto as Exhibit C) approving (i) the sale of the Purchased Assets and the Spheris India Capital Stock free and clear of Interests, and (ii) the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases to the Purchasers or, alternatively, to such other Successful Bidder under the Bidding Procedures.

21. The Debtors expressly reserve the right to modify the relief requested in this Motion, including the proposed Bidding Procedures, prior to or at the applicable hearing.

DB02:9227391.1                    068920.1001

## THE STALKING HORSE PURCHASE AGREEMENT

22.      Following extensive discussions and negotiations, the Debtors and the

Purchaser agreed to the terms of the Stalking Horse Purchase Agreement for the purchase of the

Purchased Assets and the Spheris India Capital Stock.  The significant terms of the Stalking

Horse Purchase Agreement are:[4]

(a)      Purchased Assets:  Pursuant to Section 2.1, Purchased Assets include all right, title and interest of the Debtors of any nature whatsoever in the following, free and clear of any and all Encumbrances of any and every kind, nature and description other than Permitted Encumbrances and Assumed Liabilities:

(i)      the Assumed Contracts and all rights thereunder;

(ii)      the Assumed Leases and all rights thereunder, including all options to renew, purchase, expand or lease (including rights of first refusal, first negotiation and first offer), and all credit for the prepaid rent associated therewith (excluding Lease Security Deposits);

(iii)      all Accounts Receivable of the Debtors;

(iv)      all Equipment used or held for use in the business of the Spheris Entities;

(v)      the Closing Cash;

(vi)      all real, personal and intangible property Taxes prepaid and not attributable to Pre-Closing Tax Periods;

(vii)      all advertising, marketing and promotional materials and all other printed or written materials used in connection with the business of the Spheris Entities;

(viii)      all Books and Records (provided that the Debtors may, in their discretion, retain one copy of the Books and Records);

(ix)      all Permits transferable under applicable Law;

---

[4]      The following is a summary of certain of the material terms set forth in the Stalking Horse Purchase Agreement annexed hereto as Exhibit A.  Capitalized terms used but not defined in this section have the meanings given to them in the Stalking Horse Purchase Agreement.  To the extent that this summary differs in any way from the terms set forth in the Stalking Horse Purchase Agreement, the terms of the Stalking Horse Purchase Agreement shall control.

DB02:9227391.1                                                                                          068920.1001

(x)     all Intellectual Property Rights owned by the Debtors or which the Debtors have the right to transfer or assign (together with the Intellectual Property Rights of Spheris India acquired under Section 2.3;

(xi)    all goodwill associated with the business of the Spheris Entities;

(xii)   any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any Purchased Asset subject to Section 5.1(m) to the extent occurring after the date hereof but prior to the Closing, and all right and claim of the Debtors to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing;

(xiii)  all other assets, inventory, properties, and rights used or held for use by the Debtors in connection with the business of the Spheris Entities;

(xiv)   any Lease Security Deposit that has not been returned to Debtors as contemplated by Section 5.13(a); and

(xv)    other than as set forth in Section 2.2(a), all rights, claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent related to the Purchased Assets or the Assumed Liabilities.

(b)     Excluded Assets:  Pursuant to Section 2.2, notwithstanding anything to the contrary in the Stalking Horse Purchase Agreement, nothing therein contained shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets to Medquist or any Affiliate of Medquist, and Debtors shall retain all right, title and interest to, in and under the Excluded Assets and neither the Medquist nor any Affiliate of Medquist shall have any Liability therefor.  "Excluded Assets" shall mean the following assets, properties and rights of the Debtors:

(i)     any and all rights of the Debtors under the Stalking Horse Purchase Agreement or any other agreement by and between any Seller and any Purchaser;

(ii)    all avoidance claims or causes of action available to the Debtors under chapter 5 of title 11, including Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code;

(iii)   the Excluded Agreements and any and all rights thereunder and prepaid assets related thereto;

11

(iv)     any prepaid Property Tax attributable to Pre-Closing Tax Periods, and any refund of Taxes that are not Assumed Liabilities;

(v)     all rights of Debtors in and to the Escrow Accounts;

(vi)     any claim, deposit, prepayment, refund, suit, cause of action, chose in action, right of recovery, right of setoff and right of recoupment or similar right of a Seller (A) against, or receivable from, any Seller or Spheris Holding III or any Affiliate (other than Spheris India) of the foregoing (including against any director, officer, employee or agent of the foregoing), (B) against, or receivable from, any insurance policy by or for the benefit of a person or entity described in the foregoing subclause (A) or (C) arising outside of the ordinary course of the business of the Debtors and unrelated to the Purchased Assets or the Assumed Liabilities, in each case, for conduct, events or circumstances occurring prior to the Closing;

(vii)     any cash or cash equivalents (including Seller Restricted Cash), pre-paid expenses and all bank accounts of the Debtors (including, for this purpose, all collected funds (including checks), at or prior to 12:01 a.m., New York City time on the Closing Date received by the Debtors (including in a lockbox of any Seller)) other than Closing Cash and the Spheris India Restricted Cash;

(viii)     any capital stock, securities, or other interest of any Seller held in any other Seller or any other Person, except for the Spheris India Capital Stock;

(ix)     any asset of any Seller that would constitute Purchased Assets (if owned by such Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date of the Stalking Horse Purchase Agreement until the Closing Date in accordance with the terms of the Stalking Horse Purchase Agreement (including, without limitation, Section 5.1(h));

(x)     all security, vendor, utility, and other similar deposits (other than the Lease Security Deposits), prepaid expenses, advances, advance payments, prepayments, deferred charges or rebates in favor of the Debtors, including collateral pledged for workers' compensation;

(xi)     any Lease Security Deposit that is not a Purchased Lease Security Deposit;

(xii)     all assets of the Debtors under the U.S. Benefit Plans and the Foreign Benefit Plans (except the Indian Benefit Plans);

(xiii)     all rights, claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights

(known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent related exclusively to the assets rights and properties set forth in this Section 2.2(a) or the Excluded Liabilities; and

(xiv) Retained Books and Records; provided that Debtors shall use commercially reasonable efforts to provide Purchasers with a copy (and shall allow Purchasers to make a copy) of any Retained Books and Records that are related to the Purchased Assets, the Assumed Liabilities or the Spheris India Capital Stock; provided, further, that in no case shall the Debtors be obligated to provide the Purchasers with any Retained Books and Records protected by the attorney-client privilege, work product doctrine or similar privileges or doctrines or if doing so would be contrary to applicable Law.

