## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
In re                                :      Chapter 11

Spheris Inc., <u>et al.</u>,           :      Case No. 10-10352 (KG)

                                  :      Jointly Administered

             Debtors.      :
------------------------------------------------------x

## DEBTORS' REPLY IN SUPPORT OF MOTION TO ASSUME AND ASSIGN <br> EXECUTORY CONTRACT WITH MULTIMODAL TECHNOLOGIES, INC.

WILLKIE FARR & GALLAGHER LLP
Michael J. Kelly (Admitted *Pro Hac Vice*)
Terence K. McLaughlin (Admitted *Pro Hac Vice*)
Paul W. Horan (Admitted *Pro Hac Vice*)
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

– and –

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Matthew B. Lunn (No. 4119)
Maris J. Finnegan (No. 5294)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

*Co-Counsel for Debtors and Debtors-in-Possession*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND....................................................6

ARGUMENT .................................................................................................................12

I.     THE DEBTORS MAY ASSUME THE AGREEMENT AND ASSIGN
THE BENEFITS THEREUNDER TO THE SUCCESSFUL BIDDER
FOR THE DEBTORS' ASSETS ....................................................................12

     A.    The Court's Analysis Must Be Guided By Fundamental Tenets of Contract
Construction ...............................................................................................13

     B.    "Client," As Used In Section 15(e) Of The Contract, Includes An
Entity That Succeeds To Spheris' Assets And Customers ........................15

     C.    Even If The Right To A Competitive Event Transition Period Is
Available Only To Spheris (As The "Client"), Section 15(e)
Nevertheless Provides That Spheris' Rights Under The Agreement
Shall Inure To The Benefit Of Its Successors and Assigns .......................22

     D.    M*Modal's Repeated Argument That It "Does Not Consent" To
Assignment Is A Red Herring...................................................................23

II.    ADEQUATE ASSURANCES WILL BE PROVIDED AND, UNDER
CERTAIN CIRCUMSTANCES MAY NOT EVEN BE REQUIRED. ...............25

III.   THE CURE AMOUNT IS RESOLVED ........................................................27

CONCLUSION.............................................................................................................28

DB02:9476853.1                                                            068920.1001

Spheris Inc. ("Spheris") and the other debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") [1] respectfully submit this reply memorandum in further support of the Debtors' motion dated February 3, 2010 for an order, among other things, authorizing the Debtors to assume and assign that certain Amended and Restated Clinical Documentation Solution Agreement (the "Agreement") between Spheris Operations LLC (one of the debtors) and Multimodal Technologies, Inc. ("M*Modal"), dated as of June 1, 2008.

## PRELIMINARY STATEMENT

1.      The parties dispute whether the Debtors' rights under the Agreement -- a software license critical to the operation of the Debtors' business -- are assignable in connection with the anticipated sale of substantially all of the Debtors' assets.  While the identity of the ultimate purchaser will not be known until the completion of the auction scheduled to occur on April 13, 2010, the issues in this contested matter are nevertheless ripe and fully capable of resolution at this procedural stage.  A successful bidder for the Debtors' assets will either be a M*Modal Direct Competitor (as that term is defined in the Agreement) or it will not.  Under either scenario, the Agreement is assignable (either in its entirety, or to a certain more limited extent) as demonstrated herein.

2.      If the successful bidder for the Debtors' assets is not a M*Modal Direct Competitor, under the express terms of section 15(e) of the Agreement, M*Modal has contractually consented to an assignment of the Agreement in full to such purchaser.  The

---

[1]      The last four digits of the taxpayer identification numbers of the Debtors follow in parenthesis:  (i) Spheris Inc. (5254); (ii) Spheris Holding II, Inc. (7969); (iii) Spheris Canada Inc. (9757); (iv) Spheris Leasing LLC (4780); (v) Spheris Operations LLC (1371) and (vi) Vianeta Communications (1121).  The Debtors' executive headquarters are located at 9009 Carothers Parkway, Suite C-3, Franklin, TN 37067

Debtors do not believe that there is any dispute with M*Modal with regard to the assignability of the Agreement to a purchaser that is not a M*Modal Direct Competitor.

3.     The result is not materially different if the successful bidder for the Debtors' assets turns out to be a M*Modal Direct Competitor.  As it relates to that scenario, the Agreement provides as follows:

- If the Debtors' assets are acquired by a M*Modal Direct Competitor then the Agreement may not be assigned to such purchaser without M*Modal's written consent;

  ○ Should M*Modal provide such written consent, the Agreement may be fully assigned to the M*Modal Direct Competitor.

- However, should M*Modal refuse to provide written consent to assignment of the Agreement to the M*Modal Direct Competitor, then the Debtors may terminate the Agreement effective upon the closing of the sale transaction with the M*Modal Direct Competitor (at which time the Debtors will have conveyed to the purchaser substantially all of their assets, including the customers who, until the time of the closing, were being serviced by the licensed M*Modal software);

- Upon termination of the Agreement by the Debtors, the Agreement provides that the "Client" shall be entitled to an 18-month transition period during which, subject to certain terms and conditions, the customers that were being serviced as of the closing of the sale transaction (together with any customers that are added during the first six months of the transition period) shall continue to be serviced with the M*Modal licensed software.

4.     M*Modal contends that the transition period described above exists solely for the benefit of Spheris.  In support of this interpretation, M*Modal relies on an unduly narrow myopic interpretation of the Agreement, focusing exclusively on the term "Client" without any consideration for either the larger context of the surrounding provisions or the untenable consequences that result from its myopic interpretation.  The Debtors submit that M*Modal's interpretation of the Agreement is devoid of merit for at least the following reasons.

