## EXHIBIT 1

**Blackline Disclosure Statement**

THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF
ACCEPTANCES OR REJECTIONS OF THE PLAN.  ACCEPTANCES AND
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS
BEEN APPROVED BY THE BANKRUPTCY COURT.  THE PROPOSED
DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS
NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS
RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY
THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE
STATEMENT HEARING.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| SP Wind Down Inc., f/k/a Spheris Inc., et al., | : | Case No. 10-10352 (KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | x | |

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE FIRST AMENDED JOINT LIQUIDATING PLAN OF SP WIND DOWN INC., F/K/A SPHERIS INC., AND ITS AFFILIATED DEBTORS

Dated: ~~June 11,~~ July 9, 2010
Wilmington, Delaware

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Robert S. Brady<br>Matthew B. Lunn<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>(302) 571-6600<br><br>*Co-Counsel for the Debtors and the Debtors in Possession* | **WILLKIE FARR & GALLAGHER LLP**<br>Terence K. McLaughlin<br>Myron Trepper<br>Shaunna D. Jones<br>787 Seventh Avenue<br>New York, New York  10019-6099<br>(212) 728-8000<br><br>*Co-Counsel for the Debtors and the Debtors in Possession* |
| **RICHARDS, LAYTON & FINGER, P.A.**<br>Russell C. Silberglied<br>One Rodney Square<br>920 King Street<br>Wilmington, DE 19801<br>Telephone: (302) 651-7700<br><br>*Co-Counsel for the Official Committee of Unsecured Creditors* | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>Andrew N. Rosenberg<br>Elizabeth McColm<br>Jacob Adlerstein<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>*Co-Counsel for the Official Committee of Unsecured Creditors* |

<div style="border: 1px solid black; padding: 10px;">

**VOTING DEADLINE**

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON [⸺, 2010].AUGUST 17, 2010. TO BE COUNTED, THE CLAIMS AND VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

IF YOU RECEIVED A BALLOT FROM AN INDENTURE TRUSTEE, A BROKER, BANK OR OTHER INSTITUTION, RETURN THE COMPLETED BALLOT(S) TO SUCH INDENTURE TRUSTEE BROKER, BANK OR OTHER INSTITUTION PROMPTLYON OR BEFORE AUGUST 12, 2010 AT 4:00 P.M. (PREVAILING EASTERN TIME) SO THAT IT CAN BE FORWARDED TO THE DEBTORS' CLAIMS AND VOTING AGENT BEFORE THE VOTING DEADLINE.

</div>

<div style="border: 1px solid black; padding: 10px;">

**CONFIRMATION HEARING AND**
**DEADLINE TO OBJECT TO THE PLAN**

THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN HAS BEEN SCHEDULED FOR [⸺,AUGUST 26, 2010] AT [ : ] [ 1:30 P.M.] (PREVAILING EASTERN TIME). OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED (I) ON OR BEFORE [⸺,AUGUST 17, 2010] AT 4:00 P.M.] (PREVAILING EASTERN TIME), AND (II) IN ACCORDANCE WITH PARAGRAPHS [___] OF THE DISCLOSURE STATEMENT ORDER.

</div>

<div style="border: 1px solid black; padding: 10px;">

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS ATTACHED HERETO), THE PLAN IS SPECULATIVE, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (I) THE DEBTORS, OR (II) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.

</div>

<div style="border: 1px solid black; padding: 10px;">

**RECOMMENDATION**

AS THE PROPONENTS OF THE PLAN, THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.

</div>

THE PROPONENTS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT LIQUIDATING PLAN OF SP WIND DOWN INC., F/K/A SPHERIS INC., AND ITS AFFILIATED DEBTORS TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE PROPONENTS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER

ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE LIQUIDATION TRUSTEE MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE LIQUIDATION TRUSTEE THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE PROPONENTS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' CHIEF RESTRUCTURING OFFICER HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE PROPONENTS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE PROPONENTS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PROPONENTS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE

STATEMENT.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE PROPONENTS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE PROPONENTS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF AN INTEREST IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

THE PROPONENTS RECOMMEND AND SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

# TABLE OF CONTENTS

ARTICLE I. INTRODUCTION ...................................................................................1

ARTICLE II. BUSINESS DESCRIPTION, PREPETITION INDEBTEDNESS &
      EVENTS LEADING TO CHAPTER 11 ..................................................2

    2.1.    The Debtors' Pre-Sale Businesses ...........................................................2

    2.2.    Prepetition Capital Structure and Indebtedness .....................................3

    2.3.    The Debtors' Prepetition Financial Position and the Events Leading up to
           the Commencement of These Chapter 11 Cases......................................4

ARTICLE III. ADMINISTRATION OF THE CHAPTER 11 CASES .........................4

    3.1.    Overview of Chapter 11 ..........................................................................4

    3.2.    Commencement of the Debtors' Chapter 11 Cases & First Day Pleadings
           and Certain Related Relief ......................................................................5

          (a)    Motion for Authority to Use Cash Collateral and Enter Into DIP
                 Facility ........................................................................................5

          (b)    Motion to Authorize Payment of Prepetition Claims of Certain
                 Critical and Priority Vendors .....................................................6

          (c)    Retention and Employment of Professionals ..............................6

    3.3.    Official Committee of Unsecured Creditors .......................................6̶7

    3.4.    Assumption of CHS Settlement Agreement ...........................................7

    3.5    Filing of Schedules and Setting of Bar Dates. ..................................7̶8

    3.6.    Sale of Substantially All of the Debtors' Assets.....................................8

          (a)    Sale and Marketing Efforts .........................................................8

          (b)    The Debtors' Employees and KEIP and PTO Obligations.......8̶9

          (c)    The MedQuist Claim...................................................................9

    3.7.    Sale of Subordinated Note .................................................................9̶10

    3.8.    Settlement of DB's Swap Obligation Claim .........................................10

    3.9    Certain Remaining Assets..................................................................9̶10

ARTICLE IV. SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS THEREUNDER ........................ ~~10~~11

4.1.    Summary of Plan .................................................................................... ~~10~~11

4.2.    Administrative Expense Claims ............................................................. ~~11~~13

4.3.    Time for Filing Administrative Expense Claims .................................... ~~11~~13

4.4.    Professional Compensation and Reimbursement Claims ........................ ~~12~~13

4.5.    Treatment of Fee Claims ........................................................................ ~~12~~14

4.6.    Priority Tax Claims ................................................................................ ~~13~~14

4.7.    Class 1 – Non-Tax Priority Claims ........................................................ ~~13~~15

        (a)     Impairment and Voting ................................................... ~~13~~15

        (b)     Treatment ...................................................................... ~~13~~15

4.8.    Class 2 – Other Secured Claims ............................................................ ~~13~~15

        (a)     Impairment and Voting ................................................... ~~13~~15

        (b)     Treatment ...................................................................... ~~14~~15

4.9.    Class 3 – General Unsecured Claims ..................................................... ~~14~~15

        (a)     Impairment and Voting ................................................... ~~14~~15

        (b)     Treatment ...................................................................... ~~14~~15

4.10.   Class 4 – Senior Subordinated Note Claims .......................................... ~~14~~16

        (a)     Impairment and Voting ................................................... ~~14~~16

        (b)     Distributions .................................................................. ~~14~~16

4.11.   Class 5 – Subordinated Claims .............................................................. ~~14~~16

        (a)     Impairment and Voting ................................................... ~~14~~16

        (b)     Distributions .................................................................. ~~14~~16

ii

4.12.   Class 6 – Equity Interests................................................................~~14~~16

    (a)   Impairment and Voting ..............................................~~14~~16

    (b)   Distributions..............................................................~~15~~16

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .....................~~15~~16

5.1.   Substantive Consolidation of the Debtors................................~~15~~16

5.2.   Retention of Causes of Actions/Reservation of Rights...............~~16~~18

5.3.   The Liquidation Trust. ...............................................................~~17~~18

    (a)   Creation of the Liquidation Trust ............................~~17~~18

    (b)   Purpose of the Liquidation Trust .............................~~17~~18

    (c)   <u>Liquidation Trust Advisory Board</u> .......................... 18

    (d)   <u>Liability of Liquidation Trust Advisory Board</u>........... 18

    (<u>e</u>)   Management of the Liquidation Trust Assets ..........~~17~~19

    (<s>d</s><u>f</u>)   Transfer Taxes .........................................................~~18~~20

    (<s>e</s><u>g</u>)   Federal Income Tax Treatment of the Liquidation Trust......................~~18~~20

    (<s>f</s><u>h</u>)   Reserve .....................................................................~~18~~20

    (<s>g</s><u>i</u>)   Dissolution ...............................................................~~18~~20

    (<s>h</s><u>j</u>)   Securities Law Matters .............................................~~18~~21

5.4.   Approval of Plan Documents......................................................~~19~~21

ARTICLE VI. CORPORATE GOVERNANCE AND MANAGEMENT OF
REORGANIZED DEBTORS ...........................................................~~19~~21

6.1.   Post-Effective Date Corporate Existence...................................~~19~~21

6.2.   Corporate Action........................................................................~~19~~21

6.3.   Officers and Boards of Directors. ..............................................~~20~~22

6.4.   Payment of Wind-Down Expenses. ...........................................~~20~~22

6.5.   Cancellation of Existing Securities and Agreements..................~~20~~22

6.6. Senior Subordinated Notes. ............................................................................2022

6.7. Rights of the Indenture Trustee..........................................................................2123

ARTICLE VII. PROVISIONS REGARDING VOTING AND DISTRIBUTIONS
UNDER THE PLAN..........................................................................2224

7.1. Non-Consensual Confirmation ..........................................................................2224

7.2. Elimination of Vacant Classes. .........................................................................2224

7.3. Voting Classes. ...................................................................................................2224

7.4. Distributions.......................................................................................................2224

7.5. Insurance Claims................................................................................................2224

7.6. Timing of Distributions......................................................................................2325

7.7. Holdings as of the Distribution Record Date. ....................................................2325

7.8. Distribution to Address of Record. ....................................................................2325

7.9. Minimum Distributions ......................................................................................2426

7.10. Unclaimed Distributions ....................................................................................2426

7.11. Setoffs ................................................................................................................2426

7.12. Allocation of Plan Distributions Between Principal and Interest .....................2426

7.13. Estimation of Claims; Certain Reserves ............................................................2527

7.14. Non Recourse.....................................................................................................2527

7.15. Satisfaction of Claims and Equity Interests ......................................................2527

7.16. Withholding and Reporting Requirements. ........................................................2628

ARTICLE VIII. PROCEDURES RELATING TO DISPUTED CLAIMS ............................2628

8.1. Objections to Administrative Expense Claims and Claims. ...............................2628

8.2. Amendments to Claims.......................................................................................2628

8.3. No Distributions Pending Allowance. ................................................................2729

8.4. Resolution of Disputed Claims. .........................................................................2729

iv

8.5.     Resolution of Disputed Insurance Claims.........................................2729

ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
             LEASES...................................................................................2729

9.1.     Rejection or Assumption and Retention or Assignment...................2729

         (a)     Assumption or Rejection of Executory Contracts and Unexpired
                 Leases..........................................................................2729

         (b)     Approval of Assumptions, Retentions and Rejections by Confirmation
                 Order ..........................................................................2830

9.2.     Cure of Defaults................................................................2830

         (a)     Generally.....................................................................2830

         (b)     Notice of Proposed Cure...............................................2830

9.3.     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
         Unexpired Leases Rejected Pursuant to the Plan............................2931

ARTICLE X. EFFECT OF CONFIRMATION & INDEMNIFICATION, RELEASE,
            INJUNCTIVE AND RELATED PROVISIONS.............................2931

10.1.    Injunction .......................................................................2931

10.2.    Releases..........................................................................3031

         (a)     Releases by the Debtors ...............................................3032

         (b)     Releases by Holders of Claims .......................................3032