Notwithstanding anything in the Stalking Horse Purchase Agreement to the contrary, Medquist may, in its sole and absolute discretion, at any time on or prior to the date that is one Business Day before the Closing Date, elect not to acquire any of the assets, properties and rights of the Seller, and any asset so designated by Medquist shall be an Excluded Asset for all purposes thereunder; provided, however, that with respect to Contracts and Leases, such designation shall be made in accordance with Section 2.9 of the Stalking Horse Purchase Agreement.

(c) Purchase and Sale by CBay: Pursuant to Section 2.3, The Equity Sellers agree to sell, transfer, assign, convey and deliver to CBay, and, as applicable, one or more CBay Designees, at the Closing, and CBay hereby agrees to purchase, acquire and assume, or cause one or more CBay Designees to purchase, acquire and assume, from the Equity Sellers at the Closing, upon the terms and subject to the conditions of the Stalking Horse Purchase Agreement, all right, title and interest in and to the Spheris India Capital Stock, free and clear of any and all Encumbrances of any and every kind, nature and description other than Permitted Encumbrances.

CBay agrees to assume, or to cause a CBay Designee to assume, as of the Closing Date, one half of the Spheris India Payables.

(d) Assumption of Liabilities: Pursuant to Section 2.6, and to the extent permitted by applicable Law, on the Closing Date, Medquist and one or more Medquist Designees shall assume and agree to pay, perform and discharge when due, the Assumed Liabilities. For purposes of the Stalking Horse Purchase Agreement, "Assumed Liabilities" shall mean only the following Liabilities (to the extent not paid at or prior to the Closing):

(i) the Ordinary Course Balance Sheet Liabilities of the Debtors;

13

(ii)    any Liabilities of the Debtors arising after the Closing under, and the Cure Costs in respect of, Assumed Leases and Assumed Contracts;

(iii)   the portion of Transfer Costs for which Medquist is responsible under <u>Section 7.5</u> and the portion of Property Taxes for Straddle Periods allocated to Medquist pursuant to <u>Section 7.5(c)</u>;

(iv)    Property Taxes imposed with respect to the Purchased Assets or the Assumed Liabilities for a taxable period arising after, but assessed prior to, the Closing Date;

(v)     the Liabilities of the Debtors arising under the Purchased Assets, but only to the extent such Liabilities result from events or circumstances occurring from and after the Closing, and excluding, for the avoidance of doubt, the Excluded Liabilities; and

(vi)    the half of the Spheris India Payables that are not CBay Assumed Spheris India Payables.

(e)    <u>Release of Claims</u>: Pursuant to <u>Section 5.10</u>, notwithstanding anything contained in the Stalking Horse Purchase Agreement to the contrary (including, without limitation, any restriction contained in Section 5.1) prior to the Closing, Spheris India shall deliver to each Seller, a full, irrevocable and unconditional release of any and all claims, actions, refunds, causes of action, choses in action, actions, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against the Debtors and their current and former officers, directors, stockholders, employees, agents, representatives, attorneys, investors, parents, predecessors, subsidiaries, successors, assigns, and affiliates, each of the foregoing in their capacity as such (individually and collectively, the "<u>Spheris Released Parties</u>"), from all actions, causes of action, damages, claims, and demands whatsoever, in law or in equity, known or unknown, contingent or liquidated, whether direct claims or for indemnification or contribution, that Spheris India ever had, now has, or may have against the Spheris Released Parties in connection with any event, conduct or circumstance occurring prior to the Closing. In the event that the Release is not delivered by Spheris India to each Seller prior to the Closing pursuant to <u>Section 5.10(a)</u>, after the Closing, CBay shall cause Spheris India to promptly upon the request of any Seller (and in any event within two (2) Business Days of such request) deliver the Release to the Debtors.

(f)    <u>Purchase Price Deposit</u>: Pursuant to <u>Section 2.10</u>, within one (1) Business Day of the execution of the Stalking Horse Purchase Agreement, Purchasers shall deposit into escrow an earnest money deposit (the "<u>Purchase Price Deposit</u>") in the amount of $7,500,000 as security for the performance of the Purchasers' obligations under the Stalking Horse Purchase Agreement. The Purchase Price

14

Deposit together with any interest thereon shall be applied against the Purchase Price at Closing in accordance with the Deposit Escrow Agreement. Except as set forth in <u>Section 2.10(b)</u>, if the Stalking Horse Purchase Agreement shall be terminated pursuant to <u>Section 8.1</u>, the Purchase Price Deposit, together with any interest earned thereon, shall be delivered to the Purchasers no later than one Business Day after such termination.

If this Agreement is terminated by the Debtors pursuant to <u>Section 8.1(d)</u> or <u>Section 8.1(k)</u>, the Purchase Price Deposit, and all interest thereon, shall be delivered to the Debtors in accordance with the terms of the Deposit Escrow Agreement.

(g)     <u>Breakup Fee; Expense Reimbursement; Seller Remedies</u>: Pursuant to <u>Section 8.3</u>, the Debtors shall pay, or cause to be paid, to Purchasers the Break-Up Fee:

(i)     if the Stalking Horse Purchase Agreement is terminated pursuant to <u>Section 8.1(b)</u>, <u>Section 8.1(f)</u> or <u>Section 8.1(h)</u>, and Debtors enter into an agreement with respect to a Competing Transaction no later than the 120th day following such termination, which Breakup Fee shall be paid no later than three (3) Business Days following the consummation by the Debtors of such Competing Transaction;

(ii)     if the Stalking Horse Purchase Agreement is terminated pursuant to <u>Section 8.1(c)(1)</u>, which Breakup Fee shall be paid no later than three (3) Business Days following such termination; and

(iii)     if the Stalking Horse Purchase Agreement is terminated pursuant to <u>Section 8.1(j)</u>, and Debtors enter into an agreement with respect to a Competing Transaction no later than the 120th day following such termination, which Breakup Fee shall be paid no later than three (3) Business Days following the consummation by the Debtors of a Competing Transaction.

The Debtors will pay, or cause to be paid, to Purchasers the Transaction Expenses if the Stalking Horse Purchase Agreement is terminated pursuant to <u>Section 8.1(b)</u>, <u>Section 8.1(c)</u>, <u>Section 8.1(f)</u>, <u>Section 8.1(h)</u> and <u>Section 8.1(j)</u>, which Transaction Expenses shall be paid no later than three (3) Business Days following such termination.