DB02:9476853.1

068920.1001

5.    First, contrary to M*Modal's assumption, the Agreement does not "define" Client narrowly to mean Spheris only.  Unlike hundreds of defined terms strewn throughout the Agreement, "Client" is nowhere defined.  Instead, the Agreement merely provides a "Description" of the Client.  Having demonstrated an understanding of how to make and use defined terms and having opted for a different approach with regard to the identity of the "Client," the parties signaled that "Client" could mean something other than a specific Spheris entity under certain circumstances.  At the very least, the Agreement is ambiguous as to the parties' intentions with regard to the term "Client."

6.    Second, even if the Agreement could be viewed as having defined "Client" in the immutable sense of a defined term, M*Modal's argument still fails.  Were the transition period intended to be for the benefit of Spheris only, the complicated and heavily negotiated provisions in the Agreement governing the transition period would have no practical meaning or utility.  Under the Agreement, the transition period is triggered only after the closing of a sale of all or substantially all of Spheris' assets (or a merger of Spheris into another entity).  Following the closing of such a transaction, Spheris either will cease to exist or be devoid of any assets or business.  Spheris, therefore, could not benefit in any meaningful way from a transition period.  Viewed in this context, it is clear that the parties' intent was for the transition period to benefit the entity that succeeds to Spheris' assets following the closing of the transaction (*i.e.*, the entity that obtains the customers who are expressly provided for during the transition period under the contract).  To construe the agreement any other way would require the Court to accept the untenable proposition that the parties negotiated complex provisions that can never, in fact, be utilized and which, therefore, serve no purpose.

- 3 -

7.     None of M*Modal's other grounds of opposition to assignment of the

Agreement has merit. M*Modal contends that, as a software license, under applicable law the

Agreement cannot be assigned without its consent, which it says it is not prepared to give. This

argument misses the point. M*Modal has already consented to assignment of its software

license pursuant to the express terms and conditions of the Agreement (either in full, if assigned

to a non-competitor, or to the extent of the transition period, if assigned to a M*Modal Direct

Competitor). No additional consent by M*Modal is required or even permitted.

8.     M*Modal's concerns about adequate assurances of future performance are

similarly not an impediment to assignment. As a practical matter, the Debtors submit that in all

scenarios other than a sale to a M*Modal Direct Competitor, it is unlikely that adequate

assurances of future performance will be a contested issue.[2] To the extent there were to be any

concerns about adequate assurances in connection with a sale of the Debtors' assets to a non-

M*Modal Direct Competitor, the procedures for the qualification of bidders and other procedural

safeguards set forth in the Court-approved bidding procedures, coupled with the exercise of the

Debtors' business judgment, go a long way toward ensuring that any successful bidder will be a

reputable organization with the financial and operational ability to provide M*Modal with

adequate assurances of future performance. In fact, there is a covenant in the Stalking Horse

APA (defined below) wherein the Potential Purchasers (defined below) commit to provide

---

[2]     As the Debtors comprise one of M*Modal's substantial customers, M*Modal derives a material portion of
its revenues from its relationship with the Debtors. In a scenario where the successful bidder is not a
competitor to M*Modal, it will not be in M*Modal's economic interest to impede consummation of the
sale and assignment of the Agreement to the purchaser. Doing so would threaten M*Modal's ability to
retain the acquiring entity's business as a customer and preserve an important revenue stream for M*Modal
post-sale.

adequate assurance of future performance. The Debtors would expect that all other Qualified

Bidders, and therefore any successful bidder, will provide a similar covenant.[3]

         9.      In a scenario where the successful bidder is a M*Modal Direct

Competitor, adequate assurances could and would be provided for all of the same reasons (*i.e.*,

among other things, the covenant in the M*Modal Direct Competitor's proposed asset purchase

agreement to provide adequate assurances of future performance, the fact that the bidder

qualification standards will ensure that any M*Modal Direct Competitor will be a financially and

operationally stable entity, etc.). However, in addition to the foregoing, it is debatable whether

the requirement to provide adequate assurances of future performance would even be applicable

in a scenario where the successful purchaser of the Debtors' assets is a M*Modal Direct

Competitor. Section 365(f) applies, by its terms, to executory contracts. It has no application to

a terminated contract. If a M*Modal Direct Competitor were to acquire the Debtors' assets,

M*Modal will either consent in writing to assignment to the competitor (thereby likely

eliminating adequate assurances as a contested issue) or it will refuse to consent, following

which the Debtors will terminate the Agreement. Upon such termination, the Agreement will

arguably cease to be an executory contract, thus removing the matter from Section 365 entirely.

Instead, the Debtors believe that they could assign the rights under the terminated Agreement

directly as part of the sale pursuant to Section 363 of the Bankruptcy Code.

---

[3]      The Debtors understand that Nuance Communications Inc., one of the potential bidders (either directly or
through an affiliate), intends to present evidence and argument at the hearing on this contested matter on
the subject of adequate assurance of future performance. Subject to and without waiving the Debtors'
arguments as to the inapplicability of section 365(f) in a scenario where the Agreement is terminated, the
Debtors reserve the right to rely on any such evidence and/or arguments. Furthermore, the Debtors reserve
their rights to present evidence with respect to a potential purchaser's ability to provide adequate assurance
of future performance under the Agreement at a later hearing, including, without limitation, the hearing
scheduled on April 15, 2010 to consider approval of the Sale (the "Sale Hearing").

10. Finally, M*Modal challenges the accuracy of their cure amount. The Debtors have reviewed their books and records and they agree with the cure amount asserted by M*Modal, in the amount of $125,094.39. The Debtors have confirmed this cure amount with M*Modal, and this issue is resolved.