10.3.    Exculpation and Limitation of Liability .................................3133

10.4.    Injunction Related to Releases and Exculpation..........................3234

10.5.    Releases of Liens and Encumbrances .....................................3233

10.6.    Satisfaction of Subordination Rights .....................................35

ARTICLE XI. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....................3335

11.1.    Conditions to Confirmation ................................................3335

11.2.    Effectiveness...................................................................3335

v

**ARTICLE XII. VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN** ................................................................. ~~33~~35

12.1.  Parties in Interest Entitled to Vote ..................................................... ~~34~~36

12.2.  Classes Impaired Under the Plan ....................................................... ~~34~~36

12.3.  Voting Procedures and Requirements ................................................. ~~34~~37

    (a)  Ballots ........................................................................................ ~~34~~37

    (b)  Returning Ballots ....................................................................... ~~35~~37

12.4.  Confirmation Hearing ........................................................................ ~~36~~39

12.5.  Confirmation ...................................................................................... ~~37~~39

12.6.  Acceptance of Plan ........................................................................... ~~37~~40

12.7.  Confirmation Without Acceptance of All Impaired Classes ............. ~~37~~40

12.8.  Best Interests Test ............................................................................. ~~38~~41

12.9.  Liquidation Analysis .......................................................................... ~~38~~41

12.10. Feasibility ........................................................................................... ~~39~~41

12.11. Compliance with the Applicable Provisions of the Bankruptcy Code ............. ~~39~~42

**ARTICLE XIII. ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF THE PLAN.** ................................................................................................. ~~39~~42

**ARTICLE XIV. RISK FACTORS & CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ........................................................................... ~~40~~42

14.1.  Allowed Claims May Exceed Estimates ............................................. ~~40~~42

14.2.  Plan May Not Be Accepted or Confirmed ......................................... ~~40~~43

14.3.  Certain Federal Income Tax Consequences of the Plan ................... ~~40~~43

**ARTICLE XV. RETENTION OF JURISDICTION** ............................................. ~~40~~43

15.1.  Retention of Jurisdiction .................................................................... ~~40~~43

**ARTICLE XVI. MISCELLANEOUS PROVISIONS** .......................................... ~~41~~43

16.1.  Notices ................................................................................................ ~~41~~44

YCST01:9898745.1          068920.1001

ARTICLE XVII. RECOMMENDATION AND CONCLUSION ...........................................42<u>45</u>

YCST01:9898745.1
068920.1001

# ARTICLE I.

# INTRODUCTION

SP Wind Down Inc., f/k/a Spheris Inc., and the other debtors and debtors in possession, as set forth on Exhibit 1 hereto (collectively, the "Debtors"), and the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 Cases (the "Creditors' Committee," and together with the Debtors, the "Proponents"), hereby transmit this first amended disclosure statement (including all exhibits thereto and as may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), in connection with the Proponents' solicitation of votes (the "Solicitation") to confirm the *First Amended Joint Liquidating Plan of SP Wind Down Inc., f/k/a Spheris Inc., and its Affiliated Debtors*, dated as of [———,July 9, 2010] (including all exhibits thereto and as may be amended, supplemented or otherwise modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as Exhibit 2.

The following documents are annexed hereto as exhibits to this Disclosure Statement:

| EXHIBITS TO DISCLOSURE STATEMENT | |
|---|---|
| Exhibit 1 | List of Debtors |
| Exhibit 2 | Plan |
| Exhibit 3 | Prepetition Corporate Organizational Chart |
| Exhibit 4 | Liquidation Analysis |
| Exhibit 5 | Analysis of Certain Federal Income Tax Consequences of the Plan |
| Exhibit 6 | Disclosure Statement Order (without exhibits) |

On July [ ———,2010], 2010, the Bankruptcy Court (i) entered an order approving this Disclosure Statement (the "Disclosure Statement Order") as containing "adequate information" under section 1125 of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of the holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and (ii) authorized the Proponents to use this Disclosure Statement in connection with the Solicitation.  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

---

[1]  All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement (including the Exhibits hereto), the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in or incorporated by reference into this Disclosure Statement, the Plan and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement can be accessed free of charge at http://www.gardencitygroup.com/Chapter11Cases/SPWinddown. Additional copies of this Disclosure Statement are also available upon request made to the office of the Debtors' co-counsel, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: Terence K. McLaughlin, Esq. and Shaunna D. Jones, Esq., (212) 728-8000 (phone) or (212) 728-8111 (facsimile), or Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801-1037, Attention: Robert Brady, Esq. and Matthew B. Lunn, Esq., (302) 571-6600 (phone) or (302) 571-1253 (facsimile).

## ARTICLE II.

### BUSINESS DESCRIPTION, PREPETITION INDEBTEDNESS & EVENTS LEADING TO CHAPTER 11

2.1.     The Debtors' Pre-Sale Businesses.

SP Wind Down Holding II, Inc., f/k/a Spheris Holding II, Inc. and its direct and indirect wholly-owned subsidiaries: SP Wind Down Inc., f/k/a Spheris Inc., SP Wind Down Operations LLC, f/k/a Spheris Operations LLC, VN Wind Down Communications, f/k/a Vianeta Communications, SP Wind Down Leasing LLC, f/k/a Spheris Leasing LLC, SP Wind Down Canada Inc., f/k/a Spheris Canada Inc., and Spheris, India Private Limited, a non-Debtor entity (collectively, with SP Wind Down Holding II, Inc., f/k/a Spheris Holding II, Inc., the "Company"), prior to the ~~closing~~Closing of the Sale (as those terms are defined herein), provided clinical documentation technology and services to health systems, hospitals and group medical practices located throughout the United States. Health care providers are required to maintain records that document patient visits, treatments and procedures. The Company assisted health

2

care providers in the efficient creation of such records. The Company also received medical dictation in digital format from subscribing physicians, converted the dictation into text format (either through manual transcription or voice-recognition software), stored specific data elements from the records, and then transmitted the completed medical record to the originating physician in the prescribed format. The turnaround time and detail with respect to any given record was dictated by the nature of the particular visit, treatment or procedure.

As described in detail in section 3.6 of this Disclosure Statement, the Debtors sold substantially all of their assets, including their ownership interests in Spheris, India Private Limited, through a Court-approved Sale (as defined herein) that closed on April 22, 2010. As of the date of the Closing of the Sale (as those terms are defined herein), the Debtors no longer have any significant business operations.

*For additional information regarding the Debtors' business operations prior to the Closing of the Sale (as those terms are defined herein), refer to the Affidavit of Robert L. Butler, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings, dated February 3, 2010 [Docket No. 3] (the "First Day Affidavit"), which is incorporated herein by reference.*

### 2.2. Prepetition Capital Structure and Indebtedness.

SP Wind Down Holding II, Inc., f/k/a Spheris Holding II, Inc. ("SP Holding") is the direct or indirect parent of each of the other Debtors. In November 2004, SP Wind Down Operations LLC, f/k/a Spheris Operations LLC ("SP Operations"), became a wholly-owned subsidiary of SP Holding, which in turn is wholly-owned by Spheris Holding III, Inc. ("Holding III"), an entity owned by affiliates of Warburg Pincus LLC and TowerBrook Capital Partners LLC, CHS/Community Health Systems, Inc., and indirectly by certain members of the Company's former management team.

*Senior Credit Facility.* SP Operations is the borrower under that certain Senior Credit Facility, pursuant to which each of the other Debtors act as guarantors, Ableco Finance LLC acts as collateral agent (the "Collateral Agent"), Cratos Capital Management, LLC acts as administrative agent (the "Administrative Agent," and together with the Collateral Agent, the "Agents"), and certain other lenders are party thereto (together with the Agents, the "Senior Lenders"). The Senior Credit Facility governs a credit facility consisting of a term loan in the principal amount of $69.5 million (the "Term Loan") and a revolving credit facility in an aggregate principal amount not to exceed $25 million at any time outstanding (the "Revolving Loan"). The obligations outstanding under the Senior Credit Facility (the "Senior Loan Obligations") mature on July 17, 2012, and are secured by liens on substantially all of SP Wind Down's assets (the "Prepetition Collateral"). As of January 31, 2010, the Debtors had approximately $75.6 million in Senior Loan Obligations outstanding, including accrued interest. In connection with the consummation of the Sale (as defined herein), the Debtors satisfied in full the Senior Loan Obligations.

*Interests Rate Derivative Agreements.* SP Wind Down Inc., f/k/a Spheris Inc. ("SP Wind Down") is party to certain prepetition swap agreements, dated as of October 11, 2007 (the "Swap Agreements"), with Deutsche Bank AG ("DB"). The amount outstanding under the

Swap Agreements as of the Petition Date was approximately $1,767,226 (the "Swap Obligations"). The Debtors scheduled the Swap Obligations areas a general unsecured  claim against SP Wind Down in the amount of $1,767,226. Prior to the Bar Date, DB filed proofs of claim asserting that the Swap Obligations were secured claims against each of the Debtors in the amount of $1,767,726.05 (the "DB Claim"). The Debtors, the Committee and DB have resolved the disputes concerning the Swap Obligations as discussed in Section 3.8 of this Disclosure Statement.

**Senior Subordinated Notes.** Pursuant to an indenture dated December 22, 2004 (the "Indenture"), SP Wind Down issued Senior Subordinated Notes in the principal amount of $125 million, which mature on December 15, 2012. The Senior Subordinated Notes bear interest at a fixed rate of 11.0% per annum, which is payable semi-annually through maturity. The obligations under the Senior Subordinated Notes are unsecured. As of January 31, 2010, the Debtors had approximately $125 million in principal outstanding under the Indenture and accrued interest was approximately $8.6 million.

2.3. The Debtors' Prepetition Financial Position and the Events Leading up to the Commencement of These Chapter 11 Cases.

During the past few years, the clinical documentation industry has undergone several changes including significant technology developments as well as accelerated price pressures. As a result, the Company's net revenues began to decline in the second half of 2008 and continued to decline in 2009. Because of liquidity difficulties, the Company determined that it would be unable to make the interest payment required to be made on December 15, 2009 under the Indenture. The Company's eroding financial performance further indicated that the Company would not be able to meet certain financial covenants under the Senior Credit Facility for the quarter ended December 31, 2009. Further, the Senior Credit Facility provided that an event of default under the Indenture constituted an event of default under the Senior Credit Facility. On January 6, 2010, the Agents provided notice that the Senior Lenders were reserving their ability to exercise various rights and remedies as a result of the alleged event of default for, among other things, failure to make the December 15, 2009 interest payment under the Indenture. Accordingly, the Debtors determined that a financial restructuring would be advisable, and ultimately, decided to effect that restructuring under the protection of chapter 11 of the Bankruptcy Code.

*For a more detailed description of the Debtors' prepetition financial position and the events leading up to the commencement of these Chapter 11 Cases, refer to the First Day Affidavit, which is incorporated herein by reference.*

## ARTICLE III.

## ADMINISTRATION OF THE CHAPTER 11 CASES

3.1. Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment

4

for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of a chapter 11 petition. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principle objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor, to the fullest extent permitted by applicable law, from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case until such time as a bankruptcy court has approved a disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement in satisfaction of the applicable disclosure requirements under section 1125 of the Bankruptcy Code.

3.2.    Commencement of the Debtors' Chapter 11 Cases & First Day Pleadings and Certain Related Relief.

On February 3, 2010, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Concurrently with the commencement of the Chapter 11 Cases, the Debtors filed certain motions and applications requesting typical immediate relief, including, but not limited to, authority to enter into a post-petition financing facility and use cash collateral, the payment of prepetition wages and employee benefits, taxes and other regulatory fees, the satisfaction of certain obligations in connection with customer programs, critical vendors and priority trade obligations, the establishment of notification procedures and certain restrictions with respect to certain transfers of interest in the Debtors, and the maintenance of their existing cash management system. Below are additional details regarding certain of such relief.

(a)    Motion for Authority to Use Cash Collateral and Enter Into DIP Facility.