Notwithstanding anything to the contrary contained in the Stalking Horse Purchase Agreement, (A) Purchasers shall not be entitled to reimbursement of Transaction Expenses pursuant to the Stalking Horse Purchase Agreement to the extent that such Transaction Expenses are reimbursed pursuant to that certain Letter Agreement, dated as of November 19, 2009, between CBaySystems Holdings Limited and Spheris, Inc. (the "<u>Letter Agreement</u>") and (B) the Debtors' obligation to reimburse Purchasers for Transaction Expenses pursuant to the Stalking Horse Purchase Agreement shall not exceed $375,000. Purchasers

acknowledge and agree that, subject to such payments being paid, the payments described in Section 8.3(a) and Section 8.3(b) of the Stalking Horse Purchase Agreement shall be the sole and exclusive remedy pf Purchasers of the Stalking Horse Purchase Agreement (other than (i) reimbursement of costs and expenses if and as required pursuant to Section 8.3(f), and (ii) prior to the termination of the Stalking Horse Purchase Agreement, specific performance but only as expressly permitted under Section 9.8(a), and (iii) with respect to any covenant or agreement required by the Stalking Horse Purchase Agreement to be performed by Debtors after the Closing), and Purchasers shall irrevocably waive and release Debtors, as a condition to receipt of such payments (but subject to the payment thereof), from any and all statutory, equitable, legal or common law claims or remedies that any Purchaser may have against any Seller Party in respect of any breach of or default under the Stalking Horse Purchase Agreement.

If the Stalking Horse Purchase Agreement is terminated pursuant to Section 8.1(d) or Section 8.1(k), in addition to the delivery of the Purchase Price Deposit and any interest thereon to Debtors pursuant to Section 2.10, Medquist and/or a Medquist Designee shall pay Debtors the Purchaser Termination Fee. The receipt of the Purchase Price Deposit and payment of the Purchaser Termination Fee shall be the sole and exclusive remedy of Debtors for any breach or default of Purchasers of the Stalking Horse Purchase Agreement (other than (i) reimbursement of costs and expenses if and as required pursuant to Section 8.3(f) and (ii) prior to the termination of the Stalking Horse Purchase Agreement, specific performance but only as expressly permitted under Section 9.8(b), and (iii) with respect to any covenant or agreement required by the Stalking Horse Purchase Agreement to be performed by Purchasers after the Closing), and Debtors shall irrevocably waive and release the Purchaser Parties, as a condition to receipt of the Purchase Price Deposit and payment of the Purchaser Termination Fee (but subject to the receipt thereof), from any and all statutory, equitable, legal or common law claims or remedies that any Seller may have against any of the Purchaser Parties in respect of any breach of or default under this Agreement. For purposes hereof, "Purchaser Parties" shall mean, collectively, the Purchasers and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, Affiliate or assignee of any of the foregoing.

The Parties acknowledge that the agreements contained in Section 8.3 of the Stalking Horse Purchase Agreement are an integral part of the transactions contemplated in the Stalking Horse Purchase Agreement, that the damages resulting from termination of this Agreement under circumstances where Debtors are entitled to the Purchase Price Deposit and the Purchaser Termination Fee are uncertain and incapable of accurate calculation and that the delivery of the Purchase Price Deposit and the Purchaser Termination Fee to Debtors is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Debtors in the circumstances where Debtors are entitled to the

Purchase Price Deposit and the Purchaser Termination Fee for the efforts and resources expended and opportunities foregone while negotiating the Stalking Horse Purchase Agreement and in reliance on the Stalking Horse Purchase Agreement and on the expectation of the consummation of the Transactions contemplated thereby, and that, without these agreements, Debtors would not enter into the Stalking Horse Purchase Agreement. If the Purchasers fail to take any action necessary to cause the delivery of the Purchase Price Deposit and the Purchaser Termination Fee pursuant to the Deposit Escrow Amount under circumstances where Debtors are entitled to the Purchase Price Deposit and the Purchaser Termination Fee and, in order to obtain such Purchase Price Deposit and the Purchaser Termination Fee the Debtors commence a suit which results in a judgment in favor of Debtors, the Purchasers shall pay to the Debtors an amount in cash equal to the costs and expenses (including reasonable attorney's fees) incurred by Debtors in connection with such suit.

The Parties further acknowledge that the damages resulting from termination of the Stalking Horse Purchase Agreement under circumstances where Purchasers are entitled to the Breakup Fee are uncertain and incapable of accurate calculation and that the delivery of the Breakup Fee to Purchasers is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate Purchasers in the circumstances where Purchasers are entitled to the Breakup Fee for the efforts and resources expended and opportunities foregone while negotiating the Stalking Horse Purchase Agreement and in reliance on the Stalking Horse Purchase Agreement and on the expectation of the consummation of the Transactions contemplated thereby, and that, without these agreements, Purchasers would not enter into the Stalking Horse Purchase Agreement. If the Debtors fail to take any action necessary to cause the delivery of the Breakup Fee under circumstances where Purchasers are entitled to the Breakup Fee and, in order to obtain such Breakup Fee Purchasers commence a suit which results in a judgment in favor of Purchasers, the Debtors shall pay to the Purchasers an amount in cash equal to the costs and expenses (including reasonable attorney's fees) incurred by Purchasers in connection with such suit.

(h)  Closing: Pursuant to Section 7.1, the consummation of the Transaction (the "Closing") shall take place at 10:00 a.m. on the fifth Business Day following the date on which all of the conditions set forth in Article VI have been satisfied or waived (other than any conditions that can only be satisfied as of the Closing, but subject to the satisfaction or waiver of such conditions) (the "Closing Date"), at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, or at such other time or place as may be mutually agreed to by the Parties.

23.  The Stalking Horse Purchase Agreement is explicitly subject to approval

by this Court. The obligation to consummate the Transaction is subject to a number of

conditions including regulatory approval and the absence of a Material Adverse Effect, as more fully described in the Stalking Horse Purchase Agreement.

## BIDDING PROCEDURES AND RELEVANT NOTICES

A.    Proposed Bidding Procedures

24.    The Debtors believe the proposed Bidding Procedures, which are annexed as Schedule 1 to the Bidding Procedures Order, will maximize the realizable value of the Purchased Assets and the Spheris India Capital Stock for the benefit of the Debtors' estates, creditors, and other interested parties.  The Bidding Procedures contemplate an auction process pursuant to which bids for the Purchased Assets and the Spheris India Capital Stock will be subject to higher or otherwise better offers.  While the Bidding Procedures afford the Purchasers some measure of protection for its "stalking horse" bid by virtue of the Break-Up Fee and Expense Reimbursement, they primarily benefit the Debtors by creating a bidding process that ensures, among other things:  (a) structure and logistical certainty to the process; (b) the Debtors' ability to compare the relative values of competing offers, if any; (c) that a potential Alternative Purchaser has the financial wherewithal to timely consummate its purchase; and (d) meaningful bidding increments.  The Debtors seek to implement a competitive bidding process designed to maximize recovery for the benefit of their estates.  As described below and more fully in the Bidding Procedures, only Qualified Bidders who timely submit Qualified Bids will be eligible to participate in the Auction.  Specifically, the Bidding Procedures provide, in relevant part, as follows:[5]

---

[5]    The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures annexed to the Bidding Procedures Order as Schedule 1.  Capitalized terms used but not defined in this section have the meanings ascribed to them in the Bidding Procedures.  To the extent that this summary differs in any way from the terms set forth in the Bidding Procedures, the terms of the Bidding Procedures shall control.