11. For these reasons, as amplified below, the Debtors submit that M*Modal's opposition to assumption and assignment of the Agreement is baseless and should be overruled.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Debtors' Bankruptcy Cases.

12. On February 3, 2010 (the "Petition Date"), Spheris and each of the other Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

13. The Debtors are continuing in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. By order dated February 4, 2010, these chapter 11 cases have been consolidated for procedural purposes only.

14. On February 17, 2010, the Office of the United States Trustee (the "United States Trustee") appointed an official committee of unsecured creditors (the "Committee"). As of the date hereof, no request has been made for the appointment of a trustee or examiner.

15. On the Petition Date, the Debtors filed a motion (the "Sale Motion") seeking, inter alia, the approval of certain bidding procedures in connection with the Debtors' proposed sale of substantially all of the Debtors' assets (the "Sale") pursuant to a Stock and Asset Purchase Agreement, dated February 2, 2010 (the "Stalking Horse APA"), with CBay Inc. and Medquist Inc. (the "Potential Purchasers"), subject to higher and/or better offers. The cash consideration contemplated by the Stalking Horse APA is $75.25 million, however, as a condition to closing, the Debtors and Spheris India Private Limited (a non-debtor affiliate of the

Debtors) are required to hold at least $5 million, which ultimately will be transferred to the Potential Purchasers. The Sale Motion contemplates seeking approval of and consummating the Sale with the Potential Purchasers or another successful bidder. On February 23, 2010, the Court entered an order (the "Bidding Procedures Order") approving, among other things, bidding procedures related to the Sale (the "Bidding Procedures") and procedures with respect to the assumption and assignment of the Debtors' executory contracts and unexpired leases.

16.     As contemplated by the Bidding Procedures Order, the Debtors served upon M*Modal a notice of their intent to assume and assign the Agreement on March 2, 2010 (the "Notice"). Pursuant to the Bidding Procedures Order, M*Modal was required to object to the proposed assumption, assignment and/or transfer of the Agreement (including the transfer of any related rights or benefits thereunder) on or prior to 4:00 p.m. (prevailing Eastern Time) on March 22, 2010 (the "Objection Deadline"). Furthermore, the Bidding Procedures Order provides that objections to cure notices (including, without limitation, the Notice) received prior to the Objection Deadline shall be heard before this Court on April 12, 2010, unless the Debtors, the Agent,[4] the Committee and all Qualified Bidders agree otherwise or the Court orders otherwise. M*Modal timely submitted an objection to the Notice.

17.     The procedure set forth above was the result of multi-party negotiations and resolved, in part, an objection to the entry of the Bidding Procedures Order submitted by a potential bidder. More importantly, the scheduling of a hearing to address contract disputes prior to the Auction was driven solely by the parties' need to resolve the matter of whether potential bidders could avail themselves of certain rights and benefits under the Agreement. Various

---

[4]     All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

methods to potentially address the dispute regarding transfer of the rights under the Agreement were considered and ultimately rejected, and M*Modal's counsel was involved in many of those discussions.[5] All parties contemplated — and the Bidding Procedures Order anticipates — that the assignability of the Agreement and the benefits thereunder will be resolved at this stage in the Debtors' Sale process.[6]

## B.    The Negotiation And Execution Of The Agreement.

18.    The Debtors and M*Modal executed the Agreement on or about June 1, 2008, following extensive negotiations over the course of nearly three-quarters of a year.

19.    Section 15(e) of the Agreement provides as follows (in full):

> Assignment: Neither Party shall assign, sublicense, delegate or otherwise transfer this Agreement, or its rights or liabilities herein, in whole or in part, without the prior written consent of the other Party, except that either Party (an "**Acquired Party**") may make such transfer to a Person[7] into which the Party has merged or that has otherwise succeeded to all or substantially all of such Party's business and assets to which this Agreement pertains (an "**Acquiring Party**"), provided that, in the event M*Modal is the Acquired Party, then Client[8] consents in writing if the Acquiring

---

[5]    While M*Modal's counsel objected on the record at the hearing on February 23, 2010 to a hearing on the assignability of the Agreement prior to the Auction, this Court overruled such objection.

[6]    M*Modal asserted in its objection that Medquist constitutes an M*Modal Direct Competitor. The Debtors understand that any issue with respect to the assignability of the Agreement to Medquist, Inc. ("Medquist"), the stalking horse purchaser, has already been resolved consensually between Medquist and M*Modal. Upon information and belief, Medquist and M*Modal have entered into an agreement governing the terms and conditions upon which Medquist can take assignment of the Agreement and/or have the benefit of the Competitive Event Transition Period.

[7]    "Person" is defined in section 1(r) of the Agreement as follows: "an individual (*i.e.*, natural person), corporation, business trust, non-business trust, estate, joint venture, partnership, limited liability company, association, governmental subdivision, instrumentality or agency, or any other, legally cognizable entity. (For the avoidance of doubt, the term 'Person' does not extend to, or cover, any legally cognizable entity, natural person or any other party affiliated with, or otherwise related to, such Person (each an 'Affiliate'), including, without limitation, any Affiliate that or who wholly or partially owns such Person, is wholly or partially owned by such Person, or is under common ownership or control with such Person.)"