Prior to the filing of these Chapter 11 Cases, the Debtors determined that they would not be able to meet their ongoing postpetition obligations unless they were authorized to obtain debtor in possession financing and use Cash claimed by the Senior Lenders as part of their collateral under the Senior Credit Facility. Accordingly, on the Petition Date, the Debtors filed a motion [Docket No. 13] (the "DIP Motion") seeking approval of interim and final orders authorizing the Debtors to obtain debtor in possession financing under a $15 million senior

5

secured, superpriority revolving credit facility (the "DIP Facility") entered into between the Debtors, the Agents and a syndicate of the Senior Lenders (collectively, the "DIP Lenders"). On February 4, 2010, the Bankruptcy Court entered an order approving the DIP Motion (as modified therein) on an interim basis, and on February 23, 2010, the Bankruptcy Court entered an order approving the relief requested in the DIP Motion (as modified therein) on a final basis. The DIP Facility was satisfied in full from the proceeds of the Sale (as defined herein).

(b)    Motion to Authorize Payment of Prepetition Claims of Certain Critical and Priority Vendors.

In the ordinary course of its operations prior to the Closing of the Sale (as those terms are defined herein), the Company relied upon certain vendors for certain goods, services and supplies. In order to ensure a smooth transition into chapter 11 and help preserve and maximize the Debtors' going concern value, on the Petition Date, the Debtors filed a motion seeking authority to pay certain critical and priority vendors (the "Critical Vendors Motion"), subject to certain monetary caps. On February 4, 2010, the Bankruptcy Court entered an order granting the relief requested in the Critical Vendors Motion [Docket No. 47].

(c)    Retention and Employment of Professionals.

To assist the Debtors in carrying out their duties as debtors and debtors in possession, and to represent them in these Chapter 11 Cases, the Debtors retained Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP andas their bankruptcy co-counsel. In addition, the Debtors retained Jefferies & Company, Inc. as financial advisor and investment banker and entered into an agreement with Capstone Advisory Group, LLC to provide Robert L. Butler to serve as the Debtors' Chief Restructuring Officer, as well as additional personnel to assist the Debtors. The Bankruptcy Court approved these engagements by orders dated March 2, 2010 [Docket Nos. 148, 150, 151 & 152]. Further, on April 14, 2010, the Debtors filed an application to retain Ernst & Young LLP to provide audit and tax services to the Debtors. Subsequent to the filing of that application, the Debtors and MedQuist (defined below) entered into an agreement through which MedQuist agreed to reimburse the Debtors for, among other things, costs related to Ernst & Young LLP's provision of audit services. On May 3, 2010, the Bankruptcy Court entered an order approving this engagement [Docket No. 367]. On June 25, 2010, the Debtors filed a first supplemental application seeking to expand the scope of the tax services provided by Ernst & Young LLP to the Debtors (the "Supplemental Tax Retention Application"), and a second supplemental application seeking to expand the scope of the audit services provided by Ernst & Young LLP in connection with these Chapter 11 Cases (the "Supplemental Audit Retention Application"). On July 1, 2010, the Bankruptcy Court entered an order approving the Supplemental Audit Retention Application [Docket No. 546]. The Bankruptcy Court is scheduled to consider the Supplemental Tax Retention Application on July 13, 2010.

*For additional information with respect to the first day pleadings and related relief sought by the Debtors at the beginning of these Chapter 11 Cases, refer to the First Day Affidavit, which is incorporated herein by reference.*

6

3.3.  Official Committee of Unsecured Creditors.

On February 17, 2010, the U.S. Trustee appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "Creditors' Committee"), pursuant to section 1102 of the Bankruptcy Code.  The members of the Creditors' Committee included The Bank of New York Mellon, Bennett Restructuring Fund, LP and ZM Private Equity Fund I, L.P.  Subsequent to the formation of the Creditors' Committee, ZM Private Equity Fund I, L.P. withdrew its membership from the Creditors' Committee.

By orders dated March 24, 2010, the Bankruptcy Court approved the retention of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Richards Layton & Finger, P.A. as co-counsel to the Creditors' Committee and Houlihan Lokey Howard & Zukin Capital, Inc. as investment banker and financial advisor to the Creditors' Committee [Docket Nos. 218, 219 & 220].

Subsequent to the Closing of the Sale (as those terms are defined herein), Houlihan Lokey Howard & Zukin Capital, Inc.'s engagement as the investment banker and financial advisor to the Creditors' Committee ended.  As such, on July 6, 2010, the Creditors' Committee filed an application seeking to retain CoMetrics Partners, LLC as the financial advisory to the Committee effective as of June 28, 2010 and through the Effective Date, which is scheduled to be heard on July 13, 2010.  The Proponents intend to seek authorization for the retention of Walter Jones of CoMetrics Partners, LLC as the Liquidation Trustee (as that term is defined herein) in connection with Plan confirmation.

3.4.  Assumption of CHS Settlement Agreement.

On October 3, 2008, SP Operations entered into an agreement for health information processing services with Community Health Systems Professional Services Corporation, an affiliate of CHS/Community Health Systems, Inc. ("CHS"), to provide clinical documentation technology and services to certain of its affiliated hospitals  ("CHS Services Agreement").  Contemporaneously with entering into the CHS Services Agreement, CHS became a minority owner in Holding III, the Company's indirect parent.

Prior to the Petition Date, the Company provided clinical documentation technology and services to CHS in the ordinary course of business at prices and on terms and conditions that the Company believed were the same as those that would result from arm's-length negotiations between unrelated parties.  During 2009 and 2008, the Company recognized $10.6 million and $1.9 million, respectively, of net revenues from this customer in the accompanying consolidated statements of operations.

On October 13, 2009, Holding III received a letter from CHS demanding the rescission of its October 2008 $10 million equity investment ("CHS Investment") in Holding III and the return of all amounts invested in connection therewith.  In order to consensually resolve the matters raised in such letter with respect to the CHS Investment, and solidify the business arrangement memorialized in the CHS Services Agreement, CHS, Holding III and SP Operations entered into a Confidential Settlement Agreement and Release (the "Settlement Agreement") on December 23, 2009.  Pursuant to the Settlement Agreement, the parties agreed to, among other

7

things, certain settlements, compromises, mutual releases, and amendments to the CHS Services Agreement (the "Amended CHS Services Agreement") and a contribution by Holding III of $9.2 million to the Company, all to occur upon Bankruptcy Court approval of SP Operation's assumption of the Amended CHS Services Agreement.

On February 26, 2010, the Debtors filed a motion seeking to assume the Amended CHS Services Agreement, which the Bankruptcy Court approved on March 17, 2010. Shortly thereafter, Holding III delivered approximately $9.2 million to SP Holding, which was then deposited in the account of SP Operations and will be used to fund the wind down of the Debtors' Estates and to make distributions under the Plan.

3.5.     Filing of Schedules and Setting of Bar Dates.

The Debtors filed their Schedules on April 12, 2010 and filed amended Schedules for SP Wind Down and SP Operations on May 13, 2010. On May 13, 2010, the Bankruptcy Court entered an order [Docket No. 400] (the "Bar Date Order"), which established the following dates by which proofs of claim and administrative expense request forms must be actually received by the Claims and Voting Agent:

| BAR DATES | |
|---|---|
| **General Bar Date** | **June 18, 2010 at 4:00 p.m. (ET)** |
| **Administrative Claim Bar Date** | **June 18, 2010 at 4:00 p.m. (ET)** |
| **Governmental Unit Bar Date** | **August 2, 2010 at 4:00 p.m. (ET)** |

Subject to certain limited exceptions contained in the Bankruptcy Code and the Bar Date Order, all proofs of claim and administrative expense request forms are required to be submitted by the applicable Bar Date. In accordance with the Bar Date Order, written notice of the Bar Dates, including a proof of claim form and administrative expense request form, was mailed to, among others, all known claimants holding actual or potential Claims against any of the Debtors and other parties listed in the Bar Date Order.

3.6.     Sale of Substantially All of the Debtors' Assets.

(a)     Sale and Marketing Efforts. Prior to the commencement of the Chapter 11 Cases, the Debtors determined that the value of the assets of their estates would best be maximized and preserved through a going-concern sale. To that end, the Debtors retained Jefferies & Company, Inc. ("Jefferies") to conduct and oversee the marketing and sale process. Jefferies assisted the Company in commencing a M&A process whereby indications of interest were solicited from both financial and strategic potential purchasers. Following a lengthy marketing process, the Debtors determined that the bid they received from CBay Inc. ("CBay") and MedQuist Inc. ("MedQuist," and together with CBay, the "Stalking Horse Bidders" or the "Purchasers") represented the highest and/or best offer for the purchase of their assets at that time.

On the Petition Date, the Debtors filed the *Debtors' Motion for Orders: (A)(I) Approving Bid Procedures in Connection With Sale of Substantially All of Debtors' Assets; (II) Scheduling Hearing to Consider Sale of Assets; (III) Approving Form and Manner of Notice*

8

*Thereof; and (IV) Approving Break-Up Fee and Expense Reimbursement; (B)(I) Authorizing and Approving Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 14] (the "Sale Motion"). On February 23, 2010, the Bankruptcy Court entered an order approving a postpetition marketing process and related bidding and auction procedures [Docket No. 122] (the "Bid Procedures Order").

Commencing on April 14, 2010 and concluding on April 15, 2010, the Debtors conducted an auction in accordance with the Bid Procedures Order. After consultation with the advisors for the Creditors' Committee and the Agents, the Purchasers were determined to be the successful bidders for substantially all of the Debtors' assets, including the Debtors' stock in their non-Debtor subsidiary, Spheris, India Private Limited (collectively, the "Assets") as set forth in that certain Stock and Asset Purchase Agreement, dated as of April 15, 2010 (the "Purchase Agreement"). On April 15, 2010, the Bankruptcy Court approved the Sale of the Debtors' Assets to the Purchasers (the "Sale") for $116,333,900, comprised of cash consideration of $98,833,900 and a subordinated promissory note issued by MedQuist Transcriptions, Ltd. in the principal amount of $17.5 million (the "Subordinated Note"). The Sale closed on April 22, 2010 (the "Closing").

(b) The Debtors' Employees and KEIP and PTO Obligations. On March 11 and 12, 2010, respectively, the Debtors filed motions with the Bankruptcy Court requesting (i) authority to pay certain prepetition employee-related obligations (the "PTO") [Docket No. 171] (the "PTO Motion"), and (ii) approval of, and authority to make payments under, a Key Employee Incentive Plan (the "KEIP") [Docket No. 180] (the "KEIP Motion"). On March 25, 2010, the Bankruptcy Court entered orders (i) authorizing the Debtors to make the PTO payments [Docket No. 225] (the "PTO Order"), and (ii) approving the KEIP and authorizing the Debtors to make payments thereunder in an aggregate amount of $850,000 [Docket No. 226] (the "KEIP Order"). The Purchasers made offers of employment to the majority of the Debtors' employees in conjunction with the Sale. Additionally, pursuant to the terms of the Purchase Agreement, the Purchasers assumed the Debtors' liabilities under the PTO Order and the KEIP Order.

(c) The MedQuist Claim. On June 16, 2010, MedQuist filed an Administrative Expense Claim against each of the Debtors with respect to alleged breach of contract claims arising out of the Purchase Agreement in the aggregate amount of $21,300,000 (the "MedQuist Claim"), with respect to (i) the Debtors' alleged failure to pay certain liabilities under Assumed Contracts (as defined in the Purchase Agreement) with Spheris, India Private Limited; and (ii) alleged health care continuation coverage liabilities relating to former employees of the Debtors. The Debtors dispute liability for the MedQuist Claim, and believe that, even if the MedQuist Claim is ultimately allowed, the allowed portion of such claim would be substantially less than the amount asserted in the MedQuist Claim.