(a) <u>Participation Requirements</u>: In order to participate in the bidding process or otherwise be considered for any purpose hereunder, each interested person or entity must deliver the following documents to the parties set forth below (the "<u>Participation Materials</u>"):

    (i) An executed confidentiality agreement in form and substance satisfactory to the Debtors;

    (ii) A statement demonstrating to the Debtors' and Agent's satisfaction a *bona fide* interest in purchasing all of the Purchased Assets and Spheris India Capital Stock from the Debtors;

    (iii) Current audited financial statements of (A) the Potential Bidder, or (B) if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder who shall either guarantee the obligations of the Potential Bidder or provide such other form of financial disclosure and credit-quality support information or enhancement reasonably acceptable to the Debtors and the Agent; and

    (iv) Information that can be publicly filed and/or disseminated representing that the Potential Bidder has the financial wherewithal to satisfy adequate assurance requirements with respect to the Assumed Contracts and Assumed Leases under the Bankruptcy Code, which information may be required to be supplemented at the request of the Debtors or other parties in interest.

The Participation Materials must be transmitted so as to be received no later than _____ (prevailing Eastern Time), on _____ by each of the following parties (collectively, the "<u>Notice Parties</u>"): (i) the Debtors, 9009 Carothers Parkway, Suite C-3, Franklin, Tennessee 37067 (Attn: Robert Butler); (ii) co-counsel to the Debtors, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099 (Attn: Michael J. Kelly, Esq. and Mark A. Cognetti, Esq.) and (b) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801, (Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq.); (iii) financial advisors to the Debtors, Jefferies & Company, Inc., 1050 Winter Street, Waltham, MA (Attn: Jason Auerbach and Jasson S. Cohen) ("<u>Jefferies</u>"); (iv) co- counsel to Ableco Finance LLC, as agent (the "<u>Agent</u>") for the pre-petition lenders and DIP lenders (together, the "<u>Lenders</u>"), (a) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (Attn: Adam C. Harris and Lawrence V. Gelber), and (b) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087, Wilmington, DE 19899 (Attn. Adam G. Landis, Esq.); and (v) counsel to the official committee of unsecured creditors (the "<u>Committee</u>") [_____].

Any party that delivers the Participation Materials shall be a "Potential Bidder," and by delivering the Participation Material each Potential Bidder acknowledges

that its identity will be made public, including in court filings. If the Debtors determine that a Potential Bidder has a bona fide interest in all or substantially all of the Purchased Assets and Spheris India Capital Stock, then no later than two (2) business days after such determination, the Debtors will deliver to the Potential Bidder: (a) an electronic copy of the Purchase Agreement; and (b) access information for a confidential electronic data room concerning the Purchased Assets and Spheris India Capital Stock which shall contain any and all documents furnished by the Debtors to the Purchasers in connection with its due diligence in connection with the Purchase Agreement (the "Data Room").

The Agent, for itself and on behalf of the Lenders, shall be deemed to be a Potential Bidder and a Qualified Bidder for all purposes in connection with these Bidding Procedures and, pursuant to 11 U.S.C. §363(k), shall be permitted, but not compelled, to credit bid up to the full amount of the Lenders' prepetition secured claims and claims related to postpetition debtor in possession financing against the Debtors at the Auction.

(b)   Qualified Bid. The Debtors shall determine whether a bid qualifies as a "Qualified Bid." To participate in the Auction, if any, a bidder must deliver to the Notice Parties a written offer, which must provide or otherwise comply with, at a minimum, the items noted below to be deemed a "Qualified Bid:"

(i)   The Potential Bidder offers to purchase all or substantially all of the Purchased Assets and Spheris India Capital Stock from the Debtors at the purchase price and upon the terms and conditions set forth in an executed purchase agreement in the same form as the Purchase Agreement, and submits to the Notice Parties an executed clean copy of its purchase agreement together with a marked copy showing any proposed changes to the Purchase Agreement (the "Marked Agreement");

(ii)   The bid is not subject to any due diligence or financing contingency, is not conditioned on bid protections, other than those contemplated in the Bidding Procedures for subsequent overbids, and is not subject to any future corporate or governmental consent or approval;

(iii)   The purchase price in such bid is a higher and/or better offer for the Purchased Assets and Spheris India Capital Stock (as compared to the offer of the Purchasers), and such offer shall not be considered a higher and/or better offer unless such bid provides for net consideration to the Debtors' estates of at least $3,000,000 more than that provided by the Purchasers, such amount to be deemed to include the amount of the Break-Up Fee and the Expense Reimbursement (the "Minimum Overbid Purchase Price");

(iv)   The bid is received by the Debtors by the Bid Deadline;

DB02:9227391.1                                                                                                    068920.1001

(v)     The bid does not entitle a bidder to any break-up fee, termination fee or similar type of payment or reimbursement and, by submitting a bid the bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures;

(vi)    A cash deposit in the amount of 10% of the purchase price of the bid; and

(vii)    The bid demonstrates the Qualified Bidder's commitment to pay all Cure Costs and ability to provide adequate assurance of future performance under any executory contracts or unexpired leases to be assumed and/or assigned pursuant to such bid.

(c)    <u>Bid Deadline</u>: A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to the Notice Parties so as to be received no later than _____ (prevailing Eastern Time), on _____, 2010 (the "<u>Bid Deadline</u>").

(d)    <u>Auction</u>. In the event that the Debtors receive one or more Qualified Bids (other than the bid of the Purchasers), the Debtors will hold an auction (the "<u>Auction</u>") on [_____], commencing at 9:00 a.m. (prevailing Eastern Time) at the offices of Willkie Farr & Gallagher LLP, co-counsel to the Debtors, at 787 Seventh Avenue, New York, New York, for consideration of the Qualified Bids, each as may be increased at such Auction. Bidding will start at the highest Qualified Bid and will continue with minimum bid increments of $500,000, subject to the right of the Purchasers to credit the Break-Up Fee (as defined in the Purchase Agreement) to its bid at each round of bidding. The auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to all entities that submitted a Qualified Bid.

(e)    <u>Auction Rules</u>.

(i)    Only the Debtors, proper representatives of statutorily appointed committees, the Agent, or other constituents permitted in advance by the Debtors, the Purchasers and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Purchasers and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction.