[8]    The Agreement does not define the term "Client." On the cover page of the Agreement, the Agreement provides a "Description" of the Client as "Spheris Operations LLC, a limited liability company duly

Party is a Client Direct Competitor, and in the event Client is the Acquired Party, then M\*Modal consents in writing if the Acquiring Party is a M\*Modal Direct Competitor, and further provided such Acquiring Party has assumed in writing all obligations under this Agreement owing to the non-acquired Party (the **"Non-Acquired Party"**). In the event an Acquiring Party is a Client Direct Competitor or M\*Modal Direct Competitor, as applicable, and the Non-Acquired Party elects not to provide written consent to the Acquired Party to assign, sublicense, delegate or otherwise transfer this Agreement to the Acquiring Party in the manner requested by the Acquired Party, then the Acquired Party may properly terminate this Agreement effective upon the closing date of the merger or business/asset acquisition. In the event Client terminates this Agreement as a result of M\*Modal's election not to provide written consent to Client to assign, sublicense, delegate or otherwise transfer this Agreement to the Acquiring Party in the manner requested by Client, then Client shall be entitled to a Competitive Event Transition Period pursuant to the terms and conditions set froth in Paragraph 10(f)(ii). To the extent reasonably practicable and consistent with each Party's respective confidentiality obligations, each Party as an Acquired Party agrees to use commercially reasonable efforts to notify the Non-Acquired Party of any election to terminate this Agreement (as a result of the Non-Acquired Party's election not to provide written consent) as promptly as practicable, but in any event thirty (30) calendar days prior to the closing date of the merger or business/asset acquisition. Subject to the foregoing, the rights and liabilities of the Parties hereto shall bind and inure to the benefit of their respective successors or assigns.

Agreement at § 15(e) (emphasis in original).

20.    Section 10(f)(ii) -- which is cross-referenced in section 15(e) -- provides as follows (in full):



formed and existing under the laws of the State of Tennessee (successor-in-interest of Spheris Operations Inc.)." Spheris Operations LLC is one of the Debtors.



DB02:9476853.1

068920.1001



DB02:9476853.1

068920.1001

21. As demonstrated from the foregoing excerpts, the terms applicable to a Competitive Event Transition Period are both extensive and complex. Indeed, these provisions were among the more heavily negotiated provisions over the course of the approximately nine-month negotiation of the Agreement.

22. These provisions, taken as a whole and in their proper context, render the Agreement assignable in full to a successful bidder of the Debtor's assets that is not a M*Modal Direct Competitor (or that is a M*Modal Direct Competitor where M*Modal consents in writing to the assignment) and assignable on a more limited basis (to the extent of the Competitive Event Transition Period) to a successful bidder of the Debtor's assets that is a M*Modal Direct Competitor (where M*Modal does not consent in writing to an assignment of the Agreement in full).

## ARGUMENT

## I.  THE DEBTORS MAY ASSUME THE AGREEMENT AND ASSIGN THE BENEFITS THEREUNDER TO THE SUCCESSFUL BIDDER FOR THE DEBTORS' ASSETS.

23. The fundamental question in this contested matter is what rights are created under the Agreement (and to what extent are they assignable) in the event the successful purchaser of the Debtors' assets is a M*Modal Direct Competitor. Our analysis of that issue assumes for simplicity of argument that M*Modal would decline to consent in writing to the assignment of the Agreement to a M*Modal Direct Competitor and that the Debtors would, in turn, exercise their right to terminate the Agreement. Upon such termination, the Agreement provides for an 18-month Competitive Event Transition Period during which certain customers can continue to be serviced with the M*Modal licensed technology. M*Modal contends that this transition period is available only for the Debtor and that there is no set of circumstances under

which the purchasing M*Modal Direct Competitor may obtain the benefits of the transition period.

24.     The Debtors vigorously dispute that assertion. The Debtors submit that a M*Modal Direct Competitor that succeeds to the Debtor's assets may obtain the benefit of the Competitive Event Transition Period through either of two principal mechanisms, each of which is discussed in greater detail below.

**A.     The Court's Analysis Must Be Guided By Fundamental Tenets of Contract Construction.**

25.     Under Tennessee law,[9] "[t]he central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002) (internal citations omitted). "When resolving disputes concerning contract interpretation, [the Court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999). See also Staubach Retail Services-Southeast LLC v. H.G. Hill Realty Co ., 160 S.W.3d 521, 526 (Tenn. 2005) (same); Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc., 521 S.W.2d 578, 580 (Tenn. 1975) (same).

26.     Ordinarily, "[t]he intent of the parties is presumed to be that specifically expressed in the body of the contract." Planters Gin, 78 S.W.3d at 890. However, "[i]f contractual language is found to be ambiguous, then a court must apply established rules of construction to ascertain the parties' intent." Allstate Insurance Company v. Watson, 195 S.W.3d 609, 611 (Tenn. 2006). Contract language is ambiguous when "it is of uncertain

---

[9]     The Agreement is governed and construed in accordance with the law of Tennessee. See Agreement at § 15(o).

DB02:9476853.1

068920.1001

meaning and may fairly be understood in more ways than one." Id. at 611 (quoting Farmers-Peoples Bank v. Clemmer, 519 S.W.2d 801, 805 (Tenn. 1975)). If, after application of the rules of contract construction, the ambiguity remains, the Court may look to "extrinsic or parol evidence, such as the parties' course of conduct and statements, to guide the court in construing the contract." Id. at 612.

27. The longstanding rules of contract construction are well known. They include the following:

   a. The Court must construe the Agreement so as to effectuate its primary/general purpose.[10]

   b. The Court should construe the Agreement as a whole.[11]

   c. The Court should decline to focus unduly on discrete terms or phrases in isolation and divorced from their larger context.[12]

   d. The Court should reject a construction that would render certain terms or provisions in the contract meaningless or useless. Rather,

---

[10] See, e.g., Aetna Cas. & Surety Co v. Woods, 565 S.W.2d 861, 864 (Tenn. 1978) ("The principal apparent purpose of the parties is given great weight in determining the meaning to be given to manifestations of intention of any part thereof."); State, ex rel. Neff v. Cotton Belt Ins. Co., 1987 WL 28386 at *6 (Tenn. App. Ct. 1987) ("[T]he language of a contract should be construed so as to subserve, and not subvert, the general intention of the parties. The whole agreement should, if possible, be construed so as to conform to an evident consistent purpose.").