*For more information regarding the events leading up to the commencement and pursuit of the sale process in accordance with the terms of the Bidding Procedures Order, or for more information regarding the terms of the Sale, refer to the Sale Motion and the Purchase Agreement.*

YCST01:9898745.1                                    068920.1001

3.7.    Sale of Subordinated Note.

As part of the consideration under the Purchase Agreement for the Sale, Spheris, as the obligee, and MedQuist Transcriptions, Ltd., as the maker, entered into the Subordinated Note.  On May 4, 2010, Riva Ridge Master Fund, Ltd. and Mariner LDC ("Riva Ridge") entered into that certain Note Purchase Agreement and related Commitment Letter and Pricing Letter, whereby Riva Ridge offered to purchase the Subordinated Note.  On May 18, 2010, the Debtors filed with the Bankruptcy Court the *Debtors' Motion for Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (I) Approving Sale by SP Wind Down Inc. (f/k/a Spheris Inc.) of Subordinated Promissory Note; (II) Authorizing Debtors' Entry Into Related Note Purchase Agreement; and (III) Granting Related Relief* [Docket No. 416] (the "Note Sale Motion"). Pursuant to paragraph 30 of the Note Sale Motion, the Debtors served same upon, among others, all parties that had previously expressed a *bona fide* interest in purchasing the Subordinated Note.

Subsequent to the filing of the Note Sale Motion, the Debtors received additional offers for the purchase of the Subordinated Note.  Consistent with their fiduciary duties, the Debtors conducted a telephonic auction (the "Note Auction") with respect to the sale of the Subordinated Note on June 7, 2010.  At the conclusion of the Note Auction, the Debtors, in consultation with the Creditors' Committee, determined that the bid submitted by Black Horse Capital LP, Black Horse Capital (QP) LP, and Black Horse Capital Master Fund Ltd (collectively, "Black Horse") was the highest and/or best bid for the Subordinated Note.  On June 8, 2010, the Bankruptcy Court entered an order [Docket No. 474] approving the sale of the Subordinated Note to Black Horse pursuant to the terms of that certain Note Purchase Agreement, dated as of June 7, 2010 and Commitment Letter, dated as of June 7, 2010 [Docket No. 467].

3.8.    Settlement of DB's Swap Obligation Claim

The Debtors, the Committee and DB, subsequent to the filing of the DB Claim, entered into negotiations in an attempt to resolve the dispute as to the whether the DB Claim is secured and entitled to other credit support benefits.  Those negotiations resulted in a settlement of the DB Claim whereby, in full and final resolution of the DB Claim, including, but not limited to, the underlying Swap Obligations, and, in accordance with Section 10.10 of the Plan, in full satisfaction of any and all claims of DB relating to any contractual subordination rights under the Indenture or otherwise, the DB Claim shall be allowed as a secured claim against SP Wind Down in the amount of $1,500,000 and shall be entitled to receive a distribution under the Plan as a Class 2 Claimant.  Notwithstanding the limitation contained in the releases by holders of claims Section 10.6(b) of the Plan requiring holders of claims to have voted on the Plan, DB shall be considered to be deemed to have consented to and given the releases as set forth in Section 10.06(b) of the Plan.

3.9.    ~~3.8.~~ Certain Remaining Assets.

The Debtors contemplate negotiating a settlement with the Competent Authorities of India regarding funds escrowed related to certain prepetition transfer tax matters involving Spheris India Private Limited (the "Transfer Tax Escrow").   The settlement of issues related to

the Transfer Tax Escrow may result in additional funds being available to the Debtors to fund the wind down of the Debtors' estates and/or distributions under the Plan. There are a number of considerations in respect of negotiating a settlement related to the Transfer Tax Escrow and there can be no assurance that such a settlement will be reached.

The Debtors' efforts to resolve this matter are still not complete, and will require continued attention from the Debtors and their professionals.

Similarly, the Debtors and their professionals are engaged in negotiations with counterparties to an escrow account established in connection with the acquisition by the Debtors of VN Wind Down Communications in 2006 (the "Vianeta Escrow"), which likewise may result in funds being available to the Debtors to fund the wind down of the Debtors' estates and/or distributions under the Plan. There are a number of considerations in respect of negotiating a settlement related to the Vianeta Escrow and there can be no assurance that such a settlement will be reached.

## ARTICLE IV.

### SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER

4.1.    Summary of Plan.

The Plan is a plan of liquidation, pursuant to which the net proceeds from the Sale, the sale of the Subordinated Note, the disposition of any remaining assets, and/or any recoveries in connection with Avoidance Actions are being pooled and distributed to persons or entities holding Allowed Claims in accordance with the priorities of the Bankruptcy Code and the summary of treatment of Claims and Equity Interests set forth below. The number and amount of Allowed Claims will not affect distributions for holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, or Allowed Other Secured Claims. Actual distributions may differ from those set forth in the table below depending on, among other things, the amounts of the Claims allowed in Class 3, the amount of the recoveries on account of Avoidance Actions, the proceeds from the disposition of any remaining assets, and the Wind-Down Expenses.

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS. IMMEDIATELY FOLLOWING THE CHART IS THE DESCRIPTION OF THE TREATMENT OF THE CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.

11

| Class | Description | Treatment | Entitled to Vote | Estimated Percentage Recovery |
|-------|-------------|-----------|------------------|------------------------------|
| Class 1 | Non-Priority Tax Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 2 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 3 | General Unsecured Claims | Impaired | Yes | [TBD]22.85% [2] |
| Class 4 | Senior Subordinated Note Claims | Impaired | Yes | [TBD]22.85% [3] |
| Class 5 | Subordinated Claims | Impaired | No (deemed to reject) | 0%N/A |
| Class 6 | Equity Interests | Impaired | No (deemed to reject) | 0% |

     Underlying the Estimated Percentage Recovery identified in the above-table are a number of assumptions that, although developed and considered reasonable by the Proponents, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Proponents. There is no assurance that the stated Estimated Percentage Recovery will be realized, and the actual recovery percentage for holders of Claims in Class 3 and Class 4 could vary materially from those shown here dependent on the outcome of a number of variables. For instance, although the Debtors dispute the amount, validity and extent of the MedQuist Claim, the percentage recoveries set forth above were determined by estimating the potential allowed amount of the MedQuist Claim. If the Debtors' challenge to the Medquist Claim is unsuccessful, the Estimated Percentage Recovery for holders of Claims in Class 3 and Class 4 would be less, which result is reflected in the Liquidation Analysis annexed hereto as Exhibit 4. The Estimated Percentage Recovery further takes into account the ability to utilize certain tax offsets, which may be unavailable if the wind down of the Debtors' affairs and their dissolution are not completed by December 31, 2010. If the Debtors are unable to utilize the tax offsets, the Estimated Percentage Recovery for holders of claims in Class 3 and Class 4 would be less. The Estimated Percentage Recoveries presented differ from the percentages presented in the Liquidation Analysis due primarily to the fact that the Liquidation Analysis includes the maximum allowed amount of the MedQuist Claim ($21,300,000) and discounts the tax offsets.

---

[2]     The approximate recovery percentage identified for General Unsecured Claims is based on the Debtors' best estimate of the aggregate amount of the General Unsecured Claims ultimately Allowed upon conclusion of the Claims reconciliation and objection process. Accordingly, actual recoveries may be less as they are subject to a number of factors, including, but not limited to, the successful prosecution of certain objections to Claims.

[3]     The approximate recovery percentage identified for Senior Subordinated Note Claims is based on the Debtors' best estimate of the aggregate amount of General Unsecured Claims ultimately Allowed upon the conclusion of the claims reconciliation and objection process.

## Treatment of Administrative Expense Claims and Priority Tax Claims

### 4.2. Administrative Expense Claims.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

### 4.3. Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim accruing on or after May 1, 2010, other than: (a) a Fee Claim; (b) an Administrative Expense Claim that has been Allowed on or before the Effective Date; and (c) a claim for U.S. Trustee Fees, must submit to the Claims and Voting Agent and serve on the Reorganized Debtors and their counsel, and the Liquidation Trustee and counsel to the Liquidation Trust, a request for such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the date that is forty (40) days after service of notice of occurrence of the Effective Date. Such request must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. The holder of an Administrative Expense Claim accruing from the Petition Date through April 30, 2010 must file an administrative expense request in accordance with the Bar Date Order. For the avoidance of doubt, Section 2.02 of the Plan shall not be applicable to any Indenture Trustee Fee Claim, which Indenture Trustee Fee Claim shall be paid pursuant to Section 6.07 of the Plan. **FAILURE TO FILE AND SERVE SUCH REQUEST TIMELY AND PROPERLY SHALL RESULT IN SUCH ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

### 4.4. Professional Compensation and Reimbursement Claims.

All Fee Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor(s) and their counsel, the Liquidation Trustee and counsel for the Liquidation Trust, the U.S. Trustee, and former counsel to the Creditors' Committee no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court. For the avoidance of doubt, Section 2.03 of the Plan shall not be applicable to any Indenture Trustee Fee Claim, which Indenture Trustee Fee Claim shall be paid pursuant to Section 6.07 of the Plan. **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND DISCHARGED.**

13

Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Bankruptcy Court.

4.5.  Treatment of Fee Claims.

A Fee Claim in respect of which a final fee application has been properly filed and served pursuant to Section 2.03(a) of the Plan shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all allowed Professional Fees (including estimated fees through the Effective Date) shall be Paid in Full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the Debtors and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Professional Fees for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the allowed Professional Fees of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the Reorganized Debtor(s) shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Professional Fees, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, *less* any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

4.6.  Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Liquidation Trustee, either (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim. Any Claim or demand for fines or penalties related to a Priority Tax Claim shall be disallowed and the holder of an Allowed Priority Tax Claim shall not assess or attempt to collect any such fine or penalty from the Reorganized Debtors or the Liquidation Trustee. The Debtors estimate that after accounting for Priority Tax Claims already paid and subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of the Allowed Priority Tax Claims will be approximately [$⸺].$400,000.

## Treatment of Classified Claims

4.7.    Class 1 – Non-Tax Priority Claims.

(a)    Impairment and Voting.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a holder of an Allowed Non-Tax Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Allowed Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, or as soon thereafter as is practicable.

4.8.    Class 2 – Other Secured Claims.

(a)    Impairment and Voting.  Class 2 is unimpaired by the Plan.  Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.  The Debtors estimate that after accounting for Other Secured Claims already paid and subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of the Other Secured Claims will be approximately [$————].$1,500,000.

(b)    Treatment.  Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' or Liquidation Trustee's option: (i) Cash in an amount equal to such Allowed Other Secured Claim; or (ii) deferred Cash payments in such amount, to the extent permissible under the Bankruptcy Code, on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

4.9.    Class 3 – General Unsecured Claims.

(a)    Impairment and Voting.  Class 3 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  Each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of the Unsecured Claim Distribution.

15

4.10.   Class 4 – Senior Subordinated Note Claims.

(a)   Impairment and Voting. Class 4 is impaired by the Plan. Each holder of a Senior Subordinated Note Claim is entitled to vote to accept or reject the Plan.

(b)   Distributions. Each holder of an Allowed Senior Subordinated Claim shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Senior Subordinated Note Claim, its Pro Rata share of the Unsecured Claim Distribution.

4.11.   Class 5 – Subordinated Claims.

(a)   Impairment and Voting. Class 5 is impaired by the Plan. Each holder of a Subordinated Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. The holders of Subordinated Claims shall not receive any distributions on account of such Claims.

4.12.   Class 6 – Equity Interests.

(a)   Impairment and Voting. Class 6 is impaired by the Plan. Each holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions. The holders of Equity Interests shall not receive any distributions on account of such interests. On the Effective Date, all Equity Interests in SP Holding shall be deemed cancelled.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

5.1.   Substantive Consolidation of the Debtors.

Entry of the Confirmation Order shall constitute the approval, pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors for all purposes, including voting, confirmation, and distribution. On and after the Effective Date, (i) all assets and liabilities of the Debtors shall be treated as though they were pooled, (ii) no distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor, (iii) no distributions shall be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor, and (iv) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor, and any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors.

16

The substantive consolidation effected pursuant to Section 5.01(a) of the Plan shall not affect, without limitation, (i) defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right of setoff, or (ii) distributions out of any insurance policies or proceeds of such policies.

The Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation provided for in the Plan. Unless an objection to the proposed substantive consolidation is made in writing by any creditor purportedly affected by such substantive consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation proposed by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis 18043 (Aug. 23, 2005). In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering consolidation. Instead, the Third Circuit Court of Appeals articulated a number of "principles" to guide the court in its analysis. Owens Corning, 419 F.3d at 211. These principles include: (i) absent compelling circumstances courts must respect entity separateness; (ii) recognition that substantive consolidation nearly always addresses harms caused by debtors disregarding separateness; (iii) mere benefit of administration is "hardly a harm calling substantive consolidation into play"; (iv) substantive consolidation should be used rarely and as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may not be used as a "sword." Id.

Using these principles, the Third Circuit set forth the standard by which courts in this jurisdiction must weigh requests for substantive consolidation where creditor consent is lacking. Specifically, in ordering substantive consolidation (absent consent of the parties) courts must either find, with respect to the entities in question, that (a) prepetition, they disregarded their separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (b) postpetition, "their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. (emphasis added).

The Proponents believe that substantive consolidation is warranted here because, among other reasons, the Debtors, other than SP Operations, have little or no business operations and have assets of de minimis value. Further, as the Senior Credit Facility and DIP Facility have been satisfied in full, the Debtors' primary obligations are unsecured. The Proponents further believe that substantive consolidation under the terms of the Plan will not adversely impact the treatment of any of the Debtors' creditors but, rather, will reduce administrative expenses by automatically eliminating duplicate claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the process of making Distributions.

17

Accordingly, based on the foregoing, the Proponents believe that substantive consolidation of the Debtors' Estates is justified.

In the event the Bankruptcy Court determines that substantive consolidation of the Debtors is not appropriate, the Proponents may request that the Bankruptcy Court otherwise confirm the Plan and the treatment of and distribution to the different Classes under the Plan on a Debtor-by-Debtor basis. Furthermore, the Proponents reserve their right to seek confirmation of the Plan without implementing substantive consolidation, and request that the Bankruptcy Court approve the treatment of and distribution to the different Classes under the Plan on a Debtor-by-Debtor basis.

5.2.    Retention of Causes of Actions/Reservation of Rights.

Nothing contained in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors, the Reorganized Debtors and the Liquidation Trustee shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, or other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

5.3.    The Liquidation Trust.

(a)    Creation of the Liquidation Trust. On or before the Effective Date, the Liquidation Trust shall be formed pursuant to the Liquidation Trust Agreement and the filing of a certificate of trust with the Delaware Secretary of State. It is contemplated that the Liquidation Trustee will report to an advisory board of individuals appointed by the Creditors' Committee in its sole discretion (the "Liquidation Trust Advisory Board"). The Liquidation Trustee shall administer the Liquidation Trust. The Liquidation Trustee will have authority to retain, on behalf of the Liquidation Trust, any counsel, financial advisors, claims agent, auditors, or other such professionals as it deems appropriate at all times. The Liquidation Trust may select any of the foregoing professionals in its sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors, their estates, the Creditors' Committee shall not preclude the Liquidation Trust's retention of such professionals. The Liquidation Trust Beneficiaries' interests in the Liquidation Trust shall be uncertificated and, subject to applicable law, shall only be transferable upon the death of the applicable Liquidation Trust Beneficiary or pursuant to applicable law.

(b)    Purpose of the Liquidation Trust. On the Effective Date, the Debtors shall transfer, on behalf of the Liquidation Trust Beneficiaries, the Liquidation Trust Assets to the Liquidation Trust. The Liquidation Trust shall be established as a liquidating trust for the primary purpose of monetizing and distributing the Liquidation Trust Assets to the Liquidation Trust Beneficiaries. In connection with the vesting and transfer of the Liquidation Trust Assets, including Causes of Action, any attorney-client privilege, work-product protection or other privilege or immunity attaching to any documents or communications (whether written or oral)

18

transferred to the Liquidation Trust shall vest in the Liquidation Trust. The Debtors, the Reorganized Debtors and the Liquidation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. For the avoidance of doubt, if after the Effective Date it is later determined that any of the assets transferred to the Liquidation Trust are Purchased Assets, the Liquidation Trust shall use its reasonable best efforts to convey such assets to the Purchasers in accordance with the Purchase Agreement.

(c)    Liquidation Trust Advisory Board. On or before the Effective Date, the Liquidation Trust Advisory Board shall be formed by the Creditors' Committee designating two (2) Persons. The initial members of the Liquidation Trust Advisory Board shall be identified in the Plan Supplement. In the event that no one is willing to serve on the Liquidation Trust Advisory Board after its formation or there shall have been no Liquidation Trust Advisory Board for a period of thirty (30) consecutive days, then the Liquidation Trustee may, during such vacancy, and thereafter, ignore any reference in the Plan, the Liquidation Trust Agreement or the Confirmation Order to the Liquidation Trust Advisory Board, and all such references in the Plan, the Liquidation Trust Agreement or the Confirmation Order shall be null and void. Any deadlock in a vote by the members of the Liquidation Trust Advisory Board may be broken by a vote by the Liquidation Trustee. The Liquidation Trust Advisory Board shall monitor and oversee the Liquidation Trustee, and all liquidation, distribution and other activities required in connection with management of the Liquidation Trust Assets, as more fully set forth in the Liquidation Trust Agreement. The members of the Liquidation Trust Advisory Board shall not be paid for their services except for reimbursement of actual and reasonable expenses incurred by such members. Except as otherwise expressly set forth in the Plan, Confirmation Order or the Liquidation Trust Agreement, the Liquidation Trustee shall at all times take direction from the Liquidation Trust Advisory Board and shall not make any material decision absent approval of the Liquidation Trust Advisory Board.

(d)    Liability of Liquidation Trust Advisory Board. Neither the Liquidation Trust Advisory Board, nor any of its members or designees, nor any duly designated agent or representative of the Liquidation Trust Advisory Board, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent, or representative of the Liquidation Trust Advisory Board, nor shall any member be liable for any act or omission to be taken in its capacity as a member of the Liquidation Trust Advisory Board, other than acts resulting from such member's willful misconduct or gross negligence.

(e)    (e) Management of the Liquidation Trust Assets. After the Effective Date, all property of the Liquidation Trust shall be managed and administered by the Liquidation Trustee in a manner reasonably designed to maximize values. The Liquidation Trust is authorized to prosecute the Assigned Causes of Action for the benefit of any holders of Allowed Claims who shall receive a distribution under the Plan. If the Liquidation Trustee in its discretion decides not to sell any non-Cash property or if such property cannot, in the Liquidation Trustee's judgment, be sold or liquidated in a commercially reasonable manner prior to the Final Distribution Date, the Liquidation Trustee shall have the right to abandon or otherwise dispose of such property with the prior approval of the Bankruptcy Court. Absent willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against either the Liquidation Trustee, the Liquidation Trust, the Debtors or the

19

Reorganized Debtors, or their respective directors, officers, employees, consultants, trustees or professionals arising from or related to the disposition of non-Cash property in accordance with Section 5.02(c) of the Plan.

(f)    (d) Transfer Taxes. Any transfer of the Liquidation Trust Assets to the Liquidation Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

(g)    (e) Federal Income Tax Treatment of the Liquidation Trust. The Liquidation Trust will be established for the sole purpose of distributing the Liquidation Trust Assets, and any proceeds therefrom, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, i.e., pass-through entity. All parties must treat the transfer of the portion of the Liquidation Trust Assets attributable to the Liquidation Trust Beneficiaries as a transfer of such assets directly to the Liquidation Trust Beneficiaries. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Subject to the terms of the Liquidation Trust Agreement, the Liquidation Trustee will determine the fair market value of the Liquidation Trust Assets as soon as possible after the Effective Date, and the Liquidation Trust Beneficiaries and the Liquidation Trustee must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.

(h)    (f) Reserve. The Liquidation Trust shall establish an LT Reserve on account of Claims that are Disputed. The Liquidation Trust may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the LT Reserve as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the LT Reserve, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (iii) distribute assets from the LT Reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved. The Liquidation Trust Beneficiaries shall be bound by such election, if made by the Liquidation Trustee, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

(i)    (g) Dissolution. The Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion made prior to such fifth (5th) anniversary, determines that a fixed period extension not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes is necessarily to facilitate or complete the recovery on and liquidation of the Liquidation Trust Assets. Upon the filing of any motion for an extension of the date of dissolution of the Liquidation Trust, such date shall be deemed automatically extended

until an order of the Bankruptcy Court is entered with respect to such motion or the motion is withdrawn.

(i)    (h) Securities Law Matters.  To the extent the interests in the Liquidation Trust are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

5.4.    Approval of Plan Documents.

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated thereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Reorganized Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

## ARTICLE VI.

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED DEBTORS

6.1.    Post-Effective Date Corporate Existence.

Each Reorganized Debtor is authorized and empowered to merge into or with each other Reorganized Debtor and each of the Chief Wind Down Officer and any successor thereto (including without limitation any other designated officer or trustee or representative of each such Reorganized Debtor) is authorized and empowered to effect each such merger and to take and cause to be taken such actions in order to carry out such mergers, in each case, on such terms and conditions it may deem necessary or desirable.  The Chief Wind-Down Officer and any successor thereto (including without limitation any other designated officer or trustee or representative of each such Reorganized Debtor) is authorized and empowered to effect the dissolution of any remaining Reorganized Debtors as soon as practicable after the Effective Date.  On the Effective Date, upon cancellation of the Equity Interests in SP Holding as contemplated by Section 6.05 of the Plan, SP Holding shall issue a single share of common stock to the Liquidation Trust, without the need for any further corporate or shareholder action. The foregoing actions are authorized pursuant to Section 303 of Delaware General Corporation Law, Section 1400 of the California Corporations Code, or other applicable law of the states in which the Debtors and the Reorganized Debtors are organized, without any requirement of further action by the stockholders, directors, members, managers, or partners of the Debtors or Reorganized Debtors.

6.2.    Corporate Action.

All matters provided for under the Plan that would otherwise require approval of the stockholders, directors, members, managers or partners of one or more of the Debtors or

Reorganized Debtor, including (i) the effectiveness of the certificates of incorporation and by-laws of the Reorganized Debtor, (ii) the election or appointment, as the case may be, of directors and officers of the Reorganized Debtor, and (iii) qualification of the Reorganized Debtor(s) as a foreign corporation wherever the conduct of business by the Reorganized Debtor(s) requires such qualification, will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to Section 303 of the Delaware General Corporation Law, Section 1400 of the California Corporations Code or other applicable law of the states in which the Debtors and the Reorganized Debtors are organized, without any requirement of further action by the stockholders, directors, members, managers, or partners of the Debtors or Reorganized Debtor. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) incorporated, in accordance with the applicable general corporation law of each such state.

6.3.    <u>Officers and Boards of Directors.</u>

Effective as of the Effective Date, the board of directors or board of managers, as applicable, of each Reorganized Debtor shall be comprised solely of the Chief Wind-Down Officer. Effective as of the Effective Date, members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtor(s) on or after the Effective Date. Effective as of the Effective Date, the sole officer of each Reorganized Debtor shall be the Chief Wind-Down Officer.

6.4.    <u>Payment of Wind-Down Expenses.</u>

Wind-Down Expenses shall be paid by the Liquidation Trustee from the Liquidation Trust Assets.

6.5.    <u>Cancellation of Existing Securities and Agreements.</u>

On the Effective Date, any document, agreement, or instrument evidencing any Claim (including, but not limited to, the Secured Credit Agreement and the Indenture (except to the extent otherwise provided herein)) or Equity Interests in SP Holding shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

6.6.    <u>Senior Subordinated Notes.</u>

Notwithstanding anything herein to the contrary, the applicable provisions of the Indenture shall continue in effect solely for the purposes of permitting the Indenture Trustee to: (i) make the distributions to be made to holders of Allowed Senior Subordinated Note Claims, as contemplated by Article IV of the Plan; and (ii) maintain any rights and Charging Liens the Indenture Trustee may have for any fees, costs, expenses, and indemnification under the Indenture or other agreements until all such fees, costs, and expenses are paid pursuant to Section 6.07 of the Plan; <u>provided</u>, <u>however</u>, that, except as set forth in Section 6.07 of the Plan, such rights and Liens are limited to the distributions, if any, to the holders of the Allowed Senior

Subordinated Note Claims. The holders of or parties to such cancelled (or converted, as applicable) instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation (or conversion, as applicable) thereof, except the rights provided pursuant to the Plan.