(ii)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets and Spheris India Capital Stock.

(iii)    At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's

Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder. At least one (1) Business Day prior to the Auction, the Debtors will provide notice of the Qualified Bid which the Debtors believe, in their reasonable business judgment, is the highest or otherwise best offer (the "Starting Bid") to the Purchasers, the Agent, and all other Qualified Bidders which have informed the Debtors of their intent to participate in the Auction.

(iv)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person. All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

(v)     The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(vi)     Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Debtors determine, in consultation with the Agent and the Creditors Committee, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least U.S. $500,000 over the Starting Bid or the Leading Bid, as the case may be. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchasers), the Debtors will, at each round of bidding, give effect to the Break-Up Fee

22

that may be payable to the Purchasers under the Agreement, as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors by such Qualified Bid.

(f) <u>Return of Deposits.</u> A Deposit submitted by the Back Up Bidder will be held by the Debtors until forty-eight (48) hours after the Back Up Bid has been terminated in accordance with the Bid Procedures. As to all other bidders (except the Successful Bidder), Deposits will be returned promptly after conclusion of the Sale Hearing. Other than with respect to the Deposit of the Purchasers, which shall be governed by the Purchase Agreement, if the Successful Bidder or the Back Up Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of the Successful Bidder or the Back Up Bidder, the Debtors shall be entitled to retain the Deposit in partial satisfaction of any damages resulting from the breach or failure to perform by the Successful Bidder or the Back Up Bidder without prejudice to any other rights the Debtors may have. The Debtors may, in consultation with the Agent and the Creditors Committee credit the Deposit of the Successful Bidder or the Back Up Bidder towards the purchase price on the closing of the sale of the Purchased Assets and Spheris India Capital Stock.

(g) <u>Reservation of Rights</u>. Except as otherwise provided in the Purchase Agreement or the Bidding Procedures Order, and subject to the right of the Agent to Credit Bid and the classification of such Credit Bid as a Qualified Bid, the Debtors (in consultation with the Agent and the Creditors Committee as further set forth herein) reserve the right as they may reasonably determine to be in the best interests of their estates, to: (i) determine which bidders are Qualified Bidders; (ii) determine which bids are Qualified Bids; (iii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (iv) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (c) contrary to the best interests of the Debtors and their estates; (v) remove some of the Purchased Assets from the Auction; (vi) waive terms and conditions set forth in the Bidding Procedures with respect to all Potential Bidders; (vii) impose additional terms and conditions with respect to all Potential Bidders; (viii) extend the deadlines set forth in the Bidding Procedures; (ix) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (x) modify the Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

25. The Debtors believe that the Bidding Procedures are fair and reasonable, designed to maximize the proceeds of the Sale, and are not likely to dissuade any serious potential alternative purchaser from bidding in a manner permitted under paragraph 24 above.

B.    Notice of Auction and Sale Hearing

26.    By this Motion, the Debtors also request that the objection deadline with respect to the Sale of the Purchased Assets and the Spheris India Capital Stock be at least seven (7) business days prior to such hearing.

27.    On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the notice attached as Schedule 2 to the Bidding Procedures Order (the "Notice of Auction and Sale Hearing") and the Bidding Procedures Order to be sent by first-class mail postage prepaid, to the following: (a) the Office of the United States Trustee; (b) counsel for any statutory committee in these cases, if and when appointed; (c) counsel to the agent for the Debtors' prepetition secured lenders; (d) counsel to the agent for the Debtors' proposed postpetition secured lenders; (e) all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (f) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (g) all Persons known or reasonably believed to have asserted an Interest on any of the Purchased Assets; (h) the non-Debtor parties to the Executory Contracts and Unexpired Leases; (i) all Persons known or reasonably believed to have expressed an interest in acquiring all or substantially all of the Purchased Assets and the Spheris India Capital Stock within the last six months; (j) the Attorneys General in the State(s) where the Purchased Assets are located; (k) the United States Environmental Protection Agency; (l) counsel to the Purchasers; and (m) any applicable state environmental agency.[6]    In addition to the foregoing, (x) electronic notification of this Motion, the Bidding Procedures Order and the Notice of Auction and Sale Hearing also will be posted on:

---

[6]    The proposed Notice of Auction and Sale Hearing will direct parties to contact Jefferies & Company, Inc., the Debtors' investment banker, for more information and will provide that any party in interest that wishes to obtain a copy of any related document (including the Stalking Horse Purchase Agreement), subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Auction and Sale Hearing.

(1) the Court's website, www.deb.uscourts.gov; and (2) the case website maintained by the Debtors' claims and noticing agent, Garden City Group, Inc., http://www.gardencitygroup.com/cases/spheris; and (y) on or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will: (1) serve the Notice of Auction and Sale Hearing on all known creditors of the Debtors; and (2) subject to applicable submission deadlines, publish the Notice of Auction and Sale Hearing once in a national publication the Debtors deem appropriate.

      28.     In addition, to facilitate the Sale of the Purchased Assets and the Spheris India Capital Stock and the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases, the Debtors propose to serve a notice of potential assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases initially designated by the Purchaser as Assumed Contracts and Assumed Leases, which notice shall include the identification of the Purchasers, (the "Notice of Assumption and Assignment") on all non-debtor parties to the Executory Contracts and Unexpired Leases, on or before three (3) business days after the entry of the Bidding Procedures Order by first class mail or hand delivery. If the Debtors identify additional executory contracts or unexpired leases that might be assumed by the Debtors and assigned to Purchasers not set forth in the original Notice of Assumption and Assignment, pursuant to the proposed procedures, the Debtors will promptly send a supplemental notice (a "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such additional executory contracts and unexpired leases.

      29.     In the proposed Notice of Assumption and Assignment, the Debtors will identify whether the Executory Contract or Unexpired Lease is a Purchased Asset and the calculation of the undisputed cure amounts that the Debtors believe must be paid to cure all

                                       

defaults under such Executory Contract and Unexpired Lease, as of the date of such notice (the "Cure Amounts").  If no amount is listed on the Notice of Assumption and Assignment to be served, the Debtors believe that there is no Cure Amount, as of the date of such notice (the "Cure Date").