[11] See, e.g., Shuttleworth, Williams, Harper, Waring & Derrick, PLLC v. Smith, 2010 WL 744375, at * 3 (Tenn. Ct. App. 2010) ("The entire contract must be considered in determining the meaning of any or all of its parts.").

[12] See, e.g., Smith, 2010 WL 744375 at * 3 ("The interpretation of an agreement is not dependent on any single provision, but upon the entire body of the contract and the legal effect of it as a whole.") (citing Woods, 565 S.W.2d 861, 864 (Tenn. 1978)); State, ex rel. Neff v. Cotton Belt Ins. Co., 1987 WL 28386 at *6 (Tenn. App. Ct. 1987) ("All clauses and provisions of the contract should, if possible, be so construed as to harmonize with one another . . . . Where a contract as a whole discloses a given intention and certain words or clauses would, if taken literally, defeat the intention, they will be interpreted, if possible, so as to be consistent with the general intent."); Guiliano, 995 S.W.2d at 95 ("All provisions of the contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions.").

the Court should adopt a construction that gives effect to every provisions in the contract.[13]

28.    Against the backdrop of these legal standards, the Debtors turn to an analysis of the provisions at issue in this dispute.

### B.    "Client," As Used In Section 15(e) Of The Contract, Includes An Entity That Succeeds To Spheris' Assets And Customers.

29.    Pursuant to Section 15(e), the following events must occur before a Competitive Event Transition Period can be triggered:

(a)    Spheris must be a party to a merger or otherwise sell all or substantially all of its business;

(b)    The counterparty to that transaction must be a M*Modal Direct Competitor;

(c)    the transaction **must close** (following which Spheris will either cease to exist or be left without any business or assets);

(d)    M*Modal must decline to consent to an assignment of the Agreement to the counterparty to the transaction; and

(e)    Spheris must exercise its right, **effective on the closing of the transaction**, to terminate the Agreement.

If those events occur, the Agreement provides that a Competitive Event Transition Period is triggered. Thus, under all circumstances, the right to a Competitive Event Transition Period as provided for in section 15(e) of the Agreement requires, as a condition precedent, the occurrence and closing of a transaction pursuant to which Spheris Operations LLC will either cease to exist

---

[13]    Smith, 2010 WL 744375 at * 7 ("[C]ourts must seek to give effect to all sections of the Agreement without rendering any specific provision meaningless. Contracts must be construed to the extent reasonable to 'give effect to every term.'") (quoting Buettner v. Buettner, 183 S.W.3d 354, 358 (Tenn. Ct. App. 2005)); Associated Press v. WGNS, Inc., 48 Tenn. App. 407, 417 (Tenn. Ct. App. 1961) ("A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions. The courts will look to the entire instrument, and, if possible, give such construction that each clause shall have some effect, and perform some office."); Stidham v. McCarver, 57 S.W. 212 (Tenn. Ct. Ch. App. 1900) ("The true rule of construction, as we understand it, is that if a paper, on its face, be susceptible of two constructions, then the courts will give it that construction which would make it effective and not leave it meaningless.").

(by operation of merger) or no longer have any of its business or assets. It is against this backdrop that the contract language "Client shall be entitled to a Competitive Event Transition Period . . ." must be construed. Any attempt to ignore this context would violate fundamental rules of contract interpretation.

30.     Inasmuch as the Agreement expressly provides that the Competitive Event Transition Period can be triggered only after the closing of a transaction in which Spheris will cease to exist (or cease to have any assets or business with which to operate), it would make no sense at all to argue (as M*Modal does) that the Competitive Event Transition Period is available only to Spheris. Spheris could not benefit from a Competitive Event Transition Period. Taken to its inexorable conclusion, M*Modal's construction leads to the perverse conclusion that the parties bargained extensively for a right that could never be exercised by the putative beneficiary and that, therefore, has neither utility nor purpose. Such a construction must be rejected. Parties do not put provisions into contracts that serve no purpose and can never be utilized.

31.     The Debtors' construction, on the other hand, breathes purpose and meaning into these provisions. The point of the Competitive Event Transition Period provided for under section 15(e) was to acknowledge that, upon the consummation of a merger or sale of all or substantially all of Spheris' assets to a M*Modal Competitor, while Spheris itself would cease to be an ongoing business its existing customer relationships would nevertheless endure. Through Section 15(e), the parties to the Agreement recognized that such customers could not be migrated overnight to an acquiring party's software platform immediately upon the consummation of a merger or sale of all or substantially all of Spheris' assets. On the contrary, that would take time. However, M*Modal was evidently not prepared to license its technology

and intellectual property to a competitor indefinitely and without well-defined parameters. Thus, a compromise was struck.

32.     M*Modal, for its part, consented to a finite 18-month period during which Spheris' then-existing customers and those added in the first six months of the transition period would continue to be serviced by M*Modal's technology for the benefit of the entity that acquired those customers (despite the fact that it is a competitor) in order for the acquirer to migrate those customers to its software platform. Spheris, for its part, acceded to certain supplementary terms and conditions demanded by M*Modal which would be applicable specifically to the Competitive Event Transition Period and which were designed to provide M*Modal a level of protection with regard to its technology while it was being utilized by and for the benefit of a competitor.