6.7.    Rights of the Indenture Trustee.

(a)    In full satisfaction of any Allowed Indenture Trustee Fee Claims for fees and expenses incurred through the Effective Date, including to the extent such Allowed Trustee Fee Claims are secured by any Charging Liens under the Indenture, which for the avoidance of doubt, are preserved under the Plan, the Liquidation Trustee will distribute to the Indenture Trustee, Cash equal to the amount of the Allowed Indenture Trustee Fee Claims; provided, however, that with respect to Claims to which the Debtors, the Creditors' Committee, or the Liquidation Trustee shall have objected within the later of (x) three (3) Business Days prior to the Effective Date, and (y) twenty (20) days of receipt of the request for payment, no distribution shall be payable hereunder until such objection has been resolved. To the extent the Indenture Trustee incurs fees or expenses after the Effective Date, the Indenture Trustee shall be compensated and reimbursed for such fees and expenses in accordance with Section 13.07 of the Plan, subject to the conditions set forth in subsection 6.07(b) of the Plan.

(b)    As a condition to receiving payment thereof, each holder of an Indenture Trustee Fee Claim shall deliver to the Debtors, the Creditors' Committee, or the Liquidation Trustee written copies of invoices in respect of such claims, with narrative descriptions of the services rendered (including appropriate redactions to preserve privileged matters) and itemization of expenses incurred in such detail and with such supporting documentation as is reasonably requested by the Debtors, the Creditors' Committee or the Liquidation Trustee. An Indenture Trustee Fee Claim shall be deemed Allowed except to the extent the Debtors, the Creditors' Committee or the Liquidation Trustee timely objects. If the Debtors, the Creditors' Committee or the Liquidation Trustee timely objects to the request for payment of any Indenture Trustee Fee Claim, the undisputed amount of any Indenture Trustee Fee Claims with respect to which such objection(s) are pending shall be Allowed and paid by the Liquidation Trustee on the Effective Date or as soon thereafter as any such Indenture Trustee Fee Claims are Allowed. The Disbursing Agent shall not be required to make any payments with respect to the disputed portion of an Indenture Trustee Fee Claim as to which the Debtors, the Creditors' Committee or the Liquidation Trustee has objected until resolved by the objector(s) or determined by the Bankruptcy Court. In the event such objector(s) are unable to resolve a dispute as to an Indenture Trustee Fee Claim, the Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Bankruptcy Court for resolution by application requesting payment of the disputed portion of the Indenture Trustee Fee Claims in accordance with the reasonableness standard (and not subject to the requirements of sections 503(b)(3) and (4) of the Bankruptcy Code, which shall not apply) or (ii) assert its Charging Lien (to the extent such Lien exists under the Indenture) to obtain payment of a disputed portion of the Indenture Trustee Fee Claim in lieu of Bankruptcy Court resolution described in subsection (i).

(c)    Nothing herein shall be deemed to impair, extinguish or negatively impact the Charging Liens.

# ARTICLE VII.

## PROVISIONS REGARDING VOTING
## AND DISTRIBUTIONS UNDER THE PLAN

### 7.1.   Non-Consensual Confirmation.

If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Proponents shall have the right to amend the Plan in accordance with Section 13.08 of the Plan or to ask the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, the Proponents shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 7.2.   Elimination of Vacant Classes.

Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 7.3.   Voting Classes.

If a Class contains Claims or Equity Interests eligible to vote and no holders of Claims or Equity Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Equity Interests in such Class.

### 7.4.   Distributions.

Pursuant to the terms and provisions of the Plan, the Liquidation Trustee shall make the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan. Any payment of Cash made by the Liquidation Trustee pursuant to the Plan shall, at the Liquidation Trustee's option, be made by check drawn on a domestic bank or wire transfer.

### 7.5.   Insurance Claims.

That portion of each Allowed Claim that is an Insurance Claim shall be paid solely and exclusively: (a) from the proceeds of insurance relating to such Insurance Claim as and when such proceeds are received; or (b) by the applicable insurance carrier to the extent of such insurance. Notwithstanding the foregoing, an Allowed Claim, or any portion thereof, for which insurance coverage may be available shall not be treated as an Insurance Claim under the Plan until the holder of such Allowed Claim has actually received payment from the applicable insurance carrier, its assignee, successor or affiliate (collectively, the "Insurer"), in respect of

24

such Claim or portion thereof. If the holder of an Allowed Claim does not receive payment from the applicable Insurer for any reason (other than as a result of the holder's willful misconduct or gross negligence), distributions under the Plan to such holder, if any, shall not be reduced on account of the insured portion of such Claim; provided, that as a condition to any distribution to the holder of an Allowed Claim, all or some of which may be covered by insurance, the holder of such Claim shall be deemed to have assigned to the Liquidation Trust such holder's right to receive payments on the Claim from the Insurer to the extent of the distribution under the plan and shall pay to the Liquidation Trust any amounts paid by the Insurer to or on behalf of such holder to the extent of the distribution (except to the extent such amounts have been paid by the Insurer to the Liquidation Trust). If a holder reasonably determines to abandon attempts to collect insurance from an Insurer, the holder shall give 10 Business Days' notice thereof to the Liquidation Trustee and at the expiration of such notice period may abandon attempts to collect such amounts from the Insurer and the Liquidation Trust shall thereupon be entitled to all rights of the holder against the Insurer with respect to such amounts.

    7.6.    <u>Timing of Distributions.</u>

        In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Any requirement under the Plan that the Reorganized Debtors or Liquidation Trustee make a payment or distribution on a date shall mean that such party is required to commence the process of making a payment or distribution on such date or as soon as reasonably practicable thereafter.

    7.7.    <u>Holdings as of the Distribution Record Date.</u>

        As of the close of business on the Distribution Record Date: (i) the claims register maintained in the Chapter 11 Cases shall be closed; and (ii) any transfer of any Claim (including any Senior Subordinated Note Claim) or any interest therein shall be prohibited. Neither the Debtors nor the Reorganized Debtors shall have any obligation to recognize any transfer of any Claim occurring after 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, and instead may, in their sole discretion, recognize and deal for all purposes under the Plan with only those holders of record as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date.

    7.8.    <u>Distribution to Address of Record.</u>

        Subject to Bankruptcy Rule 9010, and except as set forth in Section 7.08 of the Plan, all distributions under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtors and the Liquidation Trustee, have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules. In the event that any distribution to any such holder is returned as undeliverable, no distribution to such

<div align="center">25</div>

holder shall be made unless and until the appropriate Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such holder without interest; provided, however, that, at the later of the expiration of one (1) year from the Effective Date and the date a Claim becomes an Allowed Claim, such distributions shall be deemed unclaimed property and shall revest in the Liquidation Trust and be distributed to other holders of Allowed Claims, in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

7.9.  Minimum Distributions.

The Liquidation Trustee shall not be obligated to make any payment of Cash of less than one hundred dollars $100 to any holder of an Allowed Claim, unless such holder sends a timely written request to the Liquidation Trustee requesting that such payment be made on the next Distribution Date. All such distributions shall be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, if, on any Distribution Date there remains $10,000 or less available for distribution to holders of Allowed General Unsecured Claims, in lieu of making any further distributions to the holders of such Claims, the Liquidation Trust may distribute such Cash to the charity of its choice.

7.10.  Unclaimed Distributions.

All distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred. All such unclaimed property shall revest in the Liquidation Trust and be distributed to other holders of Allowed Claims or donated in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

7.11.  Setoffs.

The Liquidation Trust may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Causes of Action of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Liquidation Trustee of any such Causes of Action that the Liquidation Trust, the Debtors or the Reorganized Debtors, may have against the holder of such Claim.

7.12.  Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

7.13.  Estimation of Claims; Certain Reserves.

For purposes of calculating and making distributions under the Plan, the Liquidation Trustee shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class. The Liquidation Trustee also shall be entitled to seek one or more estimation orders from the Bankruptcy Court for such purposes, which requests may be joined with objections to the Claims that are subject to any such request. Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. With respect to Insurance Claims, the Liquidation Trustee shall not be required to establish an LT Reserve on account of any portion of an Insurance Claim that in the Liquidation Trustee's good faith will be paid from available insurance coverage. Notwithstanding the foregoing: (i) neither the Liquidation Trust nor the Liquidation Trustee shall be obligated to physically segregate and maintain separate accounts for LT Reserves; and (ii) unless otherwise ordered by the Bankruptcy Court, no LT Reserves shall be required to be established or maintained with respect to Claims or Administrative Expense Claims filed after the applicable Bar Date. LT Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time and evergreen in nature, as appropriate.

7.14.  Non Recourse.

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Advisory Board, the Debtors, the Reorganized Debtors, or any of their respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code, nor shall it modify or limit the ability of claimants (if any) to seek disgorgement to remedy any unequal distribution from parties other than those released under Section 7.14 of the Plan. THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

7.15.  Satisfaction of Claims and Equity Interests.

Unless otherwise provided in the Plan or the Confirmation Order, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

YCST01:9898745.1                                                                        068920.1001

7.16.    <u>Withholding and Reporting Requirements</u>.

In connection with the Plan and all distributions thereunder, the Reorganized Debtors and Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements. The Reorganized Debtors and the Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Reorganized Debtors or the Liquidation Trustee believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim or Allowed [Equity] Interest that is to receive a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (b) no Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors and the Liquidation Trustee for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' and the Liquidation Trustee's satisfaction, established an exemption therefrom.

## **ARTICLE VIII.**

## **PROCEDURES RELATING TO DISPUTED CLAIMS**

8.1.    <u>Objections to Administrative Expense Claims and Claims</u>.

Following the Effective Date, only the Liquidation Trust, through the Liquidation Trustee, shall be entitled to object to Administrative Expense Claims and Claims. Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) one hundred and twenty (120) days after the Effective Date, and (ii) such later date as may be fixed by the Bankruptcy Court, which later date may be fixed before or after the date specified in clause (i) above. No objection shall be required with respect to a proof of Claim or proof of Administrative Expense Claim filed after the applicable Bar Date, and any and all such Claims and Administrative Expense Claims shall be deemed disallowed unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

8.2.    <u>Amendments to Claims</u>.

After the Confirmation Date, a proof of Claim or Administrative Expense Claim may not be amended without the authorization of the Bankruptcy Court. Any amendment to a proof of Claim or Administrative Expense Claim submitted after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtors or the Reorganized Debtors, unless the holder of the Claim or Administrative Expense Claim has obtained prior Bankruptcy Court authorization to file the amendment.

28

8.3.    No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided under the Plan shall be required to be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Administrative Expense Claim becomes Allowed in its entirety.

8.4.    Resolution of Disputed Claims.

On and after the Effective Date, the Liquidation Trust, through the Liquidation Trustee, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims without approval of the Bankruptcy Court. The reasonable fees and expenses (including reasonable attorneys' fees and costs) that are incurred by the Liquidation Trust, the Liquidation Trustee, the Reorganized Debtors, when providing assistance at the request of the Liquidation Trustee, associated with the claims resolution process shall be borne by the Liquidation Trust.

8.5.    Resolution of Disputed Insurance Claims.

All Insurance Claims not previously Allowed shall be considered to be Disputed Claims as of the Effective Date such that no objection to an Insurance Claim is required to be filed. All Insurance Claims shall be litigated to an order of a court of competent jurisdiction over such claim except to the extent that the Liquidation Trust, through the Liquidation Trustee, in conjunction with the Debtors' applicable insurer, and the holder of the Disputed Insurance Claim compromise, settle or otherwise resolve the respective Insurance Claim or agree to another method of claim resolution such as mediation or arbitration, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court or any other court.