30.     The Debtors request that unless the non-debtor party to an Executory Contract or Unexpired Lease files an objection (the "Cure Amount/Assignment Objection") to (a) its scheduled Cure Amount and/or (b) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease by the later of (i) 4:00 p.m. (prevailing Eastern time) on the date that is three (3) business days prior to the Bid Deadline or (ii) ten (10) days after service of the Supplemental Notice of Assumption and Assignment (such later date, "Cure/Assignment Objection Deadline") and serves a copy of the Cure Amount/Assignment Objection so as to be received no later than the Cure/Assignment Objection Deadline on the same day to:  (a) the Debtors, 9009 Carothers Parkway, Suite C-3, Franklin, Tennessee 37067 (Attn: Russell G. Adkins, Esq.); (b) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899-0391 (Attn:  Robert S. Brady, Esq. and Matthew B. Lunn, Esq.), co-counsel to the Debtors; (c) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Michael J. Kelly, Esq. and Shaunna D. Jones, Esq.), co-counsel to the Debtors; (d) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022 (attn: Adam C. Harris, Esq. and Lawrence V. Gelber, Esq.), co-counsel to the agent for the prepetition lenders; (e) Landis Rath & Cobb LLP, 919 Market Street Suite 1800 P.O. Box 2087, Wilmington DE 19899 (attn: Adam G. Landis, Esq.), co-counsel to the agent for the prepetition lenders; (f) counsel to any statutory committee that may be appointed in these cases; and (g) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington,

26

Delaware 19801 (Attn: Richard Schepacarter); then such non-debtor party will (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease as of the Cure Date and the Debtors shall be entitled to rely solely upon the Cure Amount, and (ii) if the Executory Contract or Unexpired Lease was identified as a Purchased Asset and the Purchasers are the Successful Bidder, be deemed to have consented to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Purchasers or such other Successful Bidder or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, under such Executory Contract or Unexpired Lease as of the Cure Date. All amounts due and owing under the Executory Contracts and Unexpired Leases after the Cure Date shall be satisfied in the ordinary course.

31. The Debtors also request that if an objection challenges a Cure Amount, such objection must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof. Upon receipt of an objection to a Cure Amount, pursuant to the proposed procedures, the Debtors may, in their sole discretion, hold an amount equal to the Claimed Cure Amount in reserve pending further order of the Court or agreement between the Debtors and the objecting party. So long as the Debtors hold the Claimed Cure Amount in reserve, the Debtors seek authority to assume, assign and/or transfer the Executory Contract or Unexpired Lease that is the subject of an objection without further delay.

DB02:9227391.1                                                                          068920.1001

32.     Pursuant to the proposed procedures, the Debtors, the Purchasers, or the other Successful Bidder, as the case may be, may determine to exclude any Executory Contract or Unexpired Lease (an "Excluded Contract") from the list of Purchased Assets no later than one (1) business day prior to the Sale Hearing. The non-debtor party or parties to any such Excluded Contract will be notified of such exclusion by written notice mailed within two (2) business days of such determination.

33.     The Debtors also propose to serve, within one (1) business day of the Bid Deadline, on all non-debtor parties to Executory Contracts or Unexpired Leases a notice of all potential bidders (with the exception of Purchasers) that submitted a bid prior to the Bid Deadline (the "Potential Bidder Notice"). The Debtors propose that the non-debtor parties to the Executory Contracts and Unexpired Leases have until 12:00 noon on the date that is two (2) business days prior to the Sale Hearing (the "Adequate Assurance Objection Deadline") to file a contingent objection to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether any of the Potential Bidders can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

34.     Further, in the event that the Purchasers are not the Successful Bidder for the Purchased Assets and the Spheris India Capital Stock and for those Executory Contracts and Unexpired Leases identified in the Notice of Assumption and Assignment, within two (2) business days after the conclusion of the Auction, the Debtors propose to serve a notice identifying the Successful Bidder to the non-Debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid.

C.     Application of Sale Proceeds

35.     The net proceeds of the Sale shall be earmarked for and remitted directly by Purchasers (or such other Successful Bidder) to, first, the agents (the "DIP Agents") under the

28

Debtors' debtor in possession credit agreement (the "DIP Financing Agreement") and, then, the Agents for and until all obligations under the DIP Financing Agreement and the Senior Credit Agreement have been indefeasibly paid in full in cash, provided, however, that in the event at the time of closing of the sale (after giving effect thereto and to the payments contemplated by the Confidential Settlement Agreement and Release dated as of December 23, 2009 among certain of the Debtors and CHS Community Health Systems Inc., and Community Health Systems Professional Services Corporation (the "Settlement Agreement") there are insufficient unencumbered assets of the Debtors to satisfy accrued and unpaid Priority Professional Expenses (as defined in the DIP Financing Agreement), there shall be withheld from such net proceeds an amount equal to the difference between (a) the unencumbered assets available for payment of such accrued and unpaid Priority Professional Expenses, and (b) the aggregate amount of such accrued and unpaid Priority Professional Expenses, subject to the limitations set forth in the order approving the Debtors' entry, and the terms and conditions of the DIP Financing Agreement (the "DIP Order").

36. In the event the Sale does not close but Purchasers (or such other Successful Bidder) are required to pay, pursuant to the Agreement, court order or otherwise, the Debtors any amount (whether as a Purchaser Termination Fee (as defined in the Agreement), damages or otherwise), such payment(s) shall be earmarked for and remitted directly by Purchasers to the Agents for and until all obligations under the Senior Credit Agreement have been indefeasibly paid in full in cash provided, however, that in the event at the time such payment(s) are remitted (after giving effect thereto and to the Settlement Agreement) there are insufficient unencumbered assets of the Debtors to satisfy accrued and unpaid Priority Professional Expenses, there shall be withheld from such payment(s) an amount equal to the

29

difference between (a) the unencumbered assets available for payment of such accrued and unpaid Priority Professional Expenses, and (b) the aggregate amount of such accrued and unpaid Priority Professional Expenses, subject to the limitations set forth in the DIP Order.

## AUTHORITY FOR REQUESTED RELIEF

A.    The Sale of the Purchased Assets is Within the Sound
      <u>Business Judgment of the Debtors and Should be Approved</u>

37.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143 (3d Cir. 1986); <u>see also</u> <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 395 (3d Cir. 1996); <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983); <u>Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)</u>, 242 B.R. 147, 153 (D. Del. 1999).

38.    The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) that the sale was negotiated in good faith. <u>Abbotts Dairies</u>, 788 F.2d 143; <u>Titusville Country Club v. Pennbank</u>

(In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign

Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).  In this case, as set forth more fully

herein, the Debtors submit that the decision to proceed with a Sale of the Purchased Assets and

the Spheris India Capital Stock and the Bidding Procedures is based upon sound business

judgment and should be approved.  A debtor's showing of a sound business purpose need not be

unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition

with sound business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio

1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon

the facts and circumstances of each case.  Lionel, 722 F.2d at 1071; Montgomery Ward, 242

B.R. at 155 (approving funding of employee incentive and severance program; business purpose

requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to

successful reorganization).

   39.  Additionally, section 105(a) of the Bankruptcy Code provides a

bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.

Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §

105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a

result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is

proper.  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan

Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a

court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.

See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986)

("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant

to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

40.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets and the Spheris India Capital Stock to the Purchasers (or other Successful Bidder) pursuant to the Bidding Procedures, thereby satisfying the first prong of Abbotts Dairies.  The prompt Sale of the Purchased Assets and the Spheris India Capital Stock presents the best opportunity to maximize the value for the estates in light of the need to manage and transition the Purchased Assets and the Spheris India Capital Stock to a willing purchaser. In addition, the Debtors believe that the Bidding Procedures are the best method by which they can obtain the most value for the Purchased Assets and the Spheris India Capital Stock and provide interested parties with accurate and reasonable notice of the Sale.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets and the Spheris India Capital Stock by helping ensure a competitive and fair bidding process.

41.     The Debtors believe the sale of their businesses and assets must occur quickly in order to maximize the value of their estates, and that significant time spent in chapter 11 increases the real and palpable risk of business loss and value deterioration.  Absent a prompt Sale pursuant to the procedures and timelines proposed, the Debtors believe that the going

concern value of the Purchased Assets and the Spheris India Capital Stock will be significantly compromised. The Debtors believe that their business is not of a type that can survive a prolonged stay in chapter 11. The success of the Debtors' businesses relies in great part on their reputations as reliable providers of real-time medical transcription services. Each day that the Debtors remain in chapter 11, customers may lose faith in the Debtors' ability to continue to provide the services on which their business rely. As a result, such customers may look to alternative suppliers of medical transcription services to prevent disruption to their operations, which would cause the Debtors to lose valuable market share and revenue. This, in turn, could make the Purchased Assets and the Spheris India Capital Stock far less attractive to potential purchasers. It is therefore imperative that the Debtors effect a Sale as early on in these cases as possible. The Debtors further believe that a targeted sale process is most likely to achieve the highest and best price for the Purchased Assets and the Spheris India Capital Stock and will do so in an efficient and timely manner, enabling the Debtors' businesses to emerge successfully from these cases. The Debtors respectfully submit that the relief sought by this Motion not only is reasonable, but necessary, to maximize the value of these estates for the benefit of the Debtors and their stakeholders.

42.    In addition, the notice described herein and in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets and the Spheris India Capital Stock in the past six months. Accordingly, the proposed sale of the Purchased Assets and the Spheris India Capital Stock satisfies the second prong of the Abbotts Dairies standard.

DB02:9227391.1                                                                                          068920.1001

43.     The Bidding Procedures are also designed to maximize the value received for the Purchased Assets and the Spheris India Capital Stock. The process proposed by the Debtors allows for a timely auction process while providing bidders ample time and information to submit a timely bid. Along with the Debtors' marketing process, the Bidding Procedures are designed to ensure that the Purchased Assets and the Spheris India Capital Stock will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Purchased Assets and the Spheris India Capital Stock to market testing and permitting prospective purchasers to bid on the Purchased Assets and the Spheris India Capital Stock, thereby subjecting the proposed Sale to a market check through the solicitation of competing bids in a court-supervised auction process. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets and the Spheris India Capital Stock will be fair and reasonable, and therefore the third prong of the <u>Abbotts Dairies</u> standard is satisfied. As discussed below, the "good faith" prong of the <u>Abbotts Dairies</u> standard is also satisfied here.

B.      **The Proposed Sale is Proposed in "Good Faith"
        Under Section 363(m) of the Bankruptcy Code**

44.     The Debtors request that the Court find that the Purchasers and Purchaser Designee(s) (or other Successful Bidder) are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Purchased Assets and the Spheris India Capital Stock.

45.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

46.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the Sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code.  See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998).  In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497.  Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.  Like the franchise agreements protected in Krebs, the Executory Contracts and Unexpired Leases are contracts that may be assumed,  assigned and/or transferred pursuant to section 365 of the Bankruptcy Code.  In light of Krebs, the Debtors respectfully submit that section 363(m) applies to protect the Purchasers and Purchaser Designee(s) (or other Successful Bidder) with respect to the Purchased Assets, the Spheris India Capital Stock and the Executory Contracts and Unexpired Leases.

47.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale of the Purchased Assets and the Spheris

DB02:9227391.1

068920.1001

India Capital Stock and the assignment of the Executory Contracts and Unexpired Leases related thereto. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

48.     Here, the sale of the Purchased Assets and the Spheris India Capital Stock and the assignment and/or transfer of the Executory Contracts and Unexpired Leases, which have been designated by the Purchasers in the Stalking Horse Purchase Agreement and/or will be designated by any Successful Bidder,[7] is or will be in good faith. As discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, any sale agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by

---

[7]     If the Debtors ultimately sell the Purchased Assets to an Alternative Purchaser in a Superior Transaction, the Debtors believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code would be appropriate for the Alternative Purchaser as well. Pursuant to the Bidding Procedures, any Alternative Purchaser will have had to present a proposal superior to that of the Purchasers. Moreover, the Debtors will not choose any Alternative Purchaser whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and would be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

counsel. No known potential bidder for the Purchased Assets and the Spheris India Capital Stock is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms length, good faith basis. Moreover, there is no evidence of fraud or collusion in terms of the proposed Sale. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Purchasers, the Purchaser Designee(s) and any Alternative Purchaser should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

49. All parties in interest as described in paragraph 27 will receive notice of the Sale proposed herein and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Unexpired Leases will be provided notice of assumption, assignment, and/or transfer and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

C.    The Proposed Sale Satisfies the Requirements
       of Section 363(f) of the Bankruptcy Code

50. Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94

37

B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). <u>See, e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987). Because the Debtors expect that they will satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Hearing, approving the Sale of the Purchased Assets free and clear of all Interests (as defined in the Stalking Horse Purchase Agreement) is warranted.

D.     Assumption and Assignment of Executory Contracts
       and Unexpired Leases Should be Approved

51.     To facilitate and effectuate the Sale of the Purchased Assets and the Spheris India Capital Stock, the Debtors seek authority to assume, assign, and/or transfer various Executory Contracts and Unexpired Leases to the Purchasers or Purchaser Designee(s) (or other Successful Bidder) to the extent required by such Purchasers. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. <u>Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.</u>, 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and rejecting test of whether executory contract was

38

burdensome in favor of whether rejection is within debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

52.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

53.     The Purchasers and the Purchaser Designee(s) (or other Successful Bidder) will desire to take assignment of certain executory contracts and unexpired leases related to the Purchased Assets. To the extent Executory Contracts and Unexpired Leases are identified for assumption, assignment, and/or transfer, the Debtors believe that they can and will demonstrate that all requirements for assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases will be satisfied at the Sale Hearing. The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets and the Spheris India Capital Stock. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Purchased Assets and the Spheris India Capital Stock and assuming, assigning, and/or transferring to the Purchasers (or other Successful Bidder) the

Executory Contracts and Unexpired Leases would be in the best interests of their estates. Moreover, the Debtors will provide all parties to the Executory Contracts and Unexpired Leases an opportunity to be heard.