33.     The compromise is embodied in Sections 15(e) and 10(f)(ii). Section 15(e) creates the right to a Competitive Event Transition Period under the circumstances where Spheris is merged with, or acquired by, a M*Modal Direct Competitor to whom M*Modal declines to consent to assignment of the Agreement. Section 10(f)(ii), in turn, sets forth a number of details regarding the mechanics and characteristics of the Competitive Event Transition Period. For example, section 10(f)(ii) expressly references the ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

34.     These provisions do not make any sense if only "Spheris" can be the beneficiary of a Competitive Event Transition Period as M*Modal contends. Under the express terms of the Agreement, Spheris would have no existing customers (nor any ability to garner additional customers during the first six months of the transition period) for whose benefit the transition period is being given because Spheris will have been merged out of existence or will have sold it business. The lengthy negotiated details contained in Sections 15(e) and 10(f)(ii) regarding a Competitive Event Transition Period would, therefore, be entirely unnecessary, and could never be applied, if the Competitive Event Transition Period were available only to Spheris. The only entity that would need (or even be able to benefit from) the right to a Competitive Event Transition Period as provided for in Section 15(e) would be the entity into which Spheris is merged or that acquires all or substantially all of its assets and business (and customers).

35.     M*Modal, however, insists on an erroneous construction of the Agreement which focuses unduly on the word "Client" in isolation. According to M*Modal, that term is "defined" to mean only Spheris Operations LLC. As an initial matter, the Agreement does not define "Client" as "Spheris Operations LLC." Rather, the Agreement merely offers a "description" of the Client as "Spheris Operations LLC." Elsewhere throughout the Agreement the parties used a traditional formulation for designating a defined term. The usage of a mere "description" of the Client implicitly signals the parties' intent that "Client" could mean things other than "Spheris Operations LLC" depending on the context in which the term is used. At the very least, the parties' decision not to define Client (while simultaneously defining hundreds of

other terms used throughout the Agreement) creates ambiguity as to what the parties intended "Client" to mean in various contexts.

36.     Even if the term "Client" were not ambiguous, it would still be improper for the Court to focus on that term in isolation and divorced from the surrounding contractual context. In fact, by doing precisely that, M\*Modal's interpretation renders the entire concept of the Competitive Event Transition Period as set forth in section 15(e) entirely illusory and meaningless. As previously explained, if M\*Modal's interpretation is accepted, there is no set of circumstances under which the right to a Competitive Event Transition Period as provided for in section 15(e) could ever be used because the purported beneficiary of those provisions would never be in a position to make use of the rights created by the provisions.

37.     The negotiating history of the Agreement reveals that M\*Modal shared the Debtors' interpretation of the rights created by the provisions at the time they were being negotiated (namely that the true beneficiary of a Competitive Event Transition Period would be the entity that succeeds to the Debtors' business and customers following a sale or merger).[14] Specifically, on September 26, 2007 (over seven months before the Agreement was executed), M\*Modal delivered to Spheris a proposed revised draft of the Agreement. In that proposed revision, M\*Modal attempted to limit the circumstances under which a Competitive Event Transition Period (which at that stage in the negotiations was being defined as a "Change of Ownership Transition Period") could be triggered following Spheris' termination of the

---

[14]     As previously noted, where (as here) a contract provision is ambiguous, the Court may look to parol evidence as a guide in construing the contract. See Allstate, 195 S.W.3d at 611. The Debtors do not seek to introduce evidence of their uncommunicated subjective intent. Rather, they seek to introduce M\*Modal's own statements during the negotiations which are not only binding admissions against M\*Modal but also highly probative of M\*Modal's intent and understanding with regard to the provisions at issue.

DB02:9476853.1

068920.1001

Agreement under circumstances where Spheris was acquired by a M*Modal Direct Competitor to whom M*Modal did not consent to an Assignment of the Agreement.

38.      As in the final version of Section 15(e), the version of Section 15(e) that was contained in the September 26, 2007 draft provided that if Spheris was acquired by a M*Modal Direct Competitor, and M*Modal declined to give consent to an assignment of the Agreement to such M*Modal Direct Competitor, Spheris had the right to terminate the Agreement. Section 10(f)(ii) of the September 26, 2007 draft, in turn, provided that ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

39.      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[15]      At that stage in the negotiations, the parties had proposed a transition period whose duration was variable based on the volume of business during the year preceding the commencement of the transition period. It was later negotiated to a fixed 18-month period.

DB02:9476853.1                                        068920.1001

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████

40.     M*Modal's proposed language, thus, makes sense only if one assumes (as

M*Modal evidently did at the time of negotiation of the Agreement) that the successor to

Spheris' business and customers following a merger or asset sale (*i.e.*, the M*Modal Direct

Competitor) would be the beneficiary of the Competitive Event Transition Period and the

recipient of transition services from M*Modal.  Put differently, what M*Modal was obviously

trying to do was to avoid a situation where it would be forced to provide transition services

during a Competitive Event Transition Period to a M*Modal Direct Competitor who M*Modal

believed would obtain a material competitive advantage as a result of the receipt of those

services during that Competitive Event Transition Period.

41.     M*Modal's September 27, 2007 proposed revisions are wholly

inconsistent with its current contention that only Spheris, and not any successor, may obtain the

benefits of the Competitive Event Transition Period following termination of the Agreement by

Spheris due to M*Modal's refusal to consent to assignment to a M*Modal Direct Competitor.

As it turns out, Spheris rejected M*Modal's proposed revision, pointing out that it eviscerated

the right to a transition period and rendered it unclear as to whether a transition period would

ever be provided by M*Modal.[16]  M*Modal relented and abandoned the proposed language.

From that point forward, it was understood by all parties that the right to a transition period upon

---

[16]     See, e.g., October 11, 2007 email at 5:24 p.m. from Greg Stevens to Michael Finke attaching "Issues
Summary List."