## ARTICLE IX.

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

9.1.    Rejection or Assumption and Retention or Assignment.

(a)    Assumption or Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code:

(1)    all executory contracts and unexpired leases of the Debtors shall be deemed to be rejected by the applicable Debtor as of the Confirmation Date, subject to the occurrence of the Effective Date, except for any executory contract or unexpired lease: (a) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (b) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (c) that is specifically designated as a contract or lease to be

29

assumed and/or assigned or retained on Schedule 9.01(a) to the Plan, which schedule shall be contained in the Plan Supplement and shall list corresponding Cure Amounts;

(2) notwithstanding anything otherwise herein to the contrary, the Debtors reserve the right, on or prior to the Effective Date, to amend Schedule 9.01(a) to the Plan to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as applicable, rejected, assumed and/or assigned or retained. The Debtors shall provide notice of any amendments to Schedule 9.01(a) to the Plan to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 9.01(a) to the Plan shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(b)     Approval of Assumptions, Retentions and Rejections by Confirmation Order. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Section 9.01(a) to the Plan shall vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

9.2.     Cure of Defaults.

(a)     Generally. Except as may otherwise be agreed to by the Debtors, the Reorganized Debtors, or the Liquidation Trustee, as the case may be, and the non-Debtor party to the executory contract or unexpired lease, within thirty (30) days after the Effective Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. Subject to the last sentence of Section 9.02(b) of the Plan, all disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties.

(b)     Notice of Proposed Cure. The Debtors shall, prior to the conclusion of the Confirmation Hearing, file and serve on parties to executory contracts and unexpired leases that may be assumed pursuant to Section 9.01 of the Plan a notice (the "Cure Notice") listing the proposed Cure Amount to be paid in connection with the executory contracts and unexpired leases that may be Assumed, retained, assumed and/or assigned pursuant to Section 9.01(a) of the Plan. The non-Debtor parties to such executory contracts and unexpired leases shall have until fifteen (15) days following service of the Cure Notice to object in writing to the proposed cure and to propose an alternative cure. In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure proposed by the Debtors (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtors, the Reorganized Debtors and the Liquidation Trustee any

30

additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code. If an objection is timely filed with respect to the Cure Amount proposed by the Debtors for an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed cure amount not settled by the parties. Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a disputed cure amount, whether such date is before or after the Effective Date, each of the Debtors, the Reorganized Debtors and the Liquidation Trustee shall be authorized to reject such executory contract or unexpired lease by notice to the non-debtor party to such executory contract or unexpired lease.

9.3.  Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 9.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors in accordance with the Bar Date Order. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, and the Reorganized Debtors.

## ARTICLE X.

## EFFECT OF CONFIRMATION & INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

10.1.  Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Liens, Claims, liabilities or encumbrances against or Equity Interests in, any or all of the Debtors, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, with respect to any such Liens, Claims, liabilities or encumbrances or Equity Interests, as of the Confirmation Date but subject to the occurrence of the Effective Date, from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Advisory Board or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (b) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Advisory Board or any of their property (including, without limitation, the Liquidation Trust Assets), or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against

31

the Debtors, the Reorganized Debtors, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Advisory Board or any of their property (including, without limitation, the Liquidation Trust Assets), or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; (e) taking any actions to interfere with the implementation or consummation of the Plan; and (f) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, such as commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights arising under and consistent with the terms of the Plan.

10.2. Releases

(a) *Releases by the Debtors.* *Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors and Reorganized Debtors, in their individual capacities and as debtors in possession, shall be deemed to forever release and waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, which are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or after the Petition Date (or the date of appointment, engagement or qualification) and to and including the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan or this Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, or the Reorganized Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Released Party; provided, however, that in no event shall anything in Section 10.06 of the Plan be construed as a release of any Person's fraud, willful misconduct or gross negligence, or a release or waiver of the Debtors' or Reorganized Debtors' right or ability to assert or raise certain claims against any Released Party as defense to a claim or suit brought against them or their assets by any Released Party.*

(b) *Releases by Holders of Claims.* *Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan, and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim, as applicable, will be deemed to have consented to the Plan for all purposes and the restructuring embodied herein and will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown,*

32

*foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise from the beginning of time through and including the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement against the Released Parties in their respective capacities as such; provided, however, that the foregoing releases shall not apply to any holder of a Claim that (a) is entitled to vote, (b) votes to reject the Plan in a timely and properly submitted Ballot, and (c) "opts out" of the releases provided in Section 10.06(b) of the Plan in a timely and properly submitted Ballot. Notwithstanding the foregoing, in no event shall anything in Section 10.06(b) of the Plan be construed as a release of any Person's (other than a Debtor's) fraud, willful misconduct or gross negligence.*

(c) *Notwithstanding anything otherwise to the contrary, no provision of the Plan or of the Confirmation Order, including any release or exculpation provision, shall modify, release or otherwise limit the liability of any Person not specifically released hereunder, including any Person that is a co-obligor or joint tortfeasor of a Released Party, that otherwise is liable under theories of vicarious or other derivative liability.*

*Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Section 10.06 of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or Releasing Parties asserting any Claim or Cause of Action thereby released.*

10.3.    Exculpation and Limitation of Liability.

None of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Indenture Trustee, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Advisory Board or any of their respective current or former members, partners, officers, directors, employees, advisors, professionals, affiliates, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons, but solely in their capacities as such) shall have or incur any liability to any holder of any Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the negotiation and execution of the Purchase Agreement, the sale of substantially all of the Debtors' assets, the negotiation and execution of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, and the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order. Nothing in Section 10.07 of the Plan shall: (i) be construed as a release of any entity's fraud, gross negligence or willful misconduct with respect to matters set forth in Section 10.07 of the Plan; (ii) limit the liability of attorneys for the Debtors, the Reorganized Debtors, the Creditors' Committee, the Indenture Trustee, the Liquidation Trust to

their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility; or (iii) be construed as a release or waiver of the Debtors' or Reorganized Debtors' right or ability to assert or raise certain claims against any party as a defense to a claim or suit brought against them by such party.

10.4.  Injunction Related to Releases and Exculpation.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Sections 10.06 and 10.07 of the Plan.

10.5.  Releases of Liens and Encumbrances.

(a)  Each Lien or encumbrance on the Debtors' assets, other than a permitted encumbrance (excluding a permitted encumbrance securing a financial obligation that is not an Assumed Liability), including Liens or encumbrances securing:  (w) any Secured Credit Agreement Claim, Secured Tax Claim, Other Secured Claim or Administrative Expense Claim arising under or related to the Debtors' postpetition secured credit facility; (x) any Claim that is purportedly secured or (y) any judgment, personal property or *ad valorem* tax, or other tax of any kind or character, mechanic's or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, regardless of whether such Claim has been scheduled or proof of such Claim has been filed:

(b)  if such Lien or encumbrance secures a Secured Tax Claim or Other Secured Claim, such Lien or encumbrance shall upon payment of the consideration set forth in the Plan, as the case may be, automatically, and without further action by the Debtors or the Reorganized Debtors, be deemed released;

(c)  in all other cases, such Lien or encumbrance shall automatically, and without further action by the Debtors or the Reorganized Debtors, be deemed released immediately upon the occurrence of the Effective Date, and without further action by the Debtors or Reorganized Debtors, be deemed released;

(d)  the holder of any such Lien or encumbrance shall execute such documents and instruments as the Reorganized Debtors or the Liquidation Trustee, as the case may be, require to evidence such Claim holder's release of such property or Lien or encumbrance, and if such holder refuses to execute appropriate documents or instruments, the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable) may, in their discretion, file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any Claim holder's rights in such property; and

(e)  on the Effective Date, except as expressly provided in the Plan, all right, title and interest in Estate property subject to a Lien or an encumbrance immediately prior to the Effective Date shall be transferred as a Liquidation Trust Asset to the Liquidation Trust.

34

10.6.   Satisfaction of Subordination Rights.

All Claims against the Debtors and all rights and Claims between or among claimholders relating in any manner whatsoever to Claims against the Debtors, based upon any claimed subordination rights (if any), shall be deemed satisfied by the distributions under the Plan, and such subordination rights shall be deemed waived, released, and terminated as of the Effective Date.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.1.   Conditions to Confirmation.

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 11.03 of the Plan:

(a)    the Bankruptcy Court shall have approved the Disclosure Statement with respect to the Plan in an order in form and substance reasonably acceptable to the Proponents;

(b)    the Confirmation Order and Plan Documents shall be in form and substance reasonably acceptable to the Proponents;

(c)    in each case subject to the occurrence of the Effective Date, to the extent necessary or appropriate, the Plan Documents, including the Liquidation Trust Agreement, to be entered into by the Reorganized Debtors shall have been entered and delivered, all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed and the Debtors shall have received all material authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are reasonably necessary to implement the Plan and that are required by law, regulation, or order.

11.2.   Effectiveness.

The Plan shall not become effective unless and until: (i) the Confirmation Order shall have become final and non-appealable; and (ii) the Plan Documents shall have been executed and become effective.

## ARTICLE XII.

## VOTING REQUIREMENTS, ACCEPTANCE
## AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the Proponents have proposed the Plan in

good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan; (viii) the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired Class by providing to such holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Equity Interest in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date; and (x) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits, provided, however, that upon motion by the Debtors, the Bankruptcy Court may enter an order pursuant to sections 1114(e)(1) and 1114(g) providing for the modification in the payment of retiree benefits, under certain circumstances.

12.1.  Parties in Interest Entitled to Vote.

Pursuant to the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is impaired if the legal, equitable or contractual rights to which the Claims or Equity Interests of that Class are entitled are modified, other than by curing defaults and reinstating the debt. Classes of Claims and Equity Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims and Equity Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to not have accepted the Plan.

12.2.  Classes Impaired Under the Plan.

The following Classes of Claims are or may be impaired under the Plan and are entitled to vote on the Plan (the "Voting Classes"):

| IMPAIRED CREDITORS ENTITLED TO VOTE ||
| Class | Designation |
| --- | --- |
| Class 3 | General Unsecured Claims |
| Class 4 | Senior Subordinated Note Claims |

Acceptances of the Plan are being solicited only from those holders of Claims in Impaired Classes that will or may receive a distribution under the Plan. Accordingly, the Proponents are soliciting acceptances from holders of Claims in Class 3 or Class 4.

36

12.3. <u>Voting Procedures and Requirements</u>.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

(a) <u>Ballots</u>. In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please call the Claims and Voting Agent, The Garden City Group, Inc. at (800) 395-3686. Each Ballot enclosed with this Disclosure Statement has been encoded with the amount of your Claim for voting purposes and the Class in which your Claim has been classified. If your Claim is a Disputed Claim this amount may not be the amount ultimately allowed for purposes of distributions under the Plan. **PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY**.

(b) <u>Returning Ballots</u>.