54. Specifically, the Debtors will serve the Notice of Assumption and Assignment on or before three (3) business days after entry of the Bidding Procedures Order on the non-debtor parties to the Executory Contracts and Unexpired Leases. The Notice of Assumption and Assignment will, among other things, identify whether the Executory Contract and Unexpired Lease is a Purchased Asset and respective Cure Amounts as of the Cure Date, if any. The Debtors request that unless the non-debtor party to an Executory Contract and Unexpired Lease files and serves a Cure Amount/Assignment Objection setting forth the Claimed Cure Amount or objecting to an assumption, assignment, and/or transfer to the Purchasers on or before the Cure Objection Deadline, such non-debtor party will (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Executory Contract and Unexpired Lease as of the Cure Date, and the Debtors shall be entitled to rely solely upon the Cure Amount; and (ii) if the Executory Contract and Unexpired Lease was identified as a Purchased Asset and the Purchasers are the Successful Bidder, be deemed to have consented to the assumption, assignment, and/or transfer of such Executory Contract and Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Purchasers or such other successful bidder or any other assignee of the relevant Executory Contract and Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, as of the Cure Date, under such Executory Contract.

DB02:9227391.1

068920.1001

55.     The Debtors also propose to serve, within one (1) business day of the Bid Deadline, on all non-debtor parties to Executory Contracts or Unexpired Leases the Potential Bidder Notice.  The Debtors request that objections by a non-debtor party to the Executory Contracts and Unexpired Leases to the assumption, assignment, and/or transfer of such Executory Contract and Unexpired Lease solely on the issue of whether any of the Potential Bidders can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code be filed and served on or before the Adequate Assurance Objection Deadline.  Further, in the event that the Purchasers are not the Successful Bidder for the Purchased Assets and the Spheris India Capital Stock and for those Executory Contracts and Unexpired Leases identified in the Notice of Assumption and Assignment, within two (2) business days after the conclusion of the Auction, the Debtors propose to serve a notice identifying the Successful Bidder to the non-Debtor parties to the Executory Contracts and Unexpired Leases that have been identified in such Successful Bid.  Thus, the Debtors request that the assumption, assignment, and/or transfer of the Executory Contracts and Unexpired Leases should be approved.

E.     The Break-Up Fee and the Expense
       Reimbursement are Reasonable and Appropriate

56.     Approval of the Break-Up Fee and Expense Reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999).  In O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, [the inquiry] . . . depends upon the requesting party's ability to show that the fees were actually necessary to

41

preserve the value of the estate." O'Brien, 181 F.3d at 535. Here, the Expense Reimbursement should be approved because it will provide a benefit to the Debtors' estates.

57.     In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award bidding protections:  (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction;" (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;" (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

58.     Whether evaluated under the "business judgment rule" applied by certain courts[8] or the Third Circuit's "administrative expense" standard, the Break-Up Fee and the Expense Reimbursement should be approved.  First, all negotiations between the Debtors and the Purchasers have been conducted in good faith, at an arm's-length basis.  Second, based on the Debtors' pre-filing discussions, the Debtors have determined that the Break-Up Fee and Expense Reimbursement are necessary to attract and retain a stalking horse bidder.  Specifically, the Purchasers insisted that it receive a break up fee and expense reimbursement in the event the

---

[8]     See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993).

Debtors determined to sell the Purchased Assets and the Spheris India Capital Stock to another bidder as a condition of acting as the "stalking horse" in the Debtors' sale process. The Debtors' ability to continue to seek a higher or better offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse bidder.

59. The Debtors submit that authorization of the Break-Up Fee and the Expense Reimbursement will not chill any bidding for the Purchased Assets and the Spheris India Capital Stock. The Break-Up Fee and Expense Reimbursement are highly-negotiated deal points and the Debtors believe that such incentives are appropriate under the circumstances because: (i) the Purchasers are providing a substantial benefit to the estates by acting as a "stalking horse" bidder for the Purchased Assets and the Spheris India Capital Stock; (ii) the Stalking Horse Purchase Agreement will provide a floor by which other bids may be judged; and (iii) the Break-Up Fee and Expense Reimbursement afforded to the Purchasers were conditions to the Purchasers' entry into the Stalking Horse Purchase Agreement. Further, payment of the Break-Up Fee is not likely to diminish the Debtors' estates. The Debtors will incur the obligation to pay the Break-Up Fee only if an Alternative Transaction occurs, or if the Debtors materially breach the Stalking Horse Purchase Agreement without cure.

60. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and expense reimbursements as being appropriate under the facts and circumstances of the case. In re Radnor Holdings, Case No. 06-10894 (Bankr. D. Del. Sep. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. Feb. 24, 2006) (approving expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); In re Great Kansas City Paper, Inc., Case No. 03-10048 (Bankr. D. Me. Feb. 18, 2003) (approving

expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million).

F.    Relief from the Ten-Day Waiting Periods
      Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

61.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of ten (10) days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

62.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

DB02:9227391.1
068920.1001

63.     Accordingly, the Debtors hereby request that the Court waive the ten (10) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

64.     The Debtors request further that, as of the Closing, the Debtors be authorized to change the name of each Debtor to a name that does not include the Purchased Names.

## NOTICE

65.     Notice of this Motion, including a copy of all exhibits, has been provided to: (a) the United States Trustee for the District of Delaware; (b) counsel to the agents for the Debtors' prepetition secured lenders; (c) counsel to the agent for the Debtors' proposed postpetition secured lenders; (d) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; and (e) counsel to Purchasers.  In addition, the Notice of Auction and Sale Hearing, the Bidding Procedures Order, Notice of Assumption and Assignment will be served as set forth in paragraphs 27 and 28 above.  The Debtors submit that, under the circumstances, no other or further notice is required.

*The remainder of this page is intentionally left blank.*

DB02:9227391.1

068920.1001

**CONCLUSION**

WHEREFORE, the Debtors respectfully request: (a) entry of the proposed Bidding Procedures Order, substantially in the form attached hereto as Exhibit B; (b) entry of the proposed Sale Order, substantially in the form attached hereto as Exhibit C; and (c) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
February 3, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

WILLKIE FARR & GALLAGHER LLP
Michael J. Kelly
Shaunna D. Jones
Elizabeth K. Horowitz
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

DB02:9227391.1  068920.1001