DB02:9476853.1                                                                                            068920.1001

termination of the Agreement by Spheris following M*Modal's refusal to consent to an assignment of the Agreement to a M*Modal Direct Competitor that acquired Spheris would extend to <u>all</u> acquiring parties, not just those that "M*Modal determines in its sole discretion . . . will not gain a material competitive advantage over M*Modal that, absent the existence of the [Competitive Event Transition Period], the Acquiring Party would not have gained."

**C.    Even If The Right To A Competitive Event Transition Period Is Available Only To Spheris (As The "Client"), Section 15(e) Nevertheless Provides That Spheris' Rights Under The Agreement Shall Inure To The Benefit Of Its Successors And Assigns.**

42.    As discussed above, the Debtors contend that an assignment of the rights and benefits attributable to a Competitive Event Transition Period to a M*Modal Direct Competitor that acquires the Debtors' assets is permissible directly pursuant to the assignment provisions of Section 15(e) because the ambiguous term "Client" encompasses the acquiring M*Modal Direct Competitor.  However, even if M*Modal could demonstrate that "Client" is limited to Spheris Operations LLC only, that would not prevent a M*Modal Direct Competitor that acquires the Debtors' assets from enjoying the benefit of the Competitive Event Transition Period.

43.    Section 15(e) provides that "Subject to the [terms and provisions set forth in section 15(e)], the rights and liabilities of the Parties hereto shall bind and inure to the benefit of their respective successors or assigns."  Thus, were one to play out the contractual analysis as M*Modal interprets the Agreement, the following would be the result:

(a)    Upon a determination that the successful bidder for the Debtors' assets is a M*Modal Direct Competitor, the Debtors would have the right to solicit M*Modal's written consent to an assignment of the Agreement in full to that purchaser;

(b)    If M*Modal were to decline to provide written consent to a formal assignment of the Agreement; the Debtors would have the right to terminate the Agreement effective as of the closing of the sale;

(c)     Upon such termination, Spheris Operations LLC (the "Client," as M*Modal narrowly construes the term) would be entitled under the Agreement to a Competitive Event Transition Period lasting 18 months in duration.

(d)     By operation of the "successor or assigns" language quoted above, Spheris' rights under the Agreement inure to the benefit of the purchaser (*i.e.*, the M*Modal Direct Competitor);

(e)     However, the rights to which the M*Modal Direct Competitor succeeds are "subject to" the limitations contained in section 15(e). Inasmuch as Spheris' rights would be limited to an 18-month Competitive Event Transition Period, so too would the successor's rights be limited.

44.     Thus, at the end of the day, a M*Modal Direct Competitor that acquires the Debtors' assets will be entitled to the benefit of the Competitive Event Transition Period, either through a direct assignment of contractual rights or by virtue of being a successor to, or assignee of, the rights of Spheris Operations LLC.

**D.      M*Modal's Repeated Argument That It "Does Not Consent" To Assignment Is A Red Herring.**

45.     M*Modal dedicates a substantial portion of its opposition papers to demonstrate that, under applicable non-bankruptcy law, a non-exclusive software license is not assignable without the licensor's consent. M*Modal argues that because it does not so consent, the Agreement is simply non-assignable in bankruptcy. This, however, is an exercise in misdirection. The Debtors do not require any consent from M*Modal beyond that already reflected in the parties' contract. By operation of the Agreement, M*Modal has already provided all of the necessary consents to assignment of the Agreement (either in full or as limited to a Competitive Event Transition Period, as the case may be). No further or separate consent by M*Modal is required or even permitted.

46.     Section 15(e) of the Agreement generally provides that neither party may assign the Agreement without the written consent of the other except as provided in the

Agreement. That section provides for an exception whereby assignment is permitted to an Acquiring Party that is not a M\*Modal Direct Competitor. This provision represents a voluntary and legally binding consent by M\*Modal to the assignment of the Agreement to an entity that is not found to be a M\*Modal Direct Competitor. To the extent the successful bidder for the Debtors' assets is not a M\*Modal Direct Competitor, M\*Modal has already contractually consented to the assignment of the Agreement to such a purchaser by operation of the Agreement. That contractual consent is fully binding on M\*Modal. No further consent from M\*Modal is required or permitted.[17]

47.     Even if the successful bidder for the Debtors' assets is found to be a M\*Modal Direct Competitor, M\*Modal has nevertheless contractually consented to an assignment of the Agreement to such a purchaser to the extent of the rights and benefits associated with the Competitive Event Transition Period by operation of sections 15(e) and 10(f)(ii) for all the reasons discussed above. To the extent the Debtors would seek to assign the rights and benefits of the Competitive Event Transition Period to a successful bidder that is

---

[17]     In fact, such an assignment is contractually permissible even if the Acquiring Party assignee (while not itself a M\*Modal Direct Competitor) is an affiliate of or otherwise related to an entity that is a M\*Modal Direct Competitor. "Acquiring Party" is defined in Section 15(e) as a "Person into which the Party has merged or that has otherwise succeeded to all or substantially all of such Party's business and assets to which this Agreement pertains." (Emphasis added). ██████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ These provisions collectively make clear that if the "Acquiring Party" is a "Person" that is not, on a stand-alone basis, a M\*Modal Direct Competitor, then assignment of the Agreement to such an Acquiring Party is permissible (with or without M\*Modal's written consent) under section 15(e) regardless of whether the Acquiring Party is an Affiliate of another entity that is a M\*Modal Direct Competitor.

found to be a M*Modal Direct Competitor, no further consent by M*Modal (apart from that already evinced in the contract) is required or permitted.