**IF YOU ARE A HOLDER OF A CLASS 3 OR CLASS 4 CLAIM ENTITLED TO VOTE, YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO:**

| If sent via First Class Mail: | If sent via overnight deliver or courier: |
|---|---|
| The Garden City Group, Inc.<br>Attn: SP Case Administration<br>P.O. Box 9574<br>Dublin, OH 43017-4874 | The Garden City Group, Inc.<br>Attn: SP Case Administration<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017 |

**If you have any questions on the procedures for voting on the Plan, please call the Claims and Voting Agent at the following telephone number: (800) 395-3686**

**IF YOU RECEIVED A BALLOT FROM AN INDENTURE TRUSTEE, A BROKER, DEALER OR OTHER AGENT, COMMERCIAL BANK, TRUST COMPANY, TRANSFER AGENT OR OTHER NOMINEE (EACH AN "INTERMEDIARY" AND COLLECTIVELY, THE "INTERMEDIARIES"), RETURN THE COMPLETED BALLOT(S) TO SUCH INTERMEDIARY PROMPTLY SO THAT IT CAN BE FORWARDED TO THE DEBTORS' CLAIMS AND VOTING AGENT AT THE ADDRESS LISTED IMMEDIATELY ABOVE.**

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND VOTING AGENT NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON [————, 2010],AUGUST 17, 2010,** UNLESS EXTENDED BY

THE DEBTORS.  YOUR BALLOT MAY BE SENT VIA U.S.  FIRST CLASS MAIL, OVERNIGHT COURIER OR MESSENGER.  ALL BALLOTS MUST BE SIGNED.  IF YOU ARE SENDING YOUR BALLOT TO AN INTERMEDIARY FOR INCLUSION IN A MASTER BALLOT, THE ***INTERMEDIARY*** MUST RECEIVE YOUR PROPERLY COMPLETED BALLOT BY —:—4:00 **P.M. (PREVAILING EASTERN TIME) ON** [——————, 2010]**AUGUST 12, 2010.** OR SUCH OTHER TIME AND DATE AS THE INTERMEDIARY MAY AGREE THAT ALLOWS THE INTERMEDIARY SUFFICIENT TIME TO PROCESS THE BALLOTS.

In accordance with Bankruptcy Rule 3017(d), the Debtors will send Ballots to the Intermediaries holding Claims for, or acting on behalf of, beneficial holders of Claims in Class 4. Each Intermediary will be entitled to receive, upon request of the Debtors, a reasonably sufficient number of Ballots to distribute to the beneficial owners of the Claims for which it is an Intermediary, and the Debtors will be responsible for and pay each such Intermediary's reasonable costs and expenses associated with the distribution of Ballots to beneficial owners of such Claims and the tabulations of the Ballots.  Additionally, each Intermediary must receive returned Ballots by —4:—00 p.m. (prevailing Eastern Time) on [——————,August 12, 2010] or such other time or date as the Intermediary may agree so that it can tabulate and return the results to the Claims and Voting Agent in a summary "master" ballot in a form approved by the Bankruptcy Court (the "Master Ballot"), indicating the number and dollar amount of cast Ballots in the group of Claim holders for which it was an Intermediary and indicating whether the Claim holder has opted out of the Release.  The Intermediaries must certify that each beneficial holder has not cast more than one vote with respect to any given Claim for any purpose, including for determining both the number of votes and the amount of the Claim, even if such holder holds securities of the same type in more than one account.  However, persons who hold such Claims in more than one voting Class will be entitled to one vote in such Class, subject to the applicable voting rules.

Prior to deciding whether and how to vote on the Plan, each holder in a voting class should consider carefully all of the information in this Disclosure Statement.

**IMPORTANT – VOTING BY INTERMEDIARY**

- If your vote is being processed by an Intermediary, please allow time for transmission of your Ballot to your Intermediary for preparation and delivery to the Claims and Voting Agent of a Master Ballot reflecting your vote and the votes of other Claims tabulated by the Intermediary.

- To be counted, your vote must be received *either* (a) directly by the Claims and Voting Agent on or before the Voting Deadline, or (b) if your vote is processed by an Intermediary, *by your Intermediary* by [———:———.——**4:00 p.m. (prevailing Eastern Time) on** ————,**August 12,** 2010 or such other date and time as the Intermediary may agree to allow the Intermediary to process the Ballots.

- Receipt by the *Intermediary* on or close to the Voting Deadline may not allow sufficient time for the Intermediary to include your vote in the Master Ballot that it prepares and delivers to the Claims and Voting Agent by the Voting Deadline.

- If you have a question concerning the voting procedures, please contact your Intermediary directly, or the Claims and Voting Agent at (800) 395-3683.

12.4.    Confirmation Hearing.

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing with respect to whether the Plan and the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for [————————,**August 26,** 2010 at —:——0——**1:30 p.m.**] **(prevailing Eastern Time)** before the Honorable Kevin Gross, United States Bankruptcy Judge, United States Bankruptcy Court, 824 N. Market Street, 6th Floor, Wilmington, Delaware 19801. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before [————————,**August 17,** 2010, at 4:00 p.m. (prevailing Eastern Time)], in the manner set forth in the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

12.5.    Confirmation.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. As noted above, among the requirements for confirmation are that the plan (i) is accepted by the requisite holders of Claims and Equity Interests or, if not so accepted, is "fair and equitable" and "does not discriminate unfairly" as to the non-accepting Class of Claims or Equity Interests, (ii) is in the "best interests" of each holder of a Claim or Equity Interest that does not vote to accept the Plan in each impaired Class under the Plan, (iii) is feasible, and (iv) complies with the applicable provisions of the Bankruptcy Code.

YCST01:9898745.1                                                                    068920.1001

12.6.   Acceptance of Plan.

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept a plan, except under certain circumstances. See "Confirmation Without Acceptance of All Impaired Classes" below. A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan. A plan is accepted by an impaired class of interests if holders of at least two-thirds of the number of shares in such class vote to accept the plan. Only those holders of claims or interests who actually vote count in these tabulations. Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in such class. See "Best Interests Test" below. In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below. See "Confirmation Without Acceptance of All Impaired Classes" below.

12.7.   Confirmation Without Acceptance of All Impaired Classes.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly," and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest,

40

or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate, or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

### 12.8. Best Interests Test.

In order to confirm a plan, a bankruptcy court must independently determine that the plan is in the best interests of each holder of a claim or interest in any such impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the bankruptcy court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the effective date, at least equal to the value of the distribution that each such member would receive if the debtor was liquidated under chapter 7 ("Chapter 7") of the Bankruptcy Code on such date.

### 12.9. Liquidation Analysis.

The Debtors could be liquidated under Chapter 7 of the Bankruptcy Code. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in the hypothetical liquidation analysis (the "Liquidation Analysis") annexed hereto as Exhibit 4.

### 12.10. Feasibility.

Under section 1129(a)(11) of the Bankruptcy Code, the Proponents must demonstrate that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). The Plan clearly complies with this requirement because on the Effective Date, the Debtors will transfer the Liquidation Trust Assets to the Liquidation Trust. The Liquidation Trust will distribute the Liquidation Trust Assets to holders of Allowed Claims pursuant to the terms of the Plan and, provided that the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future reorganization or liquidation.

12.11. <u>Compliance with the Applicable Provisions of the Bankruptcy Code</u>.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Proponents have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

# ARTICLE XIII.

## ALTERNATIVE TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Proponents believe the Plan affords holders of Claims and Equity Interests the potential for the greatest realization on the Debtors' remaining assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, holders of Claims would revert to a "race to the courthouse," the result being that claimants would not receive a fair and equitable distribution as contemplated by the Plan. As set forth in the Liquidation Analysis, the Plan provides a greater recovery to holders of Claims than would be achieved in a case under Chapter 7 of the Bankruptcy Code. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

# ARTICLE XIV.

## RISK FACTORS & CERTAIN FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

14.1. <u>Allowed Claims May Exceed Estimates</u>.

The projected Distributions set forth in this Disclosure Statement are based upon the Debtors' good faith estimate of the amount of Wind-Down Expenses that will be incurred and total amount of Claims that will ultimately be allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving disputed claims. Additionally, the actual amount of Allowed Claims in any Class could be greater than anticipated, which will impact the distributions to be made to holders of Claims.

The Proponents reserve the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated Distributions set forth in the Plan.

42

14.2.  <u>Plan May Not Be Accepted or Confirmed</u>.

While the Proponents believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Court, there can be no guarantee that the Bankruptcy Court will agree.

14.3.  <u>Certain Federal Income Tax Consequences of the Plan</u>.

A detailed discussion of the potential federal income tax consequences of the plan can be found in the Analysis of Certain Federal Income Tax Consequences of the Plan annexed hereto as <u>Exhibit 5</u>.

# **ARTICLE XV.**

# **RETENTION OF JURISDICTION**

15.1.  <u>Retention of Jurisdiction</u>.

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the purposes set forth in Section 12.01 of the Plan.

YCST01:9898745.1          068920.1001

# ARTICLE XVI.

# MISCELLANEOUS PROVISIONS

16.1.   Notices.

All notices, requests, and demands to or upon the Debtors, the Reorganized Debtors, or the Creditors' Committee to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| The Debtors and Their Counsel | |
| --- | --- |
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Robert S. Brady<br>Matthew B. Lunn<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>**Co-Counsel for the Debtors** | **WILLKIE FARR & GALLAGHER LLP**<br>Terence K. McLaughlin<br>Shaunna D. Jones<br>787 Seventh Avenue<br>New York, New York 10019-6099<br>Telephone: (212) 728-8000<br>**Co-Counsel for the Debtors** |
| SP Wind Down Inc., et al.<br>Attn: Robert L. Butler<br>9009 Carothers Pkwy., Suite C-3<br>Franklin, Tennessee 37069 | |

| Counsel to the Creditors' Committee | |
| --- | --- |
| **RICHARDS, LAYTON & FINGER, P.A.**<br>Russell C. Silberglied<br>One Rodney Square<br>920 King Street<br>Wilmington, DE 19801<br>Telephone: (302) 651-7700<br>**Co- Counsel for the Creditors' Committee** | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>Andrew N. Rosenberg<br>Elizabeth McColm<br>Jacob Adlerstein<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>**Co-Counsel for the Creditors' Committee** |

## ARTICLE XVII.

## RECOMMENDATION AND CONCLUSION

THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS AND THAT THE PLAN SHOULD BE CONFIRMED. THE DEBTORS AND THE CREDITORS' COMMITTEE ALSO BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES BECAUSE IT WILL PROVIDE RECOVERIES TO CREDITORS IN EXCESS OF THOSE WHICH WOULD OTHERWISE BE AVAILABLE IF THE CHAPTER 11 CASES WERE DISMISSED OR CONVERTED TO CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE DEBTORS AND THE CREDITORS' COMMITTEE STRONGLY RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.

Dated: Wilmington, Delaware
~~June~~July _____, 2010

Respectfully submitted,
**SP Wind Down Inc., et al.**

By: _____
Name: Robert L. Butler
Title:   Chief Restructuring Officer

**The Official Committee of Unsecured Creditors of SP Wind Down Inc., et al., By an Authorized Signatory**

By: _____
Name: John V. Koerber
Title:   Managing Director of Bennett
Restructuring Fund, L.P.

2

| **COUNSEL:** | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br>Robert S. Brady<br>Matthew B. Lunn<br>The Brandywine Building<br>1000 West Street, 17th Floor<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 576-3312<br><br>*Co-Counsel for the Debtors* | **WILLKIE FARR & GALLAGHER LLP**<br>Terence K. McLaughlin<br>Myron Trepper<br>Shaunna D. Jones<br>787 Seventh Avenue<br>New York, New York 10019-6099<br>Telephone: (212) 728-8000<br>Facsimile: (212) 728-8111<br><br>*Co-Counsel for the Debtors* |
| **RICHARDS, LAYTON & FINGER, P.A.**<br>Russell C. Silberglied<br>One Rodney Square<br>920 King Street<br>Wilmington, DE 19801<br>Telephone: (302) 651-7700<br>Fax: (302) 651-7701<br><br>*Co- Counsel for the ~~Official Committee of Unsecured~~ Creditors' Committee* | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>Andrew N. Rosenberg<br>Elizabeth McColm<br>Jacob Adlerstein<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3990<br><br>*Co-Counsel for the ~~Official Committee of Unsecured~~ Creditors' Committee* |

# Exhibit 1

## List of Debtors and Debtors in Possession

(1)     SP Wind Down Inc., f/k/a Spheris Inc.

(2)     SP Wind Down Holding II, Inc., f/k/a Spheris Holding II, Inc.

(3)     SP Wind Down Canada Inc., f/k/a Spheris Canada Inc.

(4)     SP Wind Down Leasing LLC, f/k/a Spheris Leasing LLC

(5)     SP Wind Down Operations LLC, f/k/a Spheris Operations LLC

(6)     VN Wind Down Communications, f/k/a Vianeta Communications