## II. ADEQUATE ASSURANCES CAN AND WILL BE PROVIDED AND, UNDER CERTAIN CIRCUMSTANCES MAY NOT EVEN BE REQUIRED.

48.     M*Modal protests that neither the Debtors nor any prospective purchaser has provided adequate assurances of future performance.  This argument fails to present a viable basis on which to prevent assignment of the Agreement (either in full, or as limited to the Competitive Event Transition Period) to a purchaser of the Debtor's assets.

49.     What constitutes "adequate assurance of future performance" for purposes of Section 365(f) of the Bankruptcy Code depends on the facts and circumstances of each case, but the term should be given a "practical, pragmatic construction." In re Fleming Cos., Inc., 499 F.3d 300, 307 (3d Cir. 2007), quoting Cinicola v. Scharffenberger, 248 F.3d 110, 120, n. 10 (3d Cir. 2001).  Adequate assurance is "considered to be something less than an absolute guarantee." In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009) (citations omitted).  Nor must adequate assurance be given for every term of an executory contract.  Fleming, 499 F.3d at 305. Rather, such assurance must be provided for "material and economically significant" terms, with the focus "rightly placed on the importance of the term within the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties... and whether performance of that term gives a party the full benefit of its bargain...." Id. at 306.

50.     Here, Section 2.9 of the Stalking Horse APA, entitled "Additional and Eliminated Assumed Contracts" consists of a covenant which provides: "With respect to each Assumed Contract, Medquist . . . shall provide adequate assurance of the future performance of such Assumed Contracts by Medquist."  The Debtors expect that each other Qualified Bidder will include a comparable covenant in its proposed asset purchase agreement.  The Debtors have

no reason to doubt the ability of bidders to comply with these representations as to the provision of adequate assurances of future performance. Moreover, the Bidding Procedures ensure that only those entities with the financial and operational wherewithal to acquire and operate the Debtors' assets will be determined to be Qualified Bidders and/or selected as the successful bidder.

51.     The Debtors understand that certain potential bidders for the Debtors' assets may offer evidence on the subject of adequate assurances of future performance. The Debtors reserve the right to rely on any such evidence and to incorporate any arguments made by such bidders. Furthermore, the Debtors reserve their rights to present evidence with respect to a potential purchaser's ability to provide adequate assurance of future performance under the Agreement at a later hearing, including, without limitation, the Sale Hearing.

52.     It is important to note that, in a scenario where the successful bidder is a M*Modal Direct Competitor, Section 365(f)'s adequate assurance requirements may not even be applicable. Were the Debtors to sell their assets to a M*Modal Direct Competitor, one of two outcomes will occur: either M*Modal will consent to an assignment of the Agreement to the competitor (in which case it is unlikely that the adequacy of assurances of future performance will be a contested issue) or M*Modal will refuse to so consent (in which case the Debtors will exercise their right to terminate the Agreement). Focusing on the latter of the two outcomes, once terminated the Agreement will arguably no longer be an executory contract subject to the assumption and assignment requirements of Section 365 of the Bankruptcy Code. As such, the Debtors submit that they could simply transfer the rights associated with the terminated Agreement to the purchaser in connection with the sale transaction pursuant to Section 363 of the Bankruptcy Code.

DB02:9476853.1

068920.1001

## III. THE CURE AMOUNT IS RESOLVED

53. In accordance with the Bidding Procedures Order, the Debtors provided notice to M*Modal of their intent to assume and assign the Agreement and the cure amount, calculated as of the Petition Date, that the Debtors believe must be paid in order to cure defaults outstanding under the Agreement. M*Modal objected to the Debtors' cure amount, asserting that the cure amount should be $125,094.39. See M*Modal's Objection at ¶ 1 n.b. The Debtors have reviewed their books and records and concluded that the cure amount asserted by M*Modal is accurate. The cure amount originally scheduled by the Debtors did not include certain amounts that accrued prior to the Petition Date because such amounts had not yet been processed by the Debtors and, therefore, were not reflected in their books. The Debtors have confirmed the cure amount of $125,094.39 with M*Modal and, accordingly, this issue is resolved.[18]

---

[18] For the avoidance of doubt, as provided in the Notice, to the extent amounts are paid in the ordinary course, the cure amount that is ultimately payable will be reduced accordingly.

## CONCLUSION

For all of the reasons set forth in this memorandum of law, the Debtors

respectfully submit that M*Modal's opposition to assumption and assignment of the Agreement

to the successful purchaser of the Debtors' assets is without merit and should be overruled.  The

Debtors therefore request that the Court rule that the Debtors are free to assume the Agreement

and assign the benefits thereunder to the successful bidder for the Debtors' assets, even if that

purchaser turns out to be a M*Modal Direct Competitor.

Dated: Wilmington, Delaware
      April 7, 2010             YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                     */s/ Maris J. Finnegan*
                                 Robert S. Brady (No. 2847)
                                 Matthew B. Lunn (No. 4119)
                                 Maris J. Finnegan (No. 5294)
                                 Ryan M. Bartley (No. 4985)
                                 The Brandywine Building
                                 1000 West Street, 17th Floor
                                 Wilmington, Delaware 19801
                                 Telephone:  (302) 571-6600
                                 Facsimile:  (302) 571-1253

                                         - and -

                                 WILLKIE FARR & GALLAGHER LLP
                                 Michael J. Kelly
                                 Terrence McLaughlin
                                 Paul W. Horan
                                 787 Seventh Avenue
                                 Elizabeth K. Horowitz
                                 New York, New York 10019-6099
                                 Telephone:  (212) 728-8000
                                 Facsimile:  (212) 728-8111

                                 *Co-Counsel to the Debtors and*
                                 *Debtors in Possession